**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>     v.<br><br>DLJ MORTGAGE CAPITAL, INC.; CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.; CREDIT SUISSE SECURITIES (USA) LLC (F/K/A CREDIT SUISSE FIRST BOSTON LLC); ANDREW A. KIMURA; JEFFREY A. ALTABEF; EVELYN ECHEVARRIA; MICHAEL A. MARRIOTT; and THOMAS ZINGALLI,<br><br>          Defendants. | Civil Action No. 3:11-30047-MAP<br><br>Oral Argument Requested |

**MASSMUTUAL'S OPPOSITION TO THE MOTIONS TO DISMISS
FILED BY THE CORPORATE CREDIT SUISSE DEFENDANTS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

RELEVANT ALLEGATIONS IN THE COMPLAINT ....................................................3

    A.    The Securitizations at Issue ...................................................................3

    B.    Misrepresentations in the Offering Documents .......................................4

GOVERNING LAW...............................................................................................6

PLEADING STANDARD..........................................................................................8

ARGUMENT .....................................................................................................10

I.     MASSMUTUAL HAS STATED CLAIMS FOR PRIMARY LIABILITY
UNDER SECTION 410(A)(2) AGAINST THE SPONSOR, DEPOSITORS,
AND UNDERWRITERS...............................................................................10

    A.    MassMutual Has Sufficiently Alleged Actionable Misrepresentations.............10

           1.    The Complaint Adequately Alleges Actionable Misrepresentations
About Underwriting Standards .................................................11

                (a)    The Complaint Sufficiently Alleges Abandonment of
Underwriting Guidelines...............................................11

                (b)    There Is No Requirement That the Complaint Provide
Specific Details About Thousands of Individual Loans ................12

           2.    The Complaint Adequately Alleges Actionable Misrepresentations
About Appraisal Standards and LTV Ratios ...............................14

                (a)    The Complaint Alleges Misrepresentations of Fact
Regarding Appraisals and LTV Ratios .........................15

                (b)    The Forensic Analysis Set Forth in the Complaint Lends
Further Support to the Allegations That the LTV Ratios and
Appraisal Misrepresentations Were False and Misleading...........18

           3.    The Complaint Adequately Alleges Actionable Misrepresentations
About Owner-Occupancy Statistics..........................................19

                (a)    Defendants Are Responsible for False Owner-Occupancy
Representations That They Communicated to MassMutual..........19

(b)    The Forensic Analysis Set Forth in the Complaint Raises a Plausible Inference that the Owner-Occupancy Statistics Were False and Misleading...........................................................21

4.    The Alleged Representations Were False and Misleading, Notwithstanding Purported Disclosures and Warnings in the Offering Materials and Other Documents....................................21

(a)    The Offering Materials Did Not Disclose a Systematic Abandonment of Underwriting Guidelines.....................................22

(b)    The Offering Materials Did Not Disclose a Systematic Abandonment of Appraisal Standards or Knowingly False Appraisal Values and LTV Ratios ...................................................24

(c)    The Offering Materials Did Not Disclose That the Owner-Occupancy Statistics Were False .....................................25

(d)    The Disclosures in Defendants' Exhibits Cannot Defeat MassMutual's Claims ...................................26

5.    The Offering Materials Made Definitive Representations, Notwithstanding the "Cure, Repurchase or Substitute" Provisions...........27

B.    MassMutual Has Sufficiently Alleged Materiality. ................................................29

C.    The Sponsor, Depositors, and Underwriters Are Statutory Sellers ......................32

II.    MASSMUTUAL HAS STATED CONTROL PERSON CLAIMS AGAINST THE SPONSOR AND DEPOSITOR. ...................................................36

A.    MassMutual Has Sufficiently Alleged a Primary Violation by the Depositor and Trusts ...................................................36

B.    MassMutual Has Sufficiently Alleged Control by the Sponsor and Depositor...................................................38

III.    MASSMUTUAL'S CLAIMS ARE TIMELY ...................................................40

A.    Defendants Have Failed to Show that MassMutual Was on Inquiry Notice as of February 2007 ...................................................41

B.    Defendants' "Evidence," Even if Considered, Does Not Come Close to Establishing Inquiry Notice as a Matter of Law ...................................................43

IV.     TO THE EXTENT THE COURT FINDS ANY DEFICIENCY IN THE
        COMPLAINT, MASSMUTUAL SHOULD BE GRANTED LEAVE TO
        AMEND. ..................................................................................................................................45

CONCLUSION ............................................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  Civ. A. No. 08-7508, 2009 WL 3346674 (S.D.N.Y. Oct. 15, 2009) .....................................45

*Adams v. Hyannis Harborview, Inc.*,
  838 F. Supp. 676 (D. Mass. 1993) .................................................................................8, 32

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) .................................................................................42

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ................................................................................................39

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ...........................................................................................8, 19, 21

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ..........................................................................30, 31

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ...........................................................................................................29, 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................................8

*Bergeron v. Ridgewood Sec. Corp.*,
  610 F. Supp. 2d 113 (D. Mass. 2009) .......................................................................................7

*Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*,
  748 F. Supp. 2d 1246 (W.D. Wa. 2010) ....................................................................23, 28, 38

*Boley v. Pineloch Assocs., Ltd.*,
  Civ. A. No. 87-5124, 1990 WL 113201 (S.D.N.Y. Aug. 2, 1990) .........................................35

*Briggs v. Sterner*,
  529 F. Supp. 1155 (S.D. Iowa 1981) ..................................................................................37, 38

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)....................................................................................................9

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002)......................................................................9, 21, 30, 36, 38

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988).....................................................................................................35

*Casella v. Webb*,
  883 F.2d 805 (9th Cir. 1989) ..............................................................................................9, 17

*Cascone v. United States*,
    370 F.3d 95 (1st Cir. 2004) ............................................................................................44

*In re Centennial Tech. Litig.*,
    52 F. Supp. 2d 178 (D. Mass. 1999) ..............................................................................40

*In re CitiSource, Inc. Sec. Litig.*,
    694 F. Supp. 1069 (S.D.N.Y. 1988) ...............................................................................37

*City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*,
    Civ. A. No. 08-1418, 2010 U.S. Dist. LEXIS 137290 (E.D.N.Y. Dec. 23, 2010) ...........23, 28

*In re Columbia Sec. Litig.*,
    155 F.R.D. 466 (S.D.N.Y. 1994) ....................................................................................31

*Correa-Martinez v. Arrillaga-Belendez*,
    903 F.2d 49 (1st Cir. 1990) ............................................................................................45

*In re Credit Suisse-AOL Sec. Litig.*,
    465 F. Supp. 2d 34 (D. Mass. 2008) ..............................................................................40

*Dolphin & Bradley, Inc. v. S.E.C.*,
    512 F.3d 634 (D.C. Cir. 2008) .......................................................................................17

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003) ....................................................................................13, 14

*Emps.' Ret. Sys. of Gov't of Virgin Islands v. J.P. Morgan Chase & Co.*,
    ---- F. Supp. 2d ----, 2011 WL 1796426 (S.D.N.Y. May 10, 2011) ............................... passim

*In re Enron Corp.*,
    MDL No. 1446, H-01-3624, 2005 WL 1638039 (S.D. Tex. June 21, 2005) ........................37

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
    705 F. Supp. 2d 86 (D. Mass. 2010) ..............................................................................34

*Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan Sec. LLC*,
    No. GD09-016892, 2010 WL 5472006 (Pa. Ct. Common Pleas Nov. 29, 2010) ...................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    618 F. Supp. 2d 311 (S.D.N.Y. 2009) .......................................................................22, 25

*Foman v. Davis*,
    371 U.S. 178 (1962) ......................................................................................................45

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    Civ. A. No. 09-4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ...................20, 21, 22, 28

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996) ............................................................................................16

*Guenther v. Cooper Life Scis., Inc.*,
    Civ. A. No. 89-1823, 1992 WL 206256 (N.D. Cal. Apr. 7, 1992) .........................................43

*Hayes v. Ellrich*,
   26 Mass. L. Rptr. 27, 2009 Mass. Super. LEXIS 188 (Mass Super. Ct. July 13, 2009) ...........9

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998)......................................................................................22, 26

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   718 F. Supp. 2d 495 (S.D.N.Y. 2010)................................................................13, 17, 23, 40

*John A. Frye Shoe Co. v. Williams*,
   312 Mass. 656, 46 N.E.2d 1 (1942) ...........................................................................17

*Kemmerer v. Weaver*,
   445 F.2d 76 (7th Cir. 1971) .....................................................................................37

*In re Lehman Bros. Sec. & ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010).................................................................11, 20, 31

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005).....................................................................................42. 43

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010)....................................................................................28

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
   36 F.3d 170 (1st Cir. 1994).......................................................................................20

*MBIA Ins. Corp. v. Morgan Stanley*,
   Index No. 29951-2010 (N.Y. Sup. Ct., Westchester Co., May 26, 2011) ...............................14

*Marram v. Kobrick Offshore Fund, Ltd.*,
   442 Mass. 43, 809 N.E.2d 1017 (2004) ............................................................... passim

*Mass. Bricklayers & Mason Funds v. Deutsche Alt-A Sec.*,
   Civ. A. No. 08-3178, 2010 U.S. Dist. LEXIS 137284 (E.D.N.Y. Dec. 23, 2010) .................28

*In re Mass. Diet Drug Litig.*,
   338 F. Supp. 2d 198 (D. Mass. 2004) ...........................................................................43

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*,
   Civ. A. No. 08-5653, 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ...............................17, 23

*N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*,
   Civ. A. No. 08-5310, 2011 WL 1338195 (S.D.N.Y. Mar. 31, 2011) .....................................17

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   Civ. A. No. 08-8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) .....................................13

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   Civ. A. No. 08-8781, 2011 WL 2020260 (S.D.N.Y. May 19, 2011) .........................29, 42, 44

*N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,
   720 F. Supp. 2d 254 (S.D.N.Y. 2010)......................................................13, 24, 26, 27, 40, 44

*Nisselson v. Lernout*,
    469 F.3d 143 (1st Cir. 2006) ........................................................................................9

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
    51 F. Supp. 2d 1 (D. Mass. 1999) ...........................................................22, 25, 26

*P. Stolz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) .........................................................................................22

*Pearce v. Duchesneau Grp., Inc.*,
    392 F. Supp. 2d 63 (D. Mass. 2005) .........................................................................9

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ...........................................................................32, 33, 35

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ............................................................................. passim

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    658 F. Supp. 2d 299 (D. Mass. 2009) ...................................................................24

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
    728 F. Supp. 926 (S.D.N.Y. 1989) .........................................................................35

*In re Portal Software, Inc. Sec. Litig.*,
    Civ. A. No. 03-5138, 2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ....................32

*Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
    Civ. A. No. 09-1110, 2011 WL 135821 (S.D.N.Y. Jan. 12, 2011) .......................13, 40, 42, 44

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010) .........................................................13, 38, 40

*Quaak v. Dexia, S.A.*,
    445 F. Supp. 2d 130 (D. Mass. 2006) ...................................................................40

*In re Regions Morgan Keegan Sec. Litig.*,
    743 F. Supp. 2d 744 (W.D. Tenn. 2010) ...............................................................32

*S.E.C. v. Savoy Indus., Inc.*,
    587 F.2d 1149 (D.C. Cir. 1978) ...............................................................................37

*Salinger v. Projectavision, Inc.*,
    934 F. Supp. 1402 (S.D.N.Y. 1996) .........................................................................43

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) ................................................................................9, 34

*Sheinkopf v. Stone*,
    927 F.2d 1259 (1st Cir. 1991) ...................................................................................38

*Soderman v. Horan*,
    165 F.R.D. 8 (D. Mass. 1996) ...................................................................................45

*In re Sonus Networks, Inc. Sec. Litig.*,
　　Civ. A. No. 04-10294, 2006 WL 1308165 (D. Mass. May 10, 2006) ...............................33, 34

*Sperber Adams Assocs. v. JEM Mgmt. Assocs. Corp.*,
　　Civ. A. 90-7405, 1992 WL 138344 (S.D.N.Y. June 4, 1992) .................................................43

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
　　547 F.3d 406 (2d Cir. 2008)..........................................................................................42, 44

*Stephenson v. Deutsche Bank AG*,
　　282 F. Supp. 2d 1032 (D. Minn. 2003) ................................................................................35

*Stolzoff v. Waste Sys. Int'l, Inc.*,
　　58 Mass. App. Ct. 747 (2003)..............................................................................................32

*Stolzoff v. Waste Sys. Int'l, Inc.*,
　　Civ. A. No. 99-1664, 2000 WL 35528812 (Mass. Super. Ct. June 28, 2000)........................17

*Swack v. Credit Suisse First Boston*,
　　383 F. Supp. 2d 223 (D. Mass. 2004) ..................................................................................41

*TSC Indus., Inc. v. Northway, Inc.*,
　　426 U.S. 438 (1976)............................................................................................................30

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
　　692 F. Supp. 2d 387 (S.D.N.Y. 2010)...................................................................12, 13, 17, 23

*In re U.S.A. Classic Sec. Litig.*,
　　Civ. A. No. 93-6667, 1995 WL 363841 (S.D.N.Y. June 19, 1995) .......................................35

*In re Valence Tech. Sec. Litig.*,
　　Civ. A. No. 95-20459, 1995 WL 798927 (N.D. Cal. Sept. 19, 1995) ....................................35

*Venture Inv. Partners, LLC v. JT Venture Partners, LLC*,
　　23 Mass. L. Rptr. 304, 2007 WL 4098850 (Mass. Super. Ct. Oct. 25, 2007) .........................7

*In re Wachovia Equity Sec. Litig.*,
　　753 F. Supp. 2d 326 (S.D.N.Y. 2011)..............................................................................15, 16

*Warren Freedenfeld Assocs., Inc. v. McTigue*,
　　531 F.3d 38 (1st Cir. 2008)..............................................................................................41, 42

*In re Wash. Mut., Inc. Sec. Litig.*,
　　694 F. Supp. 2d 1192 (W.D. Wash. 2009)............................................................................15

*Welch v. Barach*,
　　27 Mass. L. Rptr. 495, 2010 WL 5173319 (Mass. Super. Ct. Oct. 1, 2010) ...........................7

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
　　712 F. Supp. 2d 958 (N.D. Cal. 2010) ..................................................................11, 12, 15, 23

*In re WorldCom, Inc.*,
　　377 B.R. 77 (Bankr. S.D.N.Y. 2007)....................................................................................39

*Young v. Lepone,*
  305 F.3d 1 (1st Cir. 2002)................................................................................42

## Statutes

15 U.S.C. § 77*l*(2) ..............................................................................................7

17 C.F.R. § 230.405 ..........................................................................................38

Fed. R. Civ. P. 8(a) .........................................................................................8, 9

Fed. R. Civ. P. 9(b) ..................................................................................9, 17, 21

Fed. R. Civ. P. 15(a) ........................................................................................45

Mass. Gen. Laws ch. 110A, § 410(a)........................................................ passim

Mass. Gen. Laws ch. 110A, § 410(b) ..........................................................36, 38

Mass. Gen. Laws ch. 110A, § 410(e)..............................................................41

Mass. Gen. Laws ch. 110A, § 410(g)..............................................................29

## Miscellaneous

2 A.A. Sommer, *Federal Securities Act of 1933*, § 9.02 .................................20

12A J.C. Long, *Blue Sky Law* § 9:24 (West 2010) .....................................7, 8

L. Loss, *Commentary on the Uniform Securities Act,*
  draftsmen's commentary to § 410(a) (1976) ..........................................7

P.L.I. Sec. Litig. § 18:4.4 (Sept. 2010) ..........................................................28

Plaintiff Massachusetts Mutual Life Insurance Company ("MassMutual") respectfully submits this Opposition to the Motions to Dismiss filed in the above-captioned action by Defendants DLJ Mortgage Capital, Inc., Credit Suisse First Boston Mortgage Securities Corp. and Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) (collectively, "Defendants").

## INTRODUCTION

MassMutual's causes of action against Defendants under the Massachusetts Uniform Securities Act (the "Massachusetts Securities Act"), an Act designed to provide redress to purchasers supplied with material misrepresentations regarding the securities they purchased, are fully supported by well-pleaded facts:  Defendants sold residential mortgage-backed securities to MassMutual in Massachusetts between May 2006 and June 2007, using Offering Materials rife with material misrepresentations.  MassMutual has alleged in detail that the Offering Materials prepared by Defendants misrepresented (i) the underwriting standards used to originate the mortgage loans underlying the securities; (ii) the appraisal procedures used to obtain appraisal values for the subject properties, which Defendants knew were inflated, and which were used to calculate the resulting loan-to-value ratios that Defendants knew were understated; and (iii) the percentage of the subject properties that were owner-occupied.  Predictably, there have been substantial losses in the overall loan portfolios and to the securities backed by these loans; the mortgage loans underlying the securities that MassMutual purchased now have defaulted at rates as high as *51 percent*.

Critically (and notably obscured in Defendants' moving papers), all that is required to state a claim here is that MassMutual allege that Defendants sold it securities in Massachusetts using any untrue statement or omission of material fact.  MassMutual's reliance on such misrepresentations, Defendants' scienter when making the representations, loss causation, and

the purchaser's sophistication are irrelevant as a matter of Massachusetts law.  MassMutual's detailed allegations amply satisfy the liberal pleading standard applied to Massachusetts Securities Act claims.  Indeed, although MassMutual has alleged three categories of material misrepresentations, any one misrepresentation would suffice.

Faced with MassMutual's detailed allegations, Defendants advance a battery of generalized arguments that seek to overcomplicate the straightforward elements of the claim at issue.  As set forth more fully in MassMutual's arguments below:

- MassMutual's detailed allegations of a systematic abandonment of disclosed underwriting guidelines are more than adequate to state a claim.

- Defendants' misrepresentations about appraisal standards and loan-to-value ratios constitute representations of fact more than adequate to state a claim.

- Regarding owner-occupancy information, well-settled case law holds that Defendants are *prima facie* liable under the Massachusetts Securities Act for communicating false information in connection with the sale of securities, regardless of its original source.

- Nowhere can Defendants show that they "warned" purchasers that they were systematically abandoning their underwriting standards, that the appraisals for these mortgaged properties were systematically inflated and obtained in violation of disclosed appraisal standards (resulting in materially inflated loan-to-value ratios), or that they were communicating false owner-occupied percentages in the Offering Materials.

- Defendants seem unaware that reliance on misrepresentations is not an element of proof under the Massachusetts Securities Act.  The Act imposes liability upon Defendants for material misrepresentations whether or not MassMutual relied upon the misrepresentations in purchasing the securities.

- Finally, Defendants' argument that MassMutual was on notice of their misrepresentations regarding inaccurate owner-occupancy rates, inaccurate loan-to-value ratios, and wholesale departure from underwriting standards by *February 2007* is unsupportable. Courts have been hesitant to find inquiry notice even in 2008, and no court has found inquiry notice on these facts as of early 2007.

These and the other arguments raised by Defendants have no merit. Defendants' motions to dismiss should be denied.

## RELEVANT ALLEGATIONS IN THE COMPLAINT

### A.    The Securitizations at Issue

Between May 2006 and June 2007, MassMutual invested a total of over $70 million in 9 residential mortgage-backed securities sold by Defendants. Compl. ¶¶ 9, 37.[1] For each securitization, DLJ Mortgage Capital, Inc. ("DLJ"), the Sponsor, originated the underlying loans through one of its affiliates or purchased them from other originators. *Id.* ¶ 23. DLJ then sold inventories of these loans to another related entity, Defendant Credit Suisse First Boston Mortgage Securities Corp. ("CSFB Mortgage"), which served as the Depositor for all 9 of the securitizations. *Id.* ¶¶ 10, 23. DLJ, as the Sponsor of the securitizations, had day-to-day control over CSFB Mortgage, the Depositor. *Id.* ¶ 178.

---

[1]   MassMutual purchased the following securities from Defendants:  (1) Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2006-1, Class CB2; (2) CSAB Mortgage-Backed Pass-Through Certificates, Series 2006-1, Class A3; (3) CSAB Mortgage-Backed Pass-Through Certificates, Series 2006-2, Classes M1 and M5; (4) CSAB Mortgage-Backed Pass-Through Certificates, Series 2006-3, Classes M5A and M6; (5) CSAB Mortgage-Backed Pass-Through Certificates, Series 2006-4, Class M7; (6) Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2007-1, Class 5A32; (7) CSAB Mortgage-Backed Pass-Through Certificates, Series 2007-1, Classes 1M1 and 1M2; (8) CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-1, Classes 1M4 and 1M5; and (9) CSMC Mortgage-Backed Pass-Through Certificates, Series 2007-3, Classes 1M1, 1M4, and 1M5. *Id.* ¶ 37.

CSFB Mortgage pooled these loans and created tranches of equity interests in the pools with various levels of seniority. *Id.* ¶ 179. Interests in these tranches were then issued by CSFB Mortgage through certain Trusts in the form of bonds or certificates ("Certificates"). *Id.* ¶¶ 10, 31-34. CSFB Mortgage, as the Depositor, had day-to-day control over the Trusts, as did DLJ through its control of CSFB Mortgage. *Id.* ¶¶ 178-79. The Trusts had no discretion or control over the mortgages in the pool. *Id.* ¶ 179. Once the loan pools were securitized, the Certificates were issued to the Underwriter, who resold them to investors such as MassMutual. *Id.* ¶ 34. Defendant Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC) ("CS Securities") served as the Underwriter for all 9 securitizations. *Id.* ¶ 11.

Sponsor DLJ, Depositor CSFB Mortgage, and Underwriter CS Securities were each legally responsible for gathering and verifying information about the credit quality and characteristics of the loans that were deposited into the Trusts, and presenting this information in the registration statements, prospectuses, and prospectus supplements (collectively, the "Offering Materials") prepared for potential investors. *Id.* ¶¶ 36, 178-79. Defendants operated collectively to structure and market the securitizations. *Id.* ¶ 22. Indeed, each of the Defendants—DLJ, CSFB Mortgage, and CS Securities—is a wholly owned subsidiary of Credit Suisse Holdings (USA), Inc. ("CS Holdings"). *Id.* ¶¶ 9-11. As a result, Defendants earned substantial profits through their securitization and sale of risky mortgage loans to unsuspecting public investors, including MassMutual. *Id.* ¶¶ 3, 29.

**B.   Misrepresentations in the Offering Documents**

MassMutual, like any other investor, did not have access to the loan files underlying each securitization. *Id.* ¶ 36. Instead, MassMutual was dependent on the due diligence conducted by the Sponsor, Depositor, and Underwriter, who represented in the Offering Materials that the securitized loans contained certain fundamental characteristics. *Id.* In their ever-increasing rush

to generate revenue and offload loans through the securitization process, however, Defendants made three critical categories of material misrepresentations in the Offering Materials. Each of the misrepresentations is independently actionable.

First, Defendants represented that the loans underlying the securities were underwritten with "consistent application of underwriting standards" in accordance with prudent standards that ensured "the borrower could repay the loan" and the adequacy of the collateral in the event that the borrowers defaulted. *Id.* ¶¶ 38-103. This was false. In reality, "the loans were often issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, or exceptions to underwriting criteria that had no proper justification." *Id.* ¶ 99. It is now unfortunately clear that the origination practices engaged in by Defendants and the originators from which they purchased mortgage loans were in "blatant disregard" of the underwriting standards disclosed in the Offering Materials. *Id.*

Second, Defendants represented that the valuations of the underlying properties in each securitization were conducted in accordance with well-established "appraisal procedure guidelines." *See, e.g.*, *id.* ¶¶ 112. Defendants also warranted that the data generated from these appraisals, including the resulting loan-to-value ("LTV") ratios, were reliable and accurate. *Id.* ("the value of the property being financed . . . currently supports and is anticipated to support in the future the outstanding loan balance"). Neither representation was true. In reality, the appraisers used by Defendants failed to follow the stated procedures, and instead systematically generated appraisals that were significantly higher than the true values of the appraised properties to allow Defendants to originate and securitize a growing volume of loans. *Id.* ¶ 114 ("loan statistics in the Offering Materials were false"). Using inflated appraisal values, Defendants' Offering Materials artificially understated LTV ratios for the underlying loans, and

significantly understated the percentage of loans with LTV ratios of greater than 90% (which was a benchmark used to indicate a loan with an inordinately high risk of default without sufficient collateral protection). *Id.* ¶¶ 104-58. Moreover, Defendants knew "that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties." *See, e.g.*, *id.* ¶ 115.

Third, Defendants purported to represent specific owner-occupancy rates for the underlying properties and identified the total number of loans in each securitization that were for primary residences. *Id.* ¶¶ 159-71. Again, these figures were materially false. In reality, "a much higher percentage of borrowers did not occupy the properties than was represented," thereby increasing the risk that the associated mortgages would go into default. *Id.* ¶ 162. Defendants, either on purpose or through their lax due diligence, allowed these material inaccuracies to permeate their Offering Materials. *Id.* ¶¶ 159-71.

These misrepresentations materially affected the risk profile of the Certificates. Investors such as MassMutual purchased securities that were far riskier and much more volatile than disclosed. *See, e.g.*, *id.* ¶¶ 38, 107, 113, 160. Indeed, just years after MassMutual purchased the Certificates, they now qualify as junk. *Id.* ¶ 7. In a majority of the 9 securitizations at issue, over 35% of the loans backing the securities have now defaulted, have been foreclosed upon, or are delinquent. *Id.* The Certificates that should be worth approximately $50 million are actually worth significantly less—only $5.5 million. *Id.* ¶ 102.

## GOVERNING LAW

The Massachusetts Securities Act, Gen. Laws ch. 110A, regulates offers and sales of securities in Massachusetts. Section 410(a) of the Massachusetts Securities Act sets forth the civil remedy for misrepresentations and omissions. Because its goals are both "redressive" and "preventative," Section 410(a) "provides strong protections for a buyer who received misleading

information from a seller of securities."  *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43,

51, 809 N.E.2d 1017, 1025 (2004) (vacating dismissal of Section 410(a) claim); *see also Welch*

*v. Barach*, 27 Mass. L. Rptr. 495, 2010 WL 5173319, at *2-*4 (Mass. Super. Ct. Oct. 1, 2010)

(applying *Marram* and denying motion to dismiss Section 410(a) claim); *Venture Inv. Partners,*

*LLC v. JT Venture Partners, LLC*, 23 Mass. L. Rptr. 304, 2007 WL 4098850, at *2-*3 (Mass.

Super. Ct. Oct. 25, 2007) (same).  Section 410(a) institutes "a heightened deterrent against sellers

who make misrepresentations by rendering tainted transactions voidable at the option of the

defrauded purchaser, regardless of the actual cause of the investor's loss."  *Marram*, 809 N.E.2d

at 1025.

To plead a claim under Section 410(a), a plaintiff such as MassMutual must allege *only*

that:  (1) a defendant offered or sold a security in Massachusetts; (2) by making any untrue

statement of a material fact or by omitting to state a material fact; (3) the plaintiff purchased the

security from the defendant; and (4) the plaintiff did not know of the untruth or omission.  *See*

Mass. Gen. Laws ch. 110A, § 410(a)(2); *Marram*, 809 N.E.2d at 1026.  This pleading standard is

"not difficult."  12A J.C. Long, *Blue Sky Law* § 9:24 (West 2010) (hereinafter "J.C. Long").

The elements are "almost identical" to those of Section 12(a) of the Securities Act of 1933,

15 U.S.C. § 77*l*(2).  *See* L. Loss, *Commentary on the Uniform Securities Act*, draftsmen's

commentary to § 410(a), at 146 (1976); *Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113,

134 n.10 (D. Mass. 2009) (statutes are "almost identical").  For this reason, Massachusetts courts

may look to federal decisions under Section 12(2) in interpreting Section 410(a).  *See Bergeron*,

610 F. Supp. 2d at 134 n.10.

Although Defendants borrow freely from fraud-based cases and their specific pleading

requirements, there are critical distinctions between MassMutual's Section 410(a) claims and

other, fraud-based securities causes of action.  The differences stem from the Massachusetts

Securities Act's "consumer-oriented focus," *Marram*, 809 N.E.2d at 1027, and are particularly

noteworthy in light of Defendants' repeated efforts to cite irrelevant cases addressing claims that

require proof of fraud, scienter, or other inapplicable elements.  The key distinctions are as

follows:

- "The plaintiff does not need to prove either negligence or scienter to meet his burden of proof." *Id.* at 1026 (citation omitted); *see also Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 688 (D. Mass. 1993) (distinguishing a Section 410(a)(2) claim from a federal Section 10(b) claim).

- The plaintiff does not have to prove reliance.  *Marram*, 809 N.E.2d at 1027 (citation omitted); *see also Adams*, 838 F. Supp. at 688.

- "The buyer's sophistication is also irrelevant to his claim."  *Marram*, 809 N.E.2d at 1027 (citations omitted); *see also* J.C. Long, *supra*, § 9:24 n.4 ("[S]ophistication of the investor is not a proper grounds for challenge.").

- The plaintiff does not have to prove loss causation.  *Marram*, 809 N.E.2d at 1025 (transactions are "voidable at the option of the defrauded purchaser, regardless of the actual cause of the investor's loss").

- With respect to the element of lack of knowledge, the buyer does not have "any duty to investigate"; the buyer need only show "ignorance of the untruth or omission."  *Id.* (citation and internal quotation marks omitted).

## PLEADING STANDARD

The adequacy of MassMutual's Complaint is assessed under the lenient notice-pleading

standard.  *See* Fed. R. Civ. P. 8(a).  Although many of Defendants' arguments concern the

particularity required in pleading fraud claims, such arguments have no relevance here.  To

satisfy the notice-pleading standard, MassMutual need only plead a short, plain statement

sufficient to provide "fair notice" of the claim and the grounds to relief.  *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007) (detailing the requirements of notice pleading).  Although

the allegations must state a "plausible" claim, MassMutual's claims have facial plausibility when

they "plead[ ] factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

In construing the Complaint, all reasonable inferences are drawn in favor of MassMutual.  *See*

*Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006) (in addressing a motion to dismiss, a

court must "assum[e] the truth of all well-pleaded facts contained in the operative version of the

complaint and indulg[e] all reasonable inferences in the plaintiff's favor").

Because the Massachusetts Securities Act does not require allegations that Defendants

acted with scienter, MassMutual is not required to meet the particularity requirements of Rule

9(b) or the heightened pleading requirements of the Private Securities Litigation Reform Act.

*See Pearce v. Duchesneau Grp., Inc.*, 392 F. Supp. 2d 63, 75-76 (D. Mass. 2005) (denying

motion to dismiss claim under Massachusetts Securities Act even though plaintiff's allegations

did not comply with Rule 9(b)); *Hayes v. Ellrich*, 26 Mass. L. Rptr. 27, 2009 Mass. Super.

LEXIS 188, at *12 (Mass Super. Ct. July 13, 2009) ("In order to prevail under G.L.c. 110A,

§ 410, [a plaintiff] need not satisfy the heightened pleading requirement set forth by SEC Rule

10b-5.").[2]

Finally, the pleading standard is further relaxed in this case because much of the evidence

is in the possession of defendants.  *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002)

(summarizing court's limited pleading expectations when discovery remains incomplete); *see*

*also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (noting, in the

context of Rule 9(b), that pleading standards should be "relaxed somewhat where the factual

information is peculiarly within the defendant's knowledge or control").

---

[2]   Defendants' argument that MassMutual must satisfy the heightened pleading standard
for fraud, *see* Jt. Br. at 26 n.54, is insupportable.  Fraud claims require allegations of scienter; the
claims here do not.  *Cf. Casella v. Webb*, 883 F.2d 805, 809 (9th Cir. 1989) (under Section 12(2),
the federal counterpart to these claims, "[s]ellers may be liable for misrepresentations they did
not know were false if they should have known it; purchasers need only establish they did not
know the statements were untrue"); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223 (1st Cir.
1996) (Rule 8(a) applies to Section 12(2) claims unless they "sound in fraud" and are brought
alongside Rule 10b-5 claims, which is not the case here).

**ARGUMENT**

I.    **MASSMUTUAL HAS STATED CLAIMS FOR PRIMARY LIABILITY UNDER SECTION 410(A)(2) AGAINST THE SPONSOR, DEPOSITORS, AND UNDERWRITERS**

MassMutual has stated a claim under Section 410(a)(2) of the Massachusetts Securities Act by alleging that (i) Defendants offered or sold specific securities in Massachusetts by making untrue statements of material fact and/or by omitting material facts, Compl. ¶¶ 29, 38-171, 188-90; (ii) MassMutual purchased the securities from Defendants, *id.* ¶¶ 37, 189; and (iii) MassMutual did not know of the untruth or omission, *id.* ¶¶ 99, 191.  *See* Mass. Gen. Laws ch. 110A, § 410(a)(2); *Marram*, 809 N.E.2d at 1026.  As set forth in more detail below, MassMutual has alleged that Defendants made three separate categories of material misrepresentations—regarding underwriting standards, appraisal standards and LTV ratios, and owner-occupancy data—with respect to each of the 9 securitizations at issue.  Each misrepresentation alone is an independent and sufficient basis to support a Section 410(a)(2) claim.  MassMutual also has alleged that each Defendant is liable as a statutory seller because it either transferred title to the Certificates or solicited MassMutual's purchases of the Certificates with a financial motivation. Accordingly, Defendants' motions to dismiss the Section 410(a)(2) claim should be denied.

A.    **MassMutual Has Sufficiently Alleged Actionable Misrepresentations**

MassMutual has alleged specific representations in the Offering Materials that can be grouped in three major categories:  (i) representations about the underwriting standards used to originate the loans underlying the Certificates, Compl. ¶¶ 38-103; (ii) representations about the standards used to generate appraisals for the mortgaged properties and the resulting LTV ratios, *id.* ¶¶ 104-58; and (iii) representations about the percentages of properties that were owner-occupied, *id.* ¶¶ 159-71.  MassMutual has alleged that these representations were false because the subject loans were systematically originated in violation of the disclosed underwriting

guidelines, appraisals were systematically conducted in violation of the disclosed appraisal standards, the actual LTV ratios were higher than represented, and the actual owner-occupancy statistics were lower than represented.  *Id.* ¶¶ 38-171.  Each of the three categories of misrepresentations independently constitutes a set of actionable misrepresentations.

1.     **The Complaint Adequately Alleges Actionable Misrepresentations About Underwriting Standards**

(a)     **The Complaint Sufficiently Alleges Abandonment of Underwriting Guidelines**

Defendants' representations in the Offering Materials about the underwriting standards used to originate the mortgage loans underlying MassMutual's Certificates included assurances that (i) the originators had collected a variety of financial information about each borrower to ensure that the loans could be repaid, *see, e.g.*, *id.* ¶ 42; (ii) underwriting standards were consistently applied to confirm borrowers' ability to repay their loans and the sufficiency of the collateral for the loans, *id.* ¶¶ 43-44; (iii) borrowers' debt-to-income ratios did not exceed certain limits, *id.* ¶ 46; and (iv) any deviations from underwriting guidelines were justified by sufficient positive compensating factors, *id.* ¶ 85.

MassMutual has alleged that these representations were false.  Defendants systematically abandoned the disclosed standards, and, as a result, loans were issued to borrowers, regardless of their ability to repay, on the basis of overstated incomes, false verifications of employment, and "exceptions" to underwriting criteria that had no proper justification.  *Id.* ¶¶ 93-99.  Courts have routinely held that allegations of systematic abandonment of disclosed underwriting guidelines are actionable misrepresentations.  *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493 (S.D.N.Y. 2010) (allegations that disclosed underwriting standards were systematically abandoned alleged material misrepresentations); *In re Wells Fargo Mortg.-Backed*

11

*Certificates Litig.,* 712 F. Supp. 2d 958, 971 (N.D. Cal. 2010) (same); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010) (same).

Indeed, the First Circuit in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011), held that allegations substantially the same as MassMutual's are *sufficient* to state a claim.  *See id.* at 773-74 (finding wholesale abandonment of underwriting guidelines and "sharp drop in the credit ratings" was sufficient to state a claim). Like the plaintiffs in *Nomura*, MassMutual has alleged that DLJ, through its affiliated originator or through its purchases from third-party originators, systematically abandoned underwriting guidelines by issuing loans on the basis of, among other things, overstated incomes and unjustified "exceptions."  *Id.* at 772-74; Compl. ¶¶ 39, 98-99.  Also like the plaintiffs in *Nomura*, MassMutual has alleged a sharp drop in the Certificates' credit ratings after their sale.  *Nomura*, 632 F.3d at 773-74; Compl. ¶¶ 100-02.  MassMutual's Complaint even goes beyond plaintiffs in *Nomura* to allege that the underlying loans have experienced high percentages of defaults, delinquencies, and foreclosures (often over 35 percent).  Compl. ¶¶ 7, 100-02.  Such allegations are sufficient to state an actionable claim, as the First Circuit has held.  *See Nomura*, 632 F.3d at 773-74.  Under controlling authority, there can be no question that these allegations, particularly when read together with all reasonable inferences drawn in favor of MassMutual, sufficiently allege systematic abandonment of underwriting guidelines.  *See id.*

**(b)    There Is No Requirement That the Complaint Provide Specific Details About Thousands of Individual Loans**

As noted above, MassMutual has alleged that the underlying mortgage loans were systematically originated in violation of underwriting guidelines.  This resulted in abnormally high defaults, foreclosures, and delinquencies.  Compl. ¶¶ 93-99.  Defendants nonetheless contend that MassMutual must identify each individual loan, among the thousands of loans, that

12

allegedly violated underwriting standards.  Jt. Br. at 18-19.  But the loan-by-loan pleading

specificity advocated by Defendants is not the law; a plaintiff need only allege the following to

assert sufficient nexus between abandonment of underwriting standards and the underlying

loans:  (i) systematic abandonment; and (ii) poor performance in the loans after securitization.

See *Tsereteli*, 692 F. Supp. 2d at 392; *see also Nomura*, 632 F.3d at 773-74 (same); *In re

IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 509-10 (S.D.N.Y. 2010) (same); *Pub.

Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010)

(same); *N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d

254, 268-69 (S.D.N.Y. 2010) (same); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp.,

Inc.*, Civ. A. No. 09-1110, 2011 WL 135821, at *10-*11 (S.D.N.Y. Jan. 12, 2011) (same);

*N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. A. No. 08-8781, 2010 WL

1257528, at *6 (S.D.N.Y. Mar. 31, 2010) ("*Residential Capital I*") (same).  MassMutual has

more than satisfied this requirement.  Compl. ¶¶ 38-92.

Defendants argue that the Court should reject the nexus alleged in the Complaint between

abandonment of underwriting standards and the poor performance of the loans because the poor

performance is "more likely explained" by "prevailing economic conditions."  Jt. Br. at 18.

Defendants' argument is contrary to the authority listed above and improperly seeks to inject loss

causation as an element of a claim under the Massachusetts Securities Act.  Section 410(a)(2)

authorizes rescission whenever there has been a material misrepresentation or omission in

connection with the purchase or sale of a security, and loss causation is not an element of a

claim.  *Marram*, 809 N.E.2d at 1025.  In any event, Defendants' factual arguments about loss

causation cannot be addressed at the pleading stage.  *See Emergent Capital Inv. Mgmt., LLC v.

Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (the determination of whether the loss is

caused by an intervening event "is a matter of proof at trial and not to be decided on a Rule

12(b)(6) motion to dismiss"); *MBIA Ins. Corp. v. Morgan Stanley*, Index No. 29951-2010, slip.

op. at 8 (N.Y. Sup. Ct., Westchester Co., May 26, 2011) (whether a mortgage-backed insurer's

losses "were caused by Morgan Stanley's representations or the economic down[turn] is a

question of fact for trial") (attached to Declaration of Stephen E. Spelman, filed concurrently

herewith ("Spelman Decl."), Ex. 1).

Defendants' unsupported factual assertions cannot defeat the Complaint's well-pleaded

allegations that the abnormally poor performance of the loans was caused by Defendants'

systematic abandonment of underwriting standards.  MassMutual's allegations satisfy all

conceivable requirements at the pleading stage. *See Emps.' Ret. Sys. of Gov't of Virgin Islands

v. J.P. Morgan Chase & Co.*, ---- F. Supp. 2d ----, 2011 WL 1796426, at *8 (S.D.N.Y. May 10,

2011) (citation omitted).  The Court should find that MassMutual has adequately pleaded its

claims.

## 2.     The Complaint Adequately Alleges Actionable Misrepresentations About Appraisal Standards and LTV Ratios

For each of the 9 securitizations at issue, MassMutual has alleged that Defendants made

specific representations in the Offering Materials about how the appraisals of the mortgaged

properties were obtained, along with the resulting LTV ratios for the underlying loans, and that

these representations were false. *See, e.g.*, Compl. ¶¶ 112-115.  Appraisals were not conducted

in accordance with the disclosed standards, which in turn produced knowingly inaccurate LTV

ratios. *See, e.g.*, *id.* ¶¶ 114-115.  In support of these allegations, MassMutual has alleged the true

LTV ratios at the time of the securitizations, as calculated by an industry standard automated

valuation model. *Id.* ¶¶ 104-158.  The Offering Materials inflated appraisals by 10% or more for

a significant percentage of loans (between 39% and 64% of the loans tested), and also

14

understated LTV ratios by 10 or more points for a significant percentage of loans (between 31%

and 50% of the loans tested).  *Id.*  MassMutual has alleged that, based on their involvement in

originating and securitizing the loans and conducting due diligence, Defendants knew the LTV

ratios and property values were false and bore no reasonable relationship to the actual

characteristics and true values of the properties.  *See, e.g.*, *id.* ¶¶ 115, 120.

Courts have recognized that allegations such as those pleaded by MassMutual regarding

appraisals and LTV ratios are sufficient to state a cause of action.  *See Wells Fargo*, 712 F. Supp.

2d at 972 (allegations that defendants practices "permitted the pervasive and systematic use of

inflated appraisals" were sufficient to state a claim); *In re Wash. Mut., Inc. Sec. Litig.*, 694

F. Supp. 2d 1192, 1210-1211 (W.D. Wash. 2009) (plaintiffs stated actionable LTV

misrepresentation claim based on allegations of knowledge of falsity and use of expert data

analysis).

### (a)  The Complaint Alleges Misrepresentations of Fact Regarding Appraisals and LTV Ratios

Defendants claim that MassMutual's allegations are insufficient because their statements

about appraisals and LTV ratios were purportedly non-actionable statements of opinion.  Jt. Br.

at 22-26; CSFB Mem. at 9.  Defendants ignore that the Complaint alleges two categories of

misrepresentations involving appraisals:  (i) that the appraisals themselves were not conducted in

accordance with the disclosed standards, Compl. ¶ 114; and (ii) that the resulting LTV ratios

were knowingly understated, *id.* ¶¶ 110, 115.  As courts have held, allegations that appraisals

were conducted in violation of disclosed appraisal standards plainly allege misrepresentations of

fact.  *See Wells Fargo*, 712 F. Supp. 2d at 972; *J.P. Morgan Chase*, 2011 WL 1796426, at *9 (it

is sufficient to allege "that appraisers deviated from [Uniform Standards of Professional

Appraisal Practice] or other representations in concrete ways"); *In re Wachovia Equity Sec.*

*Litig.*, 753 F. Supp. 2d 326, 377-378 & n.48 (S.D.N.Y. 2011) (declining to dismiss alleged LTV misrepresentations as "subjective opinions" where plaintiffs alleged appraisal guidelines were disregarded and manipulated to produce inflated valuations).

The Complaint also alleges sufficient facts to support its allegations that the resulting property values and LTV ratios were misrepresentations of fact. As even Defendants acknowledge, appraisal values (and LTV ratios) are actionable statements of fact if "the appraiser intentionally provided an opinion that was not honestly held when it was given." Jt. Br. at 22. This conforms with the general law that statements of opinion become actionable statements of fact if they are inconsistent with, or not reasonably based on, known facts. *Glassman v. Computervision Corp.*, 90 F.3d 617, 627 (1st Cir. 1996) (statements of opinion are "actionable to the extent they are not reasonably based on, or are inconsistent with, the facts at the time"); *Marram*, 809 N.E.2d at 1030 n.24 (same); *Nomura*, 632 F.3d at 775 (an opinion supports a claim "if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement").

MassMutual's allegations that each Defendant "knew that the estimations of the properties' values bore no relationship to the actual data and characteristics of the properties," and "knew the estimations of the properties' values were not justified, unreasonable, and inaccurate" *see, e.g.*, Compl. ¶ 115, satisfy the standard. The Complaint alleges that Defendants knew facts, such as the characteristics of the mortgaged properties and the sales prices of comparable properties, that were inconsistent with, and did not reasonably support, the appraisal values and LTV ratios. *See, e.g.*, *id.* ¶¶ 114-15. Given these allegations, the cases that Defendants cite to argue that appraisal values are non-actionable opinions are inapplicable. *See*

Jt. Br. at 23-24.  In those cases, the courts dismissed claims based on appraisal misrepresentations because the plaintiffs had *failed* to allege that the defendants knew the appraisal values and LTV ratios were false or unreasonable.  *See Nomura*, 632 F.3d at 775; *Tsereteli*, 692 F. Supp. 2d at 394-95; *IndyMac*, 718 F. Supp. 2d at 510-11; *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, Civ. A. No. 08-5653, 2010 WL 1473288, at *7-*8 (S.D.N.Y. Mar. 29, 2010); *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, Civ. A. No. 08-5310, 2011 WL 1338195, at *11 n.9 (S.D.N.Y. Mar. 31, 2011).[3]

Moreover, MassMutual's allegations that Defendants knew the appraisal values and LTV ratios were false are plausible.  Knowledge on the part of Defendants may be alleged generally, and may be divined from surrounding circumstances.  *See Casella*, 883 F.2d at 809 (decided under analogous Section 12(2)); Fed. R. Civ. P. 9(b).  Defendants' unique access to underlying appraisal data and loan files, and their obligation to conduct due diligence, create a reasonable inference that Defendants knew the appraisal values and LTV ratios were false.  *See, e.g.*, Compl. ¶¶ 35-36, 115; *Dolphin & Bradley, Inc. v. S.E.C.*, 512 F.3d 634, 641-42 (D.C. Cir. 2008) (in case requiring allegations of scienter, court could reasonably infer that defendant had knowledge of the misrepresentations when defendant had an obligation to ensure accurate disclosure of material facts).  The Complaint's allegations of misrepresentations regarding appraisals and LTV ratios thus qualify as actionable misrepresentations of fact.

---

[3]   The two additional cases cited by the Credit Suisse Defendants in their brief are similarly inapposite.  *See* CSFB Mem. at 9.  Unlike MassMutual, Plaintiffs in *Stolzoff v. Waste Sys. Int'l, Inc.*, Civ. A. No. 99-1664, 2000 WL 35528812 (Mass. Super. Ct. June 28, 2000), did not allege that defendant knew the challenged estimate was false prior to disclosure.  *John A. Frye Shoe Co. v. Williams*, 312 Mass. 656, 46 N.E.2d 1 (1942), issued 30 years before the Uniform Securities Act was enacted, actually supports MassMutual's position.  There, the court noted that statements of "opinion, judgment, or estimate" are generally not actionable unless—as MassMutual has alleged—the defendant "or his agent knew them to be untrue, or made them for the purpose or with the intent to deceive."  *Id.* at 5-6.

**(b)      The Forensic Analysis Set Forth in the Complaint Lends
Further Support to the Allegations That the LTV Ratios and
Appraisal Misrepresentations Were False and Misleading**

In support of its allegations that the stated appraisal standards and LTV ratios were false

and misleading, MassMutual has alleged the actual LTV ratios based on a pre-discovery forensic

analysis.  *See, e.g.*, Compl. ¶¶ 104-58.  MassMutual's Complaint includes details of the analysis,

including its methodology of collecting data relating to the underlying loans and mortgaged

properties and use of an automated valuation model based on "similar data as in-person

appraisals—primarily county assessor records, tax rolls, and data on comparable properties."

*Id.* ¶¶ 108-09.  Defendants surprisingly take issue with these detailed allegations, contending that

they are "conclusory," "fundamentally flawed" and "completely irrelevant."  Jt. Br. at 24-25.

Defendants' name-calling accomplishes nothing on a motion to dismiss.

The Complaint explains how the automated valuation model worked and the inputs it

used.  Compl. ¶¶ 104-10.  In addition, the Complaint includes specific allegations that the inputs

were similar to inputs used (or that should have been used) for in-person appraisals.  *Id.* ¶ 108.

At the pleading stage, Defendants cannot escape the import of this analysis by speculating that it

was improper or "fundamentally flawed."  Defendants' complaints about the results of the

forensic analysis ring especially hollow, given that Defendants have exclusive control over the

very loan files that would enable MassMutual to perform a more detailed direct analysis of the

loans.  *Id.* ¶ 36.

Finally, the results of the forensic analysis obviously are not "irrelevant."  As the

Complaint alleges, automated valuation models are widely accepted and produce accurate,

independent valuation estimates.  *Id.* ¶ 108.  Had Defendants used proper appraisal standards,

Defendants' appraisal results would not have deviated so significantly, and so significantly in

one direction (upward) from the automated valuation model's results.  *See, e.g.*, *id.* ¶ 114.  The

18

results of the forensic analysis alleged in the Complaint, which uses a widely accepted

methodology and relies on similar inputs as in-person appraisals, are more than sufficient to raise

a plausible inference that the represented LTV ratios were knowingly understated and that

Defendants' appraisers were systematically ignoring appraisal standards to generate inflated

property values, as alleged in the Complaint  *See Iqbal*, 129 S. Ct. at 1949.

### 3.   The Complaint Adequately Alleges Actionable Misrepresentations About Owner-Occupancy Statistics

Finally, for each of the 9 securitizations at issue, MassMutual has alleged that specific

representations about the number of owner-occupied properties securing the underlying loans

were false.  Compl. ¶¶ 159-71.  In each securitization, the number of owner-occupied properties

was substantially less than represented in the Offering Materials.  *Id.*  In support of these

allegations, the Complaint alleges details drawn from a forensic analysis of tax records, borrower

credit records, and property records.  *Id.*  Such allegations properly state a claim under the

Massachusetts Securities Act.

### (a)   Defendants Are Responsible for False Owner-Occupancy Representations That They Communicated to MassMutual

Although the owner-occupancy representations plainly qualify as facts that were

misrepresented, Defendants maintain that the statistics were not false or misleading because, as

Defendants claim, they accurately passed on information provided by the borrowers.  Jt. Br.

at 26; *see also* CSFB Mem. at 1-2, 9.  To support this argument, Defendants rely on *Footbridge*

*Ltd. v. Countrywide Home Loans, Inc.*, Civ. A. No. 09-4050, 2010 WL 3790810, at *9 (S.D.N.Y.

Sept. 28, 2010), which addressed securities fraud claims under Rule 10b-5.  *See* Jt. Br. at 26.

The argument does not work in the context of claims brought under the Massachusetts Securities

Act; Defendants are liable under the Act for *any* misrepresentations they included in their

Offering Materials, whether or not they originated with Defendants, borrowers, or some other

source. *See Marram*, 809 N.E.2d at 1025-26 (noting that the Massachusetts Securities Act

"seeks . . . to secure accuracy in the information that is volunteered to investors," treating a

securities seller "almost as an insurer in the event that there has been any material inaccurate

disclosure or nondisclosure in the sale traceable in any way to the seller's carelessness or

affirmative wrongdoing").  This is consistent with analogous federal securities laws imposing

*prima facie* liability on a defendant for repeating the misrepresentations of others.  *See Nomura*,

632 F.3d at 775 n.14 (underwriters could be held liable for reporting study by a non-party

underwriter) (citing *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 175-76 (1st

Cir. 1994)); 2 A.A. Sommer, *Federal Securities Act of 1933* § 9.02[12] [d], at 9-24 (rev. ed.

2010) (underwriters, directors, officers, and issuers can be held liable for including misleading

statements by experts in registration materials).

    Because Defendants' knowledge (and even negligence) is not an element of a Section

410(a)(2) claim, Defendants' reliance on *Footbridge* is misplaced.[4]  In *Footbridge*, the New

York district court considered whether false owner-occupancy information communicated by

defendants and based on borrowers' representations could support a Rule 10b-5 claim, which

requires allegations raising a strong inference of scienter.  *See Footbridge*, 2010 WL 3790810,

at *8.  The court held that such information could not support a securities fraud claim because

the plaintiffs had not alleged that defendants knew the information was false, as they were

---

    [4]  Under Section 410(a)(2), Defendants have available an affirmative defense if they can
prove by a preponderance of the evidence that they did not know, and in the exercise of
reasonable care could not have known, of the borrower's misrepresentation.  *See* Mass. Gen.
Laws ch. 110A, § 410(a)(2); *Marram*, 809 N.E.2d at 1026.  Because the affirmative defense is
not provable at the pleading stage, MassMutual's claims based on Defendants' communication
of false owner-occupancy information must withstand Defendants' pleading challenge.  *See
Lehman*, 684 F. Supp. 2d at 494 (parties "are strictly liable for any misstatements in the Offering
Materials that they signed unless they can establish a due diligence defense, an issue
inappropriate for consideration on a motion to dismiss").

required to do, to meet "the heightened pleading requirements of Rule 9(b) and the PSLRA." *Id.* at *9. No scienter element or heightened pleading standard applies to the claims here. *See Marram*, 809 N.E.2d at 1026. *Footbridge* is inapposite, and Defendants have no basis for avoiding responsibility for their owner-occupancy misrepresentations.

> **(b)** **The Forensic Analysis Set Forth in the Complaint Raises a Plausible Inference that the Owner-Occupancy Statistics Were False and Misleading**

MassMutual's pre-discovery forensic review also supports its allegations that the owner-occupancy statistics were false and misleading. *See, e.g.*, Compl. ¶¶ 159-62. The Complaint contains details of the analysis, including the various tests performed to determine owner-occupancy. *Id.* The forensic analysis supports the allegation that what Defendants said in the Offering Materials was false. Owner-occupancy is not something subject to interpretation; a property is either owner-occupied or it is not. MassMutual's forensic analysis conducted tests to determine whether the subject properties actually were owner-occupied, and the results showed that in every securitization Defendants misrepresented the number of owner-occupied loans materially by up to 18.48%. Compl. ¶¶ 163-71. These results support the allegations that Defendants falsely inflated the owner-occupancy statistics, and the Complaint's allegations are sufficient at the pleading stage, particularly given that MassMutual does not have access to the actual loan files. *See Iqbal*, 129 S. Ct. at 1949; *Cabletron*, 311 F.3d at 33.

> **4.** **The Alleged Representations Were False and Misleading, Notwithstanding Purported Disclosures and Warnings in the Offering Materials and Other Documents**

Faced with the Complaint's allegations of a systematic abandonment of underwriting guidelines, a systematic abandonment of appraisal standards, understated LTV ratios, and overstated owner-occupancy statistics, Defendants contend that certain language in the Offering Materials and 12 random exhibits attached to their motions to dismiss somehow disclosed or

countered these misrepresentations.  Jt. Br. at 14-19; CSFB Mem. at 3-5, 7-8.  It is well-settled

that cautionary language cannot be used to defeat a claim for misrepresentation of historical or

existing fact; it can apply only to forward-looking statements.  *See In re No. Nine Visual Tech.*

*Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 19 (D. Mass. 1999) ("The 'bespeaks caution' defense is

inapplicable where, as here, the plaintiffs challenge the truthfulness of a claim regarding *present*

*facts . . . .*") (emphasis in original); *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92,

96-97 (2d Cir. 2004) (bespeaks caution doctrine does not apply to historical or present fact).

Further, for warning language to have any effect, it "must relate directly to that by which

plaintiffs claim to have been misled."  *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159

F.3d 723, 728-29 (2d Cir. 1998); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F.

Supp. 2d 311, 322 (S.D.N.Y. 2009) ("The requirement that the cautionary language match the

specific risk is particularly important, considering that most, if not all security offerings contain

cautionary language.").  Under well-settled law, the language identified by Defendants cannot

defeat MassMutual's claims under the Massachusetts Securities Act.

### (a)    The Offering Materials Did Not Disclose a Systematic Abandonment of Underwriting Guidelines

In an attempt to defeat any claim based on underwriting misrepresentations, Defendants

point to disclosures that there could be "misrepresentation by the mortgagor," some "loans were

issued with minimal verification," "originators could and would make exceptions to their

underwriting guidelines," and "[t]he rate of default on . . . limited documentation or no

documentation mortgage loans . . . may be higher than for other types of loans."  CSFB Mem.

at 3-4; *see also* Jt. Br. at 14-19.  Defendants also stress that the Offering Materials disclosed that

"[t]he underwriting standards typically differ from, and are generally less stringent than, the

underwriting standards established by Fannie Mae or Freddie Mac."  CSFB Mem. at 3-4 (quoting

Declaration of Matthew T. McLaughlin filed by Defendants ("McLaughlin Decl."), Ex. 1 at S-18).

But numerous courts have rejected similar arguments, finding that such warnings and disclosures do not equate to informing investors that there was a systematic abandonment of underwriting standards.  *See J.P. Morgan Chase*, 2011 WL 1796426, at *8 ("Allegations that loan originators abandoned the underwriting standards . . . are actionable, notwithstanding the fact that loans could be issued pursuant to low or no documentation programs or under exceptions to those guidelines."); *IndyMac*, 718 F. Supp. 2d at 509 ("Disclosures regarding the risks stemming from the allegedly abandoned standards do not adequately warn of the risk the standards will be ignored."); *DLJ*, 2010 WL 1473288, at *6 (rejecting argument that "disclosures absolve [defendants] of almost all responsibility" because they "fail to make clear the magnitude of the risk" of "systematic borrower defaults, complete lack of controls and oversight, and flagrant violation of the Guidelines"); *see also Tsereteli*, 692 F. Supp. 2d at 392; *RBS*, 720 F. Supp. 2d at 270; *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, Civ. A. No. 08-1418, 2010 U.S. Dist. LEXIS 137290, at *16-*17 (E.D.N.Y. Dec. 23, 2010); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1255 (W.D. Wa. 2010); *Wells Fargo*, 712 F. Supp. 2d at 971-72.

In *Nomura*, the First Circuit held that the exact warnings and disclosures Defendants try to invoke here cannot defeat a claim based on systematic abandonment of underwriting standards.  There, the First Circuit reversed a Massachusetts district court decision dismissing claims alleging false and misleading statements about underwriting standards based on defendants' presentation of a "fusillade of cautionary statements," including that "the vast majority of the loans . . . had been originated under limited documentation programs," "the

borrower's income . . . had not been verified," and "the underwriting guidelines applicable to the

mortgage loans typically [were] less stringent than [those] established by Fannie Mae or Freddie

Mac." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658

F. Supp. 2d 299, 306-07 (D. Mass. 2009), *rev'd in part*, 632 F.3d 762, 773-74 (1st Cir. 2011).

The First Circuit reinstated the claims alleging false statements about underwriting standards,

emphasizing that the disclosures did not "reveal[ ] what plaintiffs allege, namely, a wholesale

abandonment of underwriting standards." *Nomura*, 632 F.3d at 772-74.  As the First Circuit

held, where a plaintiff alleges "a wholesale abandonment of underwriting standards," as

MassMutual does in this case, "it is enough to defeat dismissal" despite "warnings in the offering

documents." *Id.* at 773.  This is particularly true here, where none of the nearly identical

"warnings" Defendants present even come close to disclosing systematic abandonment.

> **(b)**    **The Offering Materials Did Not Disclose a Systematic Abandonment of Appraisal Standards or Knowingly False Appraisal Values and LTV Ratios**

In an attempt to defeat any claim based on appraisal or LTV misrepresentations,

Defendants cite two purported warnings in the Offering Materials.  First, the Offering Materials

mentioned that "[a]ppraisers may be staff appraisers employed by the originator," who may use

multiple methods in generating an appraisal valuation.  Jt. Br. at 15; CSFB Mem. at 2.  Second,

with respect to the appraisal valuations and resultant LTV ratios, the Offering Materials noted

that "[n]o assurance can be given that the value of any Mortgaged Property has remained or will

remain at the level that existed on the appraisal or sale date," and LTV ratios "might not be a

reliable indicator" of loss "[i]f residential values overall or in a particular geographic area

decline."  CSFB Mem. at 2 & n.4 (citing McLaughlin Decl., Ex. 1 at S-34).

Neither purported warning is adequate to defeat any portion of MassMutual's claims

because neither disclosure in any way suggested that the appraisals or LTV statements were false

24

when made.  Nor do such warnings put an investor on notice that appraisers were systematically

abandoning the represented appraisal procedures, as alleged in the Complaint.  *See, e.g.*, Compl.

¶¶ 111-15.  A statement that appraisers may be staff appraisers who use a variety of accepted

valuation methods in no way warns that appraisers were abandoning appraisal standards to

generate inflated valuations.  *See, e.g.*, *id.*  Further, a statement that "the value of any mortgage

property" might change following appraisal, CSFB Mem. at 2, does not warn that the existing

appraisal values were known to be inaccurate and unreasonable at the time, as MassMutual has

alleged.  *See, e.g.*, Compl. ¶¶ 110-15; *In re Flag*, 618 F. Supp. 2d at 322 (denying summary

judgment where the warnings failed to "directly address the risk" at issue).  The appraisal and

LTV representations are actionable misrepresentations.

**(c)      The Offering Materials Did Not Disclose That the Owner-Occupancy Statistics Were False**

In an attempt to defeat any claim based on owner-occupancy misrepresentations,

Defendants point to purported warnings of borrower fraud in the prospectus for the CSMC

Mortgage-Backed Pass-Through Certificates, Series 2007-3 securitization, which provides:

> No pool insurance policy will insure, and many primary insurance policies may
> not insure, against loss sustained by reason of a default arising from, among other
> things, fraud or negligence in the origination or servicing of a mortgage loan,
> including misrepresentation by the mortgagor . . . .

Jt. Br. at 16 n.38 (citing Turner Decl., Ex. 3 at 87).  As with the other purported warnings

discussed above, this language cannot defeat the specific misrepresentations in the Offering

Materials.  A generalized warning that mortgage insurers may not cover or indemnify against

mortgagor fraud does not put investors on notice of actual mortgagor fraud.  Nor does it identify

with any specificity which representations by mortgagors were likely to be false, nor call into

question, let alone negate, the Defendants' definite, factual representations that a certain number

of mortgaged properties underlying the Certificates were owner-occupied.  *See No. Nine*, 51

25

F. Supp. 2d at 19; *Hunt*, 159 F.3d at 728-29.  The owner-occupancy misrepresentations are actionable.

**(d)**      **The Disclosures in Defendants' Exhibits Cannot Defeat MassMutual's Claims**

Finally, Defendants attempt to counter the misrepresentations in the Offering Materials regarding appraisals, LTV ratios, and owner-occupancy statistics by pointing to statements in 12 documents purportedly circulated or published between 2000 and 2006.  *See* Jt. Mem. at 9-11, 16.  But Defendants cannot show that MassMutual knew about many of these documents, and they are not judicially noticeable on a motion to dismiss.  *See* Objection to Request for Judicial Notice, filed concurrently herewith.

Even assuming that the documents could be considered, however, they are insufficient to defeat the claims based on appraisal, LTV, and owner-occupancy misrepresentations.  These documents discuss only general industry conditions.  They do not mention these Defendants, these securitizations, or these loans.  For example, the October 10, 2004 New York Times article attached by Defendants focuses almost entirely on practices by Aames Financial, *see, e.g.*, Declaration of Alan C. Turner, filed by Defendants ("Turner Decl."), Ex. 14, while the half-page December 2005 FBI press release notes that the FBI's attempt to stamp out "quick-flip" schemes and "dismantle mortgage fraud rings" had resulted in a whopping 81 arrests.  *Id.*, Ex. 17.

Such statements cannot defeat claims based on the specific misrepresentations about appraisals, LTV ratios, and owner-occupancy statistics in the Offering Materials.  *See RBS*, 720 F. Supp. 2d at 267 ("Although defendants point to a number of publicly-available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information does not 'relate directly' to the [offerings] specifically at

26

issue."). Thus the specific misrepresentations that MassMutual has alleged are actionable, notwithstanding any purported generalized warnings.

     **5.**     **The Offering Materials Made Definitive Representations, Notwithstanding the "Cure, Repurchase or Substitute" Provisions**

In addition to the detailed misrepresentations discussed above, the Offering Materials set forth in meticulous detail other information regarding the specific loans underlying each securitization, including the precise number of prime and non-prime mortgages; the number of first and junior lien mortgages; the relevant mortgage rates and specific number of loans in each rate category; and the number of mortgages by locality. *See, e.g.*, McLaughlin Decl., Ex. 1 at III-2, III-8, III-16, III-23, III-29. Yet Defendants contend that this voluminous data means nothing. According to Defendants, "[t]he Offering Documents did not make any definitive or absolute representation regarding the underlying mortgage loans" because investors were told that some mortgage loans may not conform. Jt. Br. at 19; *see also* CSFB Mem. at 8. Those loans would then be subject to "cure, repurchase or substitute" provisions, which give the securitization Trustee authority to compel the originator to repurchase the loan. *Id.*

In this case, Defendants' "cure, repurchase or substitute" argument is admittedly limited. Only two out of the nine securitizations at issue—Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2006-1, and Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2007-1—contain the relevant provision. *See* CSFB Mem. at 4, 8. Thus, even if Defendants' argument was valid, which it is not, seven out of the nine securitizations at issue would remain actionable. However, with respect to the two securitizations that do contain the cited provision, Defendants' convoluted argument would allow them to render hundreds of pages of specific disclosures meaningless.

Defendants rely on *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 386 (5th Cir. 2010), and *Footbridge*, 2010 WL 3790810, at *16, which gave effect to "cure, repurchase or substitute" provisions as the sole remedy for specific numbers of loans in default at the time of the offering.  But *Lone Star* and *Footbridge* have been limited to cases involving a small number of correctable mistakes; courts refuse to enforce such provisions for "widespread misrepresentations regarding the nature of the underwriting and appraisal practices," as MassMutual has alleged here.  *See J.P. Morgan*, 2011 WL 1796426, at *11; *see also City of Ann Arbor*, 2010 U.S. Dist. LEXIS 137290, at *18 (*Lone Star* did not apply to complaint alleging "widespread misrepresentations").  Indeed, the *Lone Star* decision itself is considered "an outlier," and is rarely, if ever, followed in mortgage-backed securities cases.  P.L.I. Sec. Litig. § 18:4.4, 18-48 (Sept. 2010); *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. A. No. 08-8781, 2011 WL 2020260, *6 (S.D.N.Y. May 19, 2011) ("*Residential Capital II*") ("the overwhelming majority of courts in this Circuit have rejected the *Lone Star* approach"); *Wash. Mut.*, 748 F. Supp. 2d at 1256 (refusing to follow *Lone Star*); *Mass. Bricklayers & Mason Funds v. Deutsche Alt-A Sec.*, Civ. A. No. 08-3178, 2010 U.S. Dist. LEXIS 137284, at *4 (E.D.N.Y. Dec. 23, 2010) (same); *J.P. Morgan*, 2011 WL 1796426, at *11-*12 (same). Defendants do not, and cannot, justify over-extending an already disfavored doctrine to void every representation in the Offering Materials.

Moreover, under Defendants' argument, the sole remedy for non-conforming loans is the "cure, repurchase or substitute" remedy.  But this remedy is not MassMutual's to exercise—it is the Trustee's.  *See* McLaughlin Decl., Ex. 1 at S-96; *id.*, Ex. 2 at S-100-01.  MassMutual has no power to force the Trustee to exercise the remedy, or even to undertake an investigation.  *Id.* Because of the limited nature of the "cure, repurchase or substitute" provision, courts have

rejected arguments similar to Defendants' that the provision defeats misrepresentation claims.

*See J.P. Morgan*, 2011 WL 1796426, at *12 ("A reasonable investor might be able to conclude

that this procedure would be sufficiently difficult that it should assume repurchase or substitution

would not be available to it, and that the investment therefore makes sense only if the issuers'

representations were truthful."); *see also Fed. Home Loan Bank of Pittsburgh v. J.P. Morgan*

*Sec. LLC*, No. GD09-016892, 2010 WL 5472006, slip op. at 29-30 (Pa. Ct. Common Pleas Nov.

29, 2010) (refusing to bar misrepresentation claim based on "cure, repurchase or substitute"

provision because "[t]his is not a remedy available to certificate holders").

Finally, Defendants' argument must fail because it effectively transforms the "cure,

repurchase or substitute" clause into a waiver of rights under the Massachusetts Securities Act.

If Defendants' argument were accepted, MassMutual and other investors could never bring

claims for misrepresentations in the Offering Materials.  But it is black-letter law that claims

under the Massachusetts Securities Act *cannot* be waived.  Mass. Gen. Laws ch. 110A, § 410(g)

("Any condition, stipulation, or provision binding any person acquiring any security to waive

compliance with any provision of this chapter or any rule or order hereunder is void."); *see also*

*J.P. Morgan*, 2011 WL 1796426 at *11 (rejecting an argument similar to Defendants' because

"'individual security holders may not be forced to forego their rights under the federal securities

laws due to a contract provision'").  The Offering Materials contained definitive representations,

which MassMutual has sufficiently alleged were false or misleading.  Defendants' motions to

dismiss for failure to allege actionable misrepresentations therefore must be denied.

### B.      MassMutual Has Sufficiently Alleged Materiality.

MassMutual also has adequately alleged that Defendants' misrepresentations and failures

to provide accurate information in each of the three categories detailed above, taken individually

or collectively, "significantly altered the 'total mix' of information made available," and thus

were material.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *Cabletron*, 311 F.3d at 34.  For the underwriting misrepresentations, MassMutual has alleged that underwriting standards are "critically important to . . . investors' decisions to purchase the securities" because underwriting standards ensure a borrower's ability to repay and the sufficiency of the collateral, which is "[t]he fundamental basis upon which residential mortgage-backed securities are valued."  Compl. ¶ 38; *see Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) ("[U]nderwriting standards would be among the most important information looked to by investors").  For appraisal and LTV misrepresentations, MassMutual has alleged that appraisal standards "were material . . . because they signaled the reliability of the LTV ratios," and has alleged that LTV ratios were "material . . . because higher ratios are correlated with a higher risk of default."  *Id.* ¶¶ 107, 113.  For owner-occupancy misrepresentations, MassMutual has alleged that "[o]wner-occupancy statistics were material . . . because high owner-occupancy rates would have made the Certificates safer investments than Certificates backed by second homes or investment properties."  *Id.* ¶ 160.

These allegations are more than sufficient to allege materiality, which is an "inherently fact-specific finding," *Basic*, 485 U.S. at 236, requiring assessment of the "inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him," *TSC*, 426 U.S. at 450.  For this reason, materiality is "ordinarily decided by the trier of fact."  *Marram*, 809 N.E.2d at 1030; *see also TSC*, 426 U.S. at 450 (materiality assessments "are peculiarly ones for the trier of fact"); *Cabletron*, 311 F.3d at 34 ("[T]he materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss.").

Although demonstrating there is no fact dispute as to materiality is "perhaps impossible" even at the summary judgment stage, *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482-82 (S.D.N.Y. 1994), Defendants nevertheless try to make a lack of materiality argument at the pleading stage.  Jt. Br. at 27-28; CSFB Mem. at 9-10.  Defendants' first argument—that MassMutual has simply repeated the legal standard, *see* Jt. Br. at 28—ignores the above-noted allegations in the Complaint.  *See* Compl. ¶¶ 38, 107, 113, 160.  Defendants' remaining arguments—which reference purported warnings and disclosures in the Offering Materials and other random documents, *see* Jt. Br. at 28-29—rehash their earlier contention that the Complaint does not allege actionable misrepresentations.  Such arguments fail for the reasons discussed above:  (i) the identified "warnings" have no bearing on misrepresentations of fact; (ii) the purported disclosures did not reveal the misrepresentations at issue, including wholesale abandonment of underwriting standards, issuance of loans to borrowers who did not qualify for reduced documentation programs, and use of exceptions without sufficient compensating factors; and (iii) the references to random documents that MassMutual is not shown to have received did not reveal any misrepresentations, let alone by these Defendants, in these securitizations, involving these loans.  *See supra* Section I(A)(4).

Finally, courts have routinely found that the types of misrepresentations alleged in the Complaint cannot be found immaterial on the pleadings.  *See J.P. Morgan*, 2011 WL 1796426, at *11 ("Allegations of widespread abandonment of underwriting and appraisal guidelines can hardly be held immaterial as a matter of law."); *Atlas*, 556 F. Supp. 2d at 1155 (denying motion to dismiss when deviation from underwriting standards was alleged); *Lehman*, 684 F. Supp. 2d at 494 (even where prospectuses provided "an 'ocean's worth' of specific data," deviations from stated guidelines were sufficiently material to survive a motion to dismiss); *see also Marram*,

809 N.E.2d at 1030 (allegations relating to the "volatility" and "risk profile" of an investment are as material as it gets). Defendants' arguments contesting the allegations of materiality must be rejected.

## C.     The Sponsor, Depositors, and Underwriters Are Statutory Sellers

MassMutual's Complaint adequately alleges, as Defendants concede, that the Underwriter. CS Securities, which passed title to the Certificates to MassMutual, is liable as a statutory seller under Section 410(a)(2). *See* Jt. Br. at 30-31; CSFB Mem. at 11. MassMutual also has adequately alleged that the Sponsor, DLJ, and Depositor, CSFB Mortgage, are statutory sellers.

Seller liability extends to anyone who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interest or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *see also Stolzoff v. Waste Sys. Int'l, Inc.*, 58 Mass. App. Ct. 747, 766 n.21 (2003) (quoting *Pinter* and applying rule to Section 410(a)(2) claims); *Adams*, 838 F. Supp. 676 at 686 (same). Solicitation involves a fact-specific inquiry and is therefore not a proper subject for a motion to dismiss. *See, e.g., In re Regions Morgan Keegan Sec. Litig.*, 743 F. Supp. 2d 744, 760 (W.D. Tenn. 2010) ("[W]hether someone 'solicits' a purchase is a fact-bound inquiry unsuited for a Rule 12(b)(6) motion."); *In re Portal Software, Inc. Sec. Litig.*, Civ. A. No. 03-5138, 2006 WL 2385250, at *4 (N.D. Cal. Aug. 17, 2006) (same).

MassMutual has satisfied its pleading obligations by alleging that the Sponsor and Depositor operated collectively with the securities owner (the Underwriter) to solicit purchases and prepared the Offering Materials that were used to market the Certificates. Compl. ¶¶ 22, 173-74. Specifically, the Complaint alleges that "[t]he Sponsor/Seller, Depositor, Underwriter, and the Trusts successfully solicited MassMutual's purchase of the Certificates at issue," *id.* ¶ 177, and that these Defendants "issued, marketed, and/or sold the Certificates to the public for

their own financial benefit," *id.* ¶ 187. Additionally, MassMutual has pleaded that the Sponsor and Depositor did so to further their own financial interests. *Id.* ¶¶ 22, 173-74. Finally, MassMutual has alleged that the Sponsor and Depositor, along with their affiliated Underwriter, were motivated by a collective desire to further the financial interests of their collective parent company, CS Holdings. *See id.*

No more is required at the pleading stage, as the First Circuit in *Nomura* recently confirmed. In *Nomura*, the First Circuit held that the allegation that "defendants promoted and sold the certificates to the plaintiffs" was sufficient to state a claim against a depositor and two trusts that issued mortgage-backed securities (but did not transfer title to plaintiffs). 632 F.3d at 776. Dismissal would be even less justified on the more detailed allegations here.

Defendants argue, citing an unpublished district court case, that the Sponsor and Depositors do not qualify as sellers because they did not pass title or solicit MassMutual's purchases to further their own financial motives "*in the manner of a broker or vendor's agent*." Jt. Br. at 32 (citing *In re Sonus Networks, Inc. Sec. Litig.*, Civ. A. No. 04-10294, 2006 WL 1308165 (D. Mass. May 10, 2006) (emphasis added)). Defendants' argument applies an incorrect legal standard (not even used in the unpublished case Defendants cite) and ignores the allegations of the Complaint. Neither the Supreme Court in *Pinter* nor the First Circuit in *Nomura* imposed the requirement that the defendant act as a "broker or agent."

In addition to ignoring the Complaint's allegations, Defendants cite cases that are factually distinguishable in arguing that the Sponsor and Depositor did not solicit MassMutual's purchases. *See, e.g.*, Jt. Br. at 32-33. For example, the plaintiffs in *Shaw v. Digital Equipment Corp.*, *In re Evergreen Ultra Short Opportunities Fund Securities Litigation,* and *In re Sonus Networks, Inc. Securities Litigation* (all relied on by Defendants) did not allege facts showing

*any* relationship between the issuer and underwriters, as MassMutual has alleged here. *Compare* Compl. ¶ 22 ("the Credit Suisse Defendants operated collectively, as an enterprise, to structure and market the nine securitizations at issue in this action") *and* ¶ 177 (alleging that the Sponsor and Depositor used the Underwriter to market and sell the Certificates), *with Shaw*, 82 F.3d at 1215-16, *Sonus*, 2006 WL 1308165, at *11 (no allegations of relationship between officers of issuer and seller of securities), *and In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 96 (D. Mass. 2010) (finding no "statutory seller relationship" between Trustees and plaintiff because "plaintiffs allege only that the Trustee Defendants signed the registration statements and participated in the drafting, preparation and/or approval of the Offering Materials").  Further, unlike those plaintiffs, MassMutual has alleged that the Sponsor and Depositor had more than peripheral involvement in the preparation of the Offering Materials. *Compare* Compl. ¶¶ 22, 172-77 *with Shaw*, 82 F.3d at 1215-16 ("Plaintiffs' bald and factually unsupported allegation that the issuer . . . 'solicited' the plaintiffs' securities purchases is not, standing alone, sufficient."), *Sonus*, 2006 WL 1308165, at *11 (same), *and Evergreen*, 705 F. Supp. 2d at 95-96 (plaintiff did not distinguish *Shaw* and argued only that defendants' signature on registration statements was "suggestive" of solicitation activity).

The Complaint alleges, among other things, that the Sponsor and Depositor operated collectively with the seller of the securities (the Underwriter) to market the securitizations, had primary responsibility for preparing the Offering Materials used to solicit the purchases, identified themselves in the Offering Materials as integral to the securitizations, and were responsible for registering the offerings with the Securities and Exchange Commission.  Compl. ¶¶ 22, 172-77.  These allegations are more than sufficient to allege solicitation at the pleading stage.

Notably, courts have not hesitated to impose seller liability on defendants who, like the Sponsor and Depositors here, controlled a direct seller's solicitation efforts or the flow of information to investors (whether or not they had any direct communication with a purchaser). *See Pinter*, 486 U.S. at 646-47 (securities laws' purpose of protecting investors is best served by imposing seller liability on those persons "well positioned to control the flow of information" to investors"); *Capri v. Murphy*, 856 F.2d 473, 154-55 (2d Cir. 1988) (general partners were "sellers" based on their control over partnership's solicitation efforts); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1063-64 (D. Minn. 2003) (denying motion to dismiss where complaint alleged that defendants controlled direct seller) ; *In re U.S.A. Classic Sec. Litig.*, Civ. A. No. 93-6667, 1995 WL 363841, at *4 (S.D.N.Y. June 19, 1995) (corporation that controlled issuer was a "seller," even though unrelated underwriters passed title to plaintiffs); *In re Valence Tech. Sec. Litig.*, Civ. A. No. 95-20459, 1995 WL 798927, at *6 (N.D. Cal. Sept. 19, 1995) (defendants that "jointly orchestrated all activities necessary to effect the sale" were sellers); *Boley v. Pineloch Assocs., Ltd.*, Civ. A. No. 87-5124, 1990 WL 113201, at *6 (S.D.N.Y. Aug. 2, 1990) (defendants who were well-positioned to control the flow of information to investors were sellers despite absence of direct relationship); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 938 (S.D.N.Y. 1989) (defendants who "provided the information that was supplied to purchasers" by another entity and "contemplated and authorized all actions taken in relation to the investors" were statutory sellers).

Defendants' argument that the Sponsor and Depositor are not statutory sellers must fail at the pleading stage in light of the allegations set forth in the Complaint and highlighted above.

## II.    MASSMUTUAL HAS STATED CONTROL PERSON CLAIMS AGAINST THE SPONSOR AND DEPOSITOR.

MassMutual has adequately alleged control person claims under Section 410(b) of the Uniform Securities Act against the Sponsor (DLJ) and Depositor (CSFB Mortgage) defendants. MassMutual has alleged primary violations of Section 410(a) by the Depositor and Trusts, Compl. ¶¶ 38-172, facts showing that the Sponsor controlled the Depositor and Trusts, *id.* ¶¶ 18, 22, 31, 172-177, 178, and facts showing that the Depositor controlled the Trusts. *Id.* ¶¶ 18, 22, 31, 172-77, 179, 194-97. As set forth in more detail below, these allegations are more than sufficient to state a claim under Section 410(b), *see* Mass. Gen. Laws ch. 110A, § 410(b), especially because "[c]ontrol is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage.'" *Cabletron,* 311 F.3d at 41 (citation omitted).

### A.    MassMutual Has Sufficiently Alleged a Primary Violation by the Depositor and Trusts

MassMutual has adequately alleged primary violations of Section 410(a) by the Depositor and Trusts. *See supra* Section I; Compl. ¶¶ 38-172. MassMutual has alleged that the Depositor and each Trust offered or sold the Certificates to MassMutual in Massachusetts and made material misrepresentations in connection with the offer or sale of Certificates. *See id.*; *see also* Compl. ¶¶ 186-92, 195. This is sufficient to state a claim. *Marram*, 809 N.E.2d at 1025 (seller's oral misrepresentation regarding investment diversification was a violation of Section 410(a)).

In challenging the allegations of a primary violation, Defendants simply incorporate by reference their prior arguments, Jt. Br. at 39-41, which MassMutual has shown above do not mount an effective pleading challenge. *See supra* Section I. For the reasons set forth in Section I(C) above, the Complaint sufficiently alleges facts showing that the non-underwriter Defendants, including the Trusts, are statutory sellers under Section 410(a). *See supra* Section

I(C); Compl. ¶¶ 17, 32, 37, 175 (identifying the Trusts as the actual issuers of the Certificates). This is more than sufficient to state a claim.

Defendants also argue, without citing the Complaint, that MassMutual has not alleged primary violations by the Trusts because they are not "alleged to be . . . primary violators" or "named as defendants." Jt. Br. at 40. The first of these arguments is untrue; the second is irrelevant. First, MassMutual has plainly alleged that the Trusts are primarily liable under Section 410(a). *See, e.g.*, Compl. ¶ 172 (the Trusts are "primarily liable for misrepresentations in the Offering Materials under . . . Section 410(a)(2)"). Second, it is well-settled that MassMutual need not name primary violators as defendants for the Sponsor and Depositor to be liable for controlling them. *See In re Enron Corp.*, MDL No. 1446, H-01-3624, 2005 WL 1638039, at *6 (S.D. Tex. June 21, 2005) (in lawsuits involving a claim under Section 15, a plaintiff need not proceed against the primary violators); *S.E.C. v. Savoy Indus., Inc.*, 587 F. 2d 1149, 1170 (D.C. Cir. 1978) ("It is established that the plaintiff need not proceed against the principal perpetrator . . . ."); *Kemmerer v. Weaver*, 445 F.2d 76, 78 (7th Cir. 1971) (defendant control person may be held liable even if plaintiff fails to proceed against the principal violator); *In re CitiSource, Inc. Sec. Litig.*, 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988) ("[T]here is nothing in the language of [the control person statute] which compels the joinder of the controlled person. . . . [T]he liability of the primary violator is simply an element of proof of a [control person] claim, and that liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong.") (citations and internal quotations omitted).[5] Regardless

---

[5] The rule proposed by Defendants (that every primary violator must be sued) is not only not the law, it would run afoul of the "broad remedial purpose of the securities laws" because, for example, it would "permit officers and directors of a bankrupt corporation whose actions are alleged to have contributed to that condition to avoid the possible imposition of

of the defendants named in the Complaint, MassMutual has adequately alleged a primary

violation of Section 410(a) by the Trusts and the Depositor to state a control person claim under

Section 410(b).

      **B.**      **MassMutual Has Sufficiently Alleged Control by the Sponsor and Depositor**

      MassMutual has adequately alleged the elements of control over the primary violators—

that the Sponsor and Depositor directly or indirectly possessed "the power to direct or cause the

direction of the management and policies of [the primary violator(s)], whether through the

ownership of voting securities, by contract, or otherwise." *See Sheinkopf v. Stone,* 927 F.2d

1259, 1270 (1st Cir. 1991) (addressing Section 410(b)); *Merrill Lynch*, 714 F. Supp. 2d at 484

(addressing control-person liability for Section 12); *WaMu*, 748 F. Supp. 2d at 1257; 17 C.F.R.

§ 230.405 (defining control for purposes of the Securities Act of 1933 as "the possession, direct

or indirect, of the power to direct or cause the direction of the management and policies of a

person, whether through the ownership of voting securities, by contract, or otherwise").  Only a

"reasonable inference" of control is necessary, and because the issue "raises a number of

complexities that should not be resolved on such an undeveloped record," it should rarely be

decided on the pleadings.  *In re Cabletron*, 311 F.3d at 41.

      Specifically, MassMutual has pleaded facts that raise a reasonable inference that the

Depositor had the power to direct, and actually directed, the management and policies of each of

the Trusts.  As MassMutual has alleged, the Depositor created the Trusts, it determined the

mortgage loans to transfer to the Trusts for securitization, and it used the Trusts as agents to issue

the securities.  Compl. ¶¶ 32, 34, 174-76, 179.  Defendants do not and cannot dispute that the

Complaint adequately alleges the Depositor's control over the Trusts, *see* Jt. Br. at 39-41; CSFB

---

liability under such laws by asserting the lack of a prior adjudication against the controlled
person as a basis for dismissal."  *Briggs v. Sterner*, 529 F. Supp. 1155, 1171 (S.D. Iowa 1981).

Mem. at 11, and Defendants' motion to dismiss the control-person claim against the Depositor

must be denied.[6]

MassMutual has also alleged the following facts raising a reasonable inference that DLJ,

the Sponsor, had the power to direct, and actually did direct, the management and policies of

CSFB Mortgage, the Depositor, and, through the Depositor, the Trusts:

- "[The Sponsor] acquired and selected the loans that would be securitized and
  determined the terms under which those loans were sold to the Depositor and then
  to the Trusts."  Compl. ¶ 178.

- "[The Sponsor] determined and approved the structure of the securitizations."  *Id.*

- "[The Sponsor] determined and approved . . . the manner in which the Depositor
  and the Trusts sold the Certificates."  *Id.*

- The Sponsor "had responsibility for preparing the Offering Materials," and
  "controlled the disclosures made in connection with each securitization."
  *Id.* ¶¶ 173, 178.

In disputing the adequacy of control allegations against the Sponsor, Defendants largely

ignore these allegations. *See* Jt. Br. at 39-40.  But the allegations obviously do more than merely

recite a corporate affiliation or legal conclusions, as Defendants contend.  *See* Jt. Br. at 39.

MassMutual's allegations show that (a) the Sponsor had the power to direct, and did direct, the

day-to-day securitization business of the Depositor and, through the Depositor, the Trusts; and,

further, (b) that the Sponsor had the power to direct, and did direct, the specific

misrepresentations at issue in the Complaint.  These allegations are more than sufficient to plead

---

      [6]  Defendants' half-hearted suggestion that MassMutual must plead facts showing that
the Depositor (and Sponsor) exercised actual control over the Trusts, rather than merely having
the power to control, is not the law.  *See* Jt. Br. at 39 (citing *Aldridge v. A.T. Cross Corp.*, 284
F.3d 72, 85 (1st Cir. 2002)).  The case Defendants cite addresses control person liability for
violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934; because
these claims require scienter, courts typically adopt a higher pleading standard for those claims
than is applicable here.  *See Aldridge*, 284 F.3d at 85; *In re WorldCom, Inc.*, 377 B.R. 77, 103-04
(Bankr. S.D.N.Y. 2007).  In any event, MassMutual has alleged facts showing the exercise of
actual control, as discussed above.

that DLJ as Sponsor exercised at least some actual control over these two entities (which is not even required here, as described above and in footnote 6), in addition to having the power to exercise control. *See In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 59-61 (D. Mass. 2008) (allegations that defendant occupied a position of control and sent a one word email to a primary violator was sufficient to allege control); *see also, e.g., Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 148 (D. Mass. 2006) (allegations that defendant exercised control over primary violator's day-to-day operations sufficiently alleged control); *see also In re Centennial Tech. Litig.*, 52 F. Supp. 2d 178, 186 (D. Mass. 1999) (even the right to "discipline or influence, although short of actual direction, is sufficient to hold a *control person* liable.") (internal citations omitted). Defendants' motion to dismiss the control-person claims should be denied.

## III.   MASSMUTUAL'S CLAIMS ARE TIMELY

MassMutual's Complaint is well within the four-year statute of limitations under the Massachusetts Securities Act. Simply put, as of February 2007, there was no information in the public press or otherwise available to investors that Defendants were making material misstatements in the Offering Materials regarding the securitizations at issue. Although some defendants have argued that residential mortgage-backed securities purchasers were on notice of their claims by mid-*2008*, no defendant (prior to these Defendants) has even tried to suggest that a purchaser was on inquiry notice of misrepresentations in mortgage-backed offering materials as early as *February 2007.*

Courts have been reluctant to conclude that purchasers of mortgage-backed securities were on inquiry notice even as of mid-2008. *See, e.g.*, *IndyMac*, 718 F. Supp. 2d at 505 (no inquiry notice as of May 2008); *Goldman Sachs*, 2011 WL 135821, at *8 (no inquiry notice as of February 2008); *Merrill Lynch*, 714 F. Supp. 2d at 479-80 (no inquiry notice as of December 2007); *RBS*, 720 F. Supp. 2d at 267 (no inquiry notice as of May 2007). Interestingly, Defendant

CS Securities previously attempted to argue that inquiry notice existed as of May 2008, which

the court in *Residential Capital II* definitively rejected. *See* 2011 WL 2020260, at *4-*5. There,

as here, CS Securities pointed to a number of allegedly "publicly available" reports generally

related to the weakening and outright disregard for underwriting guidelines by subprime

originators, and contended that the plaintiffs should have discovered their mortgage-backed

securities claims by May 18, 2008. *Id.* The district court held that none of the information was

remotely sufficient to establish inquiry notice at the pleading stage. *Id.* ("It is an even further

reach to suggest that a possible ratings downgrade and the collapse of Bear Stearns [in March

2008] should have caused [plaintiffs] to discover the misstatements or omissions in the offering

documents.").

Defendants' argument that MassMutual was on inquiry notice of its claims by February

2007—over 14 months *earlier*— has no legitimate basis.

### A.      Defendants Have Failed to Show that MassMutual Was on Inquiry Notice as of February 2007

In order to prevail on the argument that MassMutual's claims are time-barred,

Defendants must show that MassMutual knew or should have known of its claims more than four

years before the February 25, 2011 filing of the Complaint. *See* Mass. Gen. Laws ch. 110A,

§ 410(e); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 234 (D. Mass. 2004). On a

motion to dismiss, Defendants must show that MassMutual's "allegations leave no doubt that an

asserted claim is time-barred." *Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 46

(1st Cir. 2008). Defendants fail to meet this burden.

To establish that MassMutual was on inquiry notice, *i.e.*, that it knew or should have

known of its claims, by February 2007, Defendants must show that: (1) "storm warnings"

triggered the duty to investigate; and (2) a reasonably diligent investor would have discovered

the misrepresentations in the Offering Materials prior to February 25, 2007.  *See Young v. Lepone*, 305 F.3d 1, 9-10 (1st Cir. 2002).

Because nothing in the Complaint supports Defendants' argument that MassMutual was on inquiry notice by February 2007, Defendants ask the Court to take judicial notice of 12 additional documents totaling more than 300 pages.  *See* Joint Br. at 9 n.5.  But none of this "evidence" comes close to satisfying Defendants' burden to show that storm warnings existed and that a reasonable investor would have discovered the claims in February 2007.  *See Warren Freedenfeld*, 531 F.3d at 46 (reversing dismissal where, although some public facts "hinted at the possibility of inquiry notice, no facts justified a *compelled* finding" that claims were time-barred) (emphasis in original); *Young*, 305 F.3d at 9 ("[I]t is for the factfinder to determine whether a particular collection of data was sufficiently aposematic to place an investor on inquiry notice."). Isolated, non-specific testimony and comments are insufficient as a matter of law to create storm warnings for investors in these specific securitizations.  *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 430-31 (2d Cir. 2008) (articles were not sufficiently specific to constitute storm warnings); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 525-27 (S.D.N.Y. 2005) (news articles were not sufficiently specific to put plaintiffs on inquiry notice); *Goldman Sachs*, 2011 WL 135821, at *9 (articles about disregard of underwriting guidelines by originators did not put purchasers of mortgage-backed securities on inquiry notice of fraud because the articles were not directly related to the issuing trusts).

Further, Defendants have failed to meet their burden of showing that MassMutual itself was aware of the 12 exhibits Defendants have submitted.  Many of the exhibits predate MassMutual's Certificate purchases by years.  Knowledge of these exhibits cannot be imputed to MassMutual, particularly at the pleading stage.  *See, e.g., Lentell v. Merrill Lynch & Co., Inc.*,

396 F.3d 161, 170 (2d Cir. 2005) (articles published before initial public offering were

"insufficient as a matter of law to put [investors] on inquiry notice"); *Salinger v. Projectavision,*

*Inc.*, 934 F. Supp. 1402, 1409 n.4 (S.D.N.Y. 1996) (refusing to consider documents published

before plaintiffs' securities purchases in determining inquiry notice).  In addition, Defendants

have not shown that the petitions, reports, and studies they submit were well-publicized, such

that MassMutual *should* have been aware of them.  *See, e.g.*, *In re Mass. Diet Drug Litig.*, 338 F.

Supp. 2d 198, 206-07 (D. Mass. 2004) (whether publicity was sufficient to put plaintiffs on

inquiry notice was a question of fact); *Guenther v. Cooper Life Scis., Inc.*, Civ. A. No. 89-1823,

1992 WL 206256, at *6 (N.D. Cal. Apr. 7, 1992) (information that was not highly publicized

could not be attributed to plaintiffs at pleading stage); *Sperber Adams Assocs. v. JEM Mgmt.*

*Assocs. Corp.*, Civ. A. 90-7405, 1992 WL 138344, at *3 (S.D.N.Y. June 4, 1992) (prior lawsuit

that was not widely publicized did not trigger inquiry notice).  Defendants cannot obtain a bar of

MassMutual's claims by presenting a smattering of generalized documents and asking the Court

to infer both that MassMutual had knowledge of the exhibits and that such knowledge would

have put it on notice as of February 2007 of the misrepresentations in the 9 securitizations at

issue.

      **B.**      <u>**Defendants' "Evidence," Even if Considered, Does Not Come Close to**</u>
                 <u>**Establishing Inquiry Notice as a Matter of Law**</u>

        The far-flung and inapposite nature of the evidence Defendants have submitted only

confirms there is no merit to their argument that MassMutual was on inquiry notice by early

2007.  None of Defendants' documents refers to specific mortgage lenders; none links reports of

potentially inflated appraisals and borrower fraud to any specific securitization (let alone the

securitizations at issue here); and none suggests wrongdoing by—or even mentions—any of the

Defendants.  None of the securitizations identified in MassMutual's Complaint is specifically

linked to any of the materials proffered by Defendants as proof of inquiry notice. Vague, non-specific, and general information is insufficient, as a matter of law, to establish inquiry notice. *See, e.g.*, *Cascone v. United States*, 370 F.3d 95, 105 (1st Cir. 2004) (media coverage of suspicious deaths did not give plaintiff reason to suspect claims based on her own husband's death); *Staehr*, 547 F.3d at 430-31 (seventeen news articles were insufficient to trigger inquiry notice because they suggested potential conflicts involving only insurers in general, not the probability of wrongdoing by the defendant); *RBS,* 720 F. Supp. 2d at 267 (publicly available documents regarding originators' disregard of underwriting guidelines did not "relate directly" to the securities or trusts at issue and therefore did not provide inquiry notice); *Goldman Sachs*, 2011 WL 135821, at *9 (same). None of the exhibits suggests the *probability* of false statements made by *Defendants* in the Offering Materials at issue. *See, e.g.*, *RBS*, 720 F. Supp. 2d at 267.

Indeed, unlike the contemporaneous news articles which CS Securities unsuccessfully argued provided notice of claims in *Residential Capital II*, much of the "evidence" submitted with these motions predates MassMutual's purchases of the Certificates by several years. Defendants fail to explain how, for example, a 2000 petition and 2003 survey suggesting that some appraisers may have inflated property values could possibly have revealed that *Defendants* were going to make misrepresentations and material omissions in the Offering Materials they prepared for securitizations in 2006 and 2007. Defendants ask this Court to become the *first* to find that generalized publicly available information put mortgage-backed securities purchasers on inquiry notice of their claims by 2007. There is no basis for finding inquiry notice at any point in 2007, let alone in *February* 2007.

Defendants have failed to raise any plausible argument that MassMutual was on inquiry notice of its mortgage-backed securities claims by February 2007.  Accordingly, the Court should reject Defendants' limitations argument.

IV.    **TO THE EXTENT THE COURT FINDS ANY DEFICIENCY IN THE COMPLAINT, MASSMUTUAL SHOULD BE GRANTED LEAVE TO AMEND.**

For all the reasons set forth above, the Complaint adequately alleges violations of the Massachusetts Securities Act.  However, if Defendants' motions are granted in any respect, MassMutual hereby requests leave to amend its Complaint to cure any deficiency.  "[L]eave to amend 'shall be freely given when justice so requires'" and "unless no sufficient justification therefor exists."  *Soderman v. Horan*, 165 F.R.D. 8, 11 (D. Mass. 1996) (citing Fed. R. Civ. P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 59 (1st Cir. 1990)); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, Civ. A. No. 08-7508, 2009 WL 3346674, at *2 & n.14 (S.D.N.Y. Oct. 15, 2009) (dismissal with prejudice is generally inappropriate until "a court puts a plaintiff on notice of a complaint's deficiencies and the plaintiff fails to correct those deficiencies after amendment") (collecting cases).

MassMutual could certainly develop additional facts through limited discovery and review of the underlying loan pools (to which it currently does not have access).  Moreover, governmental agencies have released additional evidence in support of MassMutual's claims since the date MassMutual filed its Complaint, including the U.S. Senate Permanent Subcommittee of Investigation's April 13, 2011 Levin-Coburn Report on the Financial Crisis, a 639-page document study of the high-risk lending practices and unresolved conflicts of interest of the top loan originators.  Similarly, New York Attorney General Eric Schneiderman launched a major investigation of several Wall Street banks on May 16, 2011, focused on the same kind of

45

loan origination and securitization practices at issue in this litigation, and the U.S. Department of Justice filed its first of its anticipated flood of civil cases against lenders for mortgage fraud on May 3, 2011.  Although MassMutual's current allegations are more than adequate to state a claim, the near-daily revelations of misconduct by mortgage originators provide an ongoing source of additional facts in the event the Court concludes additional factual allegations are necessary.

## <u>CONCLUSION</u>

For the reasons set forth above, MassMutual respectfully requests that the Court deny Defendants' motions to dismiss in their entirety.

DATED:  June 28, 2011                    EGAN, FLANAGAN AND COHEN, P.C.

By:     /s/ Edward J. McDonough Jr.
Edward J. McDonough Jr. (BBO 331590)
Stephen E. Spelman (BBO 632089)
Egan, Flanagan and Cohen, P.C.
67 Market Street, P.O. Box 9035
Springfield, Massachusetts  01102
Telephone:  (413) 737-0260
Fax:  (413) 737-0121
ejm@efclaw.com;
ses@efclaw.com

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY

Mark Roellig (BBO 669117)
Executive Vice President and General Counsel
Bernadette Harrigan (BBO 635103)
Assistant Vice President & Counsel
Eleanor P. Williams (BBO 667201)
Assistant Vice President & Counsel
Massachusetts Mutual Life Insurance Company
1295 State Street
Springfield, Massachusetts  01111
Telephone:  (413) 788-8411
Fax:  (413) 226-4268
bharrigan@massmutual.com;
ewilliams@massmutual.com

Of counsel:

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Philippe Z. Selendy (*pro hac* admission pending)
Jennifer J. Barrett (*pro hac* admission pending)
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Fax (212) 849-7100

A. William Urquhart (*pro hac* admission pending)
Harry A. Olivar, Jr. (*pro hac* admission pending)
Molly Stephens (*pro hac* admission pending)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Fax (213) 443-3100

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 28th day of June, 2011.

*/s/ Edward J. McDonough Jr.*

_____
Edward J. McDonough Jr.

48