CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------------- x

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | : Civil Action No. 3:11-30039-MAP |
| Plaintiff, | : |
| v. | : **Redacted Version** |
| DB STRUCTURED PRODUCTS, INC., *et al.*, | : **Complete Version Filed Under Seal** |
| Defendants. | : **Per Court Order Of May 24, 2013** |

---------------------------------------------------------------------- x

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | : Civil Action No. 3:11-30044-MAP |
| Plaintiff, | : |
| v. | : **Redacted Version** |
| RBS FINANCIAL PRODUCTS INC. (F/K/A GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.), *et al.*, | : **Complete Version Filed Under Seal** : **Per Court Order Of May 24, 2013** |
| Defendants. | : |

---------------------------------------------------------------------- x

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | : Civil Action No. 3:11-30047-MAP |
| Plaintiff, | : |
| v. | : **Redacted Version** |
| DLJ MORTGAGE CAPITAL, INC., *et al.*, | : **Complete Version Filed Under Seal** : **Per Court Order Of May 24, 2013** |
| Defendants. | : |

---------------------------------------------------------------------- x

CONFIDENTIAL

------------------------------------------------------------------- x

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,

                Plaintiff,

            v.

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., *et al.*,

                Defendants.

:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 3:11-30048-MAP

**Redacted Version**
**Complete Version Filed Under Seal**
**Per Court Order Of May 24, 2013**

------------------------------------------------------------------- x

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,

                Plaintiff,

            v.

JPMORGAN CHASE BANK, N.A., *et al.*,

                Defendants.

:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 3:11-30094-MAP

**Redacted Version**
**Complete Version Filed Under Seal**
**Per Court Order Of May 24, 2013**

------------------------------------------------------------------- x

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,

                Plaintiff,

            v.

GOLDMAN SACHS MORTGAGE COMPANY, *et al.*,

                Defendants.

:
:
:
:
:
:
:
:
:
:

Civil Action No. 3:11-30126-MAP

**Redacted Version**
**Complete Version Filed Under Seal**
**Per Court Order Of May 24, 2013**

------------------------------------------------------------------- x

CONFIDENTIAL

------------------------------------------------------------------------- x

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY,

             Plaintiff,

         v.

IMPAC FUNDING CORPORATION, *et al.*,

             Defendants.

:   Civil Action No. 3:11-30127-MAP
:
:
:
:   **Redacted Version**
:   **Complete Version Filed Under Seal**
:   **Per Court Order Of May 24, 2013**
:
:
:

------------------------------------------------------------------------- x

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY,

             Plaintiff,

         v.

HSBC BANK USA, NATIONAL ASSOCIATION, *et al.*,

             Defendants.

:   Civil Action No. 3:11-30141-MAP
:
:
:
:   **Redacted Version**
:   **Complete Version Filed Under Seal**
:   **Per Court Order Of May 24, 2013**
:
:
:

------------------------------------------------------------------------- x

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY,

             Plaintiff,

         v.

COUNTRYWIDE FINANCIAL CORPORATION., *et al.*,

             Defendants.

:   Civil Action No. 3:11-30215-MAP
:
:
:
:   **Redacted Version**
:   **Complete Version Filed Under Seal**
:   **Per Court Order Of May 24, 2013**
:
:
:

------------------------------------------------------------------------- x

CONFIDENTIAL

```
-------------------------------------------------------------  x
MASSACHUSETTS MUTUAL LIFE INSURANCE        :  Civil Action No. 3:11-30285-MAP
COMPANY,                                   :
                                           :
                Plaintiff,                 :
                                           :  **Redacted Version**
            v.                             :  **Complete Version Filed Under Seal**
                                           :  **Per Court Order Of May 24, 2013**
MERRILL LYNCH, PIERCE, FENNER & SMITH., et :
al.,                                       :
                                           :
                Defendants.                :
------------------------------------------------------------- x
```

## DECLARATION OF ARNOLD BARNETT, PH.D.

## MAY 24, 2013

CONFIDENTIAL

**TABLE OF CONTENTS**

I.     QUALIFICATIONS ...................................................................................................1

II.    CASE BACKGROUND ..........................................................................................1

III.   ASSIGNMENT.........................................................................................................4

IV.   SUMMARY OF CONCLUSIONS..........................................................................4

V.    ANALYSIS OF DR COWAN'S PROPOSED SAMPLING PROTOCOL ..........................7

     A.    Definition of the Key Question...................................................................7

     B.    Dr. Cowan's Margin of Error.....................................................................8

     C.    Definition of the Population......................................................................11

     D.    Method of Drawing the Sample ................................................................16

          1.    Representativeness Tests ................................................................ 16

          2.    Stratification.................................................................................... 18

          3.    Final Samples.................................................................................. 20

VI.   ANALYSIS OF DR. COWAN'S PROPOSED EXTRAPOLATION METHOD...............21

CONFIDENTIAL

## I.     QUALIFICATIONS

1.      I am the George Eastman Professor of Management at the Sloan School of Management, Massachusetts Institute of Technology (MIT).  I hold a BA in Physics from Columbia University and a Ph.D. in Mathematics from MIT.  My research specialty is applied statistical analysis.  I have taught Probability and Statistics at MIT for over thirty-five years, and have also taught Biostatistics in the Harvard/MIT Clinical Investigators Training Program for nearly two decades.  A web course has been created based on my Biostatistics course, and I am now writing a Probability and Statistics textbook under contract with John Wiley and Sons.  My curriculum vitae is attached hereto as Appendix A.

2.      I have provided expert reports and testimony on numerous occasions in matters involving statistical sampling and analysis.  A list of cases in which I have testified either at deposition or at trial in the last four years is contained in Appendix A.  A list of materials that I relied upon in this Declaration is set forth in Appendix B.

## II.    CASE BACKGROUND

3.      Massachusetts Mutual Life Insurance Company ("MassMutual") has brought ten actions against Banc of America Securities LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Goldman, Sachs & Co., HSBC Securities (USA) Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., RBS Securities Inc., UBS Securities LLC and WaMu Capital Corporation (collectively, the "Corporate Defendants"), as well as certain individual defendants (together with the Corporate Defendants, the "Defendants") related to alleged purchases of residential mortgage-backed securities ("RMBS") (collectively, the "MassMutual Actions" or "Actions").  More specifically,

CONFIDENTIAL

MassMutual, the Plaintiff in these Actions, alleges that it purchased certificates from 94 securitizations underwritten by the Corporate Defendants.[1]  The at-issue certificates in these 94 securitizations are supported by loan groups backed by over 300,000 loans originated by hundreds of different originators.  MassMutual further alleges that the prospectuses and prospectus supplements contained false and misleading statements and omissions regarding (i) adherence to the underwriting guidelines applicable to the mortgage loans underlying each securitization; (ii) the appraisal standards applicable to the mortgaged properties; and (iii) the resulting loan-to-value ("LTV") ratios for the mortgaged properties.[2]

      4.      Plaintiff's statistical expert in these Actions, Dr. Charles D. Cowan, submitted an expert report on April 12, 2013 in which he proposed a sampling methodology that MassMutual intends to use to draw conclusions about the alleged false and misleading statements and omissions in the prospectuses and prospectus supplements for all 94 securitizations.  As part of that methodology, Dr. Cowan selected a total of 99 loan samples for the 94 securitizations at issue in these Actions.  The 99 samples each consist of an initial sample of 100 loans for the supporting loan groups ("SLGs") from each class of certificate in the 94 securitizations (the "Populations") that MassMutual purchased.[3]  Dr. Cowan then proposed and selected an

---

[1]    I understand that MassMutual has also brought a related action against Residential Funding Securities LLC, *Massachusetts Mutual Life Insurance Company v. Residential Funding Co., LLC, et al.* (Civil Action No. 3:11-cv-30035-MAP), but that this case is currently stayed and that Dr. Cowan did not draw any samples from the loans underlying the securitizations at issue in that case.

[2]    For example, see *Massachusetts Mutual Life Insurance Company v. DB Structured Products, Inc., et al.*, First Amended Complaint, United States District Court, District of Massachusetts, Civil Action No. 3:11-30039-MAP, May 17, 2012 (Dkt. No. 68), ¶¶ 3-6.

[3]    *Massachusetts Mutual Life Insurance Company v. DB Structured Products, Inc., et al.*, Expert Report of Charles D. Cowan, Ph.D. Regarding the Selection of Statistically Valid Random Samples of Mortgage Loans for Ten Massachusetts Mutual Life Insurance Company Actions (the "Cowan Report"), United States District Court, District of Massachusetts, April 12, 2013, ¶ 4.

CONFIDENTIAL

additional 100 loans from the SLGs from each class of certificate, asserting that "[b]ecause of the possibility that MassMutual will not be able to obtain certain loan files … if any loan files are missing, substitutes will be available from [this] second set of 100 loans."[4]  He reports that he selected each sample of loans randomly and stratified each of the samples by credit score (*i.e.*, FICO score).[5]  He further states that "[t]he sample of 100 loans is sufficiently large to draw conclusions about the Populations and specifically to make a scientifically valid estimate of the number of loans in each Population about which Defendants made untrue statements or omissions in the Offering Materials for the Securitizations."[6]  In particular, Dr. Cowan asserts each sample will achieve a 95 percent confidence interval with a maximum margin of error of ±10 percentage points.[7]

    5.    Dr. Cowan does not specifically say how he intends to extrapolate the results of a reunderwriting process—the details of which I am informed have yet to be established—from these 99 loan samples to the larger populations of loans for the SLGs, aside from providing an example methodology he claims is for "expository purposes only."[8]  He states that "[t]here are several statistically valid methods of extrapolating the results of the re-underwriting conducted on the samples to the populations of loans.  The actual method to be used depends on the availability of data and the relationships between the variables in the sample."[9]

---

[4]    Cowan Report, ¶ 4.

[5]    Cowan Report, ¶ 5.

[6]    Cowan Report, ¶ 5.

[7]    Cowan Report, ¶ 5.

[8]    Cowan Report, ¶ 68.

[9]    Cowan Report, ¶ 67.

## III.    ASSIGNMENT

6.      Defendants' Counsel have asked me to review and respond to the Cowan Report and his May 21, 2013 deposition testimony in these Actions, including Dr. Cowan's comments regarding extrapolation.[10]

7.      In working on this assignment, I have relied upon the additional documents and data listed in Appendix B.  Others working under my supervision and direction have assisted me with this assignment, and I receive compensation in part based on their fees.  I am being compensated by Defendants for this assignment at a rate of $700 per hour.  My compensation is not contingent upon the outcome of these Actions or my opinions expressed herein.

8.      Because this Declaration reviews and responds to a report that provides only a portion of the opinions that Dr. Cowan intends to offer at trial, this Declaration is not intended to be, and should not be, treated as a final expert report.[11]  I reserve the right to modify, amend, or supplement my analysis as additional information becomes available.

## IV.    SUMMARY OF CONCLUSIONS

9.      My conclusions can be summarized as follows:

- Dr. Cowan's sampling proposal raises many concerns, and is difficult to evaluate at this stage of the Actions.  Any definitive conclusions about his sampling proposal must await his application of the sampling results to the loans underlying the securitizations at issue in these Actions.

---

[10]   *Massachusetts Mutual Life Insurance Company v. DB Structured Products, Inc., et al.,* Deposition of Charles D. Cowan, Ph.D. ("Cowan Deposition"), United States District Court, District of Massachusetts, May 21, 2013.

[11]   ██████████████████████████████████████████████████████████████████

CONFIDENTIAL

- Dr. Cowan's sampling proposal meets his accuracy standard of ±10 percentage points with a 95 percent confidence interval only under restricted conditions. It applies only to a "yes/no" binary question for the entire set of loans in the SLGs, but Dr. Cowan has failed to establish that all relevant questions about the breach rates of the loans are binary. Dr. Cowan cannot demonstrate that his samples would meet his own accuracy standard for questions about continuous variables or about discrete variables with more than two outcomes.

- In suggesting his samples of 100 loans will meet the ±10 percentage point proposed accuracy standard laid out in his Report, Dr. Cowan also assumes that no question in these Actions will pertain to a specific originator. However, certain allegations brought by MassMutual indicate otherwise, and I understand that the offering documents contained originator-specific disclosures. Should an estimate of the "breach" rate be required for specific originators, the margins of error in Dr. Cowan's sampling proposal could reach ±30 percentage points, rendering the estimates all but meaningless.

- In any case, the ±10 percentage point accuracy standard Dr. Cowan adopts for his sampling exercise in these Actions is far weaker than the one used in many common applications of statistical sampling, and considerably weaker than the standard of ±5 percentage points that he himself has advanced in other litigations concerning RMBS.

- Dr. Cowan's description of how he evaluated the representativeness of his samples is inadequate and in some respects incorrect. He also does not explain why he performed these representativeness tests on some variables but not others.

- Dr. Cowan suggests that stratifying the loan sample by the FICO scores of borrowers might reduce the sampling error by an appreciable amount. He further suggests that stratifying the data by other variables would yield negligible benefits, despite the fact that he has utilized the combined loan-to-value ratio ("CLTV") in prior RMBS cases. However, Dr. Cowan offers no evidence for either of these suggestions. The support he provides for these conclusions is a general chart from a Statistics textbook, which bears no relationship to FICO score, breach rates, or any other variable in these Actions.

- Dr. Cowan's decision to group borrowers with purportedly missing FICO scores together with low-FICO score borrowers creates a stratum that has the unusual

quality of being comprised of both low and these missing FICO scores, when other strata contain only known scores.  This deficiency undermines the potential gain that Dr. Cowan envisions based on stratifying by FICO score.  It is surprising that Dr. Cowan did not search more completely for the missing FICO scores using third-party data, which could largely have eliminated the anomalous nature of this lower stratum.

- The procedure that Dr. Cowan describes for replacing missing loan files from his original sample allows for biased findings even if the original sample of loans and their potential replacements are randomly selected.  Until we know the characteristics of the loan files that are missing, it is questionable whether Dr. Cowan's method of replacing missing loans in his samples would maintain the samples' claimed representativeness.

- Dr. Cowan is unclear about how he would extrapolate findings from his samples to broader populations of loans.  He suggests that he might go beyond the usual extrapolation formulas associated with stratified sampling to obtain more accurate results, but he does not commit to how he would do so.  Perhaps Dr. Cowan is suggesting that some pattern in the observed data could make it possible to improve his extrapolation, but he effectively dismisses this eventuality by suggesting that variables beyond FICO score would only marginally improve on his stratification.

10.    Given my conclusions, I have serious doubts about whether Dr. Cowan's sampling proposal would generate useful information for a trier of fact.  I further believe that Dr. Cowan's sampling proposal cannot be properly evaluated without observing its application to the securitizations at issue in these Actions.  I expand below on each of my conclusions.

CONFIDENTIAL

## V.     ANALYSIS OF DR COWAN'S PROPOSED SAMPLING PROTOCOL

### A.     Definition of the Key Question

11.     For purposes of his proposal, Dr. Cowan has assumed that each loan in his proposed samples will receive a single "yes/no" classification on each of the breach-related questions/topics.[12]  Under his proposal, Dr. Cowan plans to estimate the percentages of loans that are in breach, and proposes an accuracy standard for his results that is itself expressed in percentage points.  Dr. Cowan, however, has not explained why he believes each proposed question is binary, let alone established that each question is binary.  Indeed, he testified during his deposition that the questions may not be binary.[13]  For example, a hypothetical LTV ratio that is understated by one percentage point may have different implications than does an LTV that is understated by 10 percentage points.  A "yes/no" question about whether the LTV was understated is ill-equipped to handle these and other differences.

12.     More specifically, as agreed upon by Dr. Cowan at his deposition, for questions that do not receive a binary "yes/no" classification, it may not be possible to determine a maximum margin of error in advance (as is the case for "yes/no" questions).[14]  For a continuous variable like the weighted average LTV ratio, the formula for the margin of error depends on the

---

[12]   Cowan Report, ¶ 37, stating "[w]hen a sample is used to test a binary question (here, whether a loan was originated outside of the guidelines, whether the mortgaged property was appraised outside of applicable appraisal standards, or whether the LTV of the loan or the owner occupancy status of the underlying property was misrepresented), the estimate of the margin of error depends on the sample value."

[13]   ████████████████████████████████████████████████████████████████████████

[14]   ████████████████████████████████████████████████████████████████████████

CONFIDENTIAL

observed variability of LTV ratios within the sample size of 100.  There is no maximum margin

of error for this variability that can be derived in advance on theoretical grounds.  While the

margin of error for the question, "what percentage of collateral loans have an LTV of greater

than 90%," might have a theoretical maximum of ±10 percentage points under Dr. Cowan's

sampling proposal, the same cannot be said for a question such as, "what is the weighted average

LTV of collateral loans?"  Yet, I understand that both of these questions could be relevant from

the various allegations contained in the MassMutual complaints.[15]

### B.    Dr. Cowan's Margin of Error

13.    Dr. Cowan sets as an accuracy standard of a margin of error of no more than ±10

percentage points for extrapolating the breach rate in the samples to the full populations of loans

at issue.[16]  For example, if the observed breach rate is 50 percent, there is essentially a 95 percent

chance that the actual breach rate for that population is between 40 percent and 60 percent.  (In

statistical parlance, Dr. Cowan seeks to assure that the midpoint of the 95 percent confidence

interval is no more than 10 percentage points from the edges.)

14.    While I agree that 95 percent confidence intervals are routinely used in statistics, I

take no position as to whether such confidence intervals are legally sufficient for a particular

purpose.

15.    I note, however, that a margin of error of ±10 percentage points is by no means

standard in statistical sampling.  Perhaps the most widely-known application of statistical

---

[15]  See, for example, *Massachusetts Mutual Life Insurance Company v. DLJ Mortgage Capital, Inc., et al.*, First
Amended Complaint, United States District Court, District of Massachusetts, Civil Action No. 3:11-30047-
MAP, filed May 17, 2012 (Dkt. No. 62), ¶ 113.

[16]  Cowan Report, ¶ 5.

CONFIDENTIAL

sampling is political polling, and in that domain a ±3 percentage point margin of error is frequently used.  Indeed, if a poll announced that candidate A led candidate B by 56 percent to 44 percent, but that it had a margin of error of ±10 percentage points, the pollster would be criticized for offering such an imprecise result.  (With that margin of error, the confidence interval allows for the possibility that candidate B is actually leading candidate A by 54 percent to 46 percent.)  In the course of its own business, MassMutual sponsors surveys and studies that have a much smaller margin of error than that proposed by Dr. Cowan.  As an example, a 2011 study of business owner perspectives commissioned by MassMutual had a margin of error ±3.3 percentage points.[17]  Similarly, a 2013 MassMutual research project on the financial needs of sibling caregivers had a margin of error of ±2.6 or ±5.2 percentage points depending on the group being examined.[18]

16.    Dr. Cowan declares that a ±10 percentage point margin of error is sufficiently precise, and that sampling beyond 100 loans would yield "diminishing returns."[19]  He does not mention in his Report that he had previously proposed a ±5 percentage point margin of error in the *MBIA v. Countrywide*, *et al* litigation, in the *In re Washington Mutual Mortgage-Backed Securities Litigation*, and, as recently as December 2012, in *FHLB Chicago v. Banc of America Securities LLC et al.*, and for that reason suggested sample sizes of 400 loans per

---

[17]   MassMutual Financial Group, "MassMutual Business Owner Perspectives Study:  2011 Insights in an Uncertain Economy," 2011, p. 9.  The survey was conducted by GfK Custom Research North America.

[18]   MassMutual Financial Group, "Sibling Caregivers Meet Unexpected Challenges," February 21, 2013, p. 2.

[19]   Cowan Report, ¶ 31.

securitization.[20]  Dr. Cowan does not distinguish the accuracy requirements in the present

context from those in the three matters mentioned above, so it is striking that he now proposes a

sample only one-fourth of the size of the samples he insisted earlier were appropriate.  Although

Dr. Cowan asserted in his Report that he chose the ±10 percentage point standard to achieve

"the right balance," between accuracy and practicality he indicated during his deposition that

the choice was actually made by others.[21]

17.     In any case, a ±10 percentage point margin of error is larger than it might at first

seem for purposes of evaluating breach rates.  It is not the same as 10 percent uncertainty in the

estimated quantity.  For example, if a person brings her car to the repair shop and is told that the

bill will be $1000 plus or minus 10 percent, she understands that the bill will be somewhere

between $900 and $1100 (*i.e.*, the margin of error is 10 percent of the estimated $1000).  But if

an estimated breach rate is 40 percent and its margin of error is 10 percentage points, then the

95 percent range for the breach rate extends from approximately 30 percent to 50 percent.  In

other words, the margin of error is not 10 percent of the estimated 40 percent, but instead 25

percent of it (*i.e.*, 10/40).  Although Dr. Cowan uses the term *percent* in his Report, Dr. Cowan

---

[20]   *MBIA Insurance Corporation v. Countrywide Home Loans, Inc., et al.*, Affidavit of Dr. Charles D. Cowan in Further Support of Plaintiff's Motion *in Limine* Regarding Sampling, Supreme Court of the State of New York, County of New York, No. 08/602825, July 26, 2010, ¶ 84; *In re Washington Mutual Mortgage Backed Securities Litigation*, Daubert Motion Declaration of Charles D. Cowan, Ph.D., United States District Court, Western District of Washington, No. C09-37 (MJP) (W.D. Wash.), Docket No. 425; *FHLB Chicago v. Banc of America Securities LLC et al.*, Expert Declaration Of Charles D. Cowan In Support Of Plaintiff's Motion For Approval Of Sample Design, Superior Court of Washington, No. 10-2-36526-5, December 7, 2012, ¶ 4.

[21]   ████████████████████████████████████████████████████████████████

acknowledged at his deposition the important distinction between a *percent* margin of error and *percentage point* margin of error.[22]

18.      With a sample size of 100 loans drawn randomly from a large population and a breach result of 30 percent, the margin of error extends ±9.2 *percentage points* in each direction around 30 percent, from a low of 20.8 percent to a high of 39.2 percent.  To put it another way, the top of the range of plausible values for the statistic of interest is nearly twice as high as the bottom (39.2 vs. 20.8).  Such factor-of-two uncertainty in a key statistic could be troubling to the trier of fact.  Dr. Cowan does not explain why this level of uncertainty is irrelevant: if his position is that it does not matter whether the breach rate is 21 percent or 39 percent, he should say so explicitly.

### C.      Definition of the Population

19.      Consistent with his ±10 percentage point accuracy standard, Dr. Cowan identified 99 samples of 100 loans that he asserts were drawn from the SLGs underlying the 94 securitizations at issue.[23]  He has not drawn separate samples by originator in SLGs that contain loans originated by more than one originator.  Indeed, many SLGs contain loans made by multiple originators, with some containing loans originated by as many as over 100 originators.[24] Because Dr. Cowan has not drawn separate samples by originator for SLGs with more than one

---

[22] ██████████████████████████████████████████████

[23]   Cowan Report, ¶ 4.

[24]   For example, securitization ACE 2007-ASAP1 (MMDB_0000001.xlsx).

CONFIDENTIAL

originator, any statements about the breach rate *by originator* for SLGs with multiple originators will be based on samples containing fewer than 100 loans.

20.     I am informed that MassMutual's claims are asserted against Defendants based on alleged misstatements and omissions in the offering documents for each of the specific certificates that MassMutual purchased.  MassMutual's claims arise in part from alleged misstatements and omissions in the offering documents relating to compliance with the underwriting guidelines of the originators of the loans underlying each SLG.

21.     Because the underwriting guidelines varied by originator and the offering documents' disclosures about originators' compliance with underwriting guidelines often varied by originator, I am informed that MassMutual's claims must be proven against Defendants for each certificate.  And for each certificate, it could be necessary for Dr. Cowan's proposed sample to estimate the breach rate for all originators that originated loans underlying the certificate, based on different underwriting guidelines and different disclosures in the offering documents. Perhaps Dr. Cowan is assuming that the breach rate is the same for all originators, so the "one size fits all" rate he estimated can be applied to all of them.  Yet one might expect that there would be substantial heterogeneity because different originators have different employees, different underwriting practices, and different underwriting guidelines.  These divergences could be reflected in the different disclosures in the offering documents.

22.     As an example of this heterogeneity, consider MassMutual's complaint in the *MassMutual v. DLJ Mortgage Capital Inc., et al.* action, which distinguishes between loans originated by Countrywide and those originated by other originators in relation to the ARMT 2006-1 securitization.  Referring to all originators generally, the complaint claims that "[t]he Prospectus Supplement also promised investors that only borrowers who could repay loans had

received them."[25]  In the next paragraphs, the complaint continues that "[t]he Prospectus

Supplement also assured investors that Countrywide, which originated many of the underlying

loans, issued loans to borrowers who had a confirmed ability to repay," that Countrywide

"obtained a credit report for all borrowers," and that "a borrower's debt-to-income ratio under

Countrywide's underwriting standards did not exceed a certain limit."[26]  Thus, the complaint

distinguishes between loans originated by other originators and by Countrywide, a distinction

that Dr. Cowan apparently assumes, but fails to establish, is not relevant to these Actions.[27]

23.      Counsel for Defendants have provided me with prospectus supplements for

certain securitizations at issue in these Actions.  Based on my reading of those prospectus

supplements, there were instances where separate sets of underwriting standards were used when

different originators originated loans for the same securitization.  For example, the Prospectus

Supplement for the SAMI 2007-AR1 securitization lists three originators that originated more

than 10 percent of all mortgages (*i.e.*, Southstar Funding LLC, Countrywide Home Loans, Inc.,

and ACT Mortgage Capital).[28]  In addition to listing more general underwriting guidelines,

separate underwriting guidelines are listed in the prospectus supplement for those three

---

[25]   *Massachusetts Mutual Life Insurance Company v. DLJ Mortgage Capital, Inc., et al.*, First Amended
       Complaint, United States District Court, District of Massachusetts, Civil Action No. 3:11-30047-MAP, filed
       May 17, 2012 (Dkt. No. 62), ¶ 43.

[26]   *Massachusetts Mutual Life Insurance Company v. DLJ Mortgage Capital, Inc., et al.*, First Amended
       Complaint, United States District Court, District of Massachusetts, Civil Action No. 3:11-30047-MAP, filed
       May 17, 2012 (Dkt. No. 62), ¶¶ 44-46.

[27]   This assumption is evidenced by the fact that Dr. Cowan did not examine what the margins of error would be
       for his samples if segmented by originator. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[28]   Prospectus Supplement for SAMI 2007-AR1, p. S50.

13

CONFIDENTIAL

originators.[29]  Numerous other prospectus supplements describe different underwriting guidelines from different originators.[30]  Furthermore, the prospectus supplements provided to me contain other types of disclosures that differentiate among the underwriting guidelines of specific originators, including representations that certain originators would originate loans that generally met Fannie Mae's or Freddie Mac's underwriting guidelines, while others originated loans that I understand would typically *not* meet those same standards.[31]  Dr. Cowan's methodology does not account for these differences.

24.     Whether breach rates should be estimated at the originator level is a legal rather than a statistical matter.  But to the extent that breach rates by originator within loan groups are important in these Actions, the sampling scheme that Dr. Cowan proposes will almost certainly yield breach-rate calculations based on samples smaller than 100 loans for many of the certificates at issue.  That circumstance is important because Dr. Cowan sets an accuracy standard that may not be satisfied with sample sizes below 100.[32]

---

[29]  Prospectus Supplement for SAMI 2007-AR1, pp. S50-S61.

[30]  For example, see Prospectus Supplement for BAFC 2006-H, p. S53 (describing the underwriting guidelines of originators Bank of America, Opteum, and Wells Fargo Bank); Prospectus Supplement for BALTA 2006-6, p. S8 (describing the underwriting guidelines of originators Countrywide and EMC); Prospectus Supplement for ACE 2007-SL1, pp. S47-S59 (describing the underwriting guidelines of originators American Home Mortgage and Residential Funding Company, LLC); Prospectus Supplement for JPMMT 2005-ALT1, pp. S27-S32 (describing the underwriting guidelines of originators PHH and Greenpoint); Prospectus Supplement for CSMC 2007-1, pp. S33-S39 (describing the underwriting guidelines of DLJ Mortgage Capital, IndyMac Bank and Countrywide).

[31]  For example, see Prospectus Supplement for ACE 2007-SL1, pp. S50-S51 (for American Home, noting that "Non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac"), while other originators within the same offering would not, id. p. S56, (for Residential Funding Company, LLC, making no reference to Fannie Mae and Freddie Mac and noting that "[t]he underwriting standards described in the client guide with respect to mortgage loans originated under the home equity program may be varied in appropriate cases.  There can be no assurance that every mortgage loan was originated in conformity with the applicable underwriting standards in all material respects…").

[32]  Cowan Report, ¶ 5.

25.     Multiple originators are pervasive among the SLGs underlying the certificates purchased by MassMutual.  For example, among the eleven securitizations at issue in the *Massachusetts Mutual Life Insurance Company v. DB Structured Products, Inc., et al.* Action, seven are backed by multiple named originators.[33]  As another example, two of the four securitizations at issue in the *Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation, Inc., et al.* Action are backed by multiple named originators.[34]

26.     In Exhibit 1, I report the margins of error for a few loan group-originator combinations from five of the securitizations at issue in the Actions, using a 95 percent confidence level and an estimated breach rate of either 50 percent (the breach rate at which the margin of error is maximized) or 25 percent.  Except when there are very few loans in a sample arising from a particular originator, I calculate the margins of error using a standard approximation (also shown in the notes for Exhibit 1), $e = Z * \sqrt{\frac{P(1-P)}{n-1} * (1 - \frac{n}{N})}$ , which accounts for the finite size of each loan group-originator population from which the samples are drawn.[35]  (In instances where the loan group-originator sample size is small (fewer than 15 loans), I instead use the exact binomial distribution to calculate the margin of error, again adjusted to account for the finite size of each loan group-originator population.)

---

[33]   Prospectus Supplements for DBALT 2006-AF1, DBALT 2006-AR2, DBALT 2006-AR3, DBALT 2006-AR5, DBALT 2006-AR6, ACE 2006-ASAP4, ACE 2007-SL1, ACE 2007-ASAP1, ACE 2007-HE3, ACE 2007-WM2, and ACE 2007-HE4.

[34]   Prospectus Supplements for BAFC 2006-H, MLMI 2006-FF1, MLMI 2006-OPT1, and MLMI 2007-HE1.

[35]   In the formula, e is the margin of error, Z is the Z-score for a given confidence level, P is the breach rate of loans, n is the sample size, and N is the population size.

27.     As Exhibit 1 shows, the margins of error when considering loan group-originator specific samples are often substantially higher than the ±10 percentage point margin now advocated by Dr. Cowan.  For example, the margin of error for Dr. Cowan's sample of loans from the relevant loan group underlying the ACE 2007-SL1 securitization that were originated by American Home Mortgage Corp. is ±19 percentage points, assuming an estimated breach rate of 50 percent.[36]  Similarly, the margin of error for Dr. Cowan's sample of loans from the relevant loan group underlying the SAMI 2007-AR1 securitization that were originated by Opteum Financial Services, LLC is ±23 percentage points, assuming an estimated breach rate of 50 percent, and ±20 percentage points, assuming an estimated breach rate of 25 percent.[37]  Thus, the 95 percent confidence interval for the population estimate extends from about 5 percent to 45 percent.  In that instance, we would be dealing with about a factor-of-nine uncertainty.  The simple reason for these large margins is that far fewer than 100 loans were sampled for the associated loan group-originator combinations.  The upshot of Exhibit 1 is that, if the relevant populations are loan group-originator combinations as opposed to loans groups, the margin of error for the estimated breach rates for each population could reach ±30 percentage points, rendering such estimates all but meaningless.

**D.     Method of Drawing the Sample**

**1.     Representativeness Tests**

---

[36]     See Exhibit 1.

[37]     See Exhibit 1.

28.     To establish the representativeness of his samples, Dr. Cowan presents the results

of representativeness tests for 11 variables for each sample.[38]  For continuous variables, Dr.

Cowan purportedly "compared the mean of the sample distribution to the mean of the Population

distribution using a z-test," and for categorical variables, Dr. Cowan purportedly "compared the

distribution of the categories in the sample to the distribution of the categories in the Population

using a Chi-square test."[39]  I am unable to replicate these tests and confirm the representativeness

of the samples using Dr. Cowan's described methodology, and only made progress when I

recognized that it was incorrect to say that z-tests were performed.[40]

29.     Furthermore, Dr. Cowan has not provided justification for the variables included

in his representativeness tests or evidence that he has tested all relevant variables for a

determination regarding potential bias in the samples.  Dr. Cowan simply states that he "tested

each sample … against the Population on eleven key variables (when available) from the loan

tapes…"[41]  For example, Dr. Cowan has not reported tests of the representativeness of the

samples with respect to geographic location of the collateral properties for the mortgage loans.

Nor has he explained why he did not consider this variable.  I understand that geographic

---

[38]   Cowan Report, Appendix 1.

[39]   Cowan Report, ¶ 64.

[40]   I am unable to replicate Dr. Cowan's tests because Dr. Cowan's description was incorrect with respect to the
continuous variable tests and inadequate with respect to those tests for the categorical variables.  Upon
reviewing Dr. Cowan's backup computer programs, it became apparent that the inability to replicate his
continuous variable test results arose from a mistake Dr. Cowan has made reporting the kinds of tests that were
run on these variables.  This is because the tests contained in Appendix 1 of the Cowan Report are actually
derived from t-tests, not z-tests as is stated in the Cowan Report but which is clearly contradicted by the backup
materials (for example, see MM_SMPL_048-0000045 HIGHLY CONFIDENTIAL.sps).  For the categorical
variables, Dr. Cowan does not describe any combination of categories that may be necessary to carry out the
tests, although his backup clearly indicates he did this (for example, see MM_SMPL_048-0000001 HIGHLY
CONFIDENTIAL.docx).

[41]   Cowan Report, ¶ 64.

location may account for differential exposure to macroeconomic risks, such as changes in house prices and unemployment rates.[42]  Dr. Cowan has not explained why he selected to test certain variables but not others.

### 2.    Stratification

30.    Dr. Cowan does not propose the simple random sampling of loans.  Rather, he proposes to divide the loans into four strata based on their FICO scores.  He posits that such stratification will reduce sampling error compared to simple random sampling.  He acknowledges that his stratification might not actually improve precision, and it is true that his proportional stratification[43] would not reduce precision in the overall breach rate compared to simple random sampling.  Yet Dr. Cowan seems to imply with his Chart 3 that a 25 percent reduction in margin of error might arise from stratifying by FICO score alone (based on an example from a Statistics book that bears no relation to mortgage-backed securities).  The primary assumption of his chart seems to be that FICO score is correlated with the outcome, which in this case is the breach status of the loan.  Yet, Dr. Cowan offers no basis for that assumption, an assumption that cannot be verified, at the earliest, until the sample is re-underwritten.  Dr. Cowan admitted as much during his deposition.[44]  Dr. Cowan has failed to

---

[42]   *Federal Housing Finance Agency, et al. v. UBS Americas, Inc., et al.*, Declaration of Christopher M. James, Ph.D., United States District Court, Southern District of New York, No. 11 Civ. 5201 (DLC), June 6, 2012, ¶ 10.

[43]   Cowan Report, ¶¶ 59-60.

[44]   ████████████████████████████████████████████████████████

offer any evidence that FICO scores are correlated with breach and thus that stratifying by FICO would lower the margins of error for his samples.[45]

31.    It is noteworthy that the re-underwriting findings within individual strata could be subject to far larger margins of errors than findings for the full sample.  For example, if there are four strata each of size 25, the margin of error within each stratum could well reach ±20 percentage points.  Therefore, if there is any interest in whether the breach rate varied with FICO score, the small samples in each FICO score range could render cross-range comparisons uninformative.

32.    Dr. Cowan further uses Chart 3 to suggest that stratifying the loans on any basis beyond FICO scores yields at most a minimal gain in sampling accuracy.  Again, the chart bears no relation to the present context, and it offers no useful insight about whether other stratification variables might be helpful.  For example, if the first variable used for stratification does not improve precision, then the second one used could well have a larger benefit.  Indeed, in other cases involving RMBS, Dr. Cowan has thought it prudent to stratify by two variables: FICO score *and* CLTV.[46]  Has he now determined that the second variable is not useful for stratification?

33.    Furthermore, FICO scores for a number of loans in the proposed samples appear to have been missing.  Dr. Cowan dealt with this issue by assigning such loans to the lowest quartile of FICO scores.  As a result, his lowest quartile is a hybrid mix of low scores and other

---

[45]   For a discussion on the size of the margins of errors dictated by Dr. Cowan's samples relative to other uses of statistical sampling and relative to Dr. Cowan's own past work, see paragraph 16.

[46]   *MBIA Insurance Corporation v. Countrywide Home Loans, Inc., et al.*, Affidavit of Dr. Charles D. Cowan in Further Support of Plaintiff's Motion *in Limine* Regarding Sampling, Supreme Court of the State of New York, County of New York, No. 08/602825, July 26, 2010, ¶ 70.

CONFIDENTIAL

purportedly unknown scores that might be spread over the FICO spectrum.  Stratification may be effective in reducing the margin of error when similar objects are put together, in this case loans with similar FICO scores.  But the heterogeneity introduced by lumping loans with missing FICO scores with loans with low FICO scores works against the rationale for dividing the loans by FICO scores in the first place.

34.     More importantly, Dr. Cowan could have avoided this undesirable heterogeneity had he supplemented the loan tapes that are missing FICO scores with data provided by third parties.  Had Dr. Cowan done this more completely, he would see that any assumption that missing FICO scores belong in the lowest quartile is often incorrect.  For example, consider the case of the BALTA 2006-7 securitization, which includes 23 loans with missing FICO scores.  Using third-party data, I was able to determine the FICO score for all 23 of these loans.  I found that 22 of these 23 loans did not belong in the first quartile.  In fact, 21 of the 23 loans actually belong in the third quartile and one in the fourth.[47]  Given the importance of FICO score to his sampling proposal, it is unclear why Dr. Cowan did not take the necessary steps to confirm that the FICO scores in question were actually missing before indiscriminately assigning them to the lowest quartile.  Having a stratum that is a potpourri of FICO scores from different ranges potentially undermines the gain he seeks through stratification by FICO score.

### 3.     Final Samples

35.     Dr. Cowan accompanies his initial samples of 100 loans with what he describes as "backup" samples of 100 loans to be used in the event he needs to replace loans from his "initial"

---

[47]   This assumes Dr. Cowan's quartiles are correctly defined.  The 21 loans that should be included in the third quartile have FICO scores of 705, 707, 708, 709 (10 loans), 711 (3), 712(2), 713, 715, and 719.  The loan that belongs in the fourth quartile has a FICO score of 742.  (See ABSNet Loan data as of April 2013).

CONFIDENTIAL

sample that are missing loan files.[48]  In other words, he will replace a missing loan file from his

initial sample with another file selected from the same FICO quartile from his backup sample.

This procedure could threaten the representativeness of Dr. Cowan's final sample.  For example,

suppose that loans from Nevada are unusually common among the missing loan files.  Replacing

the absent Nevada files with other files randomly selected might effectively substitute California

or Florida files for the missing Nevada files.  The final sample might then suffer from a

geographic bias even though both the initial sample and the backup sample were randomly

drawn.  Similarly, if there are few complete loan files from a given originator, the loans that

replace those initially sampled from that originator will likely come from other originators.

36.     Dr. Cowan's discussion of backup samples does not address these potential issues

with the loans, whether taken from the initial or backup samples.  While Dr. Cowan has set forth

a proposal for the substitution of loan files when they are unavailable from his "initial" samples,

his proposed methodology does not take into account the specific characteristics of the missing

loan files.  Until we obtain information regarding which loan files are missing and their

corresponding characteristics, it is impossible to know if Dr. Cowan's final samples will be

representative of the populations based on the description offered in his Report.

## VI.     ANALYSIS OF DR. COWAN'S PROPOSED EXTRAPOLATION METHOD

37.     Beyond the issues discussed above regarding Dr. Cowan's sample size and

sample selection, Dr. Cowan has not provided clear information regarding the methodology he

would use for extrapolation, despite admitting at his deposition that extrapolation is an integral

---

[48]    Cowan Report, ¶ 30.

CONFIDENTIAL

part of a sampling proposal.[49]  Dr. Cowan states in his Report that "[t]here are several statistically valid methods of extrapolating the results of the reunderwriting conducted on the samples to the populations of loans [and] the method that will ultimately be selected will be the one that minimizes the margin of error."[50]

38.     However, Dr. Cowan does not explain what he means by that vague statement. Dr. Cowan proposes random sampling, stratified only by FICO score.  There are well-established formulas for extrapolating from the results of such a stratified sample to broader populations. These formulas cannot be manipulated to "minimize the margin of error."  Perhaps Dr. Cowan is suggesting that some striking pattern in the observed data could make it feasible to bypass the standard formulas.  Yet he effectively dismisses this possibility by suggesting that variables beyond FICO score will only marginally improve on his stratification.  In short, there is no plausible basis for assuming that he will somehow achieve margins of error that are smaller than those he presents in his Report.  And, as discussed here, there are many reasons to think that the actual margins of error arising from his sampling might substantially exceed those that he anticipates.

I declare under penalty of perjury that the foregoing is true and correct.

---

[49]     Cowan Report, ¶ 67.

[50]     Cowan Report, ¶¶ 67-68.

CONFIDENTIAL

Executed on May 24, 2013

_____Arnold Barnett_____

Arnold Barnett, Ph.D.