IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> DB STRUCTURED PRODUCTS, INC., et al., <br><br><br> Defendants. | Civil Action No. 3:11-30039-MAP-KPN |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> RBS FINANCIAL PRODUCTS INC. (F/K/A GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.), et al., <br><br><br> Defendants. | Civil Action No. 3:11-30044-MAP-KPN |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> DLJ MORTGAGE CAPITAL, INC., et al., <br><br><br> Defendants. | Civil Action No. 3:11-30047-MAP-KPN |

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., et al.,<br><br><br>Defendants. | Civil Action No. 3:11-30048-MAP-KPN |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A., et al.,<br><br><br>Defendants. | Civil Action No. 3:11-30094-MAP-KPN |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>GOLDMAN SACHS MORTGAGE COMPANY, et al.,<br><br><br>Defendants. | Civil Action No. 3:11-30126-MAP-KPN |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>IMPAC FUNDING CORPORATION, et al.,<br><br><br>Defendants. | Civil Action No. 3:11-30127-MAP-KPN |

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY,

                    Plaintiff,

                v.

HSBC BANK USA, NATIONAL ASSOCIATION,
et al.,

                   Defendants.

)  Civil Action No. 3:11-30141-MAP-KPN

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY,

                    Plaintiff,

                v.

COUNTRYWIDE FINANCIAL CORPORATION,
et al.,

                   Defendants.

)  Civil Action No. 3:11-30215-MAP-RBC

MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY,

                    Plaintiff,

                v.

MERRILL LYNCH, PIERCE, FENNER & SMITH
INC.; et al.

                   Defendants.

)  Civil Action No. 3:11-30285-MAP-RBC

## DECLARATION OF CHARLES D. COWAN, PH.D. IN RESPONSE TO DECLARATION OF ARNOLD BARNETT, PH.D.

### I.     Introduction

1.      I submit this declaration in support of Plaintiff Massachusetts Mutual Life Insurance Company's ("MassMutual") Opposition to Defendants' *Daubert* Motion to Exclude the Opinions Expressed in the April 12, 2013 Expert Report of Charles D. Cowan, Ph.D. (the "Cowan Report") and in response to the May 24, 2013 Declaration of Arnold Barnett in support of that motion (the "Barnett Declaration").

2.      Dr. Barnett makes a series of errors and misstatements in his Declaration, which I describe below.

### II.     The Underwriting Review Will Provide a Binary Result

3.      Dr. Barnett criticizes my assumption that the re-underwriting review will result in binary (e.g., yes or no) determinations about the loans.  Barnett Decl. ¶ 11.  First, I used this assumption to calculate the maximum margin of error associated with my sampling design, but my sampling design works for any type of extrapolation, regardless whether the results from the re-underwriting review are binary.  Further, the relevant inquiry is indeed binary:  it is whether the representations Defendants made about the mortgage loans were true.  Cowan Report ¶ 37. The result can only be binary:  yes or no.  Defendants raise "exceptions" to underwriting guidelines as a possible third category.  Defendants Memo. at 10-11.  But that is not a third category at all.  The only question is whether underwriting, taking into account any exceptions granted and their reasons, goes into the breach or non-breach category.

4.      During my deposition I agreed that there is a possible range of answers when determining compliance with appraisal standards.  For example, a loan could be found to have violated multiple aspects of the applicable appraisal standards.  However, as I also made clear

during my deposition, that does not mean that the ultimate question being addressed—did the appraisal of the loan comply with applicable appraisal standards—has a range of answers. *See* Cowan Tr. 80:24-81:13  Again, the only question is whether the disputed appraisal for a given loan goes into the breach or non-breach category.

5.    Dr. Barnett also argues that the question whether the true LTV ratio was understated is not properly answered with a yes or a no because different loans will have LTV ratios that are understated by a range of values.  Barnett Decl. ¶ 11.  Dr. Barnett's argument incorrectly assumes materiality standards cannot be used to make a yes/no determination.  The re-underwriter or factfinder can make a determination whether the difference is a material breach or not, guided for example by industry standards and the loan pricing guidelines used by the relevant originator.  Loan pricing guidelines show the loan prices for different LTVs and indicate what the originators themselves believed were significant differences between LTV that would lead to differential loan pricing.  Dr. Barnett admitted that if the re-underwriter or a factfinder determines that a certain level of understatement, for example 5 percentage points, is a material understatement, then the question of whether the LTV was materially understated is in fact a yes-or-no question.  Barnett Tr. 76:24-78:12.  This analysis applies similarly to whether a loan complied with the underwriting guidelines and appraisal standards.  The use of judgment by the re-underwriters in their review of whether certain underwriting or appraisal breaches for a loan are material, does not make the determination non-binary.

6.    Dr. Barnett raises the issue that for questions that do not receive a binary "yes/no" classification, it may not be possible to determine the maximum margin of error in advance of extrapolation, and he offers an example involving the weighted average LTV ratio.  Barnett Decl. ¶ 12 ("There is no maximum margin of error for this variability that can be derived in

2

advance on theoretical grounds."). Dr. Barnett's absolute statement is wrong. Dr. Barnett made

this same statement in his arguments in FHFA, and at that time I proved him wrong on this

statement. My proof is contained in Appendix A to this declaration. More importantly, because

the specific margin of error for a weighted average LTV value can be calculated after the results

of the re-underwriting review—a fact Dr. Barnett does not dispute—the trier-of-fact will be able

to decide what weight to put on this evidence.

### III.   A Maximum Margin of Error of Plus or Minus 10 Percentage Points Is More Than Adequate for The Intended Purpose

7.      Dr. Barnett states that a plus or minus 10 percentage points margin of error is "by

no means standard in statistical sampling." (Barnett Decl. ¶ 15) But there is no "standard"

margin of error in statistics, as Dr. Barnett agrees. Barnett Tr. 101:18-25. Nor is a 10 percentage

point margin of error unusual. To provide a couple of examples, the U.S. Government

Accountability Office studied management techniques and priorities at the Food and Drug

Administration by administering a questionnaire to a stratified random probability sample of

FDA managers that resulted in estimates with a margin of error of 10 percentage points. *See*

*2009 FDA Managers Survey on Performance and Management Issues (GAO-10-280SP,*

*February 2010), an E-supplement to GAO-10-279* (available at

http://www.gao.gov/special.pubs/gao-10-280sp/). In a study on methods used by researchers and

land managers to measure the effects of weed-attacking agents on vegetation, a sample size was

used that corresponded to a 10% error level at a 95% confidence level. Birdsall, et al., Image

Analysis of Leafy Spurge (*Euphorbia esula)* Cover, *Weed Science Society of America*, Vol. 11,

No. 4 (Oct. – Dec. 1997): p. 801. Dr. Barnett even testified during his deposition that there is

nothing wrong with relying on conclusions where margins of error are potentially large and hard

to quantify, as long as the methodology used is made clear. Barnett Tr. 87:22-88:13.

3

8.      Dr. Barnett claims that a +/- 3 percentage point margin of error is frequently used in political polling.  Barnett Decl. ¶ 15.  The margin of error used in a different context has nothing to do with whether the margin of error for my sampling design here is sufficiently precise for the purpose.  Also, Dr. Barnett fails to mention a variety of factors that distinguish polling studies from the sampling issues in this case.  First, most political polls in the U.S. are now conducted using the Internet and lists of persons who have agreed to be interviewed.  The marginal cost of collecting this information from this group of people who have already agreed to be interviewed is pennies—the cost of another e-mail to a respondent.  Second, nonresponse to the survey leads to no additional cost.  No effort is made to collect the information from those who do not respond, and a supplemental sample is used.  In the situation here involving reunderwriting of loans, the marginal cost of collecting and re-underwriting an additional loan is high.  As Dr. Barnett admitted at his deposition, he has no understanding of the costs or time associated with re-underwriting.  Barnett Tr. 14:16-16:22, 55:4-18, 64:15-67:2.  Finally, the hypothetical in his declaration about candidate A and candidate B has no relevance to how the factfinder will use estimates from the samples in this case.  In Dr. Barnett's hypothetical, a margin of error of 10 percentage points means you cannot tell which candidate is actually leading the race.  By contrast, when the margin of error here is at its maximum level of +/-10 percentage points, it means the confidence interval for the 50% breach rate is between 40% and 60%.  The lower bound of 40% is still a remarkably high breach rate.  In short, the comparison between a political poll or a business survey and the task in this litigation is a false contrast and serves to show that the correct inquiry is whether the margin of error is sufficiently precise for the purpose.

9.      Dr. Barnett also implies fault in my description of the sample size for this litigation because I do not mention a previously proposed plus or minus five percentage point margin of error.  Barnett Decl. ¶ 16.  In three other cases he cites, I did propose larger samples. These cases involved different plaintiffs, different circumstances, and many fewer trusts.  The largest of the three cases involved 15 trusts and a total of 6,000 loans to be reviewed.  In this case there are 94 trusts and 99 unique supporting loan groups, and my sample design proposes a review of 9,900 loans.  Had I chosen a sample size of 400 loans per deal, nearly 40,000 loans would have to be re-underwritten.  As it is, the number now is 4,000 more loans than were reviewed in *MBIA v. Countrywide*, the litigation involving 15 trusts.

10.     As noted in my deposition, I described to MassMutual and its outside counsel the associated sample sizes for a range of margin of errors from 5 to 10 percentage points, all of which were sufficiently precise for the purpose for which they were proposed.  I told MassMutual and its outside counsel that given additional consideration, such as constraints of time and cost and the legal standard of proof MassMutual must meet, MassMutual would have to consider which of these samples sizes—all of which were statistically valid and sufficiently precise for the purpose—was the most appropriate given these constraints.  The sample size selected, 100 loans per supporting loan group, is sufficiently precise for the purpose.  Dr. Barnett agreed that it is appropriate in choosing the margin of error to consider cost and time constraints. Barnett Tr. 91:6-92:4, 92:24-3.

11.     Finally, Dr. Barnett states that I do not explain why a hypothetical estimated breach rate of 30% with a maximum possible margin of error of +/- 9.2 percentage points is sufficiently precise.  Barnett Decl. ¶ 18.  I do not say anything in my report about every possible level of uncertainty for the simple reason that I have not been asked to address the question of

liability on the part of the Defendants.  The reason why the samples are sufficiently precise here is that if the trier-of-fact finds that the high breach rate of 21 percent proves material misstatements in the Offering Materials, then it hardly matters that the 39 percent breach rate is also indicative of material misstatements.  Although the ultimate determination of the level at which breach rates constitute material misstatements is a question of liability for the finder-of-fact, estimates establishing that there is only a 2.5% chance (as a result of the 95% confidence level) that the breach rate is below 21% (using Dr. Barnett's example) seem to be more than adequate.

## IV.    The Populations Are Correctly Defined as the Supporting Loan Group(s) for the Certificates

12.    Dr. Barnett states that, "for each certificate, it could be necessary for Dr. Cowan's proposed sample to estimate the breach rate for all originators that originated loans underlying the certificate, based on different underwriting guidelines and different disclosures in the offering documents."  Barnett Decl. ¶ 21.  Dr. Barnett offers no rationale for why this is true (he conceded in his deposition that this came from defendants or their counsel, Barnett Tr. 103:11-104:24; 107:18-109:17), and his statements are incorrect regarding the significance of different underwriting guidelines.  The re-underwriting of each loan is done with respect to the guidelines under which the loan was originally underwritten.  If there are different underwriting guidelines, the correct guidelines will be used in the re-underwriting process, regardless of originator, vintage of the loan, or type of loan or loan product used.  The breach rate will be computed based on whether the loan breaches the guidelines used for the original underwriting.  His assertion that I am assuming that the breach rate is the same for all originators ignores how the re-underwriting is actually conducted.

13.     As to the second part of Dr. Barnett's claim, I was informed by MassMutual that it will use the estimated breach rates for each Certificate to demonstrate that the Certificate did not comply with various representations in the relevant Offering Materials.  I was not instructed to design a sample to estimate the breach rate for each individual originator for a given Securitization; that is not the claim.

14.     Nevertheless, my sample design does allow for reliable estimates to be made on an originator-by-originator basis.  Dr. Barnett ignores that each MassMutual case involves multiple deals, many of which include loans originated by the same originators, which allows me to analyze loan performance across Certificates.  Dr. Barnett is incorrect in stating that the margin of error for conclusions about loans originated by American Home Mortgage Corp is +/-19 percentage points.  Barnett Decl.¶ 27.  American Home originated 144 loans included in the samples for the Certificates at issue in the *Deutsche Bank* action, and thus the maximum margin of error for conclusions made about loans originated by American Home is 8.2 percentage points.

15.     Furthermore, the conclusion to be drawn from Dr. Barnett's own examples is that the sample sizes are more than adequate to make estimates for each individual originator for a given securitization.  Dr. Barnett offers an example:

> [T]he margin of error for Dr. Cowan's sample of loans from the relevant loan group underlying the SAMI 2007-AR1 securitization that were originated by Opteum Financial Services, LLC is ±23 percentage points, assuming an estimated breach rate of 50 percent.[1]

Although not the question or the claim at issue, a 50 percent breach rate with a lower bound of 27 percent should be more than adequate for MassMutual's purposes of demonstrating that the breach rate is material.

---

[1]  Barnett Decl. ¶ 27

V.      **Tests of Representativeness**

16.      Although not raised by Defendants in their motion, Dr. Barnett claims he cannot replicate the results of my representativeness testing, yet acknowledges that I provided the computer programs and formulas I used and data on which the tests were run.  Barnett Decl. ¶ 28.  He should thus be able to re-create those tests exactly.

17.      Dr. Barnett wrongly claims I did not use the z-test on my samples.  Barnett Decl. ¶ 28.  Dr. Barnett relies on the label used in the computer program ("t-test") to tell him what the test is, rather than applying what he should know regarding the probability theory underlying the test.  In the derivation of hypothesis tests, a z-test would be the test between a sample mean and a known population total, and assumes that the variability in the population is known.  Thus there is a random value (the sample mean minus a known value) divided by another known value.  The only random value is in the numerator.

18.      The alternative test, the t-test, is the difference between two sample means (both random) divided by estimates of the variability in the population for the two samples being compared.  As the denominator is an estimate, it is also random.  In the t-test we have a random value divided by another random value.  The t-test is for situations where the true population values are not known.

19.      The test I ran in SPSS is called a t-test in the SPSS program.  This is because SPSS believes that I am comparing two independent samples of loans that together would also comprise a sample.  However, this clearly is not what is being done.  The test I ran considered two groups:  the sample of loans selected, and the remainder of the loans, those not selected.  Combined, these comprise the population.  I did this because it is easier to run the test in SPSS where I use the full population and indicate which piece is in the sample.  Because SPSS is a computer program, it does not know that the remainder portion is the rest of the population.

Although the SPSS program prints out that it is conducting a t-test, it is actually conducting a z-test.

20.     Dr. Barnett also points out that I conduct eleven tests using variables from the loan tapes, but do not test the representativeness of the samples with respect to geography. Barnett Decl. ¶ 29.  But geography can be defined in many ways and is not a helpful test for representativeness.  For example, if we define geography by zip code, there would likely be one loan per zip code, with many zip codes not represented.  This would be no help.  If we define geography by state, the same is true:  for a sample of 100 loans, even with concentrations in some states and sparse representation in others, the sample would be so diffuse that no representativeness test would ever fail.  These variables are therefore worthless to test for representativeness, and it makes no sense to test with respect to "geography."

**VI.     FICO Is a Reasonable Stratification Variable**

21.     Dr. Barnett's criticism of my choice of stratification variable is empty.  First, as Dr. Barnett admits, stratification can only improve (that is, decrease) the margin of error. Barnett Tr. 129:11-20.  Thus, even if my choice of stratification variable turns out not to be a good one, it will not affect the representativeness of my samples or decrease the precision of my estimate.  It will merely not deliver a benefit.

22.     Second, FICO is a reasonable stratification variable.  Contrary to Defendants' assertions, lower FICO scores are likely to correlate with underwriting guideline breaches and other false statements by both the originator and the borrower, because those are the borrowers who might not otherwise qualify for loans and thus would require underwriting guideline breaches and other false statements in order to be extended such loans.  Defendants do not dispute that FICO score is correlated with likelihood of default.  Defendants' Memo. at 17-18. In addition, FICO score presents other advantages over the other potential stratification variables.

First, FICO score is correlated with other variables on the loan tapes.  Second, FICO score is less likely to be misrepresented than other available variables.  It is, therefore, a reasonable stratification variable to use.

23.     Dr. Barnett complains that I make an assumption that borrowers with low FICO scores are more likely to have defects in the loan underwriting process than borrowers with high FICO scores.  Barnett Decl. ¶ 30.  I clearly state that it is an assumption, based on my past experience in other cases and as the Chief Statistician for the Federal Deposit Insurance Corporation.  There is nothing wrong with using personal experience or common sense to choose a stratification variable, as Dr. Barnett agreed.  Barnett Tr. 132:25-133:18.

24.     Dr. Barnett also argues that in other cases I stratify by FICO and another variable. He fails to mention that in these cases there were 400 loans in each sample.  It is much easier to stratify and consider the distribution of the sample across two variables (and 16 strata) when the sample is 400 loans; with 100 loans it would be imprudent to attempt to stratify by more than one variable.

25.     Finally, contrary to Dr. Barnett's argument, it makes no difference what value is assigned where a FICO score is missing, so long as one is consistent.  Barnett Decl. ¶ 34.  As Dr. Barnett notes, I assume that low FICO values are related to a greater likelihood that the loan underwriting is breached.  Similarly, I assume that the lack on the loan tape of a FICO score, a value that must be collected for every loan to ensure the loan can fit into the loan program used, is correlated with a greater likelihood that the loan underwriting is breached.  It is not the actual value of the FICO score that is important – it is the fact that it is low, or high, or missing.  As for computing the defect rates, the population is divided into whatever buckets I create.  If I am discerning in the construction of the buckets, I may get a reduction in the variability of the

estimate.  If I am not, then I get no reduction or a lesser reduction in the variability of the

estimate.  This does not create a bias.  What Dr. Barnett is arguing is that perfect knowledge of

the FICO scores may give me a slight reduction in the variability.  I would argue instead that I

am suspicious of loans missing the FICO score and wish to treat them differently, based on my

experience with bad underwriting and attempts to hide flawed information.  This is not a flaw in

my sample design.

## VII.   Missing Loan Files

26.     Dr. Barnett argues that replacing missing loan files with other missing loan files

(supplementation) threatens the representativeness of the sample.  Barnett Decl. ¶¶ 35-36.  What

Dr. Barnett appears to mean is that, as a result of missing loan files, the loan files available from

the sample may not match the population.  The need for substitution is not surprising.  In every

research investigation, problems arise with the availability and suitability of data.  Most real-

world (as opposed to theoretical) investigations are fraught with data difficulties.[2]  This is not a

reason not to sample, but rather can be dealt with through proper advance planning, as I have

done.  If Defendants and other third parties cannot produce loan files, supplementation of the

samples can occur by sampling in exactly the same way the first batch was sampled to provide

enough loans for review.  Random supplementation of a random sample is also representative of

the population from which both samples are selected.

27.     Dr. Barnett wants to replace missing Nevada files with other missing Nevada

files, even though there is no clear indication that geography makes any difference to the breach

rate.  This focus on minor, irrelevant details leads to a process that is unwieldy and cannot be

effectively implemented in a timely fashion.  Many of the details that Dr. Barnett wishes to

---

[2]  Thompson, op. cit. Chs. 23-26; *see also* Leslie Kish, Survey Sampling Part II "Special
Problems and Techniques" (John Wiley & Sons, Inc. 1995).

address are much more readily addressed in the analysis of the results, rather than in the sample design.

**VIII.  Choice of Extrapolation Method Can Be Based on Diminution of the Margin of Error**

28.     Dr. Barnett argues that my statement that an extrapolation method can be chosen that minimizes the margin of error is "vague."  Barnett Decl. ¶ 38.  Yet Dr. Barnett admits that it is possible to choose an extrapolation method to reduce the margin of error.  Barnett Tr. 171:19-172:5, 172:21-173:2.  There are multiple extrapolation methods accepted in statistics, and a method can be selected after the re-underwriting is completed that minimizes the maximum margin of error of +/- 10 percentage points that is associated with my sampling design.  That method, which is separate from the sampling design, will be fully set forth in a separate expert report to which Defendants can respond.

29.     Defendants also argue that the method of extrapolation must be determined before the sampling methodology can be accepted as statistically viable.  Defendants' Memo. at 1, 6.  This is wrong.  Sample design and extrapolation are two separate statistical processes.  The method of extrapolation does not determine the method of sample design.  Similarly, there is not a single method of extrapolation that must be used based on my sample design.  There are a variety of extrapolation methods that I could apply.  Defendants' expert does not opine that there is one single extrapolation method that must be applied based on my sample design—Dr. Barnett has no view on what the proper extrapolation method is.  Barnett Tr. 173:24-174:7.

30.     My statement in another case that "the process of the extrapolation of the results from the sample to the population is an integral part of the planning for and acceptance of sampling as a viable scientific method" does not mean that an extrapolation method is properly chosen at the time the sample is selected.  It simply means that the existence of methods to

extrapolate results from a sample to an entire population is critical to the acceptance of sampling as a viable scientific method *in general*.  If there were no reliable and generally accepted methods to extrapolate, then sampling would have little use because the purpose of sampling is to draw conclusions about the entire population.  With regards to the samples I have selected in this case, there is no question, and Dr. Barnett does not dispute, that there are scientifically valid and established methods for extrapolation available for me to use.  *See* Barnett Tr. 162:3-8; Barnett Decl. ¶ 38.  Thus, the important process of extrapolation has been accounted for in my sampling design to the full extent it can and should be accounted for.

I declare under penalty of perjury that the foregoing is true and correct.

Executed June 20, 2013 at Birmingham, Alabama.

CHARLES D. COWAN, Ph.D.

### Appendix A:  Proofs Regarding Maximum Variability And Estimation Of Sample Size

From Cochran, op. cit. p. 153, I have the formula for extrapolation:

$$TPB = \frac{\text{UPB in Defective Loans in Sample}}{\text{UPB in All Loans in Sample}} * \text{UPB in All Loans in Population} = \frac{d}{b}B$$

Where UPB is unpaid principal balances plus interest owed, lower case values are total from the sample, and upper case values that are known from the loan tapes for the population.  Summarize Total Principal Balance of Defective Loans as TPB.

The formula for the margin of error for a total like TPB is similar to the one cited by Dr. Barnett, but now looks like:

$$e = Z\sqrt{\text{Variance(TPB)}}$$

We want to show that there is a "worst case" and also that there is a maximum error.  From Cochran, op. cit. p. 154, I have the formula for the variability of the extrapolation:

$$\text{Variance}\left(\text{TPB}\right) = \frac{N^2}{n}\left( S_d^2 + \left(\frac{D}{B}\right)^2 S_b^2 - 2\rho\left(\frac{D}{B}\right)S_d S_b \right)$$

where $\rho$ is the correlation between D and B. The value $\rho$ must be positive because D and B both measure exactly the same values, except that D is sometimes zero for non-defective loans.

From the loan tapes, I know $S_b$ exactly.  I can approximate $S_d$ by recalling that the numerator is the sum of values b for defective loans plus zero for loans that are not defective.  So a close estimate of D from the sample would be P*B, where P is the proportion of defects.  This will be exactly correct if defects are unrelated to loan balance, and conservative if larger loans are more likely to have defects.  If B is fixed and P is the variable, then

$$S_d^2 = \text{Variance}\left(P * B\right) = B^2 V(p) = B^2 P(1 - P)$$

and the Variance(TPB) can be rewritten as

$$\text{Variance}\left(\text{TPB}\right) = \frac{N^2}{n}\left( B^2 P(1-P) + \left(\frac{P * B}{B}\right)^2 S_b^2 - 2\rho\left(\frac{P * B}{B}\right)BP(1-P)S_b \right)$$

I am now in a situation very similar to the solution to the "worst case" analysis for sampling for an estimate of P.  I know N, B, and $S_b$, and I can set $\rho$ to zero to obtain the worst case variance.  Now I simply maximize the abbreviated formula:

14

$$\text{Variance}\left(\text{TPB}\right) = \frac{N^2}{n}\left(B^2 P(1-P) + P^2 S_b^2\right)$$

through differentiation to find that:

$$P = \frac{1}{2}\frac{B^2}{S_b^2 - B^2}$$

This value of P is the "worst case" to design for, with the special case that as $B^2$ gets very large relative to $S_b^2$, P approaches .5, the "worst case" scenario for the liability evaluation. Thus, designing the sample for liability also supports estimation of a continuous variable for this type of ratio estimate.

Finally, in terms of knowing the maximum variability, we can substitute this revised estimate for P, where the worst case occurs, into the abbreviated Variance(TPB) to find the maximum variability under very conservative assumptions.

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 20th day of June, 2013.

/s/ John J. Egan

_____