# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>   v.<br><br>DLJ MORTGAGE CAPITAL, INC., et al.,<br><br>        Defendants. | Civil Action No. 11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>   v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., et al.,<br><br>        Defendants. | Civil Action No. 11-cv-30048-MGM |

## MASSMUTUAL'S PROPOSED FINDINGS OF FACT

## AND DISCUSSION OF LEGAL ISSUES

## <u>TRIAL WEEK 1</u>

## TABLE OF CONTENTS

I.    Legal Issues Presented by This Week's Evidence ............................................................. 3

      A.    Credit Suisse Is Advancing the Wrong Standard for Materiality. .......................... 3

            1.    Materiality Is Distinct from Reliance. ...................................................... 4

            2.    Materiality Is Distinct from Causation. ..................................................... 7

      B.    The Cautionary Language in the ProSupps Does Not Relieve Credit Suisse
            of Liability for its Material Misstatements and Omissions.................................... 8

      C.    Credit Suisse Represented that Loans Backing the Certificates Were
            Originated "Generally in Accordance With" Underwriting Guidelines. ............... 9

II.   Proposed Findings of Fact Based on This Week's Evidence ........................................... 11

      A.    Credit Suisse Sold the At-Issue Securities by Means of Material
            Misstatements and Omissions Regarding Underwriting Guidelines. ................... 11

            1.    Materiality............................................................................................... 11

            2.    Falsity...................................................................................................... 13

            3.    Omissions................................................................................................ 16

      B.    The Evidence to Date Shows that Credit Suisse's Challenged LTV
            Representations and Omissions Were Material. .................................................. 18

      C.    The Evidence to Date Shows That Credit Suisse's Challenged
            Representations  And Omissions Concerning Conformity With Appraisal
            Standards Were Material. .................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Am. Title Ins. Co. v. E. W. Fin. Corp.*,
    959 F.2d 345 (1st Cir. 1992) .................................................................................... 2

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*,
    No. 651612/2010, 2014 WL 2861560 (N.Y. Sup. Ct. June 23, 2014) .................................... 15

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015) .................................................... 3, 5, 9, 15

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    74 F. Supp. 3d 639 (S.D.N.Y. 2015) .......................................................... 10, 15, 16

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    No. 11cv6201 (DLC), 2015 WL 640900 (S.D.N.Y. Feb. 16, 2015) ........................................ 7

*In re Access Cardiosystems, Inc.*,
    776 F.3d 30 (1st Cir. 2015) .................................................................................. 3, 7

*Marram v. Kobrick Offshore Fund, Ltd.*,
    809 N.E.2d 1017 (Mass. 2004) ........................................................................ passim

*Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*,
    No. 11-30039-MGM, 2015 WL 2130060 (D. Mas. May 7, 2015) ............................... 14, 15, 16

*Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*,
    No. 11-30039-MGM, 2015 WL 3964560 (D. Mass. June 19, 2015) ................................ 3, 4, 9

*Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*,
    No. 12-2648-JWL, 2017 WL 235013 (D. Kan. Jan. 19, 2017) ............................................. 14

*Natl Credit Union Adm. Bd. v. RBS Sec., Inc.*,
    No. 11-2340-JWL, 2016 WL 1448480 (D. Kan. Apr. 13, 2016) ............................................ 15

*Quincy Co-Op Bank v. A.G. Edwards & Sons, Inc.*,
    655 F. Supp. 78 (D. Mass. 1986) ........................................................................... 4

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) .................................................................................... 9

*TSC Indus. v. Northway, Inc.*,
    426 U.S. 438 (1976) ............................................................................................ 4

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
    842 F.3d 71 (1st Cir. 2016) .................................................................................. 5, 6

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Secs.*,
   No. 12-cv-7322 (PKC)(JCF), 2016 WL 4690410 (S.D.N.Y. Sept. 6, 2016) ........................... 14

*Welch v. Barach*,
   993 N.E.2d 742 (Mass. App. Ct, 2013) ....................................................................................... 4

*Wright v. Nat'l Warranty Co.*,
   953 F.2d 256 (6th Cir. 1992) ...................................................................................................... 6

**Other**

Dobbs, et al., THE LAW OF TORTS § 671 (2d ed. 2017) ................................................................... 4

Loss et al., SECURITIES REGULATION § 11.C.2 (5th ed. 2013) ........................................................ 5

MASS. GEN. LAWS ch. 110A, § 410 ............................................................................................... 2

In the first week of trial, MassMutual proved material misstatements and omissions from the offering documents, through MassMutual's witnesses' testimony and Credit Suisse's party admissions. Though the offering documents represented that the loans backing the securities would be originated "generally in accordance with" underwriting guidelines (*see generally* PX1538), Credit Suisse's admissions in evidence show that its process for vetting loans was "broken" and viewed as a "joke." (PX302*[1]; PX248*; PX435*.) Credit Suisse's internal review of its own wholesale loans showed a "historical fail rate of over 35%." (PX431*.) These admissions corroborate expert testimony that at least 29% of the loans sampled from the certificates at issue had substantial underwriting defects. (July 19 pm Trial Tr. 17:20-19:13; PX1551.)

Credit Suisse does not dispute this is relevant evidence. Instead, Credit Suisse ignores this Court's rulings about MassMutual's claim under the Massachusetts Uniform Securities Act ("MUSA"). In its opening statement and cross examinations, Credit Suisse has focused on irrelevant issues like MassMutual's sophistication, its purchase of so-called "risky" certificates, and the presence of reduced documentation loans in the pools backing the certificates. Credit Suisse characterizes this information as relevant to the materiality of its misrepresentations and omissions, suggesting that—because of MassMutual's sophistication and supposed risk appetite—those untruths could not have made any difference to MassMutual. But this Court and others have held that the test for materiality is whether there is a substantial likelihood that Credit Suisse's misrepresentations and omissions would have been viewed by a hypothetical reasonable investor as altering the total mix of information available. MassMutual's sophistication, the "riskiness" of the certificates, and the presence of reduced documentation loans do not have

---

[1] An asterisk designates exhibits in evidence but not yet the subject of live testimony.

anything to do with whether a reasonable investor would have found Credit Suisse's misrepresentations important. Instead, these facts—if indeed Credit Suisse can prove them—go to reliance and causation, neither of which is an element or defense to a MUSA claim.

Credit Suisse has also ignored this Court's prior rulings on what constitutes a misstatement under MUSA. In the *Deutsche Bank* case, the Court explained that generalized risk disclaimers do not inoculate MUSA defendants from liability for misstatements and omissions. Contrary to this ruling, Credit Suisse has argued that MassMutual cannot prove its case because the offering documents advised it of risks inherent in RMBS investing.

### Legal Standard

MassMutual must prove that Credit Suisse offered or sold a security in Massachusetts, "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," and that MassMutual did not know of the untruth or omission. MASS. GEN. LAWS ch. 110A, § 410(a)(2).

The parties have stipulated that (1) the at-issue certificates are securities that (2) were sold in Massachusetts. (Pretrial Mem. at 5 ('047 D.E. 544; '048 D.E. 583.)) And the Court has ruled that (3) MassMutual lacked knowledge of Credit Suisse's misstatements and omissions. (*See* '047 D.E. 527; '048 D.E. 564.) What remains for MassMutual to prove by a preponderance of the evidence is that Credit Suisse sold the securities by means of a material misstatement or omission. *See Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1026 (Mass. 2004); *see also Am. Title Ins. Co. v. E. W. Fin. Corp.*, 959 F.2d 345, 348 (1st Cir. 1992).

I.      **Legal Issues Presented by This Week's Evidence**

      A.      **Credit Suisse Is Advancing the Wrong Standard for Materiality.**

This Court has explained that "[t]he materiality requirement is an objective standard, only requiring a substantial likelihood that the (hypothetical) reasonable investor would find that the misrepresentation significantly altered the total mix of information made available." *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, No. 11-30039-MGM, 2015 WL 3964560, at *10 (D. Mass. June 19, 2015) (internal quotation marks omitted) citing *In re Access Cardiosystems, Inc.*, 776 F.3d 30 (1st Cir. 2015); *see also Marram*, 809 N.E.2d at 1030. The evidence at trial has shown and will show that Credit Suisse's misstatements and omissions about compliance with underwriting guidelines, compliance with appraisal standards, and the LTVs of the loans backing the at-issue certificates easily satisfy this standard.

As Judge Cote found in the *Nomura* case, the characteristics of the loan collateral described in RMBS offering documents are an "essential component" of the decision to purchase an RMBS certificate. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,* 104 F. Supp. 3d 441, 535 (S.D.N.Y. 2015). And "[a]mong the key characteristics were LTV ratios and compliance with underwriting guidelines." *Id. See also id.* at 372db s ("Confirmation that these are critical components to anyone's evaluation of [an RMBS] certificate came from every corner of the record, including from defendants' business records, their fact witnesses, and their experts.").

Unable to contest the materiality under the proper test, Credit Suisse is attempting to rewrite the legal standard for materiality. Specifically, Credit Suisse is putting in evidence that

3

goes to reliance and causation—neither of which is an element of or a defense to a MUSA

claim—and characterizing it as materiality. The Court should disregard this evidence.[2]

### 1.     Materiality Is Distinct from Reliance.

Credit Suisse has devoted much attention to MassMutual's sophistication and how it used

the information in the offering documents relative to other information when making investment

decisions. This evidence relates to reliance, not materiality.

Proof of materiality in securities actions does not require a showing that a misled plaintiff

would have acted differently had the defendant provided truthful information. The Supreme

Court held that materiality "does not require proof of a substantial likelihood that disclosure of

the omitted fact would have caused the reasonable investor to change his vote." *TSC Indus. v.

Northway, Inc.*, 426 U.S. 438, 449 (1976). Courts have followed this rule when evaluating

materiality in MUSA cases. *See, e.g.*, *Welch v. Barach*, 993 N.E.2d 742, 748 (Mass. App. Ct.

2013) (holding that to be material under MUSA, information "need not have been causally or

decisively important to [the plaintiff's] investment decision"); *Quincy Co-Op Bank v. A.G.

Edwards & Sons, Inc.*, 655 F. Supp. 78, 85 (D. Mass. 1986) ("Disclosure of the omitted fact need

not have caused a reasonable investor to change his decision for it to be material.").

Proof that an investor would have acted differently goes to reliance. *See, e.g.*, Dobbs, et

al., THE LAW OF TORTS § 671 (2d ed. 2017) ("To rely, the plaintiff must enter a transaction in

whole or part because of the representation."). But MUSA does not have a reliance requirement.

*DB Structured Prods., Inc.*, 2015 WL 3964560, at *1 ("Plaintiff does not need to prove

---

[2] MassMutual has not included proposed findings of fact that refute Credit Suisse's irrelevant
arguments, and reserves its rights to supplement its proposed findings if necessary.

negligence, scienter, reliance, or loss causation."); *see also Tutor Perini Corp. v. Banc of Am.*

*Sec. LLC*, 842 F.3d 71, 85 (1st Cir. 2016).

The absence of a reliance requirement is an important feature of MUSA that the drafters

intended to enhance the statute's "strong protections" for securities buyers. *Marram*, 809 N.E.2d

at 1026–27 ("[F]oremost among the elements that the buyer does not have to prove is reliance.").

Accordingly, the Court should not permit Credit Suisse to recast MUSA's materiality element as

requiring proof of reliance:

> Inevitably, to be sure, some element of reliance (which is subjective)
> is inherent in the concept of materiality (which is an objective
> *reasonably prudent person* concept). But, especially since Congress
> left § 12(a)(2) alone when it amended § 11 in 1934 to require proof
> of reliance in some circumstances, that element should not be
> permitted to come in the back door by way of a definition of
> *materiality*.

Loss et al., SECURITIES REGULATION § 11.C.2 (5th ed. 2013).[3]

In *Nomura*, the defendants similarly tried to blur the distinction between materiality and

reliance, and the Court rejected those attempts: "There is no reliance element in FHFA's claims,

however; materiality is an objective test. What the [plaintiffs] themselves viewed as significant is

relevant only to the extent that it sheds light on what reasonable investors in the [RMBS] market

generally viewed as significant." *Nomura Holding*, 104 F. Supp. 3d at 572.

Credit Suisse is up to similar tricks here. Throughout the week, they have tried to

smuggle in a reliance defense under the guise of materiality. Credit Suisse's opening statement

and much of its questioning of MassMutual's witnesses focused on the sophistication of

MassMutual and Babson. (*See, e.g.*, July 17 am Tr. (Opening) 33:25–34:4 ("MassMutual is a

---

[3] The Massachusetts Supreme Judicial Court has instructed courts to interpret MUSA "in
coordination" with the federal securities laws, particularly section 12(a)(2) of the Securities Act
of 1933. *Marram*, 809 N.E.2d at 1025.

very experienced RMBS investor. . . .They had a sophisticated financial staff, and they had a strategy."). But as this Court is well aware, the buyer's sophistication is irrelevant under MUSA—and with good reason, as it relates to the non-element of reliance. *See, e.g.*, *Tutor Perini Corp.*, 842 F.3d at 85 ("The plaintiff's sophistication is irrelevant . . . .").[4]

Credit Suisse has also tried to introduce reliance by attempting to establish that the Prospectus Supplements ("ProSupps") did not factor into MassMutual's investment decisions, or that MassMutual relied on other sources, like investment models or outside information, when making investment decisions.[5] The first problem with this argument is that its premise—that MassMutual did not review the ProSupps—is false.[6]

But even if it were true, whether and to what extent MassMutual actually used the ProSupps relative to other sources of information is a quintessential question of reliance. Through John Richard, the same expert Credit Suisse will be calling here, the defendants in *Nomura* similarly tried to put at issue the information the plaintiff used to make investment decisions. Judge Cote rejected this effort: "Defendants may not, however, offer evidence or

---

[4] Beyond conflating the concepts of materiality and reliance, Credit Suisse's fixation on MassMutual's sophistication also amounts to an attempt to impose a duty of inquiry on MassMutual that MUSA does not require. *See Marram*, 809 N.E.2d at 1027 ("Nor does the buyer have any duty to investigate or to verify a statement's accuracy." (internal quotation marks omitted)); *accord Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 262 (6th Cir. 1992) ("[T]he district court based its decision entirely upon Wright's alleged access to the information and lack of due diligence in discovering it. But . . . Wright's sophistication as an investor is irrelevant to a section 12(2) claim, and he was under no duty to investigate for fraud.").

[5] (*See, e.g.*, July 17 am Tr. (Opening) 46:13–19 ("The evidence will show that . . . those purchase decisions were made by MassMutual before they even had the ProSupp, which would suggest that disclosures about underwriting guidelines in the ProSupps were not material to them since they made the purchase decision before they ever saw them."); July 18 pm  Tr. (Canuel) 4:17–19 ("And what other sources of information did you have that you could use to analyze RMBS certificate purchases? For instance, did you have Bloomberg data or other things?").)

[6] (*E.g.*, July 18 am Tr. (Canuel) 16:3–15; 17:21–18:7; 18:17–19:13; 47:1–49:9.)

argument for the purpose of proving that the GSE's did not rely on any specific misrepresentations that FHFA succeeds in proving were contained in the Offering Documents for the seven Certificates." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11cv6201 (DLC), 2015 WL 640900, at *4 (S.D.N.Y. Feb. 16, 2015). The Court should do the same here.

Nor does the extent to which MassMutual employees read the ProSupps relate to MUSA's requirement that the defendant sold the at-issue securities "by means of" a misrepresentation or omission. The First Circuit has held that the statute's "by means of" requirement is satisfied "when the communication containing the material misrepresentation was *used* to effect the sale—and not whether it was actually successful in securing the sale that, in any event, transpired." *In re Access Cardiosystems, Inc.*, 776 F.3d at 36 (emphasis in original). The Court elaborated that "This is an objective standard, readily met." *Id.*

### 2.    Materiality Is Distinct from Causation.

Credit Suisse has also tried to put on a loss causation defense disguised as an attack on the materiality of its misstatements and omissions. Specifically, Credit Suisse has introduced various causation theories, all of which place the blame for MassMutual's losses elsewhere. Credit Suisse has argued that MassMutual's losses were caused by each of the following: (1) its decision to purchase so-called "risky" certificates intended for CDOs;[7] (2) its decision to purchase certificates backed by reduced documentation loans;[8] (3) its inability to account for

---

[7] (*See* July 17 am Tr. (Opening) 34:11–20 ("[T]hey had a second strategy which is why they bought nine of the certificates, and that strategy was that they were going to buy the risky end of the certificates.").)

[8] (*See, e.g.*, July 17 am Tr. (Opening) 39:1–5 ("Plaintiffs here and frankly plaintiffs in our other cases . . . always ignore the reduced documentation aspect of the loans."); July 18 am Tr. (Canuel Cross) 69:8–11 ("All right.  You're aware, are you not, that many, many, many of these deals the reduced documentation percentage, the three categories together that we just described, include 80 to 90 percent of the loans in the pool?").)

declining home prices in its investment modeling;[9] and (4) the financial crisis and the collapse of the housing market.[10] All of these topics are irrelevant detours into loss causation.

This Court has already held that loss causation is neither an element of MassMutual's claim nor a defense available to Credit Suisse. ('047 D.E. 291 at 10; '048 D.E. 325 at 10.) As with reliance, the Court should not permit Credit Suisse to confuse the distinct concepts of loss causation and materiality. Even if one were to assume—contrary to the evidence—that the certificates MassMutual purchased were risky and suffered losses because of the financial crisis, that would not absolve Credit Suisse of responsibility for its misstatements and omissions. *See id.* "The *Marram* opinion used direct and specific language, explaining that tainted transactions are voidable 'regardless of the actual cause of the investor's loss.'" ('047 D.E. 291; '048 D.E. 325.) Similarly, the presence of reduced documentation loans in the pools and the housing market crisis do not render Credit Suisse's misstatements and omissions immaterial. The Court should decline to attach any significance to Credit Suisse's causation evidence.

**B.     The Cautionary Language in the ProSupps Does Not Relieve Credit Suisse of Liability for its Material Misstatements and Omissions.**

Credit Suisse has stressed that MassMutual was "fully advised and aware of [the] risks" of the at-issue certificates. (July 17 am Tr. (Opening) 29:9–10.) The mere fact that Credit Suisse informed MassMutual of risks involved with investing in RMBS does not bear on the issues in this case. MUSA requires only that the plaintiff lack "actual knowledge" of the defendant's misstatements and omissions. *Marram*, 809 N.E.2d at 1027. Constructive knowledge does not

---

[9] (*See, e.g.*, July 18 pm Tr. (Canuel Cross) 11:1–3 ("But it wasn't until later 2008 that Babson Capital thought to incorporate into its model the fact that there was this decline in home price depreciation?").)

[10] (*See, e.g.*, *id.* at 41:2–5 ("So in the first part you're saying that one of the failures was to recognize that Alt-A also was going to be subject to the factors that came into play in the finances crisis era?").)

defeat a plaintiff's claims, and plaintiffs are under no duty of inquiry. *Id.* Therefore, that Credit Suisse informed MassMutual of *other* risks associated with the certificates does not relieve Credit Suisse of liability for its misrepresentations and omissions in the offering documents. *See Nomura*, 104 F. Supp. 3d at 546 ("None of these disclosures nor the existence of relaxed underwriting standards . . . constitute notice, however, that originators of . . . loans had failed to adhere to their underwriting guidelines.").

Further, as this Court previously held, cautionary statements like the ones Credit Suisse included in the offering materials are "ineffective as a matter of law." *DB Structured Prods., Inc.*, 2015 WL 3964560, at \*11. The presence of "general cautionary language does 'not excuse the alleged failure to reveal known material, adverse facts.'" *Id.* quoting *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994). That is the case here; none of the cautionary language in the offering documents comes close to alerting investors that Credit Suisse made misstatements in the offering documents or that it had systemic failures in its underwriting and due diligence processes.

C.    **Credit Suisse Represented that Loans Backing the Certificates Were Originated "Generally in Accordance With" Underwriting Guidelines.**

In the offering documents for the certificates at issue, Credit Suisse represented that the loans backing the securities were originated "generally in accordance with the underwriting criteria described herein." (*E.g.*, PX1538 at 30.) Credit Suisse has repeatedly suggested in its cross-examination of MassMutual's witnesses that the "underwriting criteria described herein" is not a reference to the underwriting *guidelines* loan originators used to approve the loans, but instead refers to the *general descriptions* of those guidelines contained in the offering documents. (*E.g.*, July 19 pm Tr. 34:25-35:8.) Credit Suisse's interpretation is refuted by the language of the offering documents.

The offering documents make clear that the relevant underwriting measure is the underwriting guidelines. For example, on the first page of the Prospectus Supplement for CSAB 2006-2, Credit Suisse states:

"The certificates:

- Represent ownership interests in a trust, whose assets are primarily a pool of fixed-rate, first-lien residential mortgage loans that were *generally originated in accordance with underwriting guidelines* that are not as strict as Fannie Mae and Freddie Mac guidelines."

(JX99 at 1 (emphasis added).) The Registration Statement applicable to nine of the securitizations includes the representation that the loans comply "with all the terms, conditions and requirements of *the originator's underwriting standards in effect at the time of origination of such mortgage.*" (*E.g.*, PX1538 at 24 (emphasis added).)

Credit Suisse's suggested interpretation that "underwriting criteria" refers not to the originators' underwriting *guidelines*, but to the offering documents' *descriptions* of guidelines and their elements, cannot be squared with these plain offering document statements. This interpretation has also been rejected in *Nomura*. In that case, defendants advanced the same interpretation of substantially identical language in RMBS offering documents. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 643 (S.D.N.Y. 2015) ("[T]he Prospectus Supplement for NAA 2005-AR6 states that '[t]he Mortgage Loans … were originated generally in accordance with the underwriting criteria described in this section.'"). As Judge Cote explained, "the only standards and criteria to which the Supplements could be referring are those that were in the hands of the original lenders." *Id.* at 654.

> The language in the Supplements regarding the criteria is simply too vague to provide a complete description of the origination process. It omits the specific benchmarks and criteria that are part of the customary underwriting process at origination. In essence, these passages are a statement by the defendants that they have reviewed the Originators' processes and guidelines and confirmed

> that the loans within the Securitization were all *originated in compliance with
> their Originators' standards* and processes, and that those standards and
> processes all contained the central elements summarized in the Supplement.

*Id.* (emphasis added).  For the same reasons, the Court should reject Credit Suisse's

interpretation here.

## II.     Proposed Findings of Fact Based on This Week's Evidence

### A.      Credit Suisse Sold the At-Issue Securities by Means of Material Misstatements and Omissions Regarding Underwriting Guidelines.

1.      MassMutual has proven that the offering documents for each of Credit Suisse's 11

at-issue securitizations included the representation that the loans backing the securities were

originated "generally in accordance with" the originator's underwriting guidelines.  See PX1538

at 10 (Pro. Supp. for ARMT 2006-1), 17 (Pro. Supp. for CSAB 2006-1), 28 (Pro. Supp. for

CSAB 2006-2), 40 (Pro. Supp. for CSAB 2006-3), 51 (Pro. Supp. for CSAB 2006-4), 67 (Pro.

Supp. for ARMT 2007-1), 77 (Pro. Supp. for CSAB 2007-1), 89 (Pro. Supp. for CSMC 2007-1),

100 (Pro. Supp. for CSMC 2007-3), 110 (Pro. Supp. for TBW 2006-4), and 123 (Pro. Supp. for

TBW 2007-2).  MassMutual has further proven that this representation about the assets backing

the securities was material to reasonable investors, false, and rendered misleading by material

omissions.

### 1.      Materiality

2.      Roger Crandall, Chairman, President and CEO of MassMutual, testified that the

representation is significant because "understanding how the underlying collateral is originated

was important to the integrity of the whole transaction."  (July 17 am Tr. at 114:11-18.)  Mr.

Crandall testified that without that representation, an investor would "have no idea of what's in

[the securitization]," making it impossible to "begin to move forward to the next step of saying

were the statistics about the pool valid?"  (*Id.* at 116:4-116:6.)   Similarly, David Canuel, former

managing director for Babson Capital, testified that if this central underwriting representation were false, "then you don't know what else isn't true, and you're potentially in a situation where you just can't analyze the deal, period."  (July 18 am Trial Tr. at 33:3-8; *see also* July 19 am Trial Tr. at 23:4-24:4 (Richard Payne's testimony); *see* Lenkeit Deposition Designations, '047 D.E. 563 at 83:12-85:6 (Babson bond trader Paul Lenkeit explaining that his group used underwriting criteria to predict losses on securities); *see id.* at 213:20-214:7 ("our process relied on underwriting guidelines being followed"), 215:9-23.)

3.     Discrediting Credit Suisse's argument that the underwriting representation in the offering documents is not material because MassMutual did not have access to every underwriting guideline, Mr. Canuel explained:

> The point of the guidelines is to determine whether the borrower can pay the mortgage. Okay. And so that's -- can and wants to pay the mortgage, and so there's a element in that that is completely separate from any statistic that can be captured on a piece of paper or in an Excel spreadsheet and sent to us. Okay. So that's the piece that the underwriting guidelines in our understanding is meant to assess. So it's the fact that they exist and the fact that they're followed that represent a process thats followed to reach an underwriting decision that's so important.

(July 18 pm Tr. at 62:1-11.)

4.     The evidence also shows that RMBS investors, unlike securities underwriters like Credit Suisse, were unable to determine whether the loans backing the certificates were originated in compliance with applicable underwriting guidelines because the investors did not have access to the loan files.  Mr. Canuel testified that "the division of labor was that the securities underwriter did the loan file examination. We [the investors] did the evaluation of the security to figure out whether we wanted to buy it or not."  (July 18 am Tr. at 46:5-8.)  And in response to a question from the Court, Mr. Crandall explained "[a]s public securities if I had

access to those loan files, my businessman's understanding of insider trader rules would say I

could not trade the security." (July 17 am Tr. at 138:24-139:2; *see also* 137:20-138:7.)

### 2. Falsity

5.    MassMutual has also proved the underwriting guidelines representation was false.

Richard Payne, MassMutual's re-underwriting expert, testified that there were substantial

underwriting guideline breaches in at least 29% of the sampled loans backing the certificates.

(PX1551; July 19 pm Tr. at 18:1-17.) Mr. Payne reached this conclusion based on the re-

underwriting of 1,100 sample loans from the at-issue RMBS. (July 19 am Tr. at 48:22-49:20.)

Mr. Payne illustrated his findings with examples of underwriting defects he found in the loans

backing the at-issue securities. One involved a borrower who claimed a monthly income of

$5,389 per month, though a verification of employment form completed at the time and included

in the loan file showed that his actual annual salary was only $21,840 ($1,820 per month)—

which was less than the mortgage loan obligations would be for the borrower. (July 19 am Tr. at

54:10-15, 55:5-9, 55:20-56:1, 58:7-12.) Mr. Payne testified that this loan was approved despite a

breach of the underwriting guidelines. "It's just the borrower can't afford this payment." (July

19 am Tr. at 58:21-59:17.)

6.    In another example, Mr. Payne testified about loan file evidence showing a

borrower who applied for two loans that combined made up 100 percent of the purchase price of

the loan, which he testified was significant because "the borrower has no skin in the game."

(July 19 am Tr. at 62:10-20.) The underwriter noted on the underwriting summary for the loan,

"payment shock of 350%," indicating that the proposed housing expenses for the mortgaged

property were 350% of the borrower's existing housing expenses. (July 19 am Tr. at 66:7-67:4.)

The borrower, whose reported employment was as a vocational nurse, had additional debts such

that the proposed mortgage obligations would produce annual debt payments of more than

$80,000.  Mr. Payne testified that based on his re-underwriting the borrower lacked the ability to repay the debt because "the borrower probably is not making enough money to even cover their primary housing expenses, not to mention their total debt."  (July 19 am Tr. at 68:8-21.)

7.      Credit Suisse's examination of Mr. Payne raised criticisms about missing loan documents and his reliance on "post-origination" documents.  These criticisms fail.  Mr. Payne's missing document assessments are corroborated by Credit Suisse's own party admissions, which show that missing documents in loan files was a significant problem at Credit Suisse during the relevant period.  Credit Suisse's head of due diligence and underwriting, Rob Sacco, admitted in late 2005 that "the biggest problem in sampling (we experience it with Alt A/Jumbo/2nds) is the missing doc issue…. We are selling and securitizing loans with missing docs all the time...." (PX112* at 1.)

8.      In addition, several courts—including this one—have concluded that "missing loan documents at this time may provide circumstantial evidence that those documents were also missing at the relevant time."  *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, No. 11-30039-MGM, 2015 WL 2130060, at *15 (D. Mas. May 7, 2015); *see U.S. Bank, Nat'l Ass'n v. UBS Real Estate Secs.*, No. 12-cv-7322 (PKC)(JCF), 2016 WL 4690410, at *57 (S.D.N.Y. Sept. 6, 2016) ("To the extent that the applicable guidelines required these materials to be considered by or prepared by an underwriter, the Court concludes that their absence from the loan files makes it more likely than not that they were not used in the underwriting process."); *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, No. 12-2648-JWL, 2017 WL 235013, at *11 (D. Kan. Jan. 19, 2017) (denying motion to exclude Mr. Payne's testimony about missing documents).

9.      As to post-origination information, this Court (among others) has also concluded that "the guidelines generally required underwriters to verify the reasonableness of information

and to follow up on red flags. Thus, post-origination sources may provide circumstantial evidence of failures in that regard, as many courts have held." *DB Structured Prods., Inc.*, 2015 WL 2130060 at *14 (citing *Nomura*, 2015 WL 568788, at *10); *see id.* ("Defendants' specific criticism of the use of Bureau of Labor Statistics ('BLS') data likewise fails. Mr. Butler [plaintiff's re-underwriting expert] referenced BLS data because other sources do not maintain historical data but BLS does."); *see also Nomura*, 104 F. Supp. 3d at 527-30 (proper for re-underwriting expert to rely on BLS and public records data).[11]

10.    The law does not require MassMutual to replicate precisely the underwriting processes conducted at the time of origination.  If forensic inquiry in litigation were held to that standard, representations such as those at issue here—including not just the underwriting representations but also the representations regarding adherence to appraisal standards and LTVs—could not be pursued under MUSA because contemporaneous re-underwriting is impossible.  Mr. Payne's methods are relevant and reliable evidence of underwriting defects that

---

[11] Credit Suisse's cross-examination of Mr. Payne also suggested that his use of employment reverifications violated borrower privacy rights and the case protective order.  The suggestion fails.  In reverifying employment as part of his re-underwriting, Mr. Payne's team included the borrower's name and last four digits of the social security number on request forms to the borrower's former employer.  This is a routine forensic re-underwriting procedure permitted in numerous RMBS cases.  *E.g.*, *Nomura*, 74 F. Supp. 3d at 647, 653 (permitting re-underwriting expert to rely on employer reverifications).  For the reasons set forth in MassMutual's Opposition to Credit Suisse's Daubert Motion ('047 D.E. 447; '048 D.E. 482), Mr. Payne's reliance on employment reverifications did not violate the protective order or consumer privacy laws.  This conclusion is confirmed by RMBS decisions addressing and rejecting challenges to employment reverifications based on similar protective order and privacy arguments.  *See Natl Credit Union Adm. Bd. v. RBS Sec., Inc.*, No. 11-2340-JWL, 2016 WL 1448480 (D. Kan. Apr. 13, 2016) (rejecting defendant's argument that re-underwriter violated federal law and was contrary to protective order); *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 651612/2010, 2014 WL 2861560, at *5 (N.Y. Sup. Ct. June 23, 2014) (rejecting defendants' argument that employment re-verifications violated case protective order).  Credit Suisse has cited no case rejecting employment reverifications.

support MassMutual's misrepresentation claims.  *See DB Structured Prods., Inc.*, 2015 WL 2130060, at *15**Error! Bookmark not defined.**; *Nomura*, 74 F. Supp. 3d at 657.

### 3.   Omissions

11.    The evidence also shows Credit Suisse made material omissions concerning its lack of reasonable care to determine that the loans backing the certificates were originated in accordance with applicable underwriting guidelines.  For example, evidence admitted but not yet the subject of testimony shows that Credit Suisse traders responsible for selecting loans to securitize warned their superiors of significant loan quality problems.  These traders reported that Michael Fallacara, head of the Conduit (through which Credit Suisse acquired about half the relevant securitization inventory of loans), was an "impediment to best practices" (PX303*) and "subverted sound underwriting" (PX291*)

12.    Mike Daniel, an RMBS trader, documented the fact that Rob Sacco (head of due diligence and underwriting, who worked for Mr. Fallacara) "regularly has to respond to pressure from Fallacara and salespeople to approve loans that he thinks are unworthy (and he showed me plenty of emails to prove it – undeniably)."  (PX248 at 2*)  Mr. Daniel specified the types of concerns Mr. Sacco had raised with him, and that he "constantly faces pressure over":

> ** Reasonableness of income for reduced doc - he readily produced for me loans that he was receiving pressure to approve, including a gas station attendant living with his mother making 93K and a data analyst who used to be a sales clerk at Nordstroms making 110K
>
> ** Layered risk -- he showed me pressure to purchase No Doc, 80/20, first time buyer with unreasonable income and a huge OTI
>
> ** Credit inquiries - he got huge pushback when he wanted to ask borrowers about recent credit inquiries, like "did you take out a loan for that boat and car?"
>
> ** Appraisal process - hard to push back even when appraisals are iffy

(PX248 at 2)

16

13.     John Vibert, another RMBS trader, responded to Mr. Daniel's email by stating: "Rob should not report to Fallacara. It is clearly too much of a conflict…. I also have concerns that we make these underwriting exceptions and then we have liability down the road when the loans go bad and people point out that we violated our own guidelines." *Id*. at 1. "The fulfillment process is a joke at this point." *Id*.  In a separate email, Mr. Vibert, referring to Mr. Fallacara, stated: "Instead of trying to sell bonds, I spend my time playing defense from a guy supposedly on my team who *won't stop waiving credit guidelines until we've taken on so much water the firm will pull the plug*. Trust me, when this Titanic goes down, fallacara will be the guy on the bow proclaiming 'I'm the king of the world!!!!!'" (PX162* (emphasis added).)

14.     In addition to the improper pressure from Mr. Fallacara that subverted sound underwriting, Pete Sack, co-head of Credit Suisse's RMBS transaction management group, admitted in a June 2007 email that Credit Suisse had found a "35% historical fail rate" in its quality control review of the wholesale loans that Credit Suisse originated.  (PX431* at 3.)  In explaining why he nonetheless advocated *less* quality control review of the underwriting due diligence performed by Credit Suisse's third-party fulfillment centers on the loans, Mr. Sack (who is on Credit Suisse's live witness list) wrote to Rob Sacco (Credit Suisse's head of due diligence and underwriting):

> As we've been discussing for a few months, in my opinion, if we already know that the loans aren't performing, all of the characteristics of the loans, who the brokers were, the [fulfillment center], the individuals who underwrote the loans etc, the only thing QC will tell us is that there were compliance errors, occupancy misreps etc.  I think we already know *we have systemic problems in FC/UW [fulfillment centers/underwriting] re both compliance and credit.*

(*Id*. at 2 (emphasis added).)

15.     Credit Suisse did not tell RMBS investors the facts above about the various failures in its underwriting due diligence, rendering the process "broken," (PX302,*) and the underwriting representations materially misleading.

16.     Both Mr. Crandall and Mr. Canuel testified that a historical fail rate in the range of 35 percent would have been an important piece of information to take into account when making an investment decision.  (July 17 am Tr. at 137:8-14; July 18 am Tr. at 55:17-22.)  And Mr. Canuel testified that it would have impacted the total mix of information available to him if he knew that Credit Suisse talked about its own underwriting due diligence process internally as being broken and a joke and if he knew that Credit Suisse had systemic underwriting and due diligence problems.  (July 18 am Tr. at 55:23-56:16.)

17.     As trial proceeds, MassMutual will continue to offer evidence relevant to Credit Suisse's material misstatements and omissions concerning underwriting guidelines.

**B.      The Evidence to Date Shows that Credit Suisse's Challenged LTV Representations and Omissions Were Material.**

18.     In the residential mortgage-lending context, an LTV ratio expresses, as a percentage, "the loan amount over the value of the property," where the value of the property is "the lower of the purchase price or the appraised value" in a purchase transaction or simply "the appraised value" in a refinance transaction.  (July 18 am Tr. at 20:7-12 (Canuel testimony).)

19.     MassMutual has proven that the Offering Documents for each of the securitizations at issue included a "stratification table" that presented the distribution of the relevant LTV ratios for the loans backing that securitization.  (*See, e.g.*, PX1538 at 10 (Pro. Supp. for ARMT 2006-1), 17 (Pro. Supp. for CSAB 2006-1), 28 (Pro. Supp. for CSAB 2006-2), 40 (Pro. Supp. for CSAB 2006-3), 51 (Pro. Supp. for CSAB 2006-4), 67 (Pro. Supp. for ARMT

2007-1), 77 (Pro. Supp. for CSAB 2007-1), 89 (Pro. Supp. for CSMC 2007-1), 100 (Pro. Supp.

for CSMC 2007-3), 110 (Pro. Supp. for TBW 2006-4), and 123 (Pro. Supp. for TBW 2007-2).)

20.     For each securitization, the data in the stratification table showed, among other

things, that there were no loans with LTV ratios exceeding 100%.  *See id.*  The footnote

accompanying each stratification table likewise stated that "the maximum original LTV ratio" for

the loans was "100.00%."  (*See* PX1538 at 9 (Pro. Supp. for ARMT 2006-1), 18 (Pro. Supp. for

CSAB 2006-1), 29 (Pro. Supp. for CSAB 2006-2), 41 (Pro. Supp. for CSAB 2006-3), 52 (Pro.

Supp. for CSAB 2006-4), 66 (Pro. Supp. for ARMT 2007-1), 78 (Pro. Supp. for CSAB 2007-1),

90 (Pro. Supp. for CSMC 2007-1), 101 (Pro. Supp. for CSMC 2007-3),111 (Pro. Supp. for TBW

2006-4), and 124 (Pro. Supp. for TBW 2007-2).)

21.     MassMutual's witnesses, Mr. Crandall and Mr. Canuel, testified that these LTV

representations were material to reasonable RMBS investors.  Mr. Crandall described the loans'

LTV ratios as "[a]bsolutely" important, "[b]ecause if you ever have a situation where the

borrower is unable to pay for any reason, you're secured by the collateral and the value of the

collateral compared to the loan tells you a lot about what your expected recovery would be."

(July 17 am Tr. at 122:19-24)  Mr. Canuel similarly testified that "LTV ratios clearly mattered"

because they "influenced the borrower's propensities to default, and they also influenced the

severity of the loans upon default. So the validity of those statistics essentially drove the results

that we got in terms of – in terms of the cash flow scenarios we used to evaluate the bonds.  So

there was a direct link there."  (July 18 am Tr. at 19:24-20:6; *see also id*. at 42:9-43:2)

22.     Mr. Crandall also testified that the representation that no LTV ratios exceeded

100% was important because "if it's above a hundred percent it would mean that the debt

exceeds the value of the loan at the time of this transaction," causing the loan to be "under

19

water." (July 17 am Tr. at 124:25-125:8) Mr. Canuel quantified the materiality of the weighted average LTV statistic that appears in each securitization's LTV stratification table, testifying that a change in that statistic of just .25% to .5 % would change the total mix of information for investors because a change of that magnitude would indicate that "the default rate on those loans could as much as, say, double." (July 18 am Tr. at 43:14-44:4)

23.     These witnesses also testified that it would be material to a reasonable RMBS investor if the offering documents presented false LTV information or omitted correct LTV information. Mr. Crandall testified, for example, that if one of these tables showed the percentage of a deal's total principal balance in the 80-100% LTV strata to be 15-20% (instead of the much smaller percentages that were represented), and that some loans had LTVs over 100% (instead of no loans having LTVs over 100%), that "would change in various scenarios the cash flows you would think would be coming out of collateral which would then change how you think about the securities on the other side of collateral and that would be important information to know," in part because it would influence any purchase decision as to both price and tranche. (July 17 am Tr. at 125:17-126:18; *see also id.* at 135:2-13) Mr. Canuel similarly testified that, if the information in an LTV stratification table were wrong, then an investor would need to know the omitted, correct information in order to adjust the strata to assess "whether this would be a securitization that we could participate in at all." (July 18 am Tr. at 43:3-6; *see also* Lenkeit Deposition Designations, '047 D.E. 564 at 59:8-60:2 (characteristics such as LTV were "key metrics").)

24.     As trial proceeds, MassMutual will continue to offer evidence proving Credit Suisse's material misstatements and omissions concerning LTV ratios.

C. **The Evidence to Date Shows That Credit Suisse's Challenged Representations And Omissions Concerning Conformity With Appraisal Standards Were Material.**

25.     MassMutual has proven that the Offering Documents for each of the

securitizations at issue included the following representation:

> All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.

(*See, e.g.,* PX1538 at 12 (Pro. Supp. for ARMT 2006-1), 20 (Pro. Supp. for CSAB 2006-1), 31

(Pro. Supp. for CSAB 2006-2), 43 (Pro. Supp. for CSAB 2006-3), 54 (Pro. Supp. for CSAB

2006-4), 65 (Pro. Supp. for ARMT 2007-1), 76 (Pro. Supp. for CSAB 2007-1), 88 (Pro. Supp.

for CSMC 2007-1), 99 (Pro. Supp. for CSMC 2007-3), 116 (Prospectus for TBW 2006-4), and

127 (Pro. Supp. for TBW 2007-2).)

26.     MassMutual's witnesses, Mr. Crandall and Mr. Canuel, testified that these

appraisal representations were material to reasonable RMBS investors.  Asked whether it is

"important to an investor to know whether some kind of uniform appraisal standards are being

employed when putting values on all these thousands of homes that end up underlying these

securities," Mr. Crandall said yes, because "if you don't know the rule book that was used in

doing the appraisal, you run into garbage in/garbage out problem when you do your analysis."

(July 17 am Tr. at 127:5-13.)  Mr. Canuel testified that adherence to appraisal standards was

material because "the validity of the appraisal standards and the adherence thereto essentially is

driving the LTV ratio.  So clearly that's important to us."  (July 18 am Tr. at 20:7-14.)

27.     These witnesses also testified that it would be material to a reasonable RMBS

investor if these appraisal representations were false.  Mr. Canuel testified generally that the

representation's falsity "would be deleterious" to the total mix of information for an investor, because

> if we're no longer able to rely on the V in LTV, so LTVs are no longer –
> potentially at least no longer valid, we run into the question, okay, data in the
> deal is not good. Can we get a foot to shore at all?  So there's a threshold issue
> that has to be addressed:  So that's wrong, what else is wrong?  That type of
> thing.  Then we get into the issue of how do we assess.

(July 18 am Tr. at 40:16-41:1.)  Mr. Crandall agreed that if only 90% (instead of all) of the appraisals complied with appraisal standards, that would have "an effect on the investment decision" in terms of price, terms and/or tranche.  (July 17 am Tr. at 127:24-128:2.)  Mr. Canuel testified similarly that if only 90% (instead of all) of the appraisals complied with appraisal standards, the investor would need to conduct "a total rerun of the security" after seeking guidance from the securities underwriter because "it changes our approach to the deal."  (July 18 am Tr. at 41:2-19.)

As trial proceeds, MassMutual will continue to offer evidence proving Credit Suisse's material misstatements and omissions concerning conformity with appraisal standards.

July 21, 2017

Respectfully submitted,

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY

*/s/ Katherine M. Swift*

John J. Egan (BBO 151680)
EGAN FLANAGAN AND COHEN, P.C.
67 Market Street, P.O. Box 9035
Springfield, Massachusetts 01102
Telephone: (413) 737-0260
Facsimile: (413) 737-0121

Joseph C. Smith, Jr. (admitted *pro hac vice*)
Lester C. Houtz (admitted *pro hac vice*)
Karma M. Giulianelli (admitted *pro hac vice*)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Philip S. Beck (admitted *pro hac vice*)
Jeffrey A. Hall (admitted *pro hac vice*)
James B. Heaton, III (admitted *pro hac vice*)
Steven J. Nachtwey (admitted *pro hac vice*)
Cindy L. Sobel (admitted *pro hac vice*)
Katherine M. Swift (admitted *pro hac vice*)
Joshua P. Ackerman (admitted *pro hac vice*)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, 3rd Floor
Chicago, Illinois 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
kate.swift@bartlit-beck.com

*Counsel for Plaintiff Massachusetts Mutual Life
Insurance Company*

23

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on this 21st day of July, 2017.

*/s/ Katherine M. Swift*

24