**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>DLJ MORTGAGE CAPITAL, INC. et al.,<br><br>    Defendants. | Civil Action No.<br>11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. et al.,<br><br>    Defendants. | Civil Action No.<br>11-cv-30048-MGM |

**DEFENDANT'S FIRST WEEKLY**
**PRELIMINARY PROPOSED FINDINGS OF FACT**

## **TABLE OF CONTENTS**

I.     BACKGROUND .................................................................................................1

      A.     The RMBS Purchases at Issue ..................................................................3

II.    MASSMUTUAL HAS FAILED TO PROVE THE EXISTENCE OF A
      MATERIAL MISSTATEMENT OR OMISSION ..................................................6

      A.     MassMutual Has Failed to Prove the Existence of a False or
              Misleading Statement or Omission Regarding Compliance with
              Underwriting Guidelines..............................................................................6

      B.     MassMutual Has Failed to Prove the Existence of a False or
              Misleading Statement or Omission Regarding LTV Ratios ......................10

      C.     MassMutual Has Failed to Prove the Existence of a False or
              Misleading Statement or Omission Regarding USPAP Compliance ........10

III.   THE ALLEGED FALSE OR MISLEADING STATEMENTS OR
      OMISSIONS WERE NOT MATERIAL.................................................................10

      A.     MassMutual's Investment Objectives.......................................................10

      B.     Babson's RMBS Investment Process........................................................12

      C.     The Court Should Disregard Mr. Crandall's Testimony Because
              He Had No Personal Knowledge of, or Any Involvement In,
              MassMutual's Purchases of RMBS Generally, Let Alone the
              RMBS At Issue Here ................................................................................17

IV.    EMAILS ABOUT SECURITIZATIONS AND OTHER MATTERS NOT
      AT ISSUE HAVE NO RELEVANCE TO PROVE FALSITY OR
      MATERIALITY .................................................................................................18

Pursuant to the Court's May 10, 2017 pre-trial procedural order, Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") hereby submits the following preliminary proposed findings of fact based on the evidence submitted to date.[1] Credit Suisse reserves the right to add to and amend these proposed findings as trial in this matter progresses.

## I.      BACKGROUND

1.       Plaintiff Massachusetts Mutual Life Insurance Company ("MassMutual") is a Massachusetts mutual life insurance company with its principal place of business in Springfield, Massachusetts.  (6/13/17 Pre-Trial Mem., Stipulation No. 1.)

2.       Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company with its principal place of business in New York, New York.  (6/13/17 Pre-Trial Mem., Stipulation No. 3.)

**3.**       MassMutual brought these actions in February 2011 in connection with the purchase of 19 RMBS certificates (the "Certificates") from Credit Suisse in 2006 and 2007.  (7/17/17 Vol. II Tr. 3:12-15; 6/13/17 Pre-Trial Mem., Stipulation No. 8.)

**4.**       A residential mortgage-backed security ("RMBS") is a type of asset-backed security that is secured by a pool of residential mortgage loans.  (7/17/17 Vol. I Tr. 62:17-22.)

---

[1] Because the examination of plaintiff's reunderwriting expert, Mr. Payne, remains to be completed, Credit Suisse has not included herein proposed findings of fact based on Mr. Payne's testimony.  Those findings will be included in the next such filing.

5.      Investors who purchase RMBS receive periodic principal and interest payments that depend on the performance of an underlying pool of mortgage loans.  (7/18/17 Vol. I Tr. 16:25-17:6.)

6.      RMBS typically were structured into various "tranches", each of which had differing levels of risk depending in part on their exposure to losses on the underlying mortgage pool(s).  (*See* 7/17/17 Vol. I Tr. 65:13-17; 67:8-16.)

7.      RMBS routinely were rated by various credit rating agencies, with the tranches most exposed to loss generally receiving lower ratings than the senior tranches further removed from loss.  (7/17/17 Vol. I Tr. 63:18-23, 67:8-16.)  MassMutual knew that the lower rated tranches tended to have lower credit quality and be more risky than higher rated tranches. (7/17/17 Vol. I Tr. 94:23-95:2, 95:11-96:9, 105:21-106:15; *see* PX1537.)

8.       MassMutual began investing in agency RMBS in the 1980s. (7/17/17 Vol. I Tr. 86:12.)  Agency RMBS are backed by the full faith and credit of the United States government and therefore pay relatively low interest rates.  (*See* 7/17/17 Vol. I Tr. 85:25-86:8.)  In the late 1990s, MassMutual began investing in non-agency RMBS, which are not guaranteed by the government and thus carry a higher degree of credit risk.  *See* 7/17/17 Vol. I Tr. 88:8-11, 88:17-20.)

9.      All of the Certificates that MassMutual purchased from Credit Suisse were non-agency RMBS.  (7/17/17 Vol. I Tr. 89:1-4.)

10.      Each of the Certificates was backed by Alt-A mortgage loans, which, while not precisely or uniformly defined, generally is a classification between

2

prime and subprime in terms of overall credit quality.  (7/18/17 Vol. I Tr. 9:13-22, 57:13-16.)

11.      Until 2016, Babson Capital Management LLC ("Babson") was a wholly owned subsidiary of MassMutual.  In 2016, Babson Capital changed its name to Barings LLC.  (6/13/17 Pre-Trial Mem., Stipulation No. 2.)

12.      MassMutual was both Babson's parent company and its largest client.  (7/18/17 Vol. I Tr. 6:2-9.)

13.      Babson managed "MassMutual's asset/liability relationship", which means that it was charged with ensuring that MassMutual earned enough from its investments to enable it to pay liabilities on the insurance side of its business.  (7/18/17 Vol. I Tr. 8:18-9:4.)

14.      As part of that charge, Babson managed MassMutual's overall strategy with regard to, among other things, the selection of agency and non-agency mortgage-backed securities.  (7/18/17 Vol. I Tr. 8:18-9:4.)

15.      David Canuel was a managing director in Babson's Quantitative Management Group during 2006-2007.  (7/18/17 Vol. I Tr. 7:22-25, 8:15-17.)

16.      Roger Crandall, MassMutual's current chairman, president and CEO, was CEO of Babson during the relevant time period.  (7/17/17 Vol. I Tr. 57:15-18, 60:3-7.)

### A.      The RMBS Purchases at Issue

17.      Credit Suisse, acting as underwriter, sold the following certificates to MassMutual: ARMT 2006-1, class CB2; CSAB 2006-1, class A3; CSAB 2006-2, class M1; CSAB 2006-2, class M5; CSAB 2006-3, class M5A; CSAB 2006-3, class M6; CSAB 2006-4, class M7; ARMT 2007-1, class 5A32; CSAB 2007-1, class 1M1; CSAB

2007-1, class 1M2; CSMC 2007-1, class 1M4; CSMC 2007-1, class 1M5; CSMC 2007-3, class 1M1; CSMC 2007-3, class 1M4; CSMC 2007-3, class 1M5; TBW 2006-4, class A3; TBW 2006-4, class M3; TBW 2007-2, class A3A; and TBW 2007-2, class M1.

(6/13/17 Pre-Trial Mem., Stipulation No. 30.)

   18.  MassMutual purchased the Certificates (through Babson) between May 2006 and June 2007:

| Certificate | Trade Date | Settlement Date |
|---|---|---|
| ARMT 2006-1 CB2 | June 14, 2006 | June 19, 2006 |
| ARMT 2007-1 5A32 | June 21, 2007 | June 26, 2007 |
| CSAB 2006-1 A3 | May 19, 2006 | May 31, 2006 |
| CSAB 2006-2 M1 | September 22, 2006 | September 29, 2006 |
| CSAB 2006-2 M5 | October 4, 2006 | October 10, 2006 |
| CSAB 2006-3 M5A | October 20, 2006 | October 31, 2006 |
| CSAB 2006-3 M6 (first purchase, at a price of $1,462,443.30) | October 20, 2006 | October 31, 2006 |
| CSAB 2006-3 M6 (second purchase, at a price of $2,890,310.63) | December 21, 2006 | December 27, 2006 |
| CSAB 2006-4 M7 | November 14, 2006 | November 30, 2006 |
| CSAB 2007-1 1M1 | May 2, 2007 | May 4, 2007 |
| CSAB 2007-1 1M2 | May 2, 2007 | May 4, 2007 |
| CSMC 2007-1 1M4 | January 26, 2007 | January 31, 2007 |
| CSMC 2007-1 1M5 | January 26, 2007 | January 31, 2007 |
| CSMC 2007-3 1M1 | March 14, 2007 | March 30, 2007 |
| CSMC 2007-3 1M4 | March 8, 2007 | March 30, 2007 |
| CSMC 2007-3 1M5 | March 8, 2007 | March 30, 2007 |
| TBW 2006-4 A3 | August 23, 2006 | August 31, 2006 |
| TBW 2006-4 M3 | October 4, 2006 | October 10, 2006 |
| TBW 2007-2 A3A | May 23, 2007 | May 31, 2007 |
| TBW 2007-2 M1 | May 23, 2007 | May 31, 2007 |

(6/13/17 Pre-Trial Mem., Stipulation No. 31, 34.)

   19.  The Securitizations were issued, offered and sold pursuant to offering documents, including prospectus supplements, each of which included the corresponding base prospectus (collectively, the "Prospectus Supplements" or

"ProSupps").  (JX006 (ARMT 2006-1 ProSupp); JX022 (ARMT 2007-1 ProSupp);

JX010 (CSAB 2006-1 ProSupp); JX099 (CSAB 2006-2 ProSupp); JX017 (CSAB 2006-3

ProSupp); JX018 (CSAB 2006-4 ProSupp); JX031 (CSAB 2007-1 ProSupp); JX020

(CSMC 2007-1 ProSupp); JX025 (CSMC 2007-3 ProSupp); JX014 (TBW 2006-4

ProSupp); JX033 (TBW 2007-2 ProSupp).)  (6/13/17 Pre-Trial Mem., Stipulation No.

18.)

20.	The final Prospectus Supplement for ARMT 2006-1 is dated

February 27, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 19.)

21.	The final Prospectus Supplement for ARMT 2007-1 is dated

February 28, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 20.)

22.	The final Prospectus Supplement for CSAB 2006-1 is dated

July 12, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 21.)

23.	The final Prospectus Supplement for CSAB 2006-2 is dated

September 28, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 22.)

24.	The final Prospectus Supplement for CSAB 2006-3 is dated

October 27, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 23.)

25.	The final Prospectus Supplement for CSAB 2006-4 is dated

November 28, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 24.)

26.	The final Prospectus Supplement for CSAB 2007-1 is dated May

4, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 25.)

27.	The final Prospectus Supplement for CSMC 2007-1 is dated

January 30, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 26.)

28.        The final Prospectus Supplement for CSMC 2007-3 is dated

March 30, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 27.)

29.        The final Prospectus Supplement for TBW 2006-4 is dated

August 29, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 28.)

30.        The final Prospectus Supplement for TBW 2007-2 is dated May

29, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 29.)

## II.    MASSMUTUAL HAS FAILED TO PROVE THE EXISTENCE OF A MATERIAL MISSTATEMENT OR OMISSION

31.        MassMutual alleges that the Offering Documents for the

Certificates contained three categories of false or misleading statements or omissions:

(1) those relating to compliance with underwriting guidelines; (2) those relating to loan-

to-value ("LTV") ratios; and (3) those relating to compliance with appraisal standards.

(6/13/17 Pre-Trial Mem. at 5.)

32.        Based on the evidence presented, MassMutual has failed to prove

the existence of any such misstatement or omission.

### A.    MassMutual Has Failed to Prove the Existence of a False or Misleading Statement or Omission Regarding Compliance with Underwriting Guidelines

33.        The Offering Documents for the securitizations at issue each

contained certain disclosures about the underwriting guidelines used to originate or

acquire the mortgage loans underlying the Certificates at issue.  (JX006 (ARMT 2006-1

ProSupp) at S-18); (JX010 (CSAB 2006-1 ProSupp). at S-27); (JX099 (CSAB 2006-2

ProSupp) at S-28); (JX017 (CSAB 2006-3 ProSupp) at S-29); (JX018 (CSAB 2006-4

ProSupp) at S-30); (JX022 (ARMT 2007-1 ProSupp) at S-18); (JX031 (CSAB 2007-1

ProSupp) at S-36); (JX020 (CSMC 2007-1 ProSupp) at S-33); (JX025 (CSMC 2007-3

6

ProSupp) at S-39; (JX014 (TBW 2006-4 ProSupp) at S-30-S-31); (JX033 (TBW 2007-2 ProSupp) at S-31-S-32.)

34.     The Prospectus Supplements for 9 of the 11 securitizations at issue contained a version of the following statement (with minimal variation):  "The mortgage loans were originated generally in accordance with the underwriting criteria described herein."  (JX006 (ARMT 2006-1 ProSupp) at S-18); (JX010 (CSAB 2006-1 ProSupp) at S-27); (JX099 (CSAB 2006-2 ProSupp) at S-28); (JX017 (CSAB 2006-3 ProSupp) at S-29); (JX018 (CSAB 2006-4 ProSupp) at S-30); (JX022 (ARMT 2007-1 ProSupp) at S-18); (JX031 (CSAB 2007-1 ProSupp) at S-36); (JX020 (CSMC 2007-1 ProSupp) at S-33); (JX025 (CSMC 2007-3 ProSupp) at S-39).

35.     The Prospectus Supplements for the other 2 of 11 securitizations at issue did not contain that language.  Instead, they contained language that the underwriting standards  for the mortgage loans generally will conform to the originator's published underwriting guidelines.  Specifically, the TBW 2006-4 Prospectus Supplement stated that:  "The Company's underwriting standards with respect to the Mortgage Loans generally will conform to those published in the Company's underwriting guidelines."  (JX014 (TBW 2006-4 ProSupp) at S-30-S-31.  The TBW 2007-2 Prospectus Supplement stated that:  "The sponsor's underwriting standards with respect to the mortgage loans generally will conform to those published in TBW Mortgage Corp.'s Product Profiles and Credit Policy."  (JX033 (TBW 2007-2 ProSupp) at S-31-S-32.)

36.     The Offering Documents for all 11 securitizations at issue also stated:  "The underwriting standards of any particular originator typically include a set of

7

specific criteria by which the underwriting evaluation is made.  However, the application

of the underwriting standards does not imply that each specific criterion was satisfied

individually.  Rather, a loan will be considered to be originated in accordance with a

given set of underwriting standards, if, based on an overall qualitative evaluation, the

loan is in substantial compliance with the underwriting standards.  For example, a loan

may be considered to comply with a set of underwriting standards, even if one or more

specific criteria included in the underwriting standards were not satisfied, if other factors

compensated for the criteria that were not satisfied or if the loan is considered to be in

substantial compliance with the underwriting standards."  (7/18/17 Vol. I Tr. 23:6-20; *see

also* JX006 (ARMT 2006-1 Prospectus) at 29; JX010 (CSAB 2006-1 Prospectus) at 30;

JX099 (CSAB 2006-2 Prospectus) at 31; JX017 (CSAB 2006-3 Prospectus) at 31; JX018

(CSAB 2006-4 Prospectus) at 31; JX022 (ARMT 2007-1 Prospectus) at 31; JX031

(CSAB 2007-1 Prospectus) at 41; (JX020 (CSMC 2007-1 Prospectus) at 31; JX025

(CSMC 2007-3 Prospectus) at 31; JX014 (TBW 2006-4 Prospectus) at 31; JX033 (TBW

2007-2 Prospectus) at 41.)

   37.  Similarly, TBW 2006-4 Prospectus Supplement states that:  "There

can be no assurance that every Mortgage Loan was or will be originated in conformity

with the applicable underwriting standards in all material respects, or that the quality or

performance of the Mortgage Loans will be equivalent under all circumstances."  (JX014

(TBW 2006-4 ProSupp) at S-31.)

   38.  Each of these disclosures made clear to investors that not all loans

underlying the RMBS at issue would comply with applicable guidelines, and that those

loans that did comply may comply only generally or substantially, with or without compensating factors. (7/17/17 Vol. I Tr. 119:13-14.)

      39.      MassMutual's chairman, president and CEO, Roger Crandall, agreed: "yes, it is different than a hundred percent certainty." (7/17/17 Vol. I Tr. 119:13-14.) Upon questioning by the Court, Mr. Crandall also agreed that the term "generally" "acts [as] a qualifier, almost like a little bit of an escape hatch" (7/17/17 Vol. I Tr. 119:20-24) and analogized the statement to one that "driving up here to the court this morning[,] I generally observed the speed limit". (7/17/17 Vol. I Tr. 121:19-122:1).

      40.      Mr. Canuel testified that he never asked anyone the meaning of the word "generally" prior to the litigation of MassMutual's claims. (7/18/17 Vol. II Tr. 24:5-7.) His understanding of the word "generally" was such that if "a student were to say to me I 'generally' did my homework, I would expect to see *most* of the grades for the homework filled in". (7/18/17 Vol. II Tr. 24:13-15.)

      41.      It is important in assessing the truth or falsity of the statements in the Offering Documents about underwriting guidelines to identify correctly the set of guidelines pursuant to which the underlying loans are said to have been originated generally in substantial compliance.

      42.      MassMutual appears to have assumed throughout this litigation that the relevant comparison for purposes of establishing falsity is against the actual underwriting guidelines that applied at origination. However, the ProSupps refer to the underwriting criteria "described herein". For certain disclosed originators, that refers to the fairly high level summary descriptions in the ProSupps, which do not include a lot of the detailed characteristics in particular guidelines. For originators not identified in the

ProSupps, no underwriting guidelines are disclosed except at most at a very high level of generalization.  (*See, e.g.*, JX022 (ARMT 2007-1 ProSupp) at S-100-S-101.

**B.     MassMutual Has Failed to Prove the Existence of a False or Misleading Statement or Omission Regarding LTV Ratios**

43.     The Offering Documents for the securitizations at issue each contained disclosures about the LTV ratios applicable to the mortgage loans underlying the Certificates at issue.  The disclosure typically took the form of a stratification table that presented the number of loans whose LTVs fell within certain ranges listed in the table.  (*See, e.g.*, JX006 (ARMT 2006-1 ProSupp) at III-36.)

44.     [Reserved.]

**C.     MassMutual Has Failed to Prove the Existence of a False or Misleading Statement or Omission Regarding USPAP Compliance**

45.     [Reserved.]

**III.     THE ALLEGED FALSE OR MISLEADING STATEMENTS OR OMISSIONS WERE NOT MATERIAL**

**A.     MassMutual's Investment Objectives**

46.     For a significant number of the Certificates at issue, MassMutual deliberately targeted riskier segments of the RMBS structure that it typically would not have purchased for its own account.  It did so because it intended to repackage those securities into CDOs to be sold to third-party investors.

47.     Part of Babson's business included managing collateralized debt obligations, or "CDOs".  (7/17/17 Vol. I Tr. 108:10-19.)  CDOs are securities that are backed by debt securities.  (7/17/17 Vol. I Tr. 106:23-107:5.)

48.     "[B]ringing CDOs was a business line of Babson to generate fee income".  (7/18/17 Vol. II Tr. 46:18-20.)

49.     The CDOs Babson brought to market included commercial mortgaged-backed securities and other asset-backed securities in addition to RMBS. (7/17/17 Vol. I Tr. 107:21-108:1.)

50.     After launching three CDOs, Babson "came under increasing pressure to a) replace the lost fee income from Storrs, and 2) build an ABS 'down in credit' platform for the management of outside funds, with the development of the Structured Credit Group as the model or example.  New deal efforts included . . . the acquisition of collateral for a 'mezz' ABS CDO ('Storrs II')".  (DX1163 at 1-2.)

51.     RMBS purchased by Babson that Babson planned to put in a CDO were "warehoused" in the General Investment Account ("GIA") and held there until CDOs were put together.  (7/17/17 Vol. I Tr. 109:2-5.)

52.     The GIA "is the account where all of the assets of the insurance company backing [MassMutual's] insurance liabilities as well as the capital surplus of a company sit."  (7/17/17 Vol. I Tr. 61:21-62:2.)

53.     Babson had "an explicit policy to avoid exposures with credit risk as permanent investments.  Securities with credit risk would be held only on a temporary basis while warehousing assets for CDO's, and ultimate exposure would be limited to ownership of a portion of the equity in CDO's backed by credit-sensitive collateral." (DX1163 at 2.)

54.     The following Certificates at issue here were earmarked for inclusion in a CDO at the time that Babson purchased them:  CSAB 2006-2 M5, CSAB 2006-3 M5A, CSAB 2006-3 M6, CSAB 2006-4 M7, CSMC 2007-1 1M4, CSMC 2007-1

11

1M5, CSMC 2007-3 1M4, CSMC 2007-3 1M5, and TBW 2006-4 M3.  (DX1617 at 12; DX1616 at 11.

55.     None of the Certificates considered for inclusion in a CDO was rated AAA by a credit rating agency, and some were graded as low as BBB.  (7/18/17 Vol. II Tr. 50:21-52:14.)

56.     Specifically, CSAB 2006-2 M5 was rated BBB+, CSAB 2006-3 M5A was rated A-, CSAB 2006-3 M6 was rated BBB+, CSAB 2006-4 M7 was rated BBB, CSMC 2007-1 1M4 and CSMC 2007-1 1M5 were rated BBB+ and BBB, CSMC 2007-3 1M4 and CSMC 2007-3 1M5 were rated BBB+ and BBB, TBW 2006-4 M3 was rated A-.  (7/18/17 Vol. II Tr. 50:21-52:14.)

57.     In retrospect, Mr. Canuel observed that "[t]he focus on developing products to increase AUM and fee income was a major factor" in Babson's RMBS losses, and that Babson's "continuing obsession with increasing external AUM" using CDOs "beggars belief".  (DX1163 at 2-3.)

**B.     Babson's RMBS Investment Process**

58.     Mr. Canuel testified regarding the general process Babson used in evaluating RMBS investments.

59.     Babson's trading process began at its trading desk, where individuals were in contact with securities underwriting firms and other broker dealers. (7/18/17 Vol. I Tr. 11:7-18.)  Those firms notified Babson of potential transactions, and sent "an array of documents", by which Babson evaluated "the security structure as well as the underlying collateral in looking at the relationship between those elements of the security to assess whether given the pricing it was something that we wanted to

12

participate in, and then make an assessment as to what class we wanted and what its characteristics were." (7/18/17 Vol. I Tr 11:19-12:5.)

60.     In assessing the collateral, Babson looked at the loans' performance "in an array of scenarios", in order to determine the borrowers' likelihood of default and the likelihood of losses in the underlying pool of loans. (7/18/17 Vol. I Tr. 13:1-7.)

61.     Babson was provided a collection of several different documents: The Registration Statement, the Free Writing Prospectus (also called a term sheet), which includes the data about the collateral in stratification tables, and the Prospectus Supplement. (7/18/17 Vol. I Tr. 15:20-19:13.)

62.     The data received by Babson was on a pool-wide or group-wide basis. (7/18/17 Vol. I Tr. 64:3-19.)

63.     Mr. Canuel testified that the stratification tables were the "foundation or *sine qua non* for the inclusion of the loans in the transaction", as they described the characteristics of the collateral. (7/18/17 Vol. I Tr. 19:5-13.)

64.     Term sheets provided "a whole array of statistics" for the pool of loans that was expected to collateralize the securitization, such as "loan-to-value ratios, the distribution of credit scores which we just called FICO scores, information about the distribution of loans, owner occupant versus non-owner occupant, whether it was an investor property", in addition to "whether it was what we called full doc or non-full doc". (7/18/17 Vol. I Tr. 18:21-19:4.)

13

65.     Mr. Canuel testified that he has no specific recollection of receiving loan tapes containing loan-level data for any of the certificates at issue. (7/18/17 Vol. II Tr. 6:20-23.)

66.     In assessing the collateral, Babson used commercially available Bloomberg data and the Intex model when making its purchase decisions, in addition to other proprietary tools.  (7/18/17 Vol. II Tr. 4:12- 5:17.)

67.     Babson took into account "whatever [it was] reading about macroeconomic conditions and how they were changing over the course of time particularly in 2006 and 2007".  (7/18/17 Vol. II Tr. 5:18-22.)

68.     Babson used a proprietary model that took into account, among other things, LTV ratios, FICO scores, percentage of reduced documentation loans, and percentage of owner occupied properties.  (7/18/17 Vol. II Tr. 11:23-12:16.)

69.     None of the inputs into Babson's model had anything to do with compliance with underwriting guidelines.  (7/18/17 Vol. II Tr. 21:12-19.)

70.     Babson was aware that the percentage of loans in the deals at issue originated under reduced documentation programs was disclosed in the prospectus supplements and that those percentages were typically within the 80%-90% range for the deals at issue.  (7/18/17 Part I Tr. 69:8-69:21; see JX010 (CSAB 2006-1 ProSupp) at S-25; JX099 (CSAB 2006-2 ProSupp) at  S-26; JX017 (CSAB 2006-3 ProSupp) at S-27; JX018 (CSAB 2006-4 ProSupp) at  S-28; JX014 (TBW 2006-4 ProSupp) at S-23; JX033 (TBW 2007-2 ProSupp) at S-24.)

71.     Babson was never told by Credit Suisse that it could not have a piece of information it requested in connection with a potential RMBS investment. (7/18/17 Vol. II Tr. 13:14-19.)

72.     Babson typically made its purchase decisions before receipt of the Prospectus Supplement.  (7/18/17 Vol. II Tr. 37:3-11.)  The day Babson made its purchase decisions was referred to as "the trade date".  The trade date was the date "that we used to reflect when we would actually execute a purchase or commit to make a purchase at a price".  (7/18/17 Vol. I Tr. 47:3-12.)

73.     Babson typically received the Prospectus Supplement after the trade date.  7/18/17 Vol. I Tr. 47:13-16.)

74.     Of the 20 individual purchases of RMBS Certificates at issue here, 15 of them took place before issuance of the relevant Prospectus Supplements.  (6/13/17 Pre-Trial Mem., Stipulation No. 19-29, 31)

75.     Mr. Canuel had no recollection of an instance in which Babson did not close a deal on an RMBS certificate after the trade date.  (7/18/17 Vol. I Tr. 37:19-25.)

76.     Babson was "loath to back away from a deal" after the trade date. (7/18/17 Vol. II Tr. 48:3-7.)

77.     Because Babson mostly did not have Prospectus Supplements available at the time it made its purchase decisions, it had no information at all about the underwriting guidelines that applied to the loans underlying an RMBS.

78.     Mr. Canuel made clear that underwriting guidelines did not play a material role in Babson's investment decision-making process.

15

79.     Mr. Canuel did explain that he was generally interested in knowing that the underlying loans went through an underwriting process, but his analysis did not focus at all on the application of any specific set of guidelines.  In other words, he said he cared that *some* set of guidelines applied, not any *particular* set of guidelines.  (*See* 7/18/17 Vol. II Tr. 28:6-29:13)

80.     Indeed, Mr. Canuel conceded that only some of the originators underlying are identified in the Offering Documents for each securitization.  (7/18/17 Vol. II Tr. 28:3-5.)

81.     He also emphasized the proprietary and ever-changing nature of originators' guidelines during the relevant time period:  "Each underwriter had its own set of guidelines . . . every mortgage originator or many of them had multiple programs, guidelines, their guidelines could potentially vary with respect to the geography in a particular regulation at play in each state".  (7/18/17 Vol. II Tr. 29:14-30:5.)

82.     Babson did not know, based on an assigned FICO score, whether or not that number was "above or below the underwriting guidelines of the specific originator who originated that loan", and "in particular with respect to the particular program under which the loan was underwritten because they could have had different programs or different types of borrowers with different compensating factors allowed and so forth in them".  (7/18/17 Vol. II Tr. 33:15-34:2.)

83.     As a result, Mr. Canuel admitted that when he read about "substantial compliance with underwriting guidelines", he understood that was referring to originators he did not know and therefore guidelines he did not know.  (7/18/17 Vol. II Tr. 29:7-11.)

16

84.     Mr. Canuel was unequivocal that Babson never asked for any originator's underwriting guidelines.  (7/18/17 Vol. II Tr. 29:12-13, 35:8-15.)

**C.     The Court Should Disregard Mr. Crandall's Testimony Because He Had No Personal Knowledge of, or Any Involvement In, MassMutual's Purchases of RMBS Generally, Let Alone the RMBS At Issue Here**

85.     Mr. Crandall testified at length about certain representations contained in RMBS offering documents and about categories of information that are important to RMBS investors.

86.     However, Mr. Crandall's testimony on cross examination made clear that he was unfamiliar with MassMutual's evaluation of RMBS or its decision to purchase such securities, and he thus could not be sure of what would have been material to investors.  Indeed, Mr. Crandall testified that he was "not involved in purchasing the individual RMBS certificates at issue" in these cases.  (7/17/17 Vol. II Tr. 4:2-5.)

87.     Mr. Crandall further admitted that he was not involved in "reviewing any of these RMBS transactions prior to purchase" (7/17/17 Vol. II Tr. 3:20-22); he did not know whether anybody at MassMutual or Babson received Prospectus Supplements prior to purchasing the at-issue RMBS certificates (7/17/17 Vol. II Tr. 4:6-9); he did not know whether anyone at MassMutual or Babson ever asked for access to the loan files underlying the collateral (7/17/17 Vol. II Tr. 4:10-13); he was not familiar with the difference between subprime and Alt-A collateral (7/17/17 Vol. II Tr. 5:12-20); and he was not familiar with AVMs or BPOs (7/17/17 Vol. II Tr. 5:21-6: 2).  Mr. Crandall testified that he was familiar with the term "EPD", or Early Payment Default, but this was inconsistent with testimony he gave in his February 2014 deposition in these actions.  (*See* 7/17/17 Vol. II Tr. 6:3-7:14.)  Mr. Crandall had no contact with anyone at

17

Credit Suisse during the time that MassMutual was investing in the at-issue RMBS certificates (7/17/17 Vol. II Tr. 5:8-11), and he played no role in actually reviewing or selecting for purchase any of the RMBS at issue in these actions.  (7/17/17 Vol. II Tr. 3:20-4:1.)  Despite empty assertions about what was important to RMBS investors, Mr. Crandall's own testimony makes it apparent that he was too far removed from any of the transactions between MassMutual and Credit Suisse to speak to what was important to MassMutual or what would be important to an investor in RMBS.

88.     As a result, the Court should not credit Mr. Crandall's assertions about what information would have been material to RMBS investors.

## IV.    EMAILS ABOUT SECURITIZATIONS AND OTHER MATTERS NOT AT ISSUE HAVE NO RELEVANCE TO PROVE FALSITY OR MATERIALITY

89.     MassMutual's deposition designations focus on a handful of emails between and among Credit Suisse traders regarding transactions not at issue here. Nothing in those emails establishes falsity or materiality.  Credit Suisse will address those matters during its case in chief when it presents its due diligence defense.

90.     MassMutual's reliance on emails from John Vibert and Michael Daniel, Credit Suisse employees who worked on the trading desk, is unavailing.  These individuals sold certificates and securities.  "Other people were responsible for the due diligence."  (Ezra, 1/17/14 Tr. 46:20-47:6; Vibert, 8/15/13 Tr. 61:20-24.)

91.     John Vibert, who griped about Credit Suisse's due diligence in emails cited by MassMutual, acknowledged that "the whole conduit business, underwriting, diligence, et cetera, these were not businesses that reported to me, nor do I necessarily hold myself forth as an expert. . . .  I'm not really qualified to answer and inadvertently give, you know, bad information".  (Vibert 12/19/13 Tr. 79:16-25.)  He also

18

acknowledged that some of his comments in the emails were an "uninformed expression of frustration".  (Vibert 12/20/13 Tr. 405:14-15.)

Dated: July 21, 2017

By /s/ Jonathan Sablone

Jonathan Sablone (BBO #632998)
Matthew T. McLaughlin (BBO #660878)
    NIXON PEABODY LLP
    100 Summer Street
    Boston, Massachusetts 02110
    Telephone: (617) 345-1342
    Fax: (866) 947-1729
    jsablone@nixonpeabody.com
    mmclaughlin@nixonpeabody.com

Of Counsel:

Richard W. Clary (admitted pro hac vice)
Michael T. Reynolds (admitted pro hac vice)
Lauren A. Moskowitz (admitted pro hac vice)
    CRAVATH, SWAINE & MOORE LLP
    825 Eighth Avenue
    New York, New York 10019
    Telephone: (212) 474-1000
    Fax: (212) 474-3700
    rclary@cravath.com
    mreynolds@cravath.com
    lmoskowitz@cravath.com

*Counsel for Defendant Credit Suisse Securities (USA) LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing will be sent electronically through the ECF system to the registered participants and paper copies will be sent to those indicated as non-registered participants on this date.

*/s/ Jonathan Sablone*
Jonathan Sablone