**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>  v.<br><br>DLJ MORTGAGE CAPITAL, INC., et al.,<br><br>       Defendants. | Civil Action No. 11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>       Plaintiff,<br><br>  v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., et al.,<br><br>       Defendants. | Civil Action No. 11-cv-30048-MGM |

**MASSMUTUAL'S PROPOSED FINDINGS OF FACT**

**AND DISCUSSION OF LEGAL ISSUES**

**<u>TRIAL WEEK 2</u>**

# TABLE OF CONTENTS

Introduction ........................................................................................................................ 1

I.      Legal Standard ...................................................................................................... 2

II.     Legal Issues Presented by This Week's Evidence ............................................... 2

III.    Proposed Findings of Fact Based on This Week's Evidence ............................... 3

        A.      Credit Suisse Sold the At-Issue Securities by Means of Material
                Misrepresentations and Omissions Regarding Underwriting Guidelines. .............. 3

                1.      Misrepresentations and Omissions. ..................................................... 3

                        a.      Credit Suisse knew that the structure of the conduit posed
                                undue risks to loan quality and underwriting ................................. 4

                        b.      Credit Suisse prioritized loan volume at the expense of
                                sound underwriting and loan quality. ............................................. 6

                        c.      Fallacara's oversight of underwriting and due diligence
                                created a conflict that threatened the RMBS business. ................... 9

                        d.      Instead of fixing its "broken" underwriting and due
                                diligence processes, Credit Suisse continued securitizing
                                loans from shoddy originators. ..................................................... 11

                2.      Materiality. ......................................................................................... 15

        B.      Credit Suisse Sold the At-Issue Securities by Means of Material
                Misstatements and Omissions Regarding Loan-to-Value Ratios. ......................... 16

                1.      Materiality. ......................................................................................... 16

                2.      Falsity. ................................................................................................ 18

        C.      Credit Suisse Sold the At-Issue Securities by Means of Material
                Misstatements and Omissions Regarding Compliance With Appraisal
                Standards. ............................................................................................................. 22

                1.      Materiality. ......................................................................................... 22

                2.      Falsity. ................................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**

*Am. Title Ins. Co. v. E. W. Fin. Corp.*,
   959 F.2d 345 (1st Cir. 1992) .................................................................................... 2

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) .................................................................... 17

*Marram v. Kobrick Offshore Fund, Ltd.*,
   809 N.E.2d 1017 (Mass. 2004) ................................................................................ 2

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ......................................................................................... 2, 3

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
   842 F.3d 71 (1st Cir. 2016) ...................................................................................... 2

**Rules**

Fed. R. Evid. 801 ......................................................................................................... 4

Mass. Gen. Laws ch. 110A, § 410 ................................................................................ 2

## Introduction

The second trial week has confirmed there are two ways for MassMutual to win this case.

First, the testimony of former Credit Suisse trader Michael Daniel, deposition testimony of other Credit Suisse witnesses, and Credit Suisse documents show that its loan acquisition, underwriting, and due diligence machinery produced securitizations backed by misrepresented loans.  Credit Suisse failed to disclose these serious problems, including the conflict created by the conduit chief Mike Fallacara's oversight of loan underwriting and due diligence, and his pursuit of volume at the expense of loan quality.  Mr. Daniel's testimony and the other evidence—particularly Credit Suisse's contemporaneous internal documents—showed that Mr. Fallacara persistently applied inappropriate pressure to approve unworthy loans, and that Credit Suisse's loan underwriting and due diligence processes were "broken," "a joke," and plagued with "systemic problems."  By itself, this Credit Suisse evidence proves that it materially misrepresented, and omitted material facts concerning, the loans backing the securities at issue. A reasonable investor would view disclosure of those problems as significantly altering the total mix of information, regardless of the quality of the loans backing particular securities produced by this machinery.  Beset by such dysfunction, Credit Suisse had no business representing that loans complied with underwriting guidelines or appraisal standards, or that LTVs fell within specific ranges.

Second, and independent of the evidence summarized above, MassMutual has proved through expert testimony that the loans backing each of the at-issue securities were not originated generally in accordance with applicable underwriting guidelines, were not supported by USPAP-compliant appraisals, and had LTV ratios that were materially worse than those represented in the offering documents.

## I.     Legal Standard

MassMutual must prove that Credit Suisse offered or sold a security in Massachusetts,

"by means of any untrue statement of a material fact or any omission to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which

they are made, not misleading," and that MassMutual did not know of the untruth or omission.

MASS. GEN. LAWS ch. 110A, § 410(a)(2).

The parties have stipulated that (1) the at-issue certificates are securities that (2) were

sold in Massachusetts.  (Pretrial Mem. at 5 ('047 D.E. 544; '048 D.E. 583).)  And the Court has

ruled that (3) MassMutual lacked knowledge of Credit Suisse's misstatements and omissions.

(*See* '047 D.E. 527; '048 D.E. 564.)

What remains for MassMutual to prove by a preponderance of the evidence is that Credit

Suisse sold the securities by means of a material misstatement or omission.  *See Marram v.*

*Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1026 (Mass. 2004); *see also Am. Title Ins. Co. v.*

*E. W. Fin. Corp.*, 959 F.2d 345, 348 (1st Cir. 1992).

## II.     Legal Issues Presented by This Week's Evidence

Under MUSA, an underwriter's disclosures "must be complete and accurate" and "must

reveal" such other information as "needed so that what was revealed [will] not be 'so incomplete

as to mislead.'"  *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 842 F.3d 71, 88 (1st Cir. 2016)

(citation omitted).  Likewise, the federal securities laws prohibit the sale of securities based on

information that is "misleadingly incomplete."  *Omnicare, Inc. v. Laborers Dist. Council Const.*

*Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015).[1]  Thus, if an offering document "omits

---

[1] The Massachusetts Supreme Judicial Court has instructed courts to interpret MUSA "in coordination" with the federal securities laws, particularly section 12(a)(2) of the Securities Act of 1933.  *Marram*, 809 N.E.2d at 1025.

material facts about the issuer's inquiry into or knowledge concerning" a statement in the offering documents, and the facts conflict with what a reasonable investor would take from the statement itself, the omission creates liability. *Omnicare*, 133 S. Ct. at 1329.

The Credit Suisse testimony and exhibits MassMutual presented in the second trial week show that Credit Suisse omitted material information about systemic failures in its underwriting and due diligence processes. Those omissions rendered the offering documents misleadingly incomplete. That proof, standing on its own—and regardless of whether Credit Suisse's failed processes led to the inclusion of defective loans in the pools backing the at-issue securities—is sufficient to prove MassMutual's claim.

But MassMutual has also proved that the securities were backed by defective and misrepresented loans. The expert testimony corroborates Mr. Daniel's testimony and the other Credit Suisse evidence and proves the loans backing the securities were materially misrepresented. Mr. Payne's first-week testimony established that a significant number of loans backing the securities had substantial underwriting defects, and Dr. Kilpatrick testified that many of the loans were based on appraisals that were inflated and/or violated appraisal standards.

III.   **Proposed Findings of Fact Based on This Week's Evidence**

    A.   **Credit Suisse Sold the At-Issue Securities by Means of Material Misrepresentations and Omissions Regarding Underwriting Guidelines.**

        1.   **Misrepresentations and Omissions.**

1.   MassMutual proved that Credit Suisse's loan underwriting and due diligence processes were subverted by Mr. Fallacara's pressure to increase loan volume at the expense of quality. Poor underwriting and due diligence produced substantial loan quality problems, especially in loans acquired through the conduit. Credit Suisse was well aware of these systemic

problems.  Despite its knowledge, Credit Suisse misrepresented the loans produced by its

processes and never told investors about the widespread failures in its conduit business.

> **a.** **Credit Suisse knew that the structure of the conduit posed**
> **undue risks to loan quality and underwriting.**

2.      In 2004, Credit Suisse issued an internal audit report on the conduit business that

was critical of the lack of process for documenting underwriting decisions.  (PX98 at CS-MM-

TR000050932.)  The internal audit showed that loan appraisals were "not being compared to

external sources for reasonableness as required," and that loans were being approved without the

required documentation (including second appraisals/AVM results) as prescribed in Credit

Suisse's underwriting guidelines.  (*Id.*)  "These matters increase the risk of purchasing loans that

pose undue risk to the Firm."  (*Id.*)  Ernst & Young issued a similar report to Credit Suisse in

2004, that was critical of the conduit's processes and structure.  The E&Y report warned, "Seller

loan performance and loan quality information is not being consistently captured and used in the

credit underwriting/due diligence process."  (DX317 at 11 (offered in Mike Marriott's deposition

designations[2] over Credit Suisse's objection[3]).)  The report recommended "implementation of

stronger Conduit governance measures … in order to enhance the independence of these support

functions."  (*Id.* at 12.)  Mike Marriott, co-head of the RMBS group, testified that he did not

recall any steps taken in response to the Ernst &Young review.  (Marriott CPIM Dep. 82:2-88:5,

---

[2] All of the deposition designations and associated exhibits that are cited in this brief were filed on July 14, 2017.  *See* '047 D.E. 562 (Daniel Ezra Deposition Designations); D.E. 565 (Michael Marriott Deposition Designations); D.E. 570 (John Vibert Deposition Designations); *see also* '048 D.E. 601 (Ezra); D.E. 604 (Marriott); D.E. 609 (Vibert).  MassMutual asks that the Court read those designations, and watch the video provided for Mr. Marriott and Mr. Vibert, in the context of this trial brief.

[3] The Ernst & Young report is a party admission because it was prepared at the request of Credit Suisse, on Credit Suisse's behalf.  *See* FED. R. EVID. 801(d)(2)(C), (D).  It is independently admissible to show Credit Suisse's notice of the issues addressed in the report.

'047 D.E. 565 at 18; '048 D.E. 604 at 18; *see also* Marriott Dep. 93:19-22, '047 D.E. 565 at 21;

'048 D.E. 604 at 21.)

3.      Despite the early warnings from the 2004 audit reports, when Mr. Daniel started

working on the trading desk at Credit Suisse in 2006, he discovered that the fixed-rate RMBS

loan book had about $200 million in delinquent loans in inventory.  (Aug. 4 am Tr. 25:19-26:3.)

Mr. Daniel was the head of Credit Suisse's trading desk for non-agency fixed-rate residential

mortgage-backed securities from mid-2006 until late 2007.  (*Id.* at 5:5-8.)  In that job, he was

involved in the selection of loans for securitization, he interacted with Credit Suisse personnel

who originated loans and who acquired loans from third-party originators, and those who did the

underwriting and the due diligence for loans originated and acquired by Credit Suisse.  (*Id.* at

5:9-19.)  He selected loans for securitization, oversaw the buying and selling of loans, and was

"very involved in the securitization process."  (*Id.* at 18:13-15; 22:12-17.)  Mike Marriott, co-

head of the RMBS group in 2006 and 2007, supported Mr. Daniel's nomination for managing

director of the firm.  (Marriott Dep. 7:6-17, '047 D.E. 565 at 6; '048 D.E. 604 at 6.)  Mr. Daniel

worked at Credit Suisse until 2009, when he left to join Citigroup, another bank that sells RMBS.

(Aug. 4 am Tr. 7:14-21.)

4.      Most of those delinquent loans were early-payment defaults ("EPDs"), loans that

went delinquent in just the first few months after underwriters approved the loan.  (*Id.* at

26:4-19.)  Mr. Daniel admitted that Credit Suisse did not disclose that it had a large number of

delinquent loans in inventory.  (*Id.* at 30:24-31:4.)

5.      In some cases, Credit Suisse had a right to "put back" loans to the seller of an

EPD loan.  (*Id.* at 26:23-27:3.)  But for loans where Credit Suisse was the originator, the

whole notion of "put-back[s]" was beside the point, because "[y]ou can't put it back to

yourself." (*Id.* at 28:5-9.)  When wholesale loans went bad, Credit Suisse was stuck with them. (*Id.* at 28:13-16.)

6.       Mr. Daniel testified not just that loans in Credit Suisse's *inventory* showed large numbers of delinquencies, but also that loans in Credit Suisse's *securitizations* had "very high" delinquencies.  (*Id.* at 34:1-5.)  For certain deals, including the at-issue CSAB 2006-1, Mr. Daniel ordered a quality control check of the loans by Clayton, a third-party vendor, because, as he said at the time, "Based on the analysis we did, I believe there is a level of oversight provided by Clayton that we cannot currently provide."  (*Id.* at 35:8-10 (quoting PX309).)  Mr. Daniel testified that in this email, he was questioning Mr. Fallacara and whether his group could provide the proper oversight.  (*Id.* at 35:12-36:3.)

7.       Mr. Daniel ordered quality control on deals because they were "performing horribly."  (PX309.)  He also testified that conduit loans were performing so poorly that they were adversely affecting Credit Suisse's securitizations.  (Aug. 4 am Tr. 37:15-19.)

> **b.       Credit Suisse prioritized loan volume at the expense of sound underwriting and loan quality.**

8.       Mr. Daniel viewed Mr. Fallacara, the head of the conduit, as a "threat to the franchise," in part because Mr. Fallacara prioritized volume at the expense of underwriting. (*Id.* at 59:19-60:9.)  "We viewed that definitely—the conduit had more focus on volume than on performance."  (*Id.*)

9.       Mr. Fallacara was not the only one preoccupied with loan volume.  John Vibert, a senior trader on the adjustable-rate mortgage desk, testified that "[m]any people" at Credit Suisse raised concerns that there should be a greater volume of loans acquired by the conduit. (Vibert CPIM Dep. 59:14-61:6, '047 D.E. 570 at 7; '048 D.E. 609 at 7.)  In particular, Mr. Vibert said that Mr. Marriott, Mr. Kimura, Mr. Aitkenhead (the heads of the RMBS group), and

several others, including "most of the conduit sales force" expressed their desire to increase

volume.  (*Id.*)

10.     Mr. Daniel explained that the pressure for volume came at the expense of quality

underwriting and compliance with underwriting guidelines:

> Q.   In that time frame, did you come to the view that there
> really needed to be more emphasis on quality and underwriting?
>
> A.   I definitely thought there needed to be more emphasis on
> whatever it took to make these loans perform better.
>
> Q.   Including underwriting and quality, right?
>
> A.   Yes, yup.
>
> Q.   And would you say that it's almost a basic law of
> underwriting that if you focus on and are insistent on quality,
> that's going to affect the volume that you're able to bring in?
>
> A.   No doubt.  As you tighten your underwriting guidelines, as
> you restrict your eligibility matrix, you know, those type of
> things, you're going to get less loans for sure.
>
> Q.   And not only guidelines, but if you are more careful about
> actually adhering to the guidelines and not overlooking
> deviations from the guidelines, that kind of focus on quality
> also ends up restricting volume, right?
>
> A.   Yeah, if you allow less deviations from guidelines, you're
> going to have less volume for sure.

(Aug. 4 am Tr. 61:3-20.)

11.     Mr. Daniel explained that when an originator had a history of early payment

defaults, it raised questions about whether that originator was properly applying the underwriting

criteria.  (*Id.* at 29:14-19.)  Mr. Daniel also repeatedly acknowledged the link between

delinquencies and non-compliance with guidelines:  He testified that delinquencies made him

worry that appraisals and stated incomes were inflated—both problems that relate to

noncompliance with guidelines.  (*Id.* at 70:18-71:25.)  In addition, Mr. Marriott testified, "There's no way we could have had the EPD storm we had without fraud being a part of it." (Marriott Dep. 40:6-18, '047 D.E. 565 at 15; '048 D.E. 604 at 15.)

12.     Mr. Daniel's testimony and other evidence makes clear that loan quality suffered from a failure of loan originators and Credit Suisse to adhere to underwriting standards.  He acknowledged that Credit Suisse's guidelines were likely similar to other originators' guidelines, yet Credit Suisse's wholesale loans nonetheless performed worse than loans coming in through other channels, and worse than loans in the market generally.  (Aug. 4 am Tr. 62:1-16; 64:15-65:9.)  In a contemporaneous email he admitted that "NONE of these are guideline issues, but are fulfillment/diligence issues."  (PX248 at 2; *see also* Aug. 4 am Tr. 80:23-81:17; 84:2-7; 85:4-20; PX427 (June 18, 2007 Daniel email:  "Without an improvement in performance, we will have to shut the wholesale operation down.  And performance can only come from:  Buying better loans … Guidelines; Underwriting …").)  Mr. Daniel believed that Credit Suisse had fulfillment and diligence issues because "Fallacara ha[d] subverted sound underwriting."  (PX291.)

13.     Others at Credit Suisse shared Mr. Daniel's concerns about the quality of Credit Suisse's wholesale loans, and his view that the quality problems were caused in large part by poor underwriting.  In October 2006, a trader who worked for Mr. Daniel, Dan Ezra, wrote, "We are at a point in the economic/rate cycle where the VOLUME vs. UNDERWRITING choice has to [be] weighed in favor of underwriting if we intend to brand our transactions and continue doing deals."  (PX227 at 1.)  Mr. Ezra's email continued, "[T]he focus has been on VOLUME and not the FRANCHISE."  (*Id.* at 2; *see also* Ezra Dep. 300:11-301:11, '047 D.E. 562 at 14-15; '048 D.E. 601 at 14-15.)

14.    Rob Sacco, Credit Suisse's head underwriter, also agreed with Mr. Daniel's assessment that the problem was non-compliance with guidelines, not the guidelines themselves. In October 2006, Mr. Sacco wrote to Bruce Kaiserman, the co-head of the transaction management group at Credit Suisse, "I don't think we loosened our guidelines but are more relaxed around making exceptions (accepting stated income, appraisal variances, etc)."  (PX234, offered in evidence without objection.)

### c.    Fallacara's oversight of underwriting and due diligence created a conflict that threatened the RMBS business.

15.    Mr. Daniel repeatedly reported to his bosses Mr. Marriott and Mr. Kimura, as well as other colleagues, that Mr. Fallacara's oversight of due diligence and underwriting created a conflict of interest that fueled the race for volume at the expense of loan quality.  This conflict posed a threat to the RMBS business.  (*See* PX309; PX248 at 2 ("[S]hould we really have credit reporting to the conduit? … I really don't believe that Fallacara or anyone else in the conduit can make credit decisions objectively.  Mike wants volume, and is all to willing to look the other way when volume is at stake."); PX232 at 2 ("[I]s Fallacara capable psychologically, given his predominantly sales oriented role, to oversee credit.").)

16.    Mr. Daniel "definitely came to the conclusion that, you know, whoever was responsible for production would have a conflict of interest if they were also in charge of underwriting."  (Aug. 4 am Tr. 67:6-10; *see also id.* at 68:7-69:6 (answering in the affirmative the Court's question whether the term "psychologically" meant that Mr. Fallacara was "set on his way to make money. … and wasn't going to change"); *id.* at 69:19-24 ("he would have been rewarded more than anybody else in the firm based on his line. … he probably had direct incentives based on volume whereas I would not have direct incentives based on volume").)

17.     Mr. Sacco, the head of underwriting, also independently suggested that fulfillment/due diligence "fall under underwriting." (Aug. 4 pm Tr. 11:18-12:1; *see also* PX394.) In April 2007, Mr. Daniel wrote to Mr. Kimura, "I was pressing Rob as to why certain [loan by loan] sellers to us have very poor performance, and he says it's because fulfillment centers have come under such pressure from sales to overlook questionable loan characteristics (say unreasonable income or unclear credit history) that they have basically given up." (PX394.)

18.     When asked by Credit Suisse's lawyer, "Do you believe that Mr. Sacco's performance of his job was compromised as a result of his reporting to Mr. Fallacara?" Mr. Daniel testified:  "I mean, I think Rob was a pretty honorable person and tried to do the best job he could. *I think there was no doubt that his reporting to Fallacara created conflicts, you know? I don't see how they couldn't.*" (Aug. 4 pm Tr. 64:5-12 (emphasis added).)

19.     Mr. Daniel testified that he reported the pressure Mr. Sacco was under from Mr. Fallacara to various others, including Mr. Vibert, Mr. Kaiserman, and Mr. Sack.  Asked by Credit Suisse's lawyer whether he was "aware of any instance in which Mr. Sacco changed his decision, his view on a loan as a result of pressure from Mr. Fallacara," Mr. Daniel testified that there were "definitely cases" that Mr. Kaiserman and Mr. Vibert showed to him "where they thought, you know, Rob was being pressured to make a loan that he didn't want to make.  There definitely were instances of that." (*Id.* at 64:13-25.)  Asked by the Court, "Was it your feeling that—from somewhere within that company that there was pressure being put on people to approve unworthy loans?"  Mr. Daniel said, "Yes." (Aug. 4 am Tr. 89:13-16.)

20.     John Vibert, head of the adjustable-rate desk, agreed with Mr. Daniel.  In response to Mr. Daniel's November 2006 email to his superiors warning about the volume vs. quality conflict created by Mr. Fallacara's oversight of underwriting, Mr. Vibert wrote, "we make these

underwriting exceptions and then we have liability down the road when the loans go bad and people point out that we violated our own guidelines."  (PX248 at 1; *see also* PX291 ("it seems like a lot of our problems continue to stem from the fulfillment (talk about a misnomer) process.").)

### d.     Instead of fixing its "broken" underwriting and due diligence processes, Credit Suisse continued securitizing loans from shoddy originators.

21.     As a result of the systemic problems in Credit Suisse's underwriting and due diligence processes, Mr. Fallacara's team continued to buy and securitize loans from originators whom they knew were selling loans that Credit Suisse itself described as "crap" and "garbage."

22.     For example, in October 2006, Bruce Kaiserman (co-head of the transaction management group) wrote to Mr. Daniel that "Security Atlantic has all but told us they do not have the funds necessary to buy back the loans we've asked them to repurchase."  (PX232 at 2.) Nonetheless, Credit Suisse continued to securitize Security Atlantic loans—their loans back eight of the securities at issue, five of which Credit Suisse sold to MassMutual *after* Mr. Kaiserman's email.  (*See* PX1512 at 20, 35, 40, 50, 55 (interrogatory response showing originators of relevant loans); PX1549 (showing dates of purchase for at-issue securities).)

23.     Credit Suisse did not disclose that it was including loans in securitizations that it acquired from lenders that did not have the funds to repurchase bad loans.  (Aug. 4 am Tr. 73:13-74:4.)

24.     Credit Suisse also knew that certain originators consistently produced bad loans, yet Credit Suisse continued to funnel loans from these originators into the at-issue securitizations.  Credit Suisse never disclosed this knowledge.  In a December 2006 email, Mr. Ezra told Mr. Daniel about problems with a series of underperforming originators, including Mortgage Store Financial, Brooks America Mortgage Corp., Security Atlantic, Fairmont

Funding, Resource Bank, and Unprime.  (*See* Ezra Dep. 240:8-242:11 (discussing PX279,

offered in evidence without objection), '047 D.E. 562 at 10; '048 D.E. 601 at 10.)  All of those

originators contributed loans to the at-issue securities.  (*See* PX1512 at 15-56 (Credit Suisse

interrogatory response showing that Brooks America Mortgage Corporation contributed loans to

nine securities at issue, Fairmont Funding contributed loans to eight, Mortgage Store Financial

Inc. contributed loans to four, Security Atlantic contributed loans to eight, Resource Bank

contributed loans to eight, and Unprime Securities Company LLC contributed loans to nine).)

     25.     In the same email, Mr. Daniel wrote to Mr. Ezra, "Security Atlantic and Fairmont

Funding show up AGAIN!!  Are you fvcking kidding me.  This is exactly why we need to take

more control of credit.  The store is not being minded."  (PX279 at 1.)  Mr. Ezra responded, "I

agree with you on this.  Throw in Resource Bank and Unprime and we've got a quartet of sellers

that are consistently on this list."  (*Id.*)

     26.     In January 2007, Mr. Daniel wrote to Mr. Sacco about one of Credit Suisse's

securitizations, "There's some real crap in this pool.  And it's the same fvking originators every

time—Security Atlantic, ACT, Resource Bank, DreamHouse."  (PX313.)

     27.     Other Credit Suisse employees also wrote about problems with these same

originators and others that contributed loans to the RMBS at issue.  In January 2007, Mr. Daniel

referred to Fairmont Funding, Security Atlantic, and The Mortgage Store Financial as "pigs,"

(PX1507, offered in evidence without objection), and Credit Suisse employee James Buccola

described these originators as follows:

> Fairmont has gone mostly mini-bulk with the arms and I've done
> my best to avoid them like John's genital warts.  The mortgage
> store is the worst chop shop I've visited.  Honestly they are the
> boiler room of mortgages. … security atlantic has made this guy
> Grief a rich man, while you watch your markdown account light up
> like a las vegas slot machine.  As I digress, Security Atlantic is not

officially run by Jim Walsh, he's only a special consultant since he
was stripped of every license imaginable for alleged fraud.  You
can ask his brother and sister for more color, I believe you can find
them incarcerated.

(PX1507 at 1; *see also* Vibert Dep. 130:21-133:9 (explaining, e.g., that a "markdown account" is

"that ledger where the delinquent loans were swept"), '047 D.E. 570 at 14-15; '048 D.E. 609 at

14-15.)  In the same email chain, Mr. Vibert wrote that Fairmont had "tagged us pretty good,"

which he testified meant Fairmont had "sold us a lot of loans that ended up in the delinquency

sweeps."  (Vibert Dep. 125:9-14, '047 D.E. 570 at 13; '048 D.E. 609 at 13.)

28.     Mr. Daniel also expressed his concerns directly to Mr. Fallacara, whom Mr.

Daniel believed was primarily responsible for the problem.  In February 2007, Mr. Daniel wrote

to Mr. Fallacara and Mr. Vibert that "a majority of the Resource Bank delinquencies are not

EPDs.  It just seems that the Resource Bank's underwriting is horrible, especially on the fixed

side."  (PX318.)

29.     Mr. Daniel agreed that there were "systemic problems" in fulfillment and

underwriting concerning both compliance and credit.  (Aug. 4 pm Tr. 16:5-9; *see* PX431.)  John

Vibert elaborated in a January 2007 email to his boss, Mr. Marriott, that "when we have a

competent QC firm do an underwriting review, they flag all kinds of errors that our fulfillment

centers did not catch."  (PX302.)  "Our fulfillment process is broken."  (*Id.*)  Mr. Vibert went on

to write, "our underwriting group needs independence," (*id.*), which Mr. Marriott understood to

mean the same concerns about Mr. Fallacara that Mr. Daniel had raised previously.  (Marriott

Dep. 111:10-15, '047 D.E. 565 at 24; '048 D.E. 604 at 24.)  Mr. Vibert concluded, "Our conduit

needs to spend less time marketing to sales, and more time looking at the gross operation defects

of our business."  (PX302 at 2.)  Mr. Daniel told a former Credit Suisse colleague, "we should

be able to do a better job on [due diligence].  There's no real excuse for some of the crap we miss."  (PX238.)

30.     Mr. Marriott acknowledged that Pete Sack, co-head of the transaction management group, had raised similar concerns about the fact that the fulfillment centers approved loans that were later flagged by a QC firm.  (Marriott Dep. 115:18-19; 116:4-117:13, '047 D.E. 565 at 25; '048 D.E. 604 at 25.)  In an email, Mr. Sack said, "The number of defects is disturbingly high and some are credit issues that could be predictive of poor performance later."  (*Id.* at 116:4-8.)  Nonetheless, Mr. Marriott did not recall taking "a single step" in response to concerns such as those raised in Mr. Vibert's email marked as PX302.  (*Id.* at 110:20-111:9.)

31.     The situation remained largely the same throughout the first half of 2007.  In this timeframe, Credit Suisse knew that its own loans, originated through the wholesale channel of the conduit, had the highest number of delinquencies of any originator.  (PX328 at 8.)  In March 2007, Mr. Daniel told his bosses that the high combined LTV loans produced by Credit Suisse's wholesale channel were "rife with fraud."  (Aug. 4 pm Tr. 7:11-24; *see also* PX329.)  And in June 2007, Mr. Vibert wrote that "our diligence process is such a joke (really 100 percent diligence on Resource Bank?) and our expanded eligibility for every fly-by-night originator was so broad that any loan could and did get through what passed for due diligence."  (Aug. 4 pm Tr. 18:6-19; PX435.)

32.     Mr. Daniel testified that the purpose of due diligence was to protect Credit Suisse—and investors like MassMutual—from sloppy or dishonest originators.  (Aug. 4 am Tr. 56:20-57:2; 57:5-16.)  But Credit Suisse never disclosed to investors during 2006-2007 "that the fixed-rate trading desk was concerned that the conduit's preoccupation with volume was resulting in the purchase of loans with inflated appraisals and stated income."  (*Id.* at 72:1-8.)

33. Credit Suisse never addressed nor disclosed any of the systemic problems with its conduit underwriting and due diligence, particularly in the wholesale channel.  To avoid its obligation to repurchase those loans from securitizations when it discovered that they had gone bad, Credit Suisse decided to change its quality control process so that it would not select wholesale loans for quality control.  (Aug. 4 pm Tr. 20:20-21:11 (explaining an email where Pete Sack was "advising against quality controlling loans for the wholesale channel"); *see also* PX376.)

34. And instead of responding to the serious concerns Mr. Daniel raised, Credit Suisse hired extra sales staff to grow the wholesale channel.  (Aug. 4 am Tr. 101:18-102:15.)  "I think there was a view that if you could do more wholesale loans, you could make more money that way." (*Id.* at 48:2-7.)  Credit Suisse failed to address the conflict posed by Mr. Fallacara's oversight of underwriting and due diligence until after a September 2007 report by McKinsey recommended that credit and underwriting no longer report to production.  (*Id.* at 91:1-92:13.)

35. As trial proceeds, MassMutual will continue to offer evidence proving Credit Suisse's material misstatements and omissions concerning underwriting guidelines.

### 2. Materiality.

36. Mr. Daniel's testimony corroborated the evidence already in the record showing the importance of underwriting guideline compliance.  Under examination by Credit Suisse's lawyer, Mr. Daniel testified that he was "sure" investors asked questions about the  originators of the loans underlying the securitizations, as well as the underwriting standards applicable to the loans.  (Aug. 4 pm Tr. 51:15-25.)

37. Information about the originators who contributed loans to the securities, and the underwriting guidelines that applied to those loans, was all the more important to investors because, as multiple Credit Suisse witnesses admitted, Credit Suisse did not provide investors

access to the loan files used to originate the loans. (Marriott Dep. 128:21-130:22, '047 D.E. 565 at 25-26; '048 D.E. 604 at 25-26; Vibert Dep. 315:7-13, '047 D.E. 570 at 35; '048 D.E. 609 at 35.) Mr. Daniel testified that he generally got few questions from investors around mortgage credit or due diligence. But in response to a question from the Court, Mr. Daniel explained that part of the reason for that was that investors trusted or relied on Credit Suisse. (Aug. 4 pm Tr. 50:2-18.)

38.     It follows that a reasonable investor would want to know if a company in which the investor was investing tens of millions of dollars had a loan acquisition group that its own executives believed was dysfunctional (i.e., "broken"), regardless of whether any particular loan could be shown to have been affected. As Mr. Daniel testified, investors trusted and relied on Credit Suisse. (*Id.*) No reasonable investor, if informed of the true facts concerning how compromised Credit Suisse's underwriting had become, would fail to take into account this information when deciding whether to invest.

> **B.     Credit Suisse Sold the At-Issue Securities by Means of Material Misstatements and Omissions Regarding Loan-to-Value Ratios.**
>
> **1.     Materiality.**

39.     MassMutual offered further proof last week that the LTV stratifications in the offering documents were material to reasonable RMBS investors.[4]

---

[4] MassMutual also offered substantial evidence in the first week of trial regarding the materiality of LTVs. (MassMutual's Corrected Proposed Findings of Fact and Discussion of Legal Issues—Trial Week 1 ('047 D.E. 601-1; '048 D.E. 640-1), ("Week 1 Trial Brief") ¶¶ 18-23.) In particular, former Babson managing director David Canuel testified that a change in the weighted average LTV statistic (which appears in the prospectus supplement for each securitization) of just .25% to .5% would change the total mix of information because such a change would indicate that "the default rate on those loans could as much as, say, double." (*Id.* ¶ 22.)

40.     Dr. John Kilpatrick, who testified pursuant to Federal Rules of Evidence 702 as an expert in real estate finance, valuation, and appraisal, holds a Ph.D. in finance with a concentration in real estate and has been working in the field of real estate appraisal for some 35 years.  (July 31 part 1 Tr. 26:11-14; 27:19-22.)  His academic and professional history includes work related to securitization.  (*Id.* at 28:10-20.)  He is also a licensed real estate appraiser in all 50 states and the District of Columbia, an MAI designated member of the Appraisal Institute, an author and editor of various industry publications, and a certified USPAP instructor.  (*Id.* at 30:14-33:2.)  Dr. Kilpatrick testified as an expert on LTV and appraisal issues in the case of *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441 (S.D.N.Y. 2015).  (July 31 part 1 Tr. 26:17-27:3.)  This Court previously found that Dr. Kilpatrick is sufficiently qualified as an expert.  *See MassMutual v. DB Structured Prods.*, Case No. 11-cv-30039-MGM, D.E. 528, Order on Defs.' Mots. to Exclude the Expert Testimony of John A. Kilpatrick and Steven I. Butler (May 7, 2015), at 16.[5]

41.     Dr. Kilpatrick testified that LTV stratifications in RMBS offering documents are important to investors, because such information "is a principal indicator of risk associated with the security," in particular "the potential for default in the underlying loans."  (July 31 part 1 Tr. 37:13-20.)  He testified that it is especially important to investors to know about loans that have LTVs above 80% (because the risk of default on such loans is known to be much higher) and loans that have LTVs above 100% (because an LTV above 100% provides the borrower with "an incentive to walk way," i.e., to default).  (*Id.* at 37:21-38:17.)

---

[5] In *Nomura*, the court found defense counsel's efforts to discredit Dr. Kilpatrick, based on disclosure mistakes in licensing applications that he has since remedied, both futile and unhelpful in assessing Dr. Kilpatrick's relevant testimony.  *See Nomura*, 104 F. Supp. 3d at 516 ("Futile Attempts to Discredit Kilpatrick;" "The Court found this entire line of cross-examination to be unhelpful….").

42.     Dr. Kilpatrick's testimony about the importance of appraisals and LTVs corroborates the testimony of Credit Suisse's witnesses.  In his deposition testimony, Mr. Marriott, co-head of the RMBS structured products group at Credit Suisse in the 2006-2007 timeframe, said that it mattered whether appraisals were fraudulent because, "[i]f they're fraudulent, that suggests that the property values are inflated. … And if there then is ultimately a default in that mortgage, losses could be higher."  (Marriott Dep. 63:2-12, '047 D.E. 565 at 17; '048 D.E. 604 at 17.)  Mr. Marriott testified that "[i]nvestors wanted to know characteristics of the loan so there were a lot of different characteristics, one of which obviously was LTV.  It gave them some sense of, you know, what the underlying loans looked like. … It gives them some sense of the leverage in any particular loan pool. … The amount of debt relative to the amount of the, the value of the underlying collateral."  (*Id.* at 32:6-32:20, '047 D.E. 565 at 12; '048 D.E. 604 at 12.  *See also* Ezra Dep. 89:3-6; 62:14-23, '047 D.E. 562 at 8-9; '048 D.E. 601 at 8-9 (testimony of Dan Ezra, a trader who worked for Mike Daniel, that LTVs are among the loan characteristics "that the rating agencies would deem important.").)  Emphasizing the importance of an accurate loan-to-value ratio, Mr. Ezra testified that it is okay if a loan goes delinquent so long as the valuation of the property is accurate, because "the recovery rate will be high."  (Ezra Dep. 292:22-293:2 (discussing PX227), '047 D.E. 562 at 14; '048 D.E. 601 at 14.)

     **2.     Falsity.**

43.     Dr. Kilpatrick used an Automated Valuation Model called the Greenfield Automated Valuation Model or "GAVM" to determine, loan by loan, whether the LTVs for 928 sample loans (chosen by statistician Dr. Charles Cowan) were accurately reported in the offering materials for the 11 securitizations at issue.  (July 31 part 1 Tr. 44:8-21; 54:15-19.)

44.     The GAVM's statistical performance and reliability were evaluated by another expert witness for MassMutual, Dr. Albert Lee, who submitted written direct testimony and

appeared at trial for live cross-examination.  Dr. Lee is an econometrician who earned his B.A. in Mathematics and Economics, and his M.A. and Ph.D. in economics, and has worked in the field of econometric modeling for some 20 years.  ('047 D.E. 574 at 1-2 (marked as PX1548); '048 D.E. 613 at 1-2.)  Employing various tests of external and internal validity, Dr. Lee found the GAVM to be both precise and accurate.  (*Id.* at 16-21.)

45.     Using the GAVM, Dr. Kilpatrick found that the appraised values of the properties associated with the sample loans were inflated above those properties' true market values by an average of 8.60% (with mean inflation of 5.03%), which he described as "materially large and systemic inflation in these appraisals underlying these loans which were [in] these securities." (July 31 part 1 Tr. 59:16-22; *see also id.* at 58:1-4.)  That materially large and systemic appraisal inflation caused the corresponding LTVs to be "materially understated in the original offering documents" for every securitization at issue.  (*Id.* at 59:23-60:4.)

46.     In particular, using the GAVM, Dr. Kilpatrick found the following differences between (a) the securitization loan tapes' representations as to the sample loan LTVs in the strata of 0-80%, 80-100%, and above 100%, and (b) the actual sample loan LTVs in those same strata:

| Securitization | <80% | | 80%-100% | | >100% | |
|---|---|---|---|---|---|---|
| | Represented | Actual | Represented | Actual | Represented | Actual |
| ARMT 2006-1 | 98.12% | 53.36% | 1.88% | 37.49% | 0 | 9.15% |
| ARMT 2007-1 | 97.18% | 49.51% | 2.82% | 30.73% | 0 | 19.76% |
| CSAB 2006-1 | 94.87% | 43.23% | 5.13% | 45.12% | 0 | 11.65% |
| CSAB 2006-2 | 91.31% | 40.86% | 8.69% | 47.39% | 0 | 11.75% |
| CSAB 2006-3 | 97.42% | 54.50% | 2.58% | 30.74% | 0 | 14.76% |
| CSAB 2006-4 | 91.51% | 49.67% | 8.49% | 39.23% | 0 | 11.10% |
| CSAB 2007-1 | 92.09% | 26.84% | 7.91% | 58.24% | 0 | 14.92% |
| CSMC 2007-1 | 99.30% | 52.41% | 0.70% | 29.67% | 0 | 17.92% |
| CSMC 2007-3 | 82.01% | 45.61% | 17.99% | 37.95% | 0 | 16.44% |
| TBW 2006-4 | 94.97% | 45.91% | 5.03% | 48.34% | 0 | 5.75% |
| TBW 2007-2 | 91.02% | 29.94% | 8.98% | 41.37% | 0 | 28.70% |

(PX1559, July 31 part 1 Tr. 64:24-65:6.)

47.     Dr. Kilpatrick presented the foregoing data in pie-chart form as follows:



(PX1558, July 31 part 1 Tr. 64:10-23.)

48.     As trial proceeds, MassMutual will continue to offer evidence proving Credit Suisse's material misstatements and omissions concerning LTV ratios.

C.      **Credit Suisse Sold the At-Issue Securities by Means of Material Misstatements and Omissions Regarding Compliance With Appraisal Standards.**

1.      **Materiality.**

49.      The Offering Documents for each of the securitizations at issue included the following representation:

> All appraisals conform to the Uniform Standards of Professional Appraisal Practice ["USPAP"] adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.

(*See* Week 1 Trial Brief, ¶ 25.)

50.      MassMutual offered further proof last week that the foregoing representation was material to reasonable RMBS investors.  Dr. Kilpatrick testified that this representation is important to investors because it "gives assurance to investors that the appropriate standards were adhered to, the appropriate forms were used, the instructions for those forms were incorporated into the standards of care, and that therefore the investors would have some assurance that the numbers reported in the pro supps were generated in a proper fashion." (July 31 part 2 Tr. 9:25-10:23.)

2.      **Falsity.**

51.      Dr. Kilpatrick testified that he examined the appraisals for the sample loans chosen by Dr. Cowan to determine whether they sufficiently complied with USPAP to be considered "credible" as USPAP uses that term—meaning "worthy of belief" by the general public, any users of the appraisal, the appraiser's peers, and the appraiser himself or herself. (July 31 part 1 Tr. 35:1-36:15.)  One of Dr. Kilpatrick's reviews was a 22-question test that he applied to sample appraisals that he found to be inflated by more than 15% based on his GAVM

results; the other was a 3-question review that he applied to virtually all of the sample appraisals.

(July 31 part 2 Tr. 10:24-12:9.)

    52.    Dr. Kilpatrick's 22-question test produced the following results for the 252

appraisals that he found to be inflated by 15% or more:

| Securitization | Percentage of Sample Appraisals Inflated >15% that do not conform to USPAP |
|----------------|----------------------------------------------------------------------------|
| ARMT 2006-1 | 90.48% |
| ARMT 2007-1 | 85.00% |
| CSAB 2006-1 | 94.12% |
| CSAB 2006-2 | 95.45% |
| CSAB 2006-3 | 95.00% |
| CSAB 2006-4 | 88.24% |
| CSAB 2007-1 | 96.55% |
| CSMC 2007-1 | 88.89% |
| CSMC 2007-3 | 80.95% |
| TBW 2006-4 | 85.00% |
| TBW 2007-2 | 92.68% |

(PX1564, July 31 part 2 Tr. 40:16-41:2.)

53.     Dr. Lee evaluated the statistical confidence of Dr. Kilpatrick's appraisal inflation findings based on his use of the GAVM, finding that among the 252 appraisals that Dr. Kilpatrick found to be inflated by 15% or more, the median statistical confidence is 93.7%—a "high level of statistical confidence that the original appraised values are higher than the true values for these 252 properties." ('047 D.E. 574 at 22-24; '048 D.E. 613 at 22-24.)

54.     During cross-examination of Dr. Kilpatrick, defense counsel pointed out one mistake among the nearly 1,000 findings in Dr. Kilpatrick's 22-question review.  The appraisal for loan number 408737446 in the TBW 2006-4 securitization was scored as failing Dr. Kilpatrick's Question No. 4, when in fact it should have passed that question.  (*See* Aug. 1 part 1 Tr. 34:1-36:13.)  Dr. Kilpatrick's scoring summary, however, indicates that the appraisal for loan number 408737446 failed Questions 1, 4, 6, 14, 16, and 21.  (*See* PX1563 at 1.)  Removing Question 4 from that list does not change Dr. Kilpatrick's ultimate conclusion that the appraisal did not conform to USPAP, because failing both Questions 1 and 4 has the same scoring consequence as failing just Question 1.  (*See* July 31 part 2 Tr. 17:3-18.)

55.     Dr. Kilpatrick's 3-question test produced the following results:

| Securitization | Percentage of Sample Appraisals that do not conform to USPAP |
|---|---|
| ARMT 2006-1 | 29.03% |
| ARMT 2007-1 | 25.53% |
| CSAB 2006-1 | 27.37% |
| CSAB 2006-2 | 33.33% |

24

| Securitization | Percentage of Sample Appraisals that do not conform to USPAP |
|---|---|
| CSAB 2006-3 | 27.27% |
| CSAB 2006-4 | 40.63% |
| CSAB 2007-1 | 22.92% |
| CSMC 2007-1 | 26.26% |
| CSMC 2007-3 | 36.56% |
| TBW 2006-4 | 32.00% |
| TBW 2007-2 | 31.31% |

(PX1568, July 31 part 2 Tr. 46:7-14.)

56.     The combined results of Dr. Kilpatrick's 22-question test and 3-question test were

as follows:

| Securitization | Percentage of Sample Appraisals that do not conform to USPAP |
|---|---|
| ARMT 2006-1 | 40.86% |
| ARMT 2007-1 | 37.23% |
| CSAB 2006-1 | 40.00% |
| CSAB 2006-2 | 42.42% |

| Securitization | Percentage of Sample Appraisals that do not conform to USPAP |
|---|---|
| CSAB 2006-3 | 38.38% |
| CSAB 2006-4 | 45.83% |
| CSAB 2007-1 | 45.83% |
| CSMC 2007-1 | 37.37% |
| CSMC 2007-3 | 45.16% |
| TBW 2006-4 | 45.00% |
| TBW 2007-2 | 57.58% |

(PX1569, July 31 part 2 Tr. 46:21-47:8.)

57.     As trial proceeds, MassMutual will continue to offer evidence proving Credit

Suisse's material misstatements and omissions concerning conformity with appraisal standards.

26

August 7, 2017

Respectfully submitted,

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY

/s/ Katherine M. Swift

John J. Egan (BBO 151680)
EGAN FLANAGAN AND COHEN, P.C.
67 Market Street, P.O. Box 9035
Springfield, Massachusetts 01102
Telephone: (413) 737-0260
Facsimile: (413) 737-0121

Joseph C. Smith, Jr. (admitted *pro hac vice*)
Lester C. Houtz (admitted *pro hac vice*)
Karma M. Giulianelli (admitted *pro hac vice*)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Philip S. Beck (admitted *pro hac vice*)
Jeffrey A. Hall (admitted *pro hac vice*)
James B. Heaton, III (admitted *pro hac vice*)
Steven J. Nachtwey (admitted *pro hac vice*)
Cindy L. Sobel (admitted *pro hac vice*)
Katherine M. Swift (admitted *pro hac vice*)
Joshua P. Ackerman (admitted *pro hac vice*)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, 3rd Floor
Chicago, Illinois 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
kate.swift@bartlit-beck.com

*Counsel for Plaintiff Massachusetts Mutual Life
Insurance Company*

27

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified in the Notice of Electronic Filing (NEF),

and paper copies will be sent to those indicated as non-registered participants on this 7th day of

August, 2017.


*/s/ Katherine M. Swift*