## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>DLJ MORTGAGE CAPITAL, INC. et al.,<br><br>        Defendants. | Civil Action No.<br>11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. et al.,<br><br>        Defendants. | Civil Action No.<br>11-cv-30048-MGM |

## DEFENDANT'S SECOND WEEKLY
## PRELIMINARY PROPOSED FINDINGS OF FACT

# TABLE OF CONTENTS

I.     BACKGROUND ...................................................................................................1

     A.    The RMBS Purchases at Issue ....................................................................3

II.    LEGAL STANDARD..........................................................................................6

III.   MASSMUTUAL HAS FAILED TO PROVE THE EXISTENCE OF A
      MISSTATEMENT OR OMISSION.........................................................................7

     A.    MassMutual Has Failed to Prove the Existence of a False or
           Misleading Statement or Omission Regarding Compliance with
           Underwriting Guidelines..............................................................................7

     B.    MassMutual Has Failed to Prove the Existence of a False or
           Misleading Statement or Omission Regarding LTV Ratios ......................11

     C.    MassMutual Has Failed to Prove the Existence of a False or
           Misleading Statement or Omission Regarding USPAP Compliance ........22

IV.   THE ALLEGED FALSE OR MISLEADING STATEMENTS OR
      OMISSIONS WERE NOT MATERIAL..................................................................26

     A.    MassMutual's Investment Objectives........................................................26

     B.    Babson's RMBS Investment Process.........................................................29

     C.    Compliance With Underwriting Guidelines Was Not Material to
           Babson's Investment Decisions .................................................................32

     D.    Dr. Kilpatrick's Testimony Does Not Establish the Materiality of
           Any Alleged Mistatement About LTV ratios or USPAP
           Compliance .................................................................................................33

     E.    The Court Should Disregard Mr. Crandall's Testimony Because
           He Had No Personal Knowledge of, or Any Involvement In,
           MassMutual's Purchases of RMBS Generally, Let Alone the
           RMBS At Issue Here .................................................................................35

V.    EMAILS ABOUT SECURITIZATIONS AND OTHER MATTERS NOT
      AT ISSUE DO NOT ESTABLISH FALSITY OR MATERIALITY ..................36

Pursuant to the Court's May 10, 2017 pre-trial procedural order, Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") hereby submits the following preliminary proposed findings of fact based on the evidence submitted to date.[1]  Credit Suisse reserves the right to add to and amend these proposed findings as trial in this matter progresses.

## I.   BACKGROUND

1.   Plaintiff Massachusetts Mutual Life Insurance Company ("MassMutual") is a Massachusetts mutual life insurance company with its principal place of business in Springfield, Massachusetts.  (6/13/17 Pre-Trial Mem., Stipulation No. 1.)

2.   Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company with its principal place of business in New York, New York. (6/13/17 Pre-Trial Mem., Stipulation No. 3.)

3.   MassMutual brought these actions in February 2011 in connection with the purchase of 19 RMBS certificates (the "Certificates") from Credit Suisse in 2006 and 2007. (7/17/17 Vol. II Tr. 3:12-15; 6/13/17 Pre-Trial Mem., Stipulation No. 8.)

4.   A residential mortgage-backed security ("RMBS") is a type of asset-backed security that is secured by a pool of residential mortgage loans.  (7/17/17 Vol. I Tr. 62:17-22.)

5.   Investors who purchase RMBS receive periodic principal and interest payments that depend on the performance of an underlying pool of mortgage loans.  (7/18/17 Vol. I Tr. 16:25-17:6.)

---

[1] Because the examination of plaintiff's reunderwriting expert, Mr. Payne, remains to be completed, Credit Suisse has not included herein proposed findings of fact based on Mr. Payne's testimony.  Those findings will be included in the next such filing.

6.      RMBS typically were structured into various "tranches", each of which had differing levels of risk depending in part on their exposure to losses on the underlying mortgage pool(s).  (*See* 7/17/17 Vol. I Tr. 65:13-17; 67:8-16.)

7.      RMBS routinely were rated by various credit rating agencies, with the tranches most exposed to loss generally receiving lower ratings than the senior tranches further removed from loss.  (7/17/17 Vol. I Tr. 63:18-23, 67:8-16.)  MassMutual knew that the lower rated tranches tended to have lower credit quality and be more risky than higher rated tranches. (7/17/17 Vol. I Tr. 94:23-95:2, 95:11-96:9, 105:21-106:15; *see* PX1537.)

8.       MassMutual began investing in agency RMBS in the 1980s.  (7/17/17 Vol. I Tr. 86:12.)  Agency RMBS are backed by the full faith and credit of the United States government and therefore pay relatively low interest rates.  (*See* 7/17/17 Vol. I Tr. 85:25-86:8.) In the late 1990s, MassMutual began investing in non-agency RMBS, which are not guaranteed by the government and thus carry a higher degree of credit risk.  *See* 7/17/17 Vol. I Tr. 88:8-11, 88:17-20.)

9.      All of the Certificates that MassMutual purchased from Credit Suisse were non-agency RMBS.  (7/17/17 Vol. I Tr. 89:1-4.)

10.     Each of the Certificates was backed by Alt-A mortgage loans, which, while not precisely or uniformly defined, generally is a classification between prime and subprime in terms of overall credit quality.  (7/18/17 Vol. I Tr. 9:13-22, 57:13-16.)

11.     Until 2016, Babson Capital Management LLC ("Babson") was a wholly owned subsidiary of MassMutual.  In 2016, Babson Capital changed its name to Barings LLC. (6/13/17 Pre-Trial Mem., Stipulation No. 2.)

12.     MassMutual was both Babson's parent company and its largest client. (7/18/17 Vol. I Tr. 6:2-9.)

13.     Babson managed "MassMutual's asset/liability relationship", which means that it was charged with ensuring that MassMutual earned enough from its investments to enable it to pay liabilities on the insurance side of its business.  (7/18/17 Vol. I Tr. 8:18-9:4.)

14.     As part of that charge, Babson managed MassMutual's overall strategy with regard to, among other things, the selection of agency and non-agency mortgage-backed securities.  (7/18/17 Vol. I Tr. 8:18-9:4.)

15.     David Canuel was a managing director in Babson's Quantitative Management Group during 2006-2007.  (7/18/17 Vol. I Tr. 7:22-25, 8:15-17.)

16.     Roger Crandall, MassMutual's current chairman, president and CEO, was CEO of Babson during the relevant time period.  (7/17/17 Vol. I Tr. 57:15-18, 60:3-7.)

A.     **The RMBS Purchases at Issue**

17.     Credit Suisse, acting as underwriter, sold the following certificates to MassMutual: ARMT 2006-1, class CB2; CSAB 2006-1, class A3; CSAB 2006-2, class M1; CSAB 2006-2, class M5; CSAB 2006-3, class M5A; CSAB 2006-3, class M6; CSAB 2006-4, class M7; ARMT 2007-1, class 5A32; CSAB 2007-1, class 1M1; CSAB 2007-1, class 1M2; CSMC 2007-1, class 1M4; CSMC 2007-1, class 1M5; CSMC 2007-3, class 1M1; CSMC 2007-3, class 1M4; CSMC 2007-3, class 1M5; TBW 2006-4, class A3; TBW 2006-4, class M3; TBW 2007-2, class A3A; and TBW 2007-2, class M1.  (6/13/17 Pre-Trial Mem., Stipulation No. 30.)

18.     MassMutual purchased the Certificates (through Babson) between May 2006 and June 2007:

| Certificate | Trade Date | Settlement Date |
|---|---|---|
| ARMT 2006-1 CB2 | June 14, 2006 | June 19, 2006 |
| ARMT 2007-1 5A32 | June 21, 2007 | June 26, 2007 |
| CSAB 2006-1 A3 | May 19, 2006 | May 31, 2006 |
| CSAB 2006-2 M1 | September 22, 2006 | September 29, 2006 |
| CSAB 2006-2 M5 | October 4, 2006 | October 10, 2006 |
| CSAB 2006-3 M5A | October 20, 2006 | October 31, 2006 |
| CSAB 2006-3 M6 (first purchase, at a price of $1,462,443.30) | October 20, 2006 | October 31, 2006 |
| CSAB 2006-3 M6 (second purchase, at a price of $2,890,310.63) | December 21, 2006 | December 27, 2006 |
| CSAB 2006-4 M7 | November 14, 2006 | November 30, 2006 |
| CSAB 2007-1 1M1 | May 2, 2007 | May 4, 2007 |
| CSAB 2007-1 1M2 | May 2, 2007 | May 4, 2007 |
| CSMC 2007-1 1M4 | January 26, 2007 | January 31, 2007 |
| CSMC 2007-1 1M5 | January 26, 2007 | January 31, 2007 |
| CSMC 2007-3 1M1 | March 14, 2007 | March 30, 2007 |
| CSMC 2007-3 1M4 | March 8, 2007 | March 30, 2007 |
| CSMC 2007-3 1M5 | March 8, 2007 | March 30, 2007 |
| TBW 2006-4 A3 | August 23, 2006 | August 31, 2006 |
| TBW 2006-4 M3 | October 4, 2006 | October 10, 2006 |
| TBW 2007-2 A3A | May 23, 2007 | May 31, 2007 |
| TBW 2007-2 M1 | May 23, 2007 | May 31, 2007 |

(6/13/17 Pre-Trial Mem., Stipulation No. 31, 34.)

19.     The Securitizations were issued, offered and sold pursuant to offering documents, including prospectus supplements, each of which included the corresponding base prospectus (collectively, the "Prospectus Supplements" or "ProSupps").  (JX006 (ARMT 2006-1 ProSupp); JX022 (ARMT 2007-1 ProSupp); JX010 (CSAB 2006-1 ProSupp); JX099 (CSAB 2006-2 ProSupp); JX017 (CSAB 2006-3 ProSupp); JX018 (CSAB 2006-4 ProSupp); JX031 (CSAB 2007-1 ProSupp); JX020 (CSMC 2007-1 ProSupp); JX025 (CSMC 2007-3 ProSupp); JX014 (TBW 2006-4 ProSupp); JX033 (TBW 2007-2 ProSupp).)  (6/13/17 Pre-Trial Mem., Stipulation No. 18.)

20.     The final Prospectus Supplement for ARMT 2006-1 is dated February 27, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 19.)

21.     The final Prospectus Supplement for ARMT 2007-1 is dated February 28, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 20.)

22.     The final Prospectus Supplement for CSAB 2006-1 is dated July 12, 2006. (6/13/17 Pre-Trial Mem., Stipulation No. 21.)

23.     The final Prospectus Supplement for CSAB 2006-2 is dated September 28, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 22.)

24.     The final Prospectus Supplement for CSAB 2006-3 is dated October 27, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 23.)

25.     The final Prospectus Supplement for CSAB 2006-4 is dated November 28, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 24.)

26.     The final Prospectus Supplement for CSAB 2007-1 is dated May 4, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 25.)

27.     The final Prospectus Supplement for CSMC 2007-1 is dated January 30, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 26.)

28.     The final Prospectus Supplement for CSMC 2007-3 is dated March 30, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 27.)

29.     The final Prospectus Supplement for TBW 2006-4 is dated August 29, 2006.  (6/13/17 Pre-Trial Mem., Stipulation No. 28.)

30.     The final Prospectus Supplement for TBW 2007-2 is dated May 29, 2007.  (6/13/17 Pre-Trial Mem., Stipulation No. 29.)

## II.    LEGAL STANDARD

31.    Mass. Gen. Laws. ch. 110A, sec. 410(a)(2) states in relevant part, that defendant: (1) "offers or sells a security"; (2) "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading"; (3) that the plaintiff did "not know [] of the untruth or omission"; and (4) that the defendant either knew or in the exercise of reasonable care could have known of the untruth or omission.

32.    To satisfy the materiality requirement, plaintiff must demonstrate a "'substantial likelihood' that the (hypothetical) reasonable investor would find that the misrepresentation 'significantly altered the total mix of information made available." *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, No. 11-30039-MGM, 2015 WL 3964560, at *10 (D. Mass. June 19, 2015).

33.    Sec. 410(a)(2) of MUSA is modeled after the federal securities laws, particularly section 12(a)(2) of the federal Securities Act of 1933, and Massachusetts courts look to federal law and precedent for guidance in interpreting it. *See* M.G.L.A. 110A sec. 410; *Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 59 (D. Mass. 1999).

34.    As a prototypical reasonable investor in RMBS, evidence of MassMutual's investment process, its access to various sources of information about RMBS and its knowledge of the risks of investing in RMBS are highly relevant to assessing the materiality of the alleged misstatements.  For example, contrary to MassMutual's assertions (*see* MassMutual's Corrected Proposed Findings of Fact, dated July 30, 2017, '047 Action ECF No. 601-1, at 1-2) a reasonable investor's knowledge of the risks associated with reduced documentation loan programs, which accounted for 81% to 94% of the loan collateral at issue in

6

each securitization, is certainly relevant to assessing whether it would be material to know of a possibility that those risks may be borne out.  Likewise, the fact that reasonable RMBS investors routinely made decisions to purchase RMBS without first receiving a prospectus supplement is certainly relevant to whether the information contained therein can possibly have significantly altered the total mix of information available.

## III.   MASSMUTUAL HAS FAILED TO PROVE THE EXISTENCE OF A MISSTATEMENT OR OMISSION

35.     MassMutual alleges that the Offering Documents for the Certificates contained three categories of false or misleading statements or omissions:  (1) those relating to compliance with underwriting guidelines; (2) those relating to loan-to-value ("LTV") ratios; and (3) those relating to compliance with appraisal standards.  (6/13/17 Pre-Trial Mem. at 5.)

36.     Based on the evidence presented, MassMutual has failed to prove the existence of any such misstatement or omission.

### A.   MassMutual Has Failed to Prove the Existence of a False or Misleading Statement or Omission Regarding Compliance with Underwriting Guidelines

#### 1.   Statements in Offering Documents

37.     The Offering Documents for the securitizations at issue each contained certain disclosures about the underwriting guidelines used to originate or acquire the mortgage loans underlying the Certificates at issue.  (JX006 (ARMT 2006-1 ProSupp) at S-18); (JX010 (CSAB 2006-1 ProSupp). at S-27); (JX099 (CSAB 2006-2 ProSupp) at S-28); (JX017 (CSAB 2006-3 ProSupp) at S-29); (JX018 (CSAB 2006-4 ProSupp) at S-30); (JX022 (ARMT 2007-1 ProSupp) at S-18); (JX031 (CSAB 2007-1 ProSupp) at S-36); (JX020 (CSMC 2007-1 ProSupp) at S-33); (JX025 (CSMC 2007-3 ProSupp) at S-39; (JX014 (TBW 2006-4 ProSupp) at S-30-S-31); (JX033 (TBW 2007-2 ProSupp) at S-31-S-32.)

7

38.     The Prospectus Supplements for 9 of the 11 securitizations at issue contained a version of the following statement (with minimal variation):  "The mortgage loans were originated generally in accordance with the underwriting criteria described herein."  (JX006 (ARMT 2006-1 ProSupp) at S-18); (JX010 (CSAB 2006-1 ProSupp) at S-27); (JX099 (CSAB 2006-2 ProSupp) at S-28); (JX017 (CSAB 2006-3 ProSupp) at S-29); (JX018 (CSAB 2006-4 ProSupp) at S-30); (JX022 (ARMT 2007-1 ProSupp) at S-18); (JX031 (CSAB 2007-1 ProSupp) at S-36); (JX020 (CSMC 2007-1 ProSupp) at S-33); (JX025 (CSMC 2007-3 ProSupp) at S-39).

39.     The Prospectus Supplements for the other 2 of 11 securitizations at issue did not contain that language.  Instead, they contained language that the underwriting standards for the mortgage loans generally will conform to the originator's published underwriting guidelines.  Specifically, the TBW 2006-4 Prospectus Supplement stated that:  "The Company's underwriting standards with respect to the Mortgage Loans generally will conform to those published in the Company's underwriting guidelines."  (JX014 (TBW 2006-4 ProSupp) at S-30-S-31.  The TBW 2007-2 Prospectus Supplement stated that:  "The sponsor's underwriting standards with respect to the mortgage loans generally will conform to those published in TBW Mortgage Corp.'s Product Profiles and Credit Policy."  (JX033 (TBW 2007-2 ProSupp) at S-31-S-32.)

40.     The Offering Documents for all 11 securitizations at issue also stated:  "The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made.  However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually.  Rather, a loan will be considered to be originated in accordance with a given set of underwriting standards, if, based on an overall qualitative evaluation, the loan is in substantial compliance

8

with the underwriting standards.  For example, a loan may be considered to comply with a set of

underwriting standards, even if one or more specific criteria included in the underwriting

standards were not satisfied, if other factors compensated for the criteria that were not satisfied

or if the loan is considered to be in substantial compliance with the underwriting standards."

(7/18/17 Vol. I Tr. 23:6-20; *see also* JX006 (ARMT 2006-1 Prospectus) at 29; JX010 (CSAB

2006-1 Prospectus) at 30; JX099 (CSAB 2006-2 Prospectus) at 31; JX017 (CSAB 2006-3

Prospectus) at 31; JX018 (CSAB 2006-4 Prospectus) at 31; JX022 (ARMT 2007-1 Prospectus)

at 31; JX031 (CSAB 2007-1 Prospectus) at 41; (JX020 (CSMC 2007-1 Prospectus) at 31; JX025

(CSMC 2007-3 Prospectus) at 31; JX014 (TBW 2006-4 Prospectus) at 31; JX033 (TBW 2007-2

Prospectus) at 41.)

   41.  Similarly, TBW 2006-4 Prospectus Supplement states that:  "There can be

no assurance that every Mortgage Loan was or will be originated in conformity with the

applicable underwriting standards in all material respects, or that the quality or performance of

the Mortgage Loans will be equivalent under all circumstances."  (JX014 (TBW 2006-4

ProSupp) at S-31.)

   42.  Each of these disclosures made clear to investors that not all loans

underlying the RMBS at issue would comply with applicable guidelines, and that those loans that

did comply may comply only generally or substantially, with or without compensating factors.

(7/17/17 Vol. I Tr. 119:13-14, 119:20-24, 121:19-122:1.)

   43.  MassMutual's chairman, president and CEO, Roger Crandall, agreed:

"yes, it is different than a hundred percent certainty."  (7/17/17 Vol. I Tr. 119:13-14.) Upon

questioning by the Court, Mr. Crandall also agreed that the term "generally" "acts [as] a

qualifier, almost like a little bit of an escape hatch" (7/17/17 Vol. I Tr. 119:20-24) and

analogized the statement to one that "driving up here to the court this morning[,] I generally observed the speed limit". (7/17/17 Vol. I Tr. 121:19-122:1).

44.     Mr. Canuel testified that he never asked anyone the meaning of the word "generally" prior to the litigation of MassMutual's claims.  (7/18/17 Vol. II Tr. 24:5-7.)  His understanding of the word "generally" was such that if "a student were to say to me I 'generally' did my homework, I would expect to see *most* of the grades for the homework filled in". (7/18/17 Vol. II Tr. 24:13-15.)

45.     It is important in assessing the truth or falsity of the statements in the Offering Documents about underwriting guidelines to identify correctly the set of guidelines pursuant to which the underlying loans are said to have been originated generally in substantial compliance.

46.     MassMutual appears to have assumed throughout this litigation that the relevant comparison for purposes of establishing falsity is against the actual underwriting guidelines that applied at origination.  However, the ProSupps refer to the underwriting criteria "described herein".  For certain disclosed originators, that refers to the fairly high level summary descriptions in the ProSupps, which do not include a lot of the detailed characteristics in particular guidelines.  For originators not identified in the ProSupps, no underwriting guidelines are disclosed except at most at a very high level of generalization.  (*See, e.g.*, JX022 (ARMT 2007-1 ProSupp) at S-100-S-101; 7/18/17 Vol. II Tr. 28:3-29:11; 7/19/17 Vol. II Tr. 31:4-33:16.)

47.     Because only those originators that originated more than a certain threshold of the loans in a given securitization loan pool were required to be disclosed, MassMutual typically did not even know the identity of the originators of significant portions of

the loan pools underlying the Certificates, much less the underwriting guidelines those specific

originators utilized.  (7/18/17 Vol. II Tr. 28:3-20.)

> ### 2.    [Falsity]

48.        [Reserved.]

## B.    MassMutual Has Failed to Prove the Existence of a False or Misleading Statement or Omission Regarding LTV Ratios

### 1.    Statements in Offering Documents

49.        The Offering Documents for the securitizations at issue each contained

disclosures about the LTV ratios applicable to the mortgage loans underlying the Certificates at

issue.  The disclosure typically took the form of a stratification table that presented the number

of loans whose LTVs fell within certain ranges listed in the table.  (*See, e.g.*, JX006 (ARMT

2006-1 ProSupp) at III-36.)

> ### 2.    Dr. Kilpatrick's and Dr. Lee's Opinions Do Not Prove the Existence of a False or Misleading Statement or Omission Regarding LTV Ratios.

50.        MassMutual's automated valuation model ("AVM") and appraisal expert,

Dr. John A. Kilpatrick purported to "evaluate the values of the collateral in [a sample drawn by

Dr. Cowan, MassMutual's sampling expert] to determine whether those LTV ratios were correct

or if they were understated in the offering documents".  (7/31/17 Vol. I Tr. 34:8-18.)

51.        Dr. Kilpatrick offered the high-level conclusion "[t]hat there was a

systematic understatement of the LTV ratios in those offering documents".  (7/31/17 Vol. I Tr.

34:22:25.)

52.        To evaluate LTV ratios, first Dr. Kilpatrick retrospectively estimated the

value of a sample of 928 properties using his Greenfield Automated Valuation Model

("GAVM").  (7/31/17 Vol. I Tr. 44:14-18, 54:15-19.)  Dr. Kilpatrick's GAVM is a "computer

algorithm, a computer program" (7/31/17 Vol. I Tr. 44:24-25) created specifically for use in litigation.  (7/31/17 Vol. I Tr. 65:19-66:20.)  It has never been published in an academic journal or industry publication or otherwise been peer reviewed, and the version of the GAVM Dr. Kilpatrick employed here has never been tested by anyone outside of this litigation.  (7/31/17 Vol. III Tr. 30:9-20.)

53.     Dr. Lee, MassMutual's econometrics expert, was retained to assist Dr. Kilpatrick by "implementing certain statistical methods" in the GAVM and to evaluate and validate the performance and confidence levels of those statistical methods in the GAVM. (PX1548 at 3-4; 8/2/17 Vol. II Tr. 11:22-12:16.)

54.     However, Interagency Appraisal and Evaluation Guidelines require that an AVM be validated and that validation be conducted by qualified individuals who are *independent* of the model's development or sales functions.  (DX1500 at 77469.)  Dr. Lee does not meet that requirement since he admits that he himself implemented the robust regression with bootstrapping analysis that forms an integral part of the GAVM, and that he participated in the GAVM's "evolution".  (8/2/17 Vol. II Tr. 11:22-14:9.)   Therefore, the GAVM does not even meet industry standards with respect to the validation of automated valuation models.

55.     Dr. Kilpatrick's and Dr. Lee's GAVM analyses fail to establish the falsity of statements in the Offering Documents about LTV ratios.

56.     As an initial matter, Dr. Kilpatrick admits that an appraisal is an *opinion* of value.  (7/31/17 Vol. III Tr. 59:20-60:2.)

57.     In order to establish an actionable misstatement of opinion, a plaintiff must demonstrate that the speaker did not honestly believe the statement made.  *See U.S. Bank, N.A. v. UBS Real Estate Secs. Inc.*, 205 F. Supp. 3d 386, 433 (S.D.N.Y. 2016).

58.     Here, Dr. Kilpatrick's testimony does not even attempt to establish that any appraiser, underwriter or originator of the loans at issue did not honestly believe the accuracy of the appraisal as a statement of opinion. *Id.* (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011). That alone dooms MassMutual's LTV claims.

59.     Moreover, it is well recognized in the industry and by the courts that an AVM's output is not itself an appraisal and cannot supplant the professional judgment of a trained, human appraiser. *See U.S. Bank*, 205 F. Supp. 3d at 434. (7/31/17 Vol. III Tr. 58:7-59:18.)

60.     As Dr. Kilpatrick testified, Advisory Opinion No. 18 of the Appraisal Standards Board states that "the output of an AVM is not by itself an appraisal. An AVM's output may become a basis for an appraisal or appraisal review but it's not itself an appraisal." (7/31/17 Vol. III Tr. 58:7-58:18.)

61.     USPAP's frequently asked questions section also states that "[a]n AVM cannot produce an opinion of value because only individuals can exercise judgment and form opinions". (7/31/17 Vol. III Tr. 58:23-59:5.) Dr. Kilpatrick testified that he agrees "wholeheartedly" with that assessment. (7/31/17 Vol. III Tr. 59:5.)

62.     As the court in *U.S. Bank* put it:

> "[T]he AVMs used in this action cannot tell whether the roof of a home has a gaping hole or, instead, a beautiful skylight. It cannot tell whether the kitchen and bathrooms were recently remodeled or date back to construction from the 1950s. It cannot distinguish between a home with an ocean view and one with the view of a parking lot. While the AVM methodology takes account of the physical distance of a comparable property to the subject property, it draws no distinction based upon local political boundaries and may treat as comparable a home located in a school district substantially inferior to the school district in which the subject property is located. These are important considerations in valuing a residential property."

13

*U.S. Bank*, 205 F. Supp. 3d at 434.

63.     Therefore, Dr. Kilpatrick's reliance on his GAVM results to develop "point estimates" of the value of the properties in his sample (7/31/17 Vol. III Tr. 38:10-38:21) that he subsequently uses to recalculate the LTVs of the loans in his sample (7/31/17 Vol. III Tr. 40:25-41:10) is improper and unreliable.

64.     In addition to those fundamental flaws in Dr. Kilpatrick's approach, it was demonstrated during Dr. Kilpatrick's and Dr. Lee's cross-examination that the GAVM suffers from various other deficiencies that render it unreliable to establish the existence of a misleading statement or omission about LTV ratios.

65.     *First*, Dr. Kilpatrick's GAVM purports to estimate property values by "look[ing] at comparables to determine the contributory value of certain characteristics about a subject property", then "add[ing] them up [to] produce a value".  (7/31/17 Vol. I Tr. 47:11-16.) Yet the GAVM uses just three compulsory characteristics (location, sale date and tax-assessed value) (7/31/17 Vol. I Tr. 47:24-49:18) and four optional characteristics (gross living area, lot size, number of bathrooms and year of construction).  (7/31/17 Vol. I Tr. 49:21-50:13.)  The GAVM produces an estimate for a subject property even if it lacks information about some or all of the optional variables.  (7/31/17 Vol. III Tr. 32:21-33:2.)  Furthermore, the GAVM does not use other characteristics that have a clear bearing on the value of a property, including number of bedrooms, garage square footage, school district, swimming pool and water view.  (7/31/17 Vol. III Tr. 33:3-12.)  In fact, Dr. Kilpatrick does not even recall testing the impact of some of these variables on value.  (7/31/17 Vol. III Tr. 33:13-14.)

66.     *Second*, Dr. Kilpatrick's GAVM relies heavily on tax-assessed value ("TAV"), which he uses as a "proxy variable" for the numerous relevant variables that are

14

omitted from his analysis.  (7/31/17 Vol. III Tr. 33:18-20.)  But Dr. Kilpatrick admitted on cross

examination that the TAV data that GAVM uses is not even from the relevant time period—in

short, it uses TAV data from no earlier than 2009 and as late as eight years after the date of the

original appraisals that Dr. Kilpatrick purports to call into question.  (8/2/17 Vol. I Tr. 92:15-

93:11.)

       67.       In defense of his decision to use data that drastically post-dates the

relevant time period, Dr. Kilpatrick offered only that the data is what was available and that "we

tested it and found it had a high degree of correlation and allowed us to produce statistically

significant predictions of value".  (8/2/17 Vol. I Tr. 95:22-96:3.)  But that conclusory assertion is

insufficient to overcome what common sense reveals—that no amount of testing of the

correlation between TAV and sales price data in 2013 can render that data superior to the

contemporaneous information available to the original, in-person appraiser, nor can it account for

the substantial changes that might have occurred in any given locale during the span of eight

years.

       68.       Moreover, tax-assessed value is a value that is ascribed to property by

local tax authorities, which follow their own particular regimes.  (7/31/17 Vol. III Tr. 33:21-25.)

Dr. Kilpatrick acknowledged that there are jurisdictions that do not allow tax assessors to

physically access properties, and admitted that he had not reviewed rules and regulations in

relevant jurisdictions to determine how tax-assessed value is calculated.  (7/31/17 Vol. III Tr.

36:20-37:23.)  As such, Dr. Kilpatrick has not reliably established that TAV bears a consistent

relationship to sales prices, even within a particular jurisdiction.

       69.       *Third*, at the beginning of its process, the GAVM trims the pool of

potential comparable properties in several ways that may impact results.  (7/31/17 Vol. I Tr.

53:25-54:5, Vol; III Tr. 31:3-20.)  Specifically, it eliminates potential comparable properties whose gross living area, lot size, number of bathrooms, sales prices or tax-assessed value are not in "the middle 95 percent of the array".  (7/31/17 Vol. I Tr. 53:18:25.)  Yet, despite already having made that potentially results-altering adjustment, Dr. Kilpatrick uses the median, rather than the average, value of the remaining properties to generate his point estimate, purportedly to address the same problem caused by the "statistical outliers" that Dr. Kilpatrick already removed.  (7/31/17 Vol. III Tr. 38:18-39:11.)

70.    *Fourth*, Dr. Kilpatrick's methodology is biased in favor of concluding that the original appraisals were inflated and original LTVs were understated.  After generating his GAVM point estimates, Dr. Kilpatrick recalculated the LTV ratio of each loan in his sample by dividing (1) the loan amount by (2) the lesser of (a) his GAVM estimate, (b) the original appraised value of the property and (c) the sale price of the property.  (7/31/17 Vol. I Tr. 38:18-39:3, 44:14-18.)

71.    The impact of that methodology is telling.  In those instances where the GAVM point estimate is lower than the original appraisal and sales price, Dr. Kilpatrick uses the GAVM point estimate in the LTV calculation for that loan.  (7/31/17 Vol. I Tr. 38:18-39:3, 44:14-18.)  Since the GAVM point estimate is the denominator in that calculation, using a smaller number will, as a matter of mathematical fact, always result in a *higher* LTV than the original calculation (7/31/17 Vol. III Tr.  41:16-25), and Dr. Kilpatrick uses this to support his claims of appraisal inflation and LTV understatement.  On the other hand, when the GAVM point estimate is *higher* than the original appraisal—suggesting that, in the GAVM's estimation, the original appraisal may have been *understated*, Dr. Kilpatrick's methodology simply

disregards the GAVM value and accepts the original LTV calculation.  (7/31/17 Vol. III Tr. 42:1-43:5.)

72.     For example, the loan ARMT 2006-1 40581744 had a sales price of $485,000, a GAVM value of approximately $586,000, an original loan balance of $388,000 and an original LTV ratio of 80%.  (7/31/17 Vol. III Tr.  43:6-19.)  Using his methodology, Dr. Kilpatrick recalculated the LTV ratio at 80%, but if he used his GAVM value—rather than the smaller of his GAVM value, the original appraised value and the sales price as the denominator—Dr. Kilpatrick's recalculated LTV ratio for the loan would have been closer to 66%.  (7/31/17 Vol. III Tr.  43:19-44:24.)

73.     Dr. Kilpatrick cannot have it both ways.  If he believes that the GAVM provides reliable estimates of value, then his LTV recalculation methodology should use those estimates both when he believes they suggest overstatement as well as understatement of the original appraisal.  His decision to utilize in his calculations only those GAVM results that support his underlying hypothesis (that appraisals were overstated) reveals Dr. Kilpatrick's methodology to be a results-oriented approach that is unreliable to establish the existence of a misleading statement or omission about LTVs.

74.     Dr. Lee's validation methodology likewise ignored situations where the GAVM point estimate was higher than the original appraisal.  (8/2/17 Vol. II Tr. 56:6-57:1.)

75.     Dr. Kilpatrick defends this choice as being consistent with descriptions in the Prospectus Supplements about how LTV would be calculated.  (8/2/17 Vol. I Tr. 73:21-75:11; JX99 at S-21.)  But that assertion is not persuasive since the provision he relies upon says nothing at all about using an AVM in the LTV calculation.  (JX99 at S-21.)

76.     *Fifth*, Dr. Kilpatrick's and Dr. Lee's purported validation of the GAVM based on its "hit rate"—that is, by counting how many of the 1,100 sample properties the GAVM was able to value—do not prove that it is a reliable method.  (7/31/17 Vol. I Tr. 55:21-56:10.) Dr. Kilpatrick admitted that hit rate analysis is a purely quantitative measure that does not pertain to the accuracy of the AVM estimates on a particular property.  (7/31/17 Vol. III Tr. 54:3-15.) He further admitted that he cannot exclude the possibility that the GAVM's hit rates are higher than those of commercial AVMs because the commercial AVMs require the use of more or different variables (7/31/17 Vol. III Tr. 54:16-19), suggesting that the GAVM may offer estimates that the programmers of commercial AVMs have deemed too unreliable even to report.

77.     *Sixth*, Dr. Kilpatrick's attempt to validate the GAVM by comparing it to five commercially-available AVMs also fails.  (7/31/17 Vol. I Tr. 56:16-24.)  Dr. Kilpatrick described the commercial AVMs as "black boxes".  He admitted that he does not "know what the[ir] code is" and "can't testify to how those AVMs work" or "as to their statistical properties". (7/31/17 Vol. I Tr. 47:1-4.)  He further admitted that he does not know whether they have been tested for retrospective application, or whether or how they might adjust their comparables. (7/31/17 Vol. III Tr. 53:4-11.)  Finally, he and Dr. Lee admitted that they did not take into account the commercial AVMs' recommended confidence scores and did not know how to interpret them.  (7/31/17 Vol. III Tr. 53:12-23; 8/2/17 Vol. II Tr. 59:9-16.)  Yet despite "hav[ing] no idea what goes on in the guts of those AVMs" and not us[ing] them for analytical purposes" Dr. Kilpatrick claims to have used them to validate the GAVM.  (7/31/17 Vol. III Tr. 57:11-12.)

### 3.     Dr. Kilpatrick's History of Dishonesty Undermines the Credibility of His Testimony

78.     Between 1998 and 2013, Dr. Kilpatrick submitted multiple state appraisal certification applications that contained false information.  (7/31/17 Vol. III Tr. 10:13-18.)

Specifically, Dr. Kilpatrick failed to disclose that he had 14 civil judgments entered against him personally or against a home building company that he owned between 1985 and 1992 (7/31/17 Vol. III Tr. 10:23-11:2), that he had been charged with swindling and passing a fraudulent check in 1990 (7/31/17 Vol. III Tr. 11:3-6), that a federal securities fraud lawsuit was filed against him in 1986 (7/31/17 Vol. III Tr. 22:18-23:19), and that a complaint was leveled against him with the Washington State Department of Licensing in 2009 (7/31/17 Vol. III Tr. 19:28).

79.      Dr. Kilpatrick claimed that he wrote to state appraisal licensing authorities to correct all false statements.  (7/31/17 Vol. II Tr. 51:11-25.)  However, Dr. Kilpatrick only did so after his false statements were brought to his attention in a deposition in recent RMBS litigation.  (7/31/17 Vol. III Tr. 18:2-16).  And in any case, it was revealed on cross-examination that Dr. Kilpatrick has not corrected all false statements to state appraisal licensing authorities. (7/31/17 Vol. III Tr. 23:20-25).  Indeed, Dr. Kilpatrick has only disclosed the federal securities fraud lawsuit to the Financial Industry Regulatory Authority ("FINRA")—and he only did so 30 years after the complaint was filed, and a short time before his deposition in this very case. (7/31/17 Vol. III Tr. 26:20-27:1).

### 4.    Dr. Lee's Work Raises Additional Questions

80.      Dr. Lee's testimony raises more questions than it resolved.

81.      According to Dr. Lee, Dr. Cowan, MassMutual's expert in statistics and extrapolation received 1,001 estimated values for each of the sample properties that were run on the GAVM.  (8/2/17 Vol. II Tr. 21:18-22:3.)  Using that information, Dr. Cowan purports to extrapolate Dr. Kilpatrick's GAVM results to the broader universe of loans at issue.  (7/31/17 Vol. III Tr. 47:15-48:5.)  However, it was revealed during Dr. Lee's testimony that the dataset that Dr. Kilpatrick and Dr. Lee used in performing their GAVM analyses was a different dataset

than that used by Dr. Cowan when he purported to extrapolate Dr. Kilpatrick's results.  (8/2/17 Vol. II Tr. 28:12-29:21.)  The data that Dr. Kilpatrick used to generate weighted average LTVs ("WALTVs"), for example, is not the same data that Dr. Cowan used to "extrapolate" WALTVs.

82.     Thus, it now seems clear that Dr. Cowan did not extrapolate Dr. Kilpatrick's results at all, but rather calculated new results using different GAVM data than that utilized by Dr. Kilpatrick.  (8/2/17 Vol. II Tr. 29:1-11.)

83.     Dr. Lee admitted that he did not previously disclose the fact that he and Dr. Kilpatrick were operating with a different set of data than that sent to Dr. Cowan, despite knowing this for some time.  (8/2/17 Vol. II Tr. 29:12-30:8.)

84.     This revelation raises serious questions about whether the data used by each expert was manipulated so as to influence the results of his analysis.

85.     Though Dr. Lee attempted in his supplemental written direct testimony (PX1577 at 1-2) and again on re-direct (8/2/17 Vol. III Tr. 16:2-18:1) to justify the provision of a different set of data to Dr. Cowan, his testimony amounted to little more than a conclusory assertion that different data is appropriate for different purposes:  "They are different and serve different purposes.  The extrapolation distributions generated by the GAVM are the appropriate distributions to use in the extrapolation to the population of loans. The sample property value distributions also generated by the GAVM are the appropriate distributions for determining the GAVM value and confidence intervals for a sample property."  (PX1577 at 1-2.)

86.     Nowhere does Dr. Lee explain *why* one set of data is more appropriate than the other to use for a given purpose, or why it would ever make sense for one expert (Dr. Cowan) who purports to extrapolate the results of another expert (Dr. Kilpatrick) to receive a

different set of data than the one Dr. Kilpatrick used to generate those results. (*See* PX1577 at 1-2; 8/2/17 Vol. III Tr. 16:2-18:1.)

87.     As subsequent testimony in this matter will confirm, the impact of using different datasets is far from a hypothetical concern.

88.     The data that Dr. Kilpatrick used was used to generate both the point estimate and confidence intervals for the GAVM.  (PX1577 at 1-2.)  According to Dr. Kilpatrick, the point estimate is essentially the GAVM's ultimate guess as to what the value of a property is. (7/31/17 Vol. III Tr. 50:25-51:5.)  According to Dr. Lee, the confidence interval is the reasonable range for what the GAVM believes is the true value of the property.  (8/2/17 Vol. II Tr. 41:9-12.) Thus, the data that Dr. Kilpatrick used encompasses both the reasonable range of what the GAVM truly believes could be the value of a property and the GAVM's ultimate guess as to the value of a property.  (7/31/17 Vol. 1 Tr. 47:11-19; 8/2/17 Vol. II Tr. 41:9-12.)  Nowhere did Dr. Lee testify that Dr. Cowan's 1,001 values contain either the point estimate or the confidence interval of Dr. Kilpatrick's data.

89.     Instead, it appears that the data Dr. Cowan received was simply a set of 1,001 values somewhat close to the GAVM's best guess (*i.e.*, the point estimate)—possibly not the best guess itself, and also not encompassing the full range of reasonable guesses (*i.e.*, the confidence interval).  (8/2/17 Vol. II Tr. 40:17-41:8; 46:15-49:4.)  Unlike Dr. Kilpatrick's data, which was generated at the end of the bootstrapping procedure that Dr. Lee ran, Dr. Cowan's data was apparently generated somewhere in the middle of the GAVM's "bootstrapping" process.  (8/2/17 Vol. II Tr. 30:24-31:3; 41:13-23; 43:10-23.)  Again, Dr. Lee provided no explanation as to why it was appropriate to choose the particular point in the process that he chose to generate the data that was subsequently provided to Dr. Cowan.

90.     As illustrated during Dr. Lee's cross-examination, the data that Dr. Cowan received is apparently artificially "tight" compared to the data that Dr. Kilpatrick used.  (8/2/17 Vol. II Tr. 47:7-49:4.)

91.     To illustrate with an example discussed with Dr. Lee on cross-examination:  If one laid out all 1,001 values for one of Dr. Kilpatrick's sample properties from smallest to largest, the middle value would be the GAVM's point estimate.  The confidence interval ranges from the 2.5th percentile to the 97.5th percentile—meaning that any GAVM guess within that set is a guess that the GAVM truly believes could be the value of the sample property.  (8/2/17 Vol. II Tr. 40:11-41:12.)  Here, for Dr. Kilpatrick's data, that set for a given loan included guesses from $54,000 all the way to $147,000—almost a $100,000 difference.  Using the 1,001 values that Dr. Cowan received for a sample property, the same 95% confidence interval was between $106,000 and $114,000—only an $8,000 difference.  (8/2/17 Vol. II. Tr. 46:25-48:4.)  This "difference in differences" between the two data sets is so large because the data that Dr. Kilpatrick used accounts for the inherent "uncertainty" in the GAVM.  (8/2/17 Vol. II Tr. 41:13-23.)  The data that Dr. Cowan used does not.  (8/2/17 Vol. II Tr. 41:24-42:13.)  Again, Dr. Lee gave no explanation as to why that would be appropriate.  (PX1577 at 1-2.)  Importantly, the 95% confidence interval of the data that Dr. Cowan received ignores every value between $54,000 and $106,000 and every value between $114,000 and $147,000—all guesses that the GAVM reasonably believes could be the true value of the property.  Thus, at a minimum, MassMutual has not established the reliability of Dr. Cowan's extrapolation of Dr. Kilpatrick's results.  At worst, the data provided to Dr. Cowan was manipulated to influence the results.

**C.      MassMutual Has Failed to Prove the Existence of a False or Misleading Statement or Omission Regarding USPAP Compliance**

**1.      Statements in Offering Documents**

92.      The Prospectus Supplements for most of the securitizations at issue contained disclosures about conformance with Uniform Standards of Professional Appraisal Practice:  "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  (*See, e.g.*, JX006 (ARMT 2006-1 ProSupp) at S-38.)

93.      The Prospectus Supplement for TBW 2006-4 contained no such disclosure.  (*See* JX014 at S-31.)  Nonetheless, Dr. Kilpatrick failed 17 appraisals from this deal under his Conformance Review and 32 appraisals from this deal under his Hybrid Test.  (8/2/17 Vol. I Tr. 58:4-63:5; PX1563; PX1567.)

**2.      Dr. Kilpatrick's Opinions Do Not Prove the Existence of a False or Misleading Statement or Omission Regarding USPAP Compliance**

94.      Dr. Kilpatrick purports to examine the appraisals in a sample of loans selected by Dr. Cowan to determine "if and to what extent they adhered or did not adhere to" the Uniform Standards of Professional Appraisal Practice.  (7/31/17 Vol. I Tr. 35:1-8.)

95.      Dr. Kilpatrick offers the high level conclusion that "a materially large number of those appraisals did not adhere to USPAP".  (7/31/17 Vol. I Tr. 35:9-12.)  Dr. Kilpatrick bases his conclusion on two tests that he developed for use in this litigation:  his so-called "Conformance Review", which he applied to 252 of the over 29,000 loans at issue (8/2/17 Vol. I Tr. 57:1-14), and his so-called "Hybrid Test" (7/31/17 Vol. II Tr. 41:16-25), which he applied to 1,063 of the loans at issue (8/2/17 Vol. I Tr. 68:10-13).

96.     Dr. Kilpatrick's Conformance Review consists of 22 questions that Dr. Kilpatrick devised and applied to appraisals that the GAVM indicated were inflated by 15% or more.  (7/31/17 Vol. II Tr. 12:3-9.)  Dr. Kilpatrick identified individual questions as involving either an "egregious" or "less-egregious" error, and identified appraisals as USPAP non-conforming if they failed two or more egregious errors, one egregious error plus one or more less-egregious errors, or three or more less-egregious errors.  (7/31/17 Vol. II Tr. 14:1-17:2.)

97.     Dr. Kilpatrick's Hybrid Test consists of 3 questions—a subset of the 22 questions described above—that he describes as a "quickie examination or a bit of triage" that can more quickly be applied across large numbers of appraisals.  (8/2/2017 Vol. I Tr. 64:2-13.)

98.     Dr. Kilpatrick's Conformance Review and so-called Hybrid Test are unreliable for at least five distinct reasons.

99.     *First*, Dr. Kilpatrick admits that neither the 22 questions in his Conformance Review nor the 3 questions in his Hybrid Test are contained anywhere in USPAP.  (7/31/17 Vol. III Tr. 65:20-66:2.)  In fact, Dr. Kilpatrick agrees that "USPAP does not endorse a three-question conformance test of any kind".  (8/2/17 Vol. I 64:14-16.)  In addition, Dr. Kilpatrick uses terminology and assumes certain standards in his questions that are not reflective of USPAP.  For example, Dr. Kilpatrick admits that the term "bracket" or "bracketing" appears nowhere in USPAP  (7/31/17 Vol. III Tr. 65:20-67:5), yet the concept makes its way into two of the 22 questions in Dr. Kilpatrick's Conformance Review.  (7/31/17 Vol. III Tr. 66:10-17.)  And the 15% threshold that Dr. Kilpatrick used to determine whether to apply the Conformance Review likewise has no basis in USPAP.  (7/31/17 Vol. III Tr. 67:2-5.)

100.    *Second*, when Dr. Kilpatrick was retained for a similar assignment in prior RMBS litigation, the "Credibility Assessment Model" he developed to assess USPAP

24

compliance contained several questions not present in the current Conformance Review, and vice versa. (7/31/17 Vol. III Tr. 62:23-64:21.) The inconsistency of Dr. Kilpatrick's methods—with no intervening change in USPAP to explain the changes—serves to highlight that Dr. Kilpatrick's test have more to do with his own preferences and practices than any actual requirement of USPAP.

101.       *Third*, Dr. Kilpatrick admits that his Conformance Review and Hybrid tests have never been published in an academic journal or any industry publication, or otherwise been subject to peer review. (7/31/17 Vol. III Tr. 62:8-21.) Dr. Kilpatrick further admitted that he is not aware of anyone else using his 22-questions and 3-question hybrid test. (7/31/17 Vol. III Tr. 62:15-63:23.)

102.       *Fourth*, Dr. Kilpatrick admitted that his analysis did not consider any information that was not contained within the four corners of the appraisal reports and that he did not make any effort to interview, contact or review the work files of any of the actual appraisers in this case (7/31/17 Vol. III Tr. 60: 10-16), which might have provided useful context that the rote application of a 22-question test cannot detect.

103.       *Fifth*, Dr. Kilpatrick applied the supplemental standards rule and Statement 10 in his credibility determinations despite the fact that, during the covered period, they were in the process of being withdrawn by the Appraisal Standards Board. (7/31/17 Vol. III Tr. 69:21-74:18; 8/2/2017 Vol. I Tr. 13:5-15:9.) Furthermore, Dr. Kilpatrick incorrectly claimed that when an appraiser signs the appraiser certification, they are "guaranteeing" that the appraisal can be relied upon by Fannie Mae and Freddie Mac although Dr. Kilpatrick himself admitted that the word "guarantee" does not appear in the relevant portion of those certifications. (8/2/17 Vol. I Tr. 21:6-22:11). In fact he relied on statements in Certification 23 for all of his analyses

25

without actually confirming that each of the loans in this litigation had a Uniform Residential

Appraisal Report, or URAR, that contained Certification 23.  (8/2/17 Vol. I Tr. 25:15-21).

104.    Several examples demonstrate the unreliability of Dr. Kilpatrick's

approach.  In one instance, Dr. Kilpatrick found an appraisal non-conforming with USPAP

because the loan file reported the year and month but not the day of the sales contract.  (7/31/17

Vol. III Tr. 29:10-30:22.)  In another instance, Kilpatrick mistakenly found an appraisal non-

conforming with USPAP because it did not report a sale of a comparable property that occurred

in the future, after the effective date of the appraisal.  (7/31/17 Vol. III Tr. 34:1-36:13.)  In yet

another instance, Dr. Kilpatrick found an appraisal non-conforming with USPAP because the

gross living area of one of seven comparable properties was 16% higher than the subject

property's gross living area, when he would have found the appraisal conforming if it was within

15%.  (7/31/17 Vol. III Tr. 39:19-42:7.)  And in yet another instance, Dr. Kilpatrick found an

appraisal non-conforming with USPAP because comparable properties did not bracket the

subject property when one of the appraised properties was just 5 square feet smaller than the

subject property.  (7/31/17 Vol. III Tr. 44:23-46:17.)

105.    As such, Dr. Kilpatrick's Conformance Review and Hybrid Test are

unreliable to establish the existence of a misleading statement or omissions regarding USPAP

compliance.

## IV.    THE ALLEGED FALSE OR MISLEADING STATEMENTS OR OMISSIONS WERE NOT MATERIAL

### A.    MassMutual's Investment Objectives

106.    For a significant number of the Certificates at issue, MassMutual

deliberately targeted riskier segments of the RMBS structure that it typically would not have

purchased for its own account.  It did so because it intended to repackage those securities into collateralized debt obligations ("CDOs") to be sold to third-party investors.

107.     Part of Babson's business included managing CDOs.  (7/17/17 Vol. I Tr. 108:10-19.)  CDOs are securities that are backed by debt securities.  (7/17/17 Vol. I Tr. 106:23-107:5.)

108.     "[B]ringing CDOs was a business line of Babson to generate fee income".  (7/18/17 Vol. II Tr. 46:18-20.)

109.     The CDOs Babson brought to market included commercial mortgaged-backed securities and other asset-backed securities in addition to RMBS.  (7/17/17 Vol. I Tr. 107:21-108:1.)

110.     After launching three CDOs, one of them, Storrs, was liquidated.  (DX1163 at MM-RMBS-1429763.)

111.     Babson "came under increasing pressure to a) replace the lost fee income from Storrs, and 2) build an ABS 'down in credit' platform for the management of outside funds, with the development of the Structured Credit Group as the model or example.  New deal efforts included . . . the acquisition of collateral for a 'mezz' ABS CDO ('Storrs II')".  (DX1163 at 1-2.)

112.     RMBS purchased by Babson that Babson planned to put in a CDO were "warehoused" in the General Investment Account ("GIA") and held there until CDOs were put together.  (7/17/17 Vol. I Tr. 109:2-5.)

113.     The GIA "is the account where all of the assets of the insurance company backing [MassMutual's] insurance liabilities as well as the capital surplus of a company sit."  (7/17/17 Vol. I Tr. 61:21-62:2.)

114.    Babson had "an explicit policy to avoid exposures with credit risk as permanent investments.  Securities with credit risk would be held only on a temporary basis while warehousing assets for CDO's, and ultimate exposure would be limited to ownership of a portion of the equity in CDO's backed by credit-sensitive collateral."  (DX1163 at 2.)

115.    The following Certificates at issue here were earmarked for inclusion in a CDO at the time that Babson purchased them:  CSAB 2006-2 M5, CSAB 2006-3 M5A, CSAB 2006-3 M6, CSAB 2006-4 M7, CSMC 2007-1 1M4, CSMC 2007-1 1M5, CSMC 2007-3 1M4, CSMC 2007-3 1M5, and TBW 2006-4 M3.  (DX1617 at 12; DX1616 at 11.)

116.    None of the Certificates considered for inclusion in a CDO was rated AAA by a credit rating agency, and some were graded as low as BBB.  (7/18/17 Vol. II Tr. 50:21-52:14.)

117.    Specifically, CSAB 2006-2 M5 was rated BBB+, CSAB 2006-3 M5A was rated A-, CSAB 2006-3 M6 was rated BBB+, CSAB 2006-4 M7 was rated BBB, CSMC 2007-1 1M4 and CSMC 2007-1 1M5 were rated BBB+ and BBB, CSMC 2007-3 1M4 and CSMC 2007-3 1M5 were rated BBB+ and BBB, TBW 2006-4 M3 was rated A-.  (7/18/17 Vol. II Tr. 50:21-52:14.)

118.    While the Certificates earmarked for inclusion in a CDO accounted for only approximately 25% of the purchase price of the Certificate at issue (PX1549), they had an outsized impact on the RMBS losses that MassMutual experienced (DX1068 at 13).

119.    In fact, in October 2007, MassMutual wrote that:  "Both ongoing modeling and adverse scenario work showed that [the] vast majority of expected portfolio losses derived from A rated and lower quality bonds."  (DX1068 at 13.)

120.     In retrospect, Mr. Canuel observed that "[t]he focus on developing products to increase AUM and fee income was a major factor" in Babson's RMBS losses, and that Babson's "continuing obsession with increasing external AUM" using CDOs "beggars belief". (DX1163 at 2-3.)

### B.     Babson's RMBS Investment Process

#### 1.     Information Available to Babson

121.     Mr. Canuel testified regarding the general process Babson used in evaluating RMBS investments.

122.     Babson's trading process began at its trading desk, where individuals were in contact with securities underwriting firms and other broker dealers. (7/18/17 Vol. I Tr. 11:7-18.) Those firms notified Babson of potential transactions, and sent "an array of documents", by which Babson evaluated "the security structure as well as the underlying collateral in looking at the relationship between those elements of the security to assess whether given the pricing it was something that we wanted to participate in, and then make an assessment as to what class we wanted and what its characteristics were." (7/18/17 Vol. I Tr. 11:19-12:5.)

123.     In assessing the collateral, Babson looked at the loans' performance "in an array of scenarios", in order to determine the borrowers' likelihood of default and the likelihood of losses in the underlying pool of loans. (7/18/17 Vol. I Tr. 13:1-7.)

124.     Babson was provided a collection of several different documents: The Registration Statement, the Free Writing Prospectus (also called a term sheet), which includes the data about the collateral in stratification tables, and the Prospectus Supplement. (7/18/17 Vol. I Tr. 15:20-19:13.)

125.     The data received by Babson was on a pool-wide or group-wide basis. (7/18/17 Vol. I Tr. 64:3-19.)

126.     Mr. Canuel testified that the stratification tables were the "foundation or *sine qua non* for the inclusion of the loans in the transaction", as they described the characteristics of the collateral.  (7/18/17 Vol. I Tr. 19:5-13.)

127.     MassMutual received and analyzed term sheets that provided "a whole array of statistics" for the pool of loans that was expected to collateralize the securitization, such as "loan-to-value ratios, the distribution of credit scores which we just called FICO scores, information about the distribution of loans, owner occupant versus non-owner occupant, whether it was an investor property", in addition to "whether it was what we called full doc or non-full doc".  (7/18/17 Vol. I Tr. 18:21-19:4.)

128.     Mr. Canuel testified that he has no specific recollection of receiving loan tapes containing loan-level data for any of the certificates at issue.  (7/18/17 Vol. II Tr. 6:20-23.)

129.     Babson was aware that the percentage of loans in the deals at issue originated under reduced documentation programs was disclosed in the prospectus supplements and that those percentages were typically within the 80%-90% range for the deals at issue. (7/18/17 Part I Tr. 69:8-69:21; *see* JX010 (CSAB 2006-1 ProSupp) at S-25; JX099 (CSAB 2006-2 ProSupp) at  S-26; JX017 (CSAB 2006-3 ProSupp) at S-27; JX018 (CSAB 2006-4 ProSupp) at S-28; JX014 (TBW 2006-4 ProSupp) at S-23; JX033 (TBW 2007-2 ProSupp) at S-24.)

130.     Babson was never told by Credit Suisse that it could not have a piece of information it requested in connection with a potential RMBS investment.  (7/18/17 Vol. II Tr. 13:14-19.)

131.     Babson typically made its purchase decisions before receipt of the Prospectus Supplement.  (7/18/17 Vol. II Tr. 37:3-11.)  The day Babson made its purchase decisions was referred to as "the trade date".  The trade date was the date "that we used to reflect when we would actually execute a purchase or commit to make a purchase at a price".  (7/18/17 Vol. I Tr. 47:3-12.)

132.     Babson typically received the Prospectus Supplement after the trade date. (7/18/17 Vol. I Tr. 47:13-16.)

133.     Of the 20 individual purchases of RMBS Certificates at issue here, 15 of them took place before issuance of the relevant Prospectus Supplements.  (6/13/17 Pre-Trial Mem., Stipulation No. 19-29, 31.)

134.     Mr. Canuel had no recollection of an instance in which Babson did not close a deal on an RMBS certificate after the trade date.  (7/18/17 Vol. I Tr. 37:19-25.)

135.     When MassMutual reviewed a prospectus supplement at all, an analyst typically did a hurried review focused on the stratification tables that described the characteristics of the underlying loans, not the disclosure about underwriting guidelines. (7/18/17 Vol. II Tr. 37:12-38:11.)

136.     Babson was "loath to back away from a deal" after the trade date. (7/18/17 Vol. II Tr. 48:3-7.)

### 2.     Babson's RMBS Models

137.     In assessing the collateral, Babson used commercially available Bloomberg data and the Intex model when making its purchase decisions, in addition to other proprietary tools.  (7/18/17 Vol. II Tr. 4:12-5:17.)

138.     Babson took into account "whatever [it was] reading about macroeconomic conditions and how they were changing over the course of time particularly in 2006 and 2007".  (7/18/17 Vol. II Tr. 5:18-22.)

139.     Babson used a proprietary model that took into account, among other things, LTV ratios, FICO scores, percentage of reduced documentation loans, and percentage of owner occupied properties.  (7/18/17 Vol. II Tr. 11:23-12:16.)

140.     None of the inputs into Babson's model had anything to do with compliance with underwriting guidelines.  (7/18/17 Vol. II Tr. 21:12-19.)

**C.     Compliance With Underwriting Guidelines Was Not Material to Babson's Investment Decisions**

141.     Because Babson mostly did not have Prospectus Supplements available at the time it made its purchase decisions, it had no information at all about the underwriting guidelines that applied to the actual loans underlying an RMBS.  (6/13/17 Pre-Trial Mem., Stipulation No. 19-29, 31.)

142.     Mr. Canuel made clear that underwriting guidelines did not play a material role in Babson's investment decision-making process.

143.     Mr. Canuel did explain that he was generally interested in knowing that the underlying loans went through an underwriting process, but his analysis did not focus at all on the application of any specific set of guidelines.  In other words, he said he cared that *some* set of guidelines applied, not any *particular* set of guidelines.  (*See* 7/18/17 Vol. II Tr. 28:6-29:13.)

144.     Indeed, Mr. Canuel conceded that only some of the originators of the underlying loans are identified in the Offering Documents for each securitization.  (7/18/17 Vol. II Tr. 28:3-5.)

145.     He also emphasized the proprietary and ever-changing nature of originators' guidelines during the relevant time period:  "Each underwriter had its own set of guidelines . . . every mortgage originator or many of them had multiple programs, guidelines, their guidelines could potentially vary with respect to the geography in a particular regulation at play in each state".  (7/18/17 Vol. II Tr. 29:14-30:5.)

146.     Babson did not know, based on an assigned FICO score, whether or not that number was "above or below the underwriting guidelines of the specific originator who originated that loan", and "in particular with respect to the particular program under which the loan was underwritten because they could have had different programs or different types of borrowers with different compensating factors allowed and so forth in them".  (7/18/17 Vol. II Tr. 33:15-34:2.)

147.     As a result, Mr. Canuel admitted that when he read about "substantial compliance with underwriting guidelines", he understood that was referring to originators he did not know and therefore guidelines he did not know.  (7/18/17 Vol. II Tr. 29:7-11.)

148.     Mr. Canuel was unequivocal that Babson never asked for any originator's underwriting guidelines.  (7/18/17 Vol. II Tr. 29:12-13, 35:8-15.)

149.     Mr. Canuel also admitted that he was aware that Credit Suisse was not conducting a complete reunderwriting of the loans underlying a securitization.  (7/18/17 Vol. II Tr. 54:5-14.)

### D.     Dr. Kilpatrick's Testimony Does Not Establish the Materiality of Any Alleged Mistatement About LTV ratios or USPAP Compliance

150.     Dr. Kilpatrick opines that "there was a systematic understatement of the LTV ratios in th[e] offering documents" and that a "materially large" number of appraisals did not adhere to USPAP.  (7/31/17 Vol. I Tr. 34:22-25; 35:9-12.)

151.       But Dr. Kilpatrick only ran the GAVM and his USPAP conformance tests on 928 and 1,063, respectively, of the over 29,000 loans underlying the RMBS Certificates at issue.  (07/31/17 Vol. I Tr. 61:7-62:21; 7/31/17 Vol. III Tr. 48:11-49:18; 8/2/17 Vol. I Tr. 68:10-13.)  Based on those reviews, he opined that approximately 252 loans had appraisals inflated by more than 15% (8/2/17 Vol. I Tr. 57:1-9) and that approximately 460 appraisals were "not credible" under USPAP.  (PX1562, PX1563, PX1566,  PX1567.)

152.       Even assuming that Dr. Kilpatrick's methodologies were reliable—and they are not—absent some statistically valid extrapolation of those opinions to the broader loan pools at issue, they cannot establish the existence of a material misstatement or omission regarding LTVs or USPAP compliance with respect to the Offering Documents as a whole.  Instead, the import of those opinions would remain limited to the specific appraisals that Dr. Kilpatrick deemed deficient, which represent a subset of an already small sample of the over 29,000 loans at issue.

153.       Dr. Kilpatrick readily admits that he did not engage in any form of extrapolation.  (7/31/17 Vol. III Tr. 48:3-49:18.)

154.       Therefore, a series of exhibits introduced during Dr. Kilpatrick's direct testimony are highly misleading.  (*See* PX1556-PX1559.)

155.       Each purports to compare "represented" versus alleged "actual" characteristics of the loans.  But, as Dr. Kilpatrick admitted during his testimony, the "actual" columns of each chart relate only to the specific samples that Dr. Kilpatrick reviewed.  As such, despite the clear intention of these charts to imply otherwise, they in no way constitute an actual apples-to-apples comparison to the "represented" column, which, in each instance, relates to statistics for a supporting loan group as a whole.  (*See, e.g.*, PX1556.)

156.     Matters concerning extrapolation will be discussed further in the next set of proposed findings after the testimony of MassMutual's sampling expert, Dr. Cowan.

**E.     The Court Should Disregard Mr. Crandall's Testimony Because He Had No Personal Knowledge of, or Any Involvement In, MassMutual's Purchases of RMBS Generally, Let Alone the RMBS At Issue Here**

157.     Mr. Crandall testified at length about certain representations contained in RMBS offering documents and about categories of information that he considers to be important to RMBS investors.

158.     However, Mr. Crandall's testimony on cross examination made clear that he was unfamiliar with MassMutual's evaluation of RMBS or its decision to purchase such securities, and he thus could not be sure of what would have been material to investors.  Indeed, Mr. Crandall testified that he was "not involved in purchasing the individual RMBS certificates at issue" in these cases.  (7/17/17 Vol. II Tr. 4:2-5.)

159.     Mr. Crandall further admitted that he was not involved in "reviewing any of these RMBS transactions prior to purchase" (7/17/17 Vol. II Tr. 3:20-22); he did not know whether anybody at MassMutual or Babson received Prospectus Supplements prior to purchasing the at-issue RMBS certificates (7/17/17 Vol. II Tr. 4:6-9); he did not know whether anyone at MassMutual or Babson ever asked for access to the loan files underlying the collateral (7/17/17 Vol. II Tr. 4:10-13); he was not familiar with the difference between subprime and Alt-A collateral (7/17/17 Vol. II Tr. 5:12-20); and he was not familiar with AVMs or BPOs (7/17/17 Vol. II Tr. 5:21-6: 2).  Mr. Crandall testified that he was familiar with the term "EPD", or Early Payment Default, but this was inconsistent with testimony he gave in his February 2014 deposition in these actions.  (*See* 7/17/17 Vol. II Tr. 6:3-7:14.)  Mr. Crandall had no contact with anyone at Credit Suisse during the time that MassMutual was investing in the at-issue RMBS

35

certificates (7/17/17 Vol. II Tr. 5:8-11), and he played no role in actually reviewing or selecting

for purchase any of the RMBS at issue in these actions.  (7/17/17 Vol. II Tr. 3:20-4:1.)  Despite

his generalized and conclusory assertions about what was important to RMBS investors, Mr.

Crandall's own testimony makes it apparent that he was too far removed from any of the

transactions between MassMutual and Credit Suisse to speak to what was important to

MassMutual or what would be important to an investor in RMBS.

161. As a result, the Court should not credit Mr. Crandall's assertions about

what information would have been material to RMBS investors.

## V.     EMAILS ABOUT SECURITIZATIONS AND OTHER MATTERS NOT AT ISSUE DO NOT ESTABLISH FALSITY OR MATERIALITY

161. MassMutual's deposition designations focus on a handful of emails

between and among Credit Suisse traders regarding transactions not at issue here.  Nothing in

those emails establishes falsity or materiality.  Credit Suisse will address those matters during its

case in chief when it presents its due diligence defense.

162. MassMutual's reliance on emails from John Vibert and Michael Daniel,

Credit Suisse employees who worked on the trading desk, is unavailing.  These individuals sold

certificates and securities.  "Other people were responsible for the due diligence."  (Ezra, 1/17/14

Tr. 46:20-47:6; Vibert, 8/15/13 Tr. 61:20-24.)

163. John Vibert, who griped about Credit Suisse's due diligence in emails

cited by MassMutual, acknowledged that "the whole conduit business, underwriting, diligence,

et cetera, these were not businesses that reported to me, nor do I necessarily hold myself forth as

an expert. . . .  I'm not really qualified to answer and inadvertently give, you know, bad

information".  (Vibert 12/19/13 Tr. 79:16-25.)  He also acknowledged that some of his

comments in these emails were an "uninformed expression of frustration". (Vibert 12/20/13 Tr. 405:14-15.)

164.     Similarly, during Michael Daniel's testimony, MassMutual introduced a series of inflammatory emails in which Mr. Daniel and others criticized various aspects of Credit Suisse's mortgage business, including comments about a handful of originators who contributed small numbers of loans to the securitizations at issue.

165.     Mr. Daniel's testimony provided some context regarding the atmosphere in which those communications took place.  Mr. Daniel explained that when he became head of the non-agency trading desk at Credit Suisse in 2006, having worked mostly in the agency and commercial mortgage space to that point, it represented his first foray into the non-agency space, where considerations of credit quality took on much greater prominence than what he had experienced in the agency and commercial mortgage space. (8/4/17 Vol. II Tr. 27:8-29:19.)  As part of that shift, Mr. Daniel was attempting to learn about and understand the inherent tradeoff between volume and credit quality that everyone in the mortgage business must come to terms with.  (8/4/17 Vol. I Tr. 59:22-61:14; 8/4/17 Vol. I Tr. 75:1-8.)  To that end, he engaged in numerous, sometimes animated, email and other conversations with his colleagues about where the right place was to strike the balance between volume and credit quality.  (8/4/17 Vol. II Tr. 32:4-16.)

166.     At the same time, the housing market was beginning to decline, which increased the stakes and heightened the already steep learning curve Mr. Daniel faced to familiarize himself with the non-agency business. (8/4/17 Vol. II Tr. 29:14-30:1; 30:23-32:16.)

167.     Against that backdrop, Mr. Daniel testified that he sometimes exaggerated in order to make a point or to prod management to address an issue that he felt needed to be

addressed.   (8/4/17 Vol. II Tr. 31:24-32:16; 8/4/17 Vol. I Tr. 87:6-23.)  He also testified that he

was not involved in and not very familiar with many of the processes that he criticized, including

due diligence and quality control.  (8/4/17, Vol. II Tr. 17:6-8; 8/4/17 Vol. II Tr. 38:4-40:1; 8/4/17

Vol. II Tr. 46:7-23; 8/4/17 Vol. II Tr. 66:25-67:4)

168.　　　Mr. Daniel also emphasized the distinction between violations of

guidelines versus having objections to the guidelines themselves, and the fact that he did not

always make that distinction clear in his communications during the relevant time period.  (*See,

e.g.*, 8/4/17 Vol. I Tr. 29:13-25; 8/4/17 Vol. I Tr. 84:9-24; 8/4/17 Vol. II Tr. 32:17-33:11.)  Mr.

Daniel explained that many of his disagreements with Mr. Fallacara and concerns about the

Conduit stemmed from his view of the wisdom of various aspects of Credit Suisse's guidelines,

rather than from any belief that the guidelines were being violated.  (8/4/17 Vol. I Tr. 61:9-25.)

And he added that poor performance and early payment defaults ("EPDs") did not necessarily

have any connection at all to violations of underwriting guidelines.  (8/4/17 Vol. II Tr. 71:18-25.)

169.　　　Therefore, Mr. Daniel's emails do not establish the existence of a false or

misleading statement or omission.  To the extent any of his emails does bear on compliance with

underwriting guidelines, this sort of generalized evidence is not an adequate substitute for

specific and reliable evidence concerning the quality of the actual loans underlying the

Certificates at issue, which MassMutual has thus far failed to produce.

Dated:  August 7, 2017      Respectfully submitted,


By */s/ Jonathan Sablone*    

Jonathan Sablone (BBO #632998)
Matthew T. McLaughlin (BBO #660878)
  NIXON PEABODY LLP
  100 Summer Street
  Boston, Massachusetts 02110
  Telephone: (617) 345-1342
  Fax: (866) 947-1729
  jsablone@nixonpeabody.com
  mmclaughlin@nixonpeabody.com

Of Counsel:

Richard W. Clary (admitted pro hac vice)
Michael T. Reynolds (admitted pro hac vice)
Lauren A. Moskowitz (admitted pro hac vice)
  CRAVATH, SWAINE & MOORE LLP
  825 Eighth Avenue
  New York, New York 10019
  Telephone: (212) 474-1000
  Fax: (212) 474-3700
  rclary@cravath.com
  mreynolds@cravath.com
  lmoskowitz@cravath.com

*Counsel for Defendant Credit Suisse Securities (USA)
LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 7, 2017.

By */s/ Jonathan Sablone*
Jonathan Sablone