**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>     v.<br><br>DLJ MORTGAGE CAPITAL, INC., et al.,<br>          Defendants. | Civil Action No. 11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>     v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., et al.,<br>          Defendants. | Civil Action No. 11-cv-30048-MGM |

**MASSMUTUAL'S PROPOSED FINDINGS OF FACT**
**AND DISCUSSION OF LEGAL ISSUES**

**<u>TRIAL WEEK 3</u>**

## TABLE OF CONTENTS

I.     Legal Issues Presented by This Week's Evidence ................................................ 2

     A.     The Court Should Give No Weight to Testimony That Lacks Credibility. ............. 2

II.     Proposed Findings of Fact Based on This Week's Evidence ................................. 2

     A.     Credit Suisse Sold the At-Issue Securities by Means of Material
            Misrepresentations and Omissions Regarding Underwriting Guidelines. ............. 2

            1.     Mr. Payne's Re-Underwriting Analysis Revealed Significant
                  Underwriting Defects in the Loans Backing Each At-Issue
                  Security. ................................................................................................. 2

            2.     Dr. Cowan's Extrapolations of Mr. Payne's Re-Underwriting
                  Findings Demonstrate that Significant Numbers of Loans Backing
                  Each of the At-Issue Securities Have Underwriting Defects. .................... 6

     B.     Credit Suisse Sold the At-Issue Securities by Means of Material
            Misstatements and Omissions Regarding Loan-to-Value Ratios. ........................... 8

     C.     Credit Suisse Sold the At-Issue Securities by Means of Material
            Misstatements and Omissions About Compliance With Appraisal
            Standards. .......................................................................................................... 10

     D.     Credit Suisse Made Material Omissions About Its Quality Control Process ........ 11

     E.     The Court Should Give No Weight to Bruce Kaiserman's Trial Testimony
            to Date. .............................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*,
  No. 651612/2010, 2014 WL 2861560 (N.Y. Sup. Ct. June 23, 2014) ....................................... 5

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ................................................................................... 5, 6

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  74 F. Supp. 3d 639 (S.D.N.Y. 2015) ......................................................................................... 5

*Int'l Adhesive Coating Co. v. Bolton Emerson Int'l*,
  851 F.2d 540 (1st Cir. 1988) ...................................................................................................... 6

*Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*,
  No. 11-30039-MGM, 2015 WL 2130060 (D. Mass. May 7, 2015) ...................................... 4, 5

*Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*,
  No. 12-2648-JWL, 2017 WL 235013 (D. Kan. Jan. 19, 2017) ................................................. 4

*Natl Credit Union Adm. Bd. v. RBS Sec., Inc.*,
  No. 11-2340-JWL, 2016 WL 1448480 (D. Kan. Apr. 13, 2016) ............................................... 5

*P.R. Ports Auth. v. BARGE KATY-B*,
  427 F.3d 93 (1st Cir. 2005) ........................................................................................................ 2

*State Farm Mut. Auto. Ins. Co. v. Liverett*,
  475 F.2d 188 (5th Cir. 1973) ...................................................................................................... 2

*TK-7 Corp. v. Estate of Barbouti*,
  993 F.2d 722 (10th Cir. 1993) .................................................................................................... 6

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Secs.*,
  No. 12-cv-7322 (PKC)(JCF), 2016 WL 4690410 (S.D.N.Y. Sept. 6, 2016) ............................. 4

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973) .................................................................................................................... 2

Through the expert testimony of Mr. Richard Payne and Dr. Charles Cowan, MassMutual has proven that Credit Suisse's representations that the at-issue loans were originated generally in accordance with underwriting guidelines were false.  Mr. Payne's testimony showed that at least 29% of the loans in the samples he analyzed suffered from substantial underwriting guideline defects.  Dr. Cowan extrapolated these findings to each of the supporting loan groups backing the at-issue certificates and found defect rates ranging from 28% to 44% for each certificate.  Dr. Cowan's extrapolations of Dr. Kilpatrick's analyses to the populations of loans backing the at-issue certificates also proved that the LTV and USPAP representations in the offering documents were false.

By deposition designations and exhibits, MassMutual has also proven that Credit Suisse made material omissions regarding its quality control ("QC") process.  The evidence shows that when faced with high QC failure rates, instead of taking steps to expand its testing or to improve its underwriting and due diligence processes, Credit Suisse chose to change its QC process to avoid generating findings that would require it to repurchase bad loans from securitizations.

Credit Suisse's first witness, Transaction Management Group co-head Bruce Kaiserman, testified on direct examination expansively about supposed underwriting, due diligence, and securitization practices.  MassMutual's cross examination—which has only begun—revealed that Mr. Kaiserman had no legitimate foundation for this expansive testimony.  By numerous impeachments with prior inconsistent sworn testimony, the cross has already significantly undermined Mr. Kaiserman's credibility and demonstrated that his testimony to date deserves no weight.

I.       **Legal Issues Presented by This Week's Evidence**

     A.       **The Court Should Give No Weight to Testimony That Lacks Credibility.**

The credibility of witnesses and the weight accorded to their testimony are, within wide

limits, matters for the factfinder.  *See, e.g.*, *P.R. Ports Auth. v. BARGE KATY-B*, 427 F.3d 93,

104 (1st Cir. 2005) (citation omitted).  Evidence should be given no weight if it is not credible.

*See, e.g.*, *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 567 (1973) (self-serving

company witness testimony that was contrary to objective market evidence in antitrust case

"should obviously be given no weight if it is not credible").  The decision to disregard a

witness's testimony in its entirety based on the witness's inconsistent prior testimony is "well

within the discretion of the District Court."  *State Farm Mut. Auto. Ins. Co. v. Liverett*, 475 F.2d

188, 189 (5th Cir. 1973).

II.      **Proposed Findings of Fact Based on This Week's Evidence**

     A.       **Credit Suisse Sold the At-Issue Securities by Means of Material Misrepresentations and Omissions Regarding Underwriting Guidelines.**

          1.       **Mr. Payne's Re-Underwriting Analysis Revealed Significant Underwriting Defects in the Loans Backing Each At-Issue Security.**

1.       MassMutual has proved that the underwriting guideline representations at issue

were false.  Richard Payne, MassMutual's re-underwriting expert, testified that there were

substantial underwriting guideline breaches in at least 29% of the sampled loans backing the

certificates.  (PX1551; July 19 pm Tr. 18:1–17.)  Mr. Payne reached this conclusion based on the

re-underwriting of 1,100 sample loans, 100 from each of the at-issue RMBS.  (July 19 am Tr.

19:15–24.)

2.       Mr. Payne illustrated his findings with examples of underwriting defects he found

in loans backing the at-issue securities:

- One involved a borrower who claimed a monthly income of $5,389 per month, though a verification of employment form completed at the time and included in the loan file showed that his actual annual salary was only $21,840 ($1,820 per month)—which was less than the mortgage loan obligations would be for the borrower. (July 19 am Tr. at 54:10–15; 55:5–9; 55:20–56:1; 58:7–12.) Mr. Payne testified that this loan was approved despite a breach of the underwriting guidelines. "It's just the borrower can't afford this payment." (July 19 am Tr. 58:21–59:17.)

- In another example, Mr. Payne testified about loan file evidence showing a borrower who applied for two loans that combined made up 100% of the purchase price of the loan, which demonstrated that "the borrower has no skin in the game." (July 19 am Tr. at 62:10-20.) The underwriter noted on the loan underwriting summary, "payment shock of 350 percent," indicating that the proposed housing expenses for the mortgaged property were 350% of the borrower's existing housing expenses. (July 19 am Tr. at 66:7-67:4.) The borrower, whose reported employment was vocational nurse, had additional debts such that the proposed mortgage obligations would produce annual debt payments of more than $80,000. Mr. Payne testified that based on his re-underwriting, the borrower lacked the ability to repay the debt because "the borrower probably is not making enough money to even cover their primary housing expenses, not to mention their total debt." (July 19 am Tr. 68:8–21.)

3.      Credit Suisse's cross-examination of Mr. Payne criticized his treatment of missing key credit documents in the loan files. But Mr. Payne explained that "payment histories on housing, past housing obligations, documentation that verifies assets for down payments and reserves and, if required, income and employment information" were "typically required to be obtained and then maintained *and kept* in accordance to underwriting guidelines." (Aug. 8 am Tr. 9:2–13 (emphasis added).) Mr. Payne further explained that it is unlikely that these documents were lost sometime after the loan was originated because of the way loan files were typically prepared. He explained that "in order to sell the loans and create the most liquid market for the loans, all the originators would scan the documents into the credit file as they obtained the documents." (*Id.* at 9:21–10:23.) It is not plausible that individual documents would go missing from such electronic files. A reference in the loan files to such missing documents does not establish that the document was once in the loan file because, as Mr. Payne testified, in 2005-07

3

when an originator did not have all key credit documents at closing, "it was common in the industry in order to facilitate closings of loans for the originators to just check the box and not get the document."  (*Id.* at 11:21–12:6.)

4.      Credit Suisse's admissions corroborate Mr. Payne's missing document assessments.  The admissions show that documents missing from loan files was a significant problem at Credit Suisse during the relevant period.  For example, Credit Suisse's head of due diligence and underwriting, Rob Sacco, admitted in late 2005 that "the biggest problem in sampling (we experience it with Alt A/Jumbo/2nds) is the missing doc issue. . . .We are selling and securitizing loans with missing docs all the time . . . ."  (PX112 at 1.)

5.      In addition, this Court and others have concluded that "missing loan documents at this time may provide circumstantial evidence that those documents were also missing at the relevant time."  *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, No. 11-30039-MGM, 2015 WL 2130060, at *15 (D. Mass. May 7, 2015); *see U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 457 (S.D.N.Y. 2016) ("To the extent that the applicable guidelines required these materials to be considered by or prepared by an underwriter, the Court concludes that their absence from the loan files makes it more likely than not that they were not used in the underwriting process."); *Nat'l Credit Union Admin. Bd. v. UBS Sec., LLC*, No. 12-2648-JWL, 2017 WL 235013, at *11 (D. Kan. Jan. 19, 2017) (denying motion to exclude Mr. Payne's testimony about missing documents).

6.      As to post-origination information, this Court (among others) has also concluded that "the guidelines generally required underwriters to verify the reasonableness of information and to follow up on red flags.  Thus, post-origination sources may provide circumstantial evidence of failures in that regard, as many courts have held."  *DB Structured Prods., Inc.*, 2015

WL 2130060, at *14 (citing *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d

639, 653 (S.D.N.Y. 2015)); *see id.* ("Defendants' specific criticism of the use of Bureau of Labor

Statistics ('BLS') data likewise fails.  Mr. Butler [plaintiff's re-underwriting expert] referenced

BLS data because other sources do not maintain historical data but BLS does."); *see also Fed.*

*Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 527–30 (S.D.N.Y. 2015)

(proper for re-underwriting expert to rely on BLS and public records data).[1]

7.     The law does not require MassMutual to replicate precisely the underwriting

processes conducted at the time of origination.  If forensic inquiry in litigation were held to that

standard, representations such as those at issue here—including not just the underwriting

representations but also the representations regarding adherence to appraisal standards and

LTVs—could not be pursued under MUSA because contemporaneous re-underwriting is

impossible.  Mr. Payne's analyses are relevant and reliable evidence of underwriting defects that

support MassMutual's misrepresentation claims.  *See DB Structured Prods., Inc.*, 2015 WL

2130060, at *15; *Nomura*, 74 F. Supp. 3d at 657.

8.     The Court asked Mr. Payne about his reliance on input from Dr. Kilpatrick as to

certain of Mr. Payne's opinions.  (Aug. 8 am Tr. 56:22–57:2.)  Such reliance on the conclusions

---

[1] Credit Suisse's cross-examination of Mr. Payne also suggested that his use of employment reverifications violated borrower privacy rights and the case protective order.  Mr. Payne's forensic procedure, however, has been permitted in numerous RMBS cases.  *E.g.*, *Nomura*, 74 F. Supp. 3d at 647, 653 (permitting re-underwriting expert to rely on employer reverifications). *See also* MassMutual's Mem. of Law in Opp'n to Credit Suisse's Mo. to Excl. Test. of Richard W. Payne III ('047 D.E. 447; '048 D.E. 482) (explaining why Mr. Payne's reliance on employment reverifications did not violate the protective order or consumer privacy laws). *Accord Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, No. 11-2340-JWL, 2016 WL 1448480 (D. Kan. Apr. 13, 2016) (rejecting defendant's argument that re-underwriter violated federal law and was contrary to protective order); *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 651612/2010, 2014 WL 2861560, at *5 (N.Y. Sup. Ct. June 23, 2014) (rejecting defendants' argument that employment re-verifications violated case protective order).  Credit Suisse has cited no case rejecting employment reverifications.

of another testifying expert is a longstanding and proper means of formulating an expert opinion.

*See, e.g., Int'l Adhesive Coating Co. v. Bolton Emerson Int'l*, 851 F.2d 540, 545–46 (1st Cir.

1988); *accord TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 731 (10th Cir. 1993).  But even if

Mr. Payne's reliance on Dr. Kilpatrick's findings was determined to be misplaced, that would

implicate only those opinions of Mr. Payne's that rely on Dr. Kilpatrick's conclusions, *i.e.*, Mr.

Payne's additional substantial underwriting defect opinions related to Dr. Kilpatrick's LTV

conclusions (*see* PX1551 at 2).  Also, Mr. Payne established that his own substantial

underwriting guideline defect findings, which showed that an average of 29% of the loan

samples he re-underwrote from each of the 11 securitizations at issue suffered from material

underwriting defects, are independent of Dr. Kilpatrick's findings.  (Aug. 8 am Tr. 15:5–16:12.)

> **2.     Dr. Cowan's Extrapolations of Mr. Payne's Re-Underwriting Findings Demonstrate that Significant Numbers of Loans Backing Each of the At-Issue Securities Have Underwriting Defects.**

9.     Statistician Dr. Charles Cowan is well-qualified to opine on sampling and

statistics:

- He holds a Ph.D. in mathematical statistics and has engaged in statistical studies, research, and design for some 40 years.  (Aug. 8 am Tr. 60:5–13; 58:23–25.)

- He served as the Chief of the Survey Design Branch of the U.S. Bureau of the Census, the Chief Statistician of the U.S. Department of Education's Center for Education Statistics, and the Chief Statistician of the FDIC, all of which positions involved sampling work.  (*Id.* at 60:14–65:21.)

- He has taught, published, and participated in professional associations in the field of statistics.  (*Id.* at 58:18–22; 66:20–67:22.)

- He has served as an expert in several RMBS cases, including for the plaintiff in *Nomura*, 104 F. Supp. 3d at 441.  (*Id.* at 67:23–68:18; 59:3–11.)  Courts have accepted him as an expert in statistics in many cases.  (*Id.* at 68:19–21.)

10.     Earlier in this litigation, MassMutual submitted a report from Dr. Cowan

describing the statistical sampling methodology he would use to select each 100-loan sample and

to analyze the rate of misrepresentation in each sample.  After an evidentiary hearing on October 18, 2013, the Court (Saris, C.J.) denied the joint motion of Credit Suisse and other defendants to exclude Dr. Cowan's opinion as expressed in that report.  ('047 D.E. 189; '048 D.E. 216.)

11.     Dr. Cowan took a representative sample from the Supporting Loan Group ("SLG") backing each certificate at issue, as identified in the Prospectus Supplements.  (Aug. 8 am Tr. 72:4–15.)  His methodology included choosing an initial random sample of 100 loans as well as a back-up random sample of 100 loans from each SLG.  To the extent missing files or information required the removal of any loans from the initial random sample, those loans were replaced with loans from the back-up sample, yielding a final sample that is "highly likely to be a random sample."  (*Id.* at 72:21–74:6.)  Dr. Cowan then demonstrated the representativeness of the samples by using certain statistical tests.  (Aug. 8 pm Tr. 4:7–6:25.)  For two of the eleven securitizations, where the final random samples failed some of those representativeness tests, Dr. Cowan weighted the sample so that it came back in line with the general population (*i.e.*, the SLG) from which it was taken.  (*Id.* at 7:1–9:5.)  Other experts (*i.e.*, Mr. Payne and Drs. Kilpatrick and Lee) then analyzed the sample loans and reported results to Dr. Cowan, who extrapolated their results to each SLG.  (*See* Aug. 8 am Tr. 59:17–60:2.)

12.     Given the large number of loans at issue in this litigation (*see id.* at 72:16–20), Dr. Cowan's sampling and extrapolation methods, which are well-known, standard methods (*see id.* at 70:20–72:3; Aug. 8 pm Tr. 10:7–23; 11:19–12:9; 13:12–14:18) are appropriate means by which to test the SLGs for their compliance with the representations in the offering documents. In particular, Dr. Cowan's use of 100-loan samples with a +/- 10% margin of error at a 95% level of confidence provides a reliable basis for the Court's relevant findings.  (*See* Aug. 8 am Tr. 74:17–78:14.)

13.     Dr. Cowan extrapolated Mr. Payne's findings as to loans that did not comply with underwriting guidelines, excluding any findings based on Dr. Kilpatrick's work, to the full population of loans in each SLG backing the at-issue certificates:

| Securitization | Underwriting Defect Rate | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| ARMT 2006-1 | 33.0% | 24.1% | 42.9% | 9.4% |
| ARMT 2007-1 | 34.0% | 25.0% | 44.0% | 9.5% |
| CSAB 2006-1 | 31.0% | 22.4% | 40.7% | 9.1% |
| CSAB 2006-2 | 32.0% | 23.1% | 41.9% | 9.4% |
| CSAB 2006-3 | 25.0% | 17.0% | 34.5% | 8.7% |
| CSAB 2006-4 | 22.0% | 14.4% | 31.3% | 8.4% |
| CSAB 2007-1 | 34.5% | 25.6% | 44.3% | 9.4% |
| CSMC 2007-1 | 31.0% | 22.3% | 40.9% | 9.3% |
| CSMC 2007-3 | 18.0% | 11.1% | 26.8% | 7.8% |
| TBW 2006-4 | 34.0% | 25.1% | 43.9% | 9.4% |
| TBW 2007-2 | 24.0% | 16.1% | 33.4% | 8.6% |

(PX1588; Aug. 8 pm Tr. 17:20–18:19; *see also* PX1589; Aug. 8 pm Tr. 18:20–19:12.)

14.     Dr. Cowan separately extrapolated Mr. Payne's findings as to loans that did not comply with underwriting guidelines, including those findings that Mr. Payne based solely on results of Dr. Kilpatrick's GAVM work.  (PX1586; Aug; 8 pm Tr. 14:19–16:8; *see also* PX1587; Aug. 8 pm Tr. 16:9–17:7.)

15.     Dr. Cowan also explained that, because the sample size for each SLG is 100, and because the extrapolation method he used is the "classical estimator," an adjustment of about 1% up or down can be made to his extrapolations for each loan that is added to or dropped from Mr. Payne's findings.  (Aug. 8 pm Tr. 22:2–23:6.)

**B.      Credit Suisse Sold the At-Issue Securities by Means of Material Misstatements and Omissions Regarding Loan-to-Value Ratios.**

16.     With respect to each SLG's compliance with the LTV representations at issue, Dr. Cowan performed and extrapolated the results of various calculations based on the LTV formula in the Prospectus Supplements.  (*See generally* Aug. 8 pm Tr. 23:19–25:16.)

17.     First, Dr. Cowan re-calculated and extrapolated to each SLG its weighted average
LTV ("WALTV"), using the results of Dr. Kilpatrick's GAVM work, and compared that
recalculation to corresponding WALTV in the relevant Prospectus Supplement, as follows:

| Securitization | ProSupp WALTV | GAVM Based WALTV | 95% Lower Bound WALTV | 95% Upper Bound WALTV |
|---|---|---|---|---|
| ARMT 2006-1 | 73.6% | 83.2% | 77.5% | 90.3% |
| ARMT 2007-1 | 78.0% | 88.8% | 83.6% | 94.2% |
| CSAB 2006-1 | 78.8% | 85.6% | 82.3% | 89.1% |
| CSAB 2006-2 | 73.8% | 80.7% | 77.1% | 84.0% |
| CSAB 2006-3 | 77.0% | 85.2% | 80.9% | 90.1% |
| CSAB 2006-4 | 74.2% | 82.0% | 76.9% | 87.5% |
| CSAB 2007-1 | 72.3% | 85.7% | 79.6% | 93.7% |
| CSMC 2007-1 | 73.3% | 84.0% | 77.9% | 90.6% |
| CSMC 2007-3 | 75.6% | 82.4% | 77.9% | 86.7% |
| TBW 2006-4 | 77.5% | 82.4% | 80.1% | 84.9% |
| TBW 2007-2 | 76.1% | 93.4% | 87.1% | 99.8% |

(PX1590; Aug. 8 pm Tr. 26:4–16.)  Dr. Cowan also presented the data in PX1590 in
demonstrative form.  (PX1591; Aug. 8 pm Tr. 26:17–27:3.)

18.     PX1590 and PX1591 show, among other things, that even the lower bound of Dr.
Cowan's 95% confidence interval for each SLG's true WALTV significantly exceeds the
WALTV reported in the Prospectus Supplement.  Dr. Cowan explained that "there's only a 2 1/2
percent chance that the true population value is less than that lower bound, that tells me that the
differences found by Dr. Kilpatrick are not due to sampling or modeling variability, that there's
not—that the difference between the GAVM and the pro sup WALTV, the weighted average loan
to value, that difference is it not due just to random chance, either in terms of the sampling or his
model or both."  (Aug. 8 pm Tr. 27:4–16.)

19.     Second, also using the results of Dr. Kilpatrick's GAVM work, Dr. Cowan re-
calculated and extrapolated to each SLG the percentage of LTVs, weighted by dollar, that fell

into the strata of 0–80%, 80–100%, and above 100%, and compared those to the same

information as represented in the relevant Prospectus Supplement, as follows:

| Securitization | <80% | | 80%–100% | | >100% | |
|---|---|---|---|---|---|---|
| | Represented | Actual | Represented | Actual | Represented | Actual |
| ARMT 2006-1 | 98.19% | 51.85% | 1.81% | 38.57% | 0 | 9.58% |
| ARMT 2007-1 | 91.95% | 49.52% | 8.05% | 29.91% | 0 | 20.57% |
| CSAB 2006-1 | 95.55% | 43.25% | 4.45% | 45.83% | 0 | 10.92% |
| CSAB 2006-2 | 95.26% | 40.75% | 4.74% | 47.42% | 0 | 11.82% |
| CSAB 2006-3 | 96.31% | 54.75% | 3.69% | 30.23% | 0 | 15.02% |
| CSAB 2006-4 | 94.41% | 51.22% | 5.59% | 37.86% | 0 | 10.91% |
| CSAB 2007-1 | 90.98% | 28.74% | 9.02% | 55.69% | 0 | 15.57% |
| CSMC 2007-1 | 97.07% | 52.40% | 2.93% | 29.69% | 0 | 17.91% |
| CSMC 2007-3 | 88.82% | 44.90% | 11.18% | 38.90% | 0 | 16.20% |
| TBW 2006-4 | 92.03% | 46.09% | 7.97% | 48.39% | 0 | 5.53% |
| TBW 2007-2 | 91.84% | 29.92% | 8.16% | 41.24% | 0 | 28.84% |

(PX1604; Aug. 8 pm Tr. 35:19–36:10; *see also* PX1606; Aug. 8 pm Tr. 36:11–23.)

20.     Third, also using the results of Dr. Kilpatrick's GAVM work, Dr. Cowan re-calculated and extrapolated to each SLG the percentage of LTVs, by loan count, that fell into the strata of 0–80%, 80–100%, and above 100%, and compared those to the same information as represented in the relevant Prospectus Supplement.  (PX1603; Aug. 8 pm Tr. 31:9–32:2.)

21.     At a level of granularity below the categorizations in PX1603, Dr. Cowan demonstrated Credit Suisse's specific misrepresentations as to the LTV strata above 75% with a series of demonstratives showing the differences between the actual LTVs and those that Credit Suisse represented in the Prospectus Supplements.  (PX1592–1602; Aug. 8 pm Tr. 29:4–31:5; *see also* PX1605; Aug. 8 pm Tr. 32:3–18.)

### C.    Credit Suisse Sold the At-Issue Securities by Means of Material Misstatements and Omissions About Compliance With Appraisal Standards.

22.     With respect to each SLG's compliance with the appraisal representations at issue, Dr. Cowan performed two sets of calculations and extrapolations.  First, he extrapolated to each SLG the results of Dr. Kilpatrick's 3-question USPAP compliance test, as follows:

| Securitizations | Non-Compliance Rate | 95% Lower Bound | 95% Upper Bound | Margin of Error |
|---|---|---|---|---|
| ARMT 2006-1 | 28.4% | 19.7% | 38.5% | 9.4% |
| ARMT 2007-1 | 25.5% | 17.2% | 35.4% | 9.1% |
| CSAB 2006-1 | 27.4% | 19.0% | 37.1% | 9.1% |
| CSAB 2006-2 | 33.3% | 24.3% | 43.4% | 9.5% |
| CSAB 2006-3 | 27.3% | 19.0% | 37.0% | 9.0% |
| CSAB 2006-4 | 40.8% | 31.1% | 51.2% | 10.1% |
| CSAB 2007-1 | 26.0% | 17.9% | 35.6% | 8.9% |
| CSMC 2007-1 | 26.2% | 18.1% | 35.9% | 8.9% |
| CSMC 2007-3 | 36.4% | 26.8% | 46.8% | 10.0% |
| TBW 2006-4 | 32.0% | 23.3% | 41.8% | 9.3% |
| TBW 2007-2 | 31.4% | 22.6% | 41.4% | 9.4% |

(PX1607; Aug. 8 pm Tr. 37:19–38:16; *see also* PX1608; Aug. 8 pm Tr. 38:17–39:4.)

23.     Second, while Dr. Kilpatrick did not end up subjecting enough loans to his 22-question USPAP compliance test for Dr. Cowan to extrapolate the results to each SLG,[2] Dr. Cowan was able to extrapolate the results of that test to the case level, and he did so as follows:

|  | Noncompliance Rate | Lower Bound at 95% Conf. Lev. | Upper Bound at 95% Conf. Lev. |
|---|---|---|---|
| '047 Case | 19.1% | 16.4% | 21.8% |
| '048 Case | 31.1% | 24.4% | 38.2% |

(PX1609; Aug. 8 pm Tr. 39:20–41:6.)

**D.     Credit Suisse Made Material Omissions About Its Quality Control Process.**

24.     Credit Suisse maintained a quality control process for loan underwriting that was supposed to identify systemic trends or issues with the loans and opportunities to improve Credit Suisse's procedures.  (Sacco CPIM Dep. 30:14–31:6, '047 D.E. 587 at 7; '048 D.E. 626 at 7.) Credit Suisse's quality control reviews revealed widespread problems with loans Credit Suisse

---

[2] Dr. Kilpatrick applied his 22-question USPAP compliance test only to those appraisals that Dr. Kilpatrick found, using the GAVM, to be inflated by more than 15%.  Instead of using this test on all or even most of the 1,100 loans in Dr. Cowan's samples, therefore, Dr. Kilpatrick used this test on only 246 loans.  (*See* PX1609.)

acquired as well as those Credit Suisse originated.  (*See* PX431 (noting a "historical fail rate of over 35% (major rep defects)" for wholesale loans (which Credit Suisse itself originated)).)

25.     The defective loans that Credit Suisse discovered through its quality control reviews fit into two significant categories.  Many were "early payment defaults" ("EPDs"), loans for which the borrowers defaulted very shortly after taking out the mortgage.  (Sack SEC Dep. 128:17–21, '047 D.E. 611 at 6; '048 D.E. 650 at 6.)  The second significant category included defective loans that had "negative results" corresponding to breaches of the representations and warranties Credit Suisse made in RMBS offering documents.  (PX373 at 2 (offered in evidence through Sack's FHLB deposition designations over Credit Suisse's objections).)

26.     Credit Suisse employees knew RMBS investors were concerned about EPDs because loans that suffered from EPDs were likely to have underwriting defects.  For example, Peter Sack, co-head of the transaction management group, wrote in December 2006:

> I've been fielding an increasing # of calls from investors asking about "EPDs" in securitizations, along the lines of "notwithstanding that we don't make an 'EPD' covenant in our deals, what do we do to determine that loans that appear likely to have some defect, especially loans that become immediately and significantly [delinquent] in securitizations, do not breach a PSA rep/warrant?"  Other issuers say they QC these loans.

(PX1581 (offered in evidence through Sack's FHLB deposition designations over Credit Suisse's objection); *see also* PX376 (email from Mr. Sacco to Mr. Sack regarding QC results, in which he states: "Investors always ask direct questions about misreps, fraud, compliance, etc.  They want to know how we handle them with regards to deals."); Sack MBIA Dep. 85:7–85:25, '047 D.E. 614 at 5; '048 D.E. 653 at 5; Sack W&S Dep. 147:11–14, '047 D.E. 613 at 7; '048 D.E. 653.[3])

---

[3] Mr. Sack wrote many of the documents related to Credit Suisse's quality control program.  Mr. Sack still works for Credit Suisse and was on Credit Suisse's "will call" live witness list through the second week of trial.  Credit Suisse recently elected not to call him to testify at trial.

Credit Suisse's employees, including Bruce Kaiserman, also recognized that EPD loans likely did not comply with the originator's underwriting guidelines.  (*See* PX232 ("[U]nless they go EPD, we will not catch the defect on the back end.").)

27.    Credit Suisse's loan purchase agreements allowed Credit Suisse to "put back," or return, EPD loans to the originators.  (*See* PX373 at 4.)  But the same was not always true for the second category of problem loans identified during the QC process—those that suffered from underwriting defects but were not EPDs.  (PX290 (offered in evidence through Sack's FHLB deposition designations over Credit Suisse's objections) ("[W]e have no good answer for investors who ask what we do about 'EPDs,' and we have no process to put these loans back to sellers unless they qualify for EPD.").)  These loans uncovered during these QC reviews were nonetheless "unsourceable," meaning that they were not supposed to be securitized and sold to investors.  (Sacco CPIM Dep. 184:7–18, '047 D.E. 587 at 8–9; '048 D.E. 626 at 8–9; PX376.)

28.    Further, Credit Suisse's quality control reviews identified defective loans that Credit Suisse could not put back to the originator, regardless of whether they were EPDs:

- For example, Credit Suisse could not put back loans to insolvent originators because those originators did not have funds available to buy the loans back.  (PX360.)

- Credit Suisse could not put back loans that it originated in-house, because Credit Suisse could not pay itself back for defective loans.  (Sack FHLB Dep. 169:18–170:4, '047 D.E. 612 at 15; '048 D.E. 651 at 15.)

29.    Identifying defective loans that it could not put back to originators created a problem for Credit Suisse.  Credit Suisse was not supposed to securitize these loans, but they did not want them accumulating in inventory, which was both unprofitable and risky because Credit Suisse bore the risk that the loans might default.  (Sack CPIM Dep. 203:25–204:7, '047 D.E. 615 at 12; '048 D.E. 654 at 12 (accumulating loans in inventory was counter to Credit Suisse's business objectives); Vibert Dep. 151:6–25; 152:20–24, '047 D.E. 571 at 6–7; '048 D.E. 610 at

6–7 (expressing concern about "what the ultimate, you know, profitability impact would be of

put-backs.").)

30.      Mr. Sack set out to solve the problem of these defective loans "pil[ing] up in

inventory." (PX376.) He proposed "revising the QC process" to focus only on loans "in

relatively recent securitizations and inventory" that were 60 days delinquent. (PX376 at 2.)

He explained:

> [the proposed] more focused sample . . . should avoid the previous
> approach by which a lot of loans were QC'd regardless of
> opportunity for put-back and a lot of negative results were emailed
> to PBG but not widely seen, creating a record of possible
> rep/warrant breaches in deals but, I think, resulting in few if any
> put-backs to sellers other than for EPD.

(PX376 at 2; *see also* PX420 at 1 ("[W]e don't want to spend a lot of $ to generate a lot of QC

results that give us no recourse anyway but generate a lot of negative data.").)

31.      Beyond reducing the scope of Credit Suisse's QC reviews, Mr. Sack further

proposed that when QC reviews uncovered problems with loans in inventory, Credit Suisse

should securitize those loans anyway. Mr. Sack explained:

> I don't want to securitize loans that are obviously Section 32 cost,
> Georgia Fair Lending disasters with unlimited assignee liability
> and criminal sanctions. But I am inclined to securitize loans that
> are close calls or marginally non-compliant, and take the risk that
> we have to repurchase, if we can't put them back, rather than
> adding to sludge in inventory.

(PX 376; *see also* Sack CPIM Dep. 196:14–197:3, '047 D.E. 615 at 7; '048 D.E. 654 at 7

(testifying that "marginally non-compliant" could have referred to non-compliance with

"underwriting criteria").)

32.      John Vibert, head of the ARM trading desk, endorsed Mr. Sack's proposal and

further suggested not QC'ing loans from insolvent sellers, because "QC would only result in a

potential obligation on our behalf to repurchase [from securitizations] without any recourse to a

seller." (PX360 at 2; *see also* Sack FHLB Dep. 166:7–14, '047 D.E. 612 at 13; '048 D.E. 651 at 13.)

33. Consistent with Mr. Vibert's suggestion, Mr. Sack enforced the revised quality control process to avoid identifying problems with the wholesale loans that Credit Suisse originated. Identifying problems with these loans would be costly for Credit Suisse, because it would obligate Credit Suisse to repurchase the loans from securitizations but there would be no originator to put the loans back to (because Credit Suisse was the originator). As Mr. Sack said:

> I think we already know we have systemic problems in FC/UW re both compliance and credit. The downside of QC'ing these 44 loans is, after we get the QC results, we will be obligated to repurchase a fair chunk of the loans from deals, assuming the loans are securitized and the QC results look like the QC we've done in the past. So based on a wholesale QC historical fail rate of over 35% (major rep defects), the avg bal of wholesale loans and the loss severities, it is reasonable to expect this QC may cost us a few million dollars.

(PX430 (offered in evidence through Sack's FHLB deposition designations without objection).)

34. From Credit Suisse's perspective, this new QC process had a salutary benefit beyond preventing the accumulation of unsourceable loans. The new process would allow Credit Suisse to remain willfully blind to problems with the loans it had securitized, and therefore would not trigger its repurchase obligations to securitizations:

- Mr. Sack explained that under the revised QC process, "we will cut down on the number of negative QC results floating around that we do not respond to by repurchasing loans from deals." (PX360 at 2.)

- Thus, as Mr. Sack explained it, Credit Suisse could avoid triggering its obligation to repurchase loans by minimizing its effort to discover such loans: "We are legally obligated to repurchase/substitute for loans in deals that breach reps if we discover a breach or are notified of a breach. We are not legally obligated to perform QC to search for a breach." (*Id.* at 1.)

35. Even when Credit Suisse received compensation from an originator for a defective loan that Credit Suisse had securitized, Credit Suisse did not always repurchase the

loan from the securitization.  In a transaction called a "CTO," Credit Suisse accepted cash from

originators in satisfaction of EPD claims as an alternative to selling the loan back to the

originator.  (Sack SEC Dep. 169:11–170:8, '047 D.E. 611 at 8; '048 D.E. 650 at 8; Sack FHLB

Dep. 229:21–24, '047 D.E. 612 at 27; '048 D.E. 651 at 27.)

36.     Mr. Sack explained that Credit Suisse did not always pass funds received in CTO

transactions to the securitization trusts that owned the loan:

> The purpose of this email is to say (1) we receive CTO $ from
> originators for delq loans in our deals but we do not always
> repurchase the related loans from the deals or pass the $ to the
> deals, (2) this is a practice that I could argue to investors is not
> technically deficient under the terms of our deal docs, but I know
> from my experience talking to our bond investors every day about
> EPDs that this would be a surprise and concern to them . . . .

(PX300 at 1 (offered in evidence through Sack's FHLB deposition designations over Credit

Suisse's objections)).)

37.     The CTO practice was common at Credit Suisse in 2006 and 2007:

- In 2006, Credit Suisse engaged in 452 CTOs versus 177 repurchases.
  (Sack W&S Dep. 169:14–21; 171:4–25, '047 D.E. 613 at 7–8; '048 D.E.
  652 at 7–8.)

- In 2007, Credit Suisse engaged in 578 CTOs versus 347 repurchases.  (*Id.*
  at 176:12–19; 177:3–9.)

38.     Although Mr. Sack knew that the CTO practice would be a "surprise and concern"

to investors like MassMutual, Credit Suisse never told investors about the practice.  (PX300 at 1;

Sack MBIA Dep. 154:11–19, '047 D.E. 614 at 8; '048 D.E. 653 at 8.)

39.     Whether technically deficient or not under the terms of the deal documents,

the failure to disclose this practice, as well as Credit Suisse's manipulation of the QC process

to avoid discovering underwriting defects that would trigger repurchase obligations or add

"sludge" loans to inventory, were material omissions.

16

**E.    The Court Should Give No Weight to Bruce Kaiserman's Trial Testimony to Date.**

40.    Bruce Kaiserman is the former co-head of the RMBS Transaction Management Group, and a company witness for Credit Suisse who has testified  25–35 times in RMBS depositions or trials.  (Aug. 10 part 3 Tr. 4:8–12.)  Over the years, Mr. Kaiserman has spent close to a month preparing for that testimony with Credit Suisse's lawyers, including trial counsel, and he is a lawyer himself.  (*Id.* at 5:3–8; Aug. 10 part 1 Tr. 20:10–14.)

41.    Though he claimed on direct examination to have experience drafting and reading RMBS offering documents based on his legal career and other experience outside the relevant timeframe, Mr. Kaiserman never testified—nor could he—that he had personal knowledge of the offering documents for the securitizations at issue.  (Aug. 10 part 2 Tr. 57:1–10; 60:7–22; 63:1–5.)  The Court properly sustained an objection to his testimony about the meaning of those documents as undisclosed expert opinion.  (*Id.* at 79:3–24.)

42.    In response to MassMutual's foundation objections as to Mr. Kaiserman's expansive testimony as to Credit Suisse's RMBS underwriting, due diligence, and securitization practices, the Court warned Credit Suisse that "if the witness' testimony today is impeached in some way . . . , that will or could potentially be devastating to the Court's assessment of his credibility."  (*Id.* at 59:25–60:4.)  Nonetheless, Credit Suisse persisted in eliciting the expansive testimony from Mr. Kaiserman.

43.    On cross-examination, MassMutual's counsel repeatedly impeached Mr. Kaiserman's testimony, showing that on the same subjects of his broad testimony he had previously disclaimed personal knowledge, including as to his minimal involvement in Credit Suisse's approval process for new loan sellers, his limited role in Credit Suisse's "putback"

process for asking originators to repurchase bad loans, and his substantial awareness of concerns about the quality of loans coming through the fulfillment centers:

| Trial Testimony | Prior Inconsistent Testimony |
|---|---|
| Q.   Tell me whether it's true or not that you would have to speculate as to why a trading desk wanted to acquire loans because your responsibility was just to help them complete what they wanted to do? . . .<br><br>THE COURT:  So forget about for a second that you ever gave a deposition, forget about just for one second that you ever gave deposition in your life.  Ask the question, *would you have to speculate?*<br><br>THE WITNESS:  *No.*<br><br>(Aug. 10 part 3 Tr. 9:24–10:2; 10:12–16 (emphases added).) | Q.   "Question:  And so in your work as co-head of transaction management, which you have described you were therefore involved in whole loan purchases or some aspect of that, did the trading desk ever communicate to you the purpose of acquiring loans through whole loan purchases or did you ever gain an understanding of why Credit Suisse would engage in such transactions?"<br><br>"Answer:  I think you're asking me why did they buy loans?"<br><br>"Question: Yes."<br><br>"Answer:  I wasn't a trader.  I'm not sure why they bought the loans.  *I'm happy to speculate if you'd like as to why they [bought] the loans, but it wasn't my decision to buy the loans*.  It's my responsibility to help them complete what they wanted to do, which was to acquire loans.  As to the reasons therefore, I don't think I am the right person."<br><br>Was that your testimony, sir?<br><br>A.   Yes, sir.<br><br>(Aug. 10 part 3 Tr. 11:2–20 (emphasis added).) |
| Q.   You also testified this morning about all the visits that you made to approve new clients on the bulk side.  Do you remember that?<br><br>A.   I recall talking about visiting clients, yes.<br><br>Q.   And you described how that was part of the new client approval process as I recall, is that right?<br><br>A.   Yes, sir.<br><br>Q.   How often did you make such visits?<br><br>A.   Maybe two or three a month. . . . | Q.   "*Did you or people who reported to you continue to make visits to sellers in*—to potential clients in advance of their being approved to sell loans to Credit Suisse *throughout the period from 2005 through 2008?*"<br><br>"Answer: *I don't recall*."<br><br>Was that your testimony?<br><br>A.   Yes.<br><br>(*Id.* at 13:13–19 (emphases added).) |

| Trial Testimony | Prior Inconsistent Testimony |
|---|---|
| Q.   Okay.  *How about 2005, 2006, 2007? You don't even recall, do you, whether these visits took place during that time period?*<br><br>A.   *I do recall, sir.*<br><br>(*Id.* at 12:4–25 (emphases added).) | |
| Q.   And **on direct examination you described the purpose of the visits** that you claimed to have made, and tell us again what the purpose was how you say that fit into the new client approval process?<br><br>A.   It was for a person independent of sales to go and evaluate whether or not the client was a suitable client insofar as their philosophy towards lending was the same as ours, sort of an integrity check. . . .<br><br>Q.   Well, in fact, given your roles and responsibilities at Credit Suisse **you don't know what the purpose was or even whether it was part of the approval process, isn't that true?**<br><br>A.   **I don't believe that's true.**<br><br>(*Id.* at 13:20–14:2, 14:16–20 (emphases added).) | Q.   *"Question:  Were these visits that we have been discussing part of the client approval process?"*<br><br>   *"Answer:  In light of my earlier statement that I wasn't responsible for the client approval process*, I can't say whether it was or it wasn't."<br><br>Was that your testimony?<br><br>A.   Yes.<br><br>(*Id.* at 15:4–10 (emphases added).) |
| Q.   And you've said a couple of times now that *the reason was to see if they met Credit Suisse's standards, is that right?*<br><br>**A.   Yes**.<br><br>(*Id.* at 19:15–18 (emphases added).) | Q.   "In addition to establishing a relationship with a potential client, *was another purpose of the visit to provide additional information to the people making the approval decision about whether the client met various standards that Credit Suisse had for sellers*?"<br><br>"*Answer:  Not that I know.*"<br><br>Was that your sworn testimony?<br><br>A.   Yes.<br><br>(*Id.* at 19:21–20:3 (emphases added).) |
| Q.   *Did anybody in the transaction management group have any role working with the put-back group?*<br><br>A.   Well, in addition to the discussion we just had about my role, *I'm confident that Joe or Rick in my absence may have gone to folks* | Q.   Okay.  When the SEC was investigating Credit Suisse, did you give sworn testimony to them?<br><br>A.   Yes.<br><br>Q.   . . . Up there towards the top on page 35 |

| Trial Testimony | Prior Inconsistent Testimony |
|---|---|
| *on my team and asked them similar questions.*<br><br>THE COURT: *Well, you're confident that they may have or you're confident that they did?*<br><br>THE WITNESS: *The latter, I'm sorry.*<br><br>THE COURT:  All right.<br><br>BY MR. BECK:  Q.   *Your answer was you're confident they did, is that right?*<br><br>*A.   Yes.*<br><br>(*Id*. at 24:11–24 (emphases added).) | of the SEC transcript, "Question:  *To your understanding, did anyone in the transaction management group have any role in working with the put-back group?*"<br><br>"*Answer:  No, sir*."<br><br>Was that your testimony?<br><br>A.   Yes.<br><br>(*Id*. at 24:25–25:14 (emphases added).) |
| Q.   So you say *you were personally aware of concerns about the quality of loans coming through the fulfillment center, right?*<br><br>*A.   Yes.*<br><br>(*Id*. at 46:18–21 (emphases added).) | Q.   Okay.  Now let's look at page 71 of your 30(b)(6) deposition where you're speaking on behalf of the entire company.  "*Were you, Credit Suisse, ever made aware of any concerns about the quality of loans that were coming through fulfillment centers?*"<br><br>"*Answer:  No.*"<br><br>Was that your testimony on behalf of the company? . . .<br><br>THE WITNESS:  I'm just reading around.  That's what it says, but what concerns me is we're talking about a quality control program so it may be—that is my answer and that was the question, but I'm wondering whether— . . . .<br><br>(*Id*. at 46:22–47:12 (objection omitted; emphases added).) |

The repeated significant inconsistencies between Mr. Kaiserman's trial testimony and his prior sworn testimony show that his trial testimony to date on the processes and procedures in place at Credit Suisse—and, in particular, his testimony suggesting that Credit Suisse took steps to make sure that the loans Credit Suisse securitized were in compliance with underwriting guidelines—was not credible.  The Court should give it no weight.

August 14, 2017

Respectfully submitted,

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY

*/s/ Katherine M. Swift*

John J. Egan (BBO 151680)
EGAN FLANAGAN AND COHEN, P.C.
67 Market Street, P.O. Box 9035
Springfield, Massachusetts 01102
Telephone: (413) 737-0260
Facsimile: (413) 737-0121

Joseph C. Smith, Jr. (admitted *pro hac vice*)
Lester C. Houtz (admitted *pro hac vice*)
Karma M. Giulianelli (admitted *pro hac vice*)
Bartlit Beck Herman Palenchar & Scott LLP
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Philip S. Beck (admitted *pro hac vice*)
Jeffrey A. Hall (admitted *pro hac vice*)
James B. Heaton, III (admitted *pro hac vice*)
Steven J. Nachtwey (admitted *pro hac vice*)
Cindy L. Sobel (admitted *pro hac vice*)
Katherine M. Swift (admitted *pro hac vice*)
Joshua P. Ackerman (admitted *pro hac vice*)
Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, 3rd Floor
Chicago, Illinois 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
kate.swift@bartlit-beck.com

*Counsel for Plaintiff Massachusetts Mutual Life
Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified in the Notice of Electronic Filing (NEF),

and paper copies will be sent to those indicated as non-registered participants on this 14th day of

August, 2017.


*/s/ Katherine M. Swift*