# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DLJ MORTGAGE CAPITAL, INC. et al.,<br><br>Defendants. | Civil Action No.<br>11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. et al.,<br><br>Defendants. | Civil Action No.<br>11-cv-30048-MGM |

## DEFENDANT'S THIRD WEEKLY
## PRELIMINARY PROPOSED FINDINGS OF FACT

## TABLE OF CONTENTS

I.      Introduction ............................................................................................................. 1

II.    MassMutual's Reunderwriting Expert, Mr. Payne, Does Not Establish the
Existence of a False or Misleading Statement or Omission About
Compliance With Underwriting Guidelines ............................................................ 1

        A.      Mr. Payne's Reunderwriting Analysis Does Not Answer a
Relevant Question ........................................................................................ 4

        B.      Mr. Payne's Analysis Is Flawed .................................................................. 7

III.   Dr. Cowan's Extrapolations of Mr. Payne's and Dr. Kilpatrick's Opinions
Are Unreliable ....................................................................................................... 11

IV.   Credit Suisse Performed Due Diligence on the Loans It Purchased and
Securitized ............................................................................................................. 17

Credit Suisse submits the following preliminary proposed findings of fact based on the evidence submitted during the third week of trial.

## I.   INTRODUCTION

1.   The third week of trial confirmed that MassMutual has not and cannot establish the existence of a material misstatement or omission in the Offering Documents for the Certificates at issue.  MassMutual argues that it can prove its claims solely on the basis of a small number of emails from individuals who admittedly had no involvement in the processes they criticized and about originators who, in many cases, contributed nothing more than a handful of loans (out of a universe of over 29,000 loans at issue) to a subset of the securitizations at issue.  Such one-off emails cannot substitute for the evidence that it is MassMutual's burden to present about the compliance of the actual loans at issue with underwriting and appraisal standards as described in the ProSupps.  Thus, MassMutual's suggestion that the law entitles it to rescind its investments "regardless of whether Credit Suisse's failed processes led to the inclusion of defective loans in the pools backing the at-issue securities" (8/7/17 MassMutual PFOF (ECF No. 609, '047 Action) at 3) should be rejected.  If MassMutual cannot prove that the nature of the underlying collateral was misrepresented, it cannot establish, as it must, that any statement in the Offering Documents was rendered misleading by the omission of information about these one-off emails.  *See Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 687 (D. Mass. 1993) ("[W]here liability is based on silence, a duty to disclose arises only to correct or update what would otherwise be a materially misleading prior statement by the defendants.")

## II.   MassMutual's Reunderwriting Expert, Mr. Payne, Does Not Establish the Existence of a False or Misleading Statement or Omission About Compliance With Underwriting Guidelines

2.   MassMutual's reunderwriting expert, Richard Payne, reviewed a sample of the mortgage

loans underlying the Certificates at issue.

3.      In that review, Mr. Payne compared the loan file for each loan in his sample against the actual underwriting guidelines that he believed applied to each loan at origination.  (7/19/17 Vol. I Tr. 41:6-25.)  Those underwriting guidelines included detailed requirements as to various characteristics, such as DTI, FICO score, LTV and assets.  (7/19/17 Vol. I Tr. 27:2-17; 7/19/17 Vol. II T r. 32:13-33:16.)

4.      Even within a single originator, there could be several different loan programs and loan types offered, each with their own detailed guidelines.  7/18/17 Vol. II T r. 33:15-24:10.)

5.      As an initial matter, Mr. Payne's testimony was woefully inadequate to establish the reliability of his opinions.  On direct examination, Mr. Payne presented only *two examples* out of the 1,100 loans he and his team purportedly reviewed (PX792R; PX933R; 7/19/17 Vol. I Tr. 50:20-72:6), and one of the two was a loan about which Credit Suisse's expert does not even disagree with Mr. Payne's findings (7/20/17 Vol. II Tr. 69:1-19).  The only other information Mr. Payne provided the Court about the basis for his loan-level opinions is PX1550, which is nothing more than a color-coded listing of loan numbers, dollar amounts and dates, with the colors indicating whether Mr. Payne believes the loan is defective and whether the defects were his own beliefs (red) or solely those of Dr. Kilpatrick (orange).  Beyond that, PX1550 provides no information at all about the nature of the defects Mr. Payne alleges, the reasons for those defect opinions, how many defects Mr. Payne alleges or any other details about the relevant loans.  Without that information, Mr. Payne has given the Court no basis to evaluate the accuracy and reasonableness of his opinions, and he appears to expect the Court to simply take his word for it.  But the law is clear that an opinion supported by nothing more than the *ipse dixit* of an expert is invalid.  *Smith v. Jenkins*, 732 F.3d 51 (1st Cir. 2013); *United States v. Zolot*, 968 F.

Supp. 2d 411, 429 (D. Mass. 2013) ("[T]he opinion of an expert, no matter how qualified cannot simply be based on her say so.").

6.      In addition to giving the Court nothing with which to evaluate his opinions, Mr. Payne made numerous changes to PX1550 within the span of time he spent on the stand.  For example, on cross examination, he withdrew his defect findings with respect to three loans:  Loan #408513896 (7/20/17 Vol. I Tr. 63:19-65:20; 8/8/17 Vol. I Tr. 48:21-49:6), Loan #410023997 (7/20/17 Vol. II Tr. 75:17- 76:21) and an unnumbered loan whose only alleged defect was a missing appraisal (7/20/17 Vol. II Tr. 19:4-15), despite testifying that he "checked, rechecked and then checked again" PX1550 to ensure its accuracy (7/20/17 Vol. II Tr. 76:4-6).  On re-cross examination over two weeks later, Mr. Payne withdrew *two more* loans that he alleged had substantially increased credit risk based solely on a missing appraisal (8/8/17 Vol. I Tr. 52:3-53:2).  He also added back Loan #410023997 into his defective loan population, and admitted that he was unaware that his counsel had withdrawn that loan's findings in writing following Mr. Payne's cross.  (8/8/17 Vol. I Tr. 49:25-50:2; 50:24-51:7).  Mr. Payne's numerous corrections during his testimony call into question the reliability of his conclusory opinions—and yet, he provides the Court no basis to evaluate whether the rest of his opinions are similarly flawed.

7.      Moreover, Mr. Payne's opaque presentation to the Court provides the Court no way to identify the precise allegation(s) that caused him to conclude that a loan had substantially increased credit risk.  As such, there is no way to tell whether or not any change in an individual finding would result in a change of Mr. Payne's overall opinion with respect to any given loan. (7/20/17 Vol. II Tr. 67:25-68:3; 68:8-13.)  Mr. Payne admitted that he has not informed the Court whether in his opinion any single loan would still have substantially increased credit risk if the Court were to reject Mr. Payne's use of post-origination information, Bureau of Labor Statistics

3

("BLS") data or missing documents.  (8/8/17 Vol. I Tr. 25:4-15, 30:7-13, 32:5-10.)  Mr. Payne's

conclusory assertions simply do not satisfy MassMutual's burden of proof.

### A.      Mr. Payne's Reunderwriting Analysis Does Not Answer a Relevant Question

8.      In order to demonstrate the falsity of the Offering Documents at issue, Mr. Payne's

analysis must test the accuracy of the actual statements contained in those documents.  But by

Mr. Payne's own admission, he did not vary his analysis at all based on the nature of the actual

statements contained in any of the Offering Documents at issue (7/19/17 Vol. II Tr. 32:23-35:9).

9.      Each of the ProSupps for the Certificates at issue contained a section that generally

described the underwriting guidelines applicable to the underlying mortgage loans.  Only certain

of the larger originators in each securitization were disclosed, and even among those originators,

the disclosures regarding their particular underwriting guidelines varied.  (7/18/17 Vol. II Tr.

28:3-30:5.)

10.      Importantly, the disclosures for all of the loans at issue state that the "mortgage loans

were originated generally in accordance with the underwriting criteria described herein", and

what is contained "herein" is a further description that for many of the loans at issue, refer to

nothing outside of the ProSupp.  Instead, the descriptions of the underwriting criteria that follow

are very general in nature—for example, explaining that the underwriting process requires a loan

application and an appraisal—but do not contain any of the specific numerical thresholds (LTV

and DTI maximums, cash reserve requirements, minimum FICO score, etc.) that Mr. Payne uses

to assess whether a loan complies with guidelines.  (*See, e.g.*, JX22 at S-46-S-47 (Credit Suisse

Financial Corporation description); JX22 at S-36-S-37 (general description for all loans other

than those originated or acquired by a disclosed originator).)

11.     With respect to all loans governed by the "described herein" language, Mr. Payne's analysis has no relevance to demonstrate falsity.  Mr. Payne's work may answer the question whether the loans complied with the guidelines applicable at origination (incorrectly, in Credit Suisse's view), but it does not answer the question whether any actual statement in the Offering Documents was false or misleading, since the Offering Documents make no mention at all of compliance with guidelines that are not contained or even referenced anywhere in the Offering Documents.

12.     Mr. Payne's assertion in response to questioning from the Court that underwriting the loans pursuant to the guidelines described in the ProSupps "would produce the same results" as obtained in his analysis should be rejected.  Mr. Payne admitted in his very next answer that what he meant was that only the extrinsic guidelines should be used to reunderwrite a loan (which is incorrect for the reasons described above).  (7/19/17 Vol. II Tr. 34:6-35:9.)  It is self-evident that, without reference to the specific numerical thresholds required by the extrinsic guidelines, there would have been no basis at all for Mr. Payne's defect claims.

13.     Mr. Payne also admitted that his analysis did not take account of language shown to him from the TBW 2006-4 ProSupp, which stated that "[t]here can be no assurance that every mortgage loan was or will be originated in conformity with the applicable underwriting standards in all material respects".  (JX14 at S-30; 7/20/17 Vol. II Tr. 74:4-6.)  Instead, he applied the same one-size-fits-all approach to allege that 34 loans in his sample for that securitization were defective.  (PX1550 at 14.)

14.     None of this would be viewed as surprising or unusual by a reasonable RMBS investor since, as Mr. Canuel testified earlier in the trial, even with respect to a disclosed originator, he would not have known the specific guidelines pursuant to which any particular loan was

originated, and never bothered to ask for guidelines because what he cared about was that *some* set of guidelines applied, not any *particular* set of guidelines.  (*See* 7/18/17 Vol. II Tr. 28:6-30:15, 33:15-34:10.)

15.     Mr. Canuel's testimony also underscores why Mr. Payne's analysis does not answer a relevant question with respect to the *materiality* of any of the three categories of statements described above.  Mr. Payne's reunderwriting review tests compliance with the specific thresholds in an extrinsic set of underwriting guidelines, the specifics of which Mr. Canuel has admitted MassMutual did not know.  Thus, for example, Mr. Payne might deem a pool of loans defective because the borrowers' debt-to-income ratios were 55%, when the actual guidelines at origination only permitted a maximum DTI of 50%.  But, the clear implication of Mr. Canuel's testimony is that MassMutual could just as easily have believed that the guidelines permitted DTI up to 55%—it simply would not have known one way or the other.  (*See, e.g.*, 7/18/17 Vol. II Tr. 33:15-34:2.)  Without establishing what MassMutual reasonably believed the guidelines would be, Mr. Payne's analysis cannot establish that the loans were in any way materially different than what MassMutual thought it was getting based on the actual disclosures at issue.

16.     Mr. Canuel did testify that he was generally interested in knowing that the underlying loans went through an underwriting process, even if he knew none of the specifics.  (7/18/17 Vol. I Tr. 20:20-21:8.)  So, for example, if one could demonstrate that the underlying loans were "not . . . underwritten . . . at all" (7/18/17 Vol. I Tr. 20:24-21:1)—that a material number of originators were simply rubber-stamping every loan application that came through the door— that might get closer to suggesting the existence of a material misstatement.  But Mr. Payne's analysis was not designed in any way to test that hypothesis and he did not express that opinion about any originator based on any work he performed in this matter.  It was revealed during re-

cross examination that, when Mr. Payne expressed his opinion that certain originators "never met a loan that [they] wouldn't approve", he did so without any empirical basis whatsoever.  (8/8/17 Vol. I Tr. 45:20-46:14.)  The large number of sample loans that passed even Mr. Payne's biased analysis undermines any assertion that the loans were "not . . . underwritten . . . at all".

### B.    Mr. Payne's Analysis Is Flawed

17.    Even if Mr. Payne's analysis were responsive to the representations in the Offering Documents (it is not), he did not reliably conduct his analysis.

18.    *First*, when a credit document was missing from a loan file that he reviewed in connection with his work in this matter, a decade or more after the time of origination, Mr. Payne assumed that the document was missing at the time of origination.  (7/20/17 Vol. I Tr. 60:17-22.) He admitted to systematically ignoring notes in the loan file by underwriters indicating that the document was present at the time of origination.  (7/20/17 Vol. I Tr. 61:2-14.)  And he further testified that he "never ever considered a waived condition evidence that the document was provided, because I just suspect that the underwriter waived the condition so they could close the loan without getting the document".  (7/20/17 Vol. I Tr. 62:14-63:11.)  Mr. Payne's unsupported "suspicions" are not substitutes for evidence.  At the same time, Mr. Payne ignored a number of alternative explanations for why documents may have gone missing over this time period.  He acknowledged that documents may have been lost as mortgages were bought and sold and loan files were transferred, but admitted that he "did not account for that possibility" when reunderwriting the sample of loans in this case.  (7/20/17 Vol. II Tr. 4:15-5:6.)  Similarly, he noted that documents may have been misplaced while they were being imaged or scanned, but conceded that "that possibility also did not factor into" his reunderwriting analysis.  (7/20/17 Vol. II Tr. 6:2-7; 8/8/17 Vol. I Tr. 30:25-31:9.)  And he admitted that he did not investigate the

imaging practices of the originators of loans at issue in this case.  (7/20/17 Vol. II Tr. 5:23-6:1;

8/8/17 Vol. I Tr. 30:22-24.)  Essentially, Mr. Payne found it more plausible to assume that

numerous individuals had failed to do their jobs than that a document might simply have gone

missing over time.  (7/20/17 Vol. II Tr. 13:2-12.)  That unfounded assumption is not evidence.

19.     *Second*, Mr. Payne testified that he would only reunderwrite a loan that contained *both*

information to assess the borrower's ability to repay *and* adequacy of the collateral.  (7/20/17

Vol. II Tr. 15:23-16:11.)  Yet, despite acknowledging that the appraisal is the only document that

contains information regarding the adequacy of the borrower's collateral (7/20/17 Vol. II Tr.

17:12-23), Mr. Payne reunderwrote and alleged substantial defects on at least 13 loans where the

appraisal was missing from the file (7/20/17 Vol. II Tr. 23:16-24).

20.     *Third*, for 331 of the 428 loans that he alleges had substantially increased credit risk, Mr.

Payne used documents or information that came into existence *after* the close of the mortgage

loan as the basis for the defect claim, despite admitting that the Offering Documents only

represented that loans *were originated* in accordance with the applicable guidelines.  (7/19/17

Vol. II Tr. 30:18-20; 7/20/17 Vol. II Tr. 34:23-35:3; 38:4-11.)  Therefore, Mr. Payne's use of

information that was not—and admittedly could not have been—available to the original

underwriter at origination is inappropriate and unreliable.  Mr. Payne also admitted that "any

time there was a discrepancy between the information that's contained in the loan file and the

information contained in the post-closing source, [he] always believed that the information in the

post-closing source was correct" (7/20/17 Vol. II Tr. 35:13-24), refusing to accept that a

borrower whom he accuses of having lied at origination may have misstated information in a

bankruptcy proceeding in which the borrower may have an incentive to understate his income or

assets (*see* 7/20/17 Vol. II Tr. 64:12-16; 65:16-19).  And Mr. Payne made those assumptions

even with respect to post-origination sources that did not require any attestation or oath. (7/20/17 Vol. II Tr. 35:24-38:3.)

21.     *Fourth*, Mr. Payne relied upon re-verifications of employment, a form of post-origination information, even where the underwriting guidelines did not require it, even where stated income loan program guidelines provided that there was going to be no verification of borrowers' income, and even where stated income loan program guidelines specifically *prohibited* underwriters from verifying borrowers' income.  (7/20/17 Vol. II Tr. 42:22-25; 43:23-44:1; 45:8-20.)  Mr. Payne's failure to follow the applicable guidelines renders his opinions about those loans irrelevant and unreliable.

22.     *Fifth*, Mr. Payne required his underwriters to use Bureau of Labor Statistics ("BLS") data, even though none of the guidelines at issue required or even mentioned using BLS. (7/20/17 Vol. II Tr. 53:1-6.)  Mr. Payne's admission that he "cannot recall a single instance other than litigation in which [he has] used BLS", emphasizes that BLS was not a tool that origination underwriters were expected to use during the relevant time period.  (7/20/17 Vol. II Tr. 54:8-13.) Nor could they have since there was a lag of approximately 12 months before BLS data would be updated.  (7/20/17 Vol. II Tr. 56:16-20.)  The BLS data that Mr. Payne and his team used suffers from a number of other limitations (7/20/17 Vol. I Tr. 36:5-8; 7/20/17 Vol. II Tr. 54:21-55:17; 56:8-57:21; 58:17-59:13):

- Mr. Payne admitted that BLS data is based on surveys of employers;

- BLS does not distinguish between full- and part-time jobs; there is a predetermined set of job titles in BLS that fall within a smaller number of job categories;

- certain types of incomes, including overtime pay, severance pay, shift differentials and employer contributions, are excluded;

- BLS does not capture variations based upon tenure, employee experience or job responsibilities;

9

- BLS data does not capture wage ranges for those making more than approximately $145,000 in 2006; and

- selection of an appropriate category and title for BLS, like whether a loan complied with underwriting guidelines, is a judgment call on which reasonable minds could differ.

23.    *Sixth*, Mr. Payne blindly relied upon Dr. Kilpatrick's GAVM to recalculate the LTV/CLTV ratios, even while admitting that he did not meet with Dr. Kilpatrick, did not review Dr. Kilpatrick's expert report, did not undertake any analysis of Dr. Kilpatrick's methodology and simply took Dr. Kilpatrick's GAVM values—given to Mr. Payne by counsel—at face value. (7/20/17 Vol. II Tr. 66:20-67:5; 8/8/17 Vol. I Tr. 56:6-57:2.)  Moreover, Mr. Payne used Dr. Kilpatrick's GAVM values irrespective of whether Dr. Kilpatrick offered any opinion regarding an appraisal's conformance to appraisal standards.  (8/8/17 Vol. I Tr. 27:4-28:16.)  Doing so contravenes the holdings of at least two courts in RMBS cases that have refused to rely solely on the results of an AVM without it being paired with reliable analysis of USPAP non-compliance for a given appraisal.  *See U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 437 (S.D.N.Y. 2016); *Fed. Hous. Fin. Agency v. Nomura Holding Am.*, 104 F. Supp. 3d 441, 531 (S.D.N.Y. 2015).  Therefore, Mr. Payne's opinions for the 109 loans that he would not have found to have a substantially increased credit risk if not for his reliance on Dr. Kilpatrick's opinions should be stricken.  (8/8/17 Vol. I Tr. 21:21-22:1; PX 1550.)

24.    *Finally*, Mr. Payne faulted the origination underwriter for failing to document compensating factors, even while acknowledging that most guidelines at the time did not require underwriters to document compensating factors and even while agreeing that whether or not compensating factors were documented did not affect the credit risk of the loan.  (7/20/17 Vol. I Tr. 39:2-17; 43:5-9.)  Mr. Payne's litigation requirement that compensating factors be documented rendered those opinions irrelevant and unreliable.  Moreover, the weight of the

evidence refutes Mr. Payne's claim that he nevertheless considered *undocumented* compensating factors in his review.  When pressed, Mr. Payne could offer only 2 examples out of the approximately 1,100 loans that his team reviewed in this case in which he cleared a loan on the basis of compensating factors that were not specifically documented in the file.  (7/20/17 Vol. I Tr. 45:4-18; 57:5-14; 63:20-64:16; 65:16-20; 8/8/17 Vol. I Tr. 48:21-49:10.)

### III. Dr. Cowan's Extrapolations of Mr. Payne's and Dr. Kilpatrick's Opinions Are Unreliable

25.     Dr. Charles Cowan, MassMutual's statistical sampling expert, purports to extrapolate the opinions generated by Mr. Payne and Dr. Kilpatrick with respect to samples of loans to the broader loan populations at issue.

26.     Notwithstanding his failure to disclose this on direct because it was not technically a "Daubert" ruling (8/8/17 Vol. II Tr. 42:21-45:9), earlier this month, Dr. Cowan's opinions on statistical sampling in an RMBS case were rejected by the court as not reliable, and not "factually supported, probative or persuasive".  *The Western and Southern Life Ins. Co. v. The Bank of New York Mellon*, No. A1302490, 2017 WL 3392855, at *12 (Ohio Com. Pl. Aug. 4, 2017).  The court there determined that Dr. Cowan's sampling methodology was, "as a matter of credibility, so riddled with holes as to make it unreliable and unusable" in the case.  *The Western and Southern Life Ins. Co. v. The Bank of New York Mellon,* No. A1302490, 2017 WL 3392856, at *4 (Ohio Com. Pl. Aug. 4, 2017).  Dr. Cowan's opinions on sampling and extrapolation in this case are similarly flawed.

27.     *First*, Dr. Cowan used a smaller sample size in this case than he has advocated in other RMBS cases, leading to far less precise results.  Here, Dr. Cowan used a sample size of 100 loans for each of the eleven securitizations at issue.  (8/8/17 Vol. I Tr. 72:21-73:5.)  That sample size provides for a maximum margin of error of plus or minus ten percentage points (8/8/17 Vol.

11

I Tr. 74:17-75:4), which is far greater than the plus or minus five percentage points margin of error that Dr. Cowan has utilized in prior RMBS cases.  (8/8/17 Vol. I Tr. 78:15-19; 8/9/17 Vol. I Tr. 16:5-20; 17:19-18:5; 19:18-20:15.)  That renders Dr. Cowan's methodology unreasonably imprecise and unreliable, particularly given that Mr. Payne's reunderwriting defect opinions were as low as 18% (PX 1551), meaning that the values within the margin of error (11.1% to 26.8%) would span a range nearly as wide (15.7%) as the estimate itself (18%).  A ten percentage point margin of error may have seemed reasonable to MassMutual's counsel when it was expecting to see breach rates from Mr. Payne on the order of 60, 70 or 80 percent (8/9/17 Vol. I Tr. 26:4-9; DX3504 (ECF No. 172, '047 Action at 43-44), but, as demonstrated above, the inordinately large margin of error became far more problematic when Mr. Payne's breach rates came back far lower than MassMutual expected.

28.     *Second*, Dr. Cowan erred in assuming that Mr. Payne's and Dr. Kilpatrick's opinions about underwriting and USPAP compliance, respectively, would be binary in nature (*i.e.*, capable of a simple yes/no response).  That is important because the formula that Dr. Cowan used to extrapolate those results cannot even be used for non-binary inquiries (8/9/17 Vol. I Tr. 7:22-25; 8:13-14) and the margins of error he calculated rely on the assumption that the opinions he extrapolated were binary.  (8/8/17 Vol. I Tr. 74:17-75:4; 8/9/17 Vol. I Tr. 7:22-25; 8:13-14.)  But the questions that Mr. Payne and Dr. Kilpatrick purported to answer are qualitative, subjective determinations, not capable of being compartmentalized into rigid "definitely yes" and "definitely no" categories.  Dr. Cowan and Mr. Payne agree, for example, that whether an exception to underwriting guidelines is warranted is inherently a matter of subjective judgment.  (8/9/17 Vol. I Tr. 40:24-41:6; 7/20/17 Vol. I Tr. 36:22-37:2.)  Yet Dr. Cowan was provided only binary answers.  (8/9/17 Vol. I Tr. 42:13-43:2.)  That was MassMutual's choice.  Dr. Cowan

12

confirmed that, if Mr. Payne had been asked to provide outcomes with degrees of certainty (*e.g.*, definitely yes, maybe yes, etc.), Dr. Cowan could have accounted for that.  (8/9/17 Vol. I Tr. 39:9-16; 40:18-23.)  The same is true of Dr. Kilpatrick's opinions.  (8/9/17 Vol. I Tr. 43:3-6.)  By forcing its experts to provide only binary opinions in response to inherently non-binary questions, MassMutual rendered Dr. Cowan's extrapolations and margins of error unreliable.

29.     *Third*, Dr. Cowan has not demonstrated the representativeness of his samples with respect to key variables like the originator of the underlying loans.  Dr. Cowan contends that, as a technical matter, a randomly drawn sample is by definition representative of the broader population from which it is drawn.  (8/8/17 Vol. II Tr. 4:4-6.)  But, on cross, Dr. Cowan conceded that if a coin flipped randomly lands on heads ten times in a row, he would want to "look at the coin".  (8/9/17 Vol. I Tr. 44:3-16.)

30.     Dr. Cowan tested the representativeness of his samples on 11 variables that may or may not have any correlation to underwriting or USPAP compliance.  (8/9/17 Vol. I Tr. 62:25-63:6.)  But Dr. Cowan skipped certain other variables—geography and originator, among others—that have been deemed significant by other RMBS plaintiffs.  (8/9/17 Vol. I Tr. 63:11-14; 64:15-18.)  Notably, for originators,

- Dr. Cowan agreed that if one originator disregarded underwriting guidelines, it does not mean another did, and that the rates of alleged noncompliance from one originator to the next could be different.  (8/9/17 Vol. I Tr. 64:19-25.)

- In other cases with offering documents that contained, in substance, the same statements as the Offering Documents here, plaintiffs have assumed that originators were so important as to design their sampling regimes around them.  (8/8/17 Vol. II Tr. 73:3-8.)  For example, Dr. Cowan ultimately presented originator-based defect rates in the bellwether case (MassMutual v. Deutsche Bank) after criticism by defendants' sampling expert, Dr. Barnett.  (8/8/17 Vol. II Tr. 73:20-24.)

- Here, not only did Dr. Cowan fail to sample by originator, he did not even confirm that his samples were representative by originator.  (8/8/17 Vol. II Tr. 72:5-12.)  For example, in one securitization, CSAB 2007-1, SunTrust loans made up about 8% of the population

13

(8/9/17 Vol. II Tr. 72:7-14), yet the final sample included zero SunTrust loans (8/9/17 Vol. II Tr. 72:15-73:1), and Dr. Cowan's representativeness testing did not flag this.

The omission of variables like originator and geography from Dr. Cowan's representativeness testing is a significant flaw that renders his analysis unreliable.

31.     *Fourth*, Dr. Cowan ignored the fact that the CSAB 2007-1 sample failed the representativeness testing that Dr. Cowan himself designed.  While Dr. Cowan's initial CSAB 2007-1 samples did not fail representativeness testing (8/9/17 Vol. I Tr. 65:7-9), the subsequent need to substitute loans from his backup sample substantially altered the composition of that sample.  (8/9/17 Vol. I Tr. 65:10-16.)  As a result, the reunderwriting and appraisal standards samples each failed on three out of ten variables.  (8/9/17 Vol. I Tr. 67:20-68:4.)  Dr. Cowan's AVM sample failed on four out of ten variables.  (8/9/17 Vol. I Tr. 68:10-12.)  The fact that the CSAB 2007-1 samples failed to meet the representativeness standards that Dr. Cowan himself set forth at an earlier stage of this litigation renders unreliable any extrapolation of results for that securitization, notwithstanding Dr. Cowan's *post hoc* efforts to remedy the issue by "reweighting" the sample.  (8/8/17 Vol. II Tr. 6:17-7:5; 8/9/17 Vol. I Tr. 68:19-70:14.)  And Dr. Cowan's extrapolations of unrepresentative samples render his opinions on CSAB 2007-1 unreliable.

32.     *Fifth*, despite his protestations to the contrary, Dr. Cowan did not in any real sense "extrapolate" the GAVM-based LTV recalculations.  Dr. Cowan has explained that extrapolation involves two parts, one of which involves providing an estimate of *how reliable* the estimate is. (8/8/17 Vol. II Tr. 9:6-18.)  But for the LTV recalculations, Dr. Cowan admits that he did not calculate a margin of error, essentially because it would have been too complicated and he "do[esn't] know how" to do so.  (8/9/17 Vol. II Tr. 54:11-13.)  Dr. Cowan nevertheless argues that his LTV tables are extrapolations because they are "based on a sample".  (8/8/17 Vol. II Tr.

14

34:20-35:6.)  But a conclusory statement that the characteristics of a sample apply to a larger population does not constitute an extrapolation of those results.  Indeed, if extrapolation were as simple as Dr. Cowan suggests, his work would have been unnecessary because Dr. Kilpatrick could have made the same conclusory statement without any statistical calculations.

33.     *Sixth*, for the same reasons described above with respect to Mr. Payne, Dr. Cowan should not have extrapolated LTV and WALTV results that were based on GAVM results for particular loans for which there was not also a reliable finding of USPAP non-compliance.  *See U.S. Bank*, 205 F. Supp. 3d at 437; *Nomura*, 104 F. Supp. 3d at 531.  Here, the GAVM was run on all properties included in the AVM samples regardless of the results of Dr. Kilpatrick's appraisal standards testing, and in fact, Dr. Kilpatrick used the GAVM to recalculate LTVs for appraisals that affirmatively passed his testing.  (8/8/17 Vol. II Tr. 60:25-62:1.)  Dr. Cowan's LTV and WALTV results are unreliable because the GAVM value should not have been used in situations where there was no asserted defect in the credibility of the appraisal.

34.     Notwithstanding Dr. Cowan's statement that he was calculating LTVs according to the "prescription" set forth in the ProSupps, what the ProSupps actually state is that LTV would be calculated using the lower of the sale price or the "appraised value determined in an appraisal obtained by the originator at origination of the mortgage loan".  (*See, e.g.*, JX6 at S-34.)

35.     *Seventh*, the majority of Dr. Cowan's LTV re-calculations suffered from the same systematic upward bias described in week 2's proposed findings with respect to Dr. Kilpatrick's LTV recalculations.  By using the lesser of the GAVM or a different measure of value that existed at origination, Dr. Cowan ensured that his calculations could increase, but never decrease, the originally calculated LTV.  (8/9/17 Vol. I Tr. 79:12-83:1.)  Similarly, Dr. Cowan's WALTV calculations are flawed because, as a matter of mathematical fact, there will always be

an upward bias when calculating averages of ratios with uncertain denominators.  (8/9/17 Vol. I Tr. 74:13-20; 72:12-15.)  Dr. Cowan testified that he believed this upward bias was immaterial and acceptable when the standard deviation of the dataset with which he was working was 1.9%.  (8/9/17 Vol. I Tr. 73:24-74:3; 78:6-17.)  However, when confronted with the 40% standard deviation present in the data that corresponds with Dr. Kilpatrick's final results that was *not* given to Dr. Cowan, Dr. Cowan testified that he did not know what his view would be on the upward bias and had not "thought about that".  (8/9/17 Vol. I Tr. 78:18-79:1.)

36.     Moreover, there continue to be serious questions about the propriety of Dr. Cowan being provided a different set of data than the one Dr. Kilpatrick used for his calculations, notwithstanding that Dr. Cowan purported to extrapolate Dr. Kilpatrick's results.  As confirmed during his testimony, Dr. Cowan did not extrapolate Dr. Kilpatrick's data at all—he was given an entirely different data set to work with.  (8/9/17 Vol. II Tr. 20:16-21.)  Dr. Cowan did not reveal in his report or backup materials that he was using a different data set of 1,001 values than that actually used by Dr. Kilpatrick.  (8/9/17 Vol. II Tr. 44:18-22.)

37.     Notwithstanding Dr. Lee's and Dr. Cowan's explanations on the stand for why they "expected" different sets of data would be used, the failure of any of Drs. Cowan, Kilpatrick or Lee to disclose, let alone explain, this discrepancy in their reports belies that testimony.  In fact, Dr. Cowan admitted on the stand that at his deposition in this matter, when asked whether it was his understanding that the GAVM data provided to him "contained data that was utilized in connection with Dr. Kilpatrick's report", Dr. Cowan testified that "[i]t was my understanding it was the same data set".  (8/9/17 Vol. II Tr. 42:21-43:6.)  That testimony directly contradicted Dr. Cowan's more recent testimony at trial that he "sort of expected" the data to be different.  (8/9/17 Vol. II Tr. 43:13-16.)  Likewise, while on the stand at trial, Dr. Lee indicated that he believed Dr.

16

Kilpatrick's Appendix 6-1 to contain the data utilized by Dr. Kilpatrick to calculate his GAVM point estimates (8/2/17 Vol. II Tr. 37:14-24), when in fact Appendix 6-1 contains the different set of data provided to Dr. Cowan (8/9/17 Vol. II Tr. 32:16-41:24).

38.     Having concluded its case in chief, MassMutual has not carried its burden to demonstrate the reliability of the data utilized by Dr. Kilpatrick and Dr. Cowan.

**IV.      Credit Suisse Performed Due Diligence on the Loans It Purchased and Securitized**

39.     Bruce Kaiserman, managing director at Credit Suisse, provided an overview of Credit Suisse's mortgage business during the relevant time period, including its due diligence processes. During the relevant time period, Mr. Kaiserman was Credit Suisse's co-head of Transaction Management.  (*See* 8/10/17 Vol. I Tr. 22:17-22.)  In that capacity, he was personally involved in acquiring loans in the 2005 to 2007 time period.  (*See* 8/10/17 Vol. I Tr. 22:17-22.)

40.     During the relevant time period, the RMBS Group at Credit Suisse consisted of several departments, including Trading, Sales, Collateral Analysis, Transaction Management, and the Residential Conduit.  (*See* DX3701.)  The Residential Conduit alone employed over one hundred people.  (8/10/17 Vol. I Tr. 40:13-15.)

41.     Credit Suisse acquired loans during the 2005 to 2007 time period through four main channels:  the bulk channel, the mini-bulk channel, the loan-by-loan channel, and the wholesale channel.  (*See* 8/10/17 Vol. I Tr. 23:23-24:4.)  The bulk channel consisted of loans from large independent originators that originated a large amount of loans and also had the capacity to service loans.  (*See* 8/10/17 Vol. I Tr. 24:5-8.)  The loan-by-loan channel consisted of loans from small independent originators who originated fewer loans than bulk originators, and were not able to service loans.  (*See* 8/10/17 Vol. I Tr. 24:9-13.)  The mini-bulk channel mostly consisted of originators who had sold loans through the loan-by-loan channel, but had grown and were

selling larger portfolios that they could also service.  (*See* 8/10/17 Vol. I Tr. 24:23-25:5.)  The wholesale channel consisted of loans originated through mortgage brokers by Credit Suisse itself.  (*See* 8/10/17 Vol. I Tr. 25:6-13.)  The mini-bulk, loan-by-loan, and wholesale channels were generally referred to collectively as "the conduit".  (*See* 8/10/17 Vol. I Tr. 25:14-21.)

42.     There were several components of Credit Suisse's loan-level due diligence process: Credit and Compliance, Valuation, Data Integrity, Collateral, and Fraud Review.  (*See* DX3703.)

43.     Credit Suisse performed loan-level due diligence for at least two reasons.  *First*, as Mr. Kaiserman described, "when we were acquiring loans, we were acquiring loans as principal. They were our loans and we were going to own them.  And so when we were reviewing them prior to purchase, we wanted to ensure that the loans were consistent with what we thought we were buying."  *Second*, Credit Suisse "knew that at some point in the future we would sell the loans and in so doing the buyer would want to be given certain representations and warranties about what the loans were and so we wanted to be in a position to have a basis to make those representations and warranties.  So we did all this review on the front to ensure when it came time to the back we were positioned to either make representations or warranties and/or prepare [an] offering memorandum that described" the characteristics of the loans.  (*See* 8/10/17 Vol. I Tr. 77:4-22.)

44.     For pools of loans acquired through the bulk channel, a member of the Underwriting group would select a sample of loans to be reviewed.  That sample would be adverse (*i.e.*, targeted at the riskiest loans), rather than random, and its size would be based on product type. (*See* 8/10/17 Vol. I Tr. 78:6-79:19; PX151 at 13.3.)  For Alt-A loans, Credit Suisse's policy was to select a 20 percent sample.  (*See* PX151 at 13.3.)  Of the 194 bulk pools containing loans underlying the certificates at issue in this case, Credit Suisse selected a sample size of at least 30

percent for 111 bulk pools.  (*See* DX1651.)  Credit Suisse sometimes increased its sample size after its review had already begun.  (*See* 8/10/17 Vol. II Tr. 31:20-32:2.)

45.     Credit Suisse engaged third-party due diligence firms, such as Clayton, Bohan, and PricewaterhouseCoopers, to conduct the loan-level review for the samples of loans acquired through the bulk channel.  (*See* 8/10/17 Vol. I Tr. 72:25-73:7; PX151 at 13.2.)  The seller would send the loan files for the sample to the due diligence firm Credit Suisse engaged for each bulk pool.  (*See* 8/10/17 Vol. I Tr. 81:4-11; PX151 at 13.6.)

46.     Credit Suisse would send the underwriting guidelines to the due diligence vendor, along with any overlays desired for the review.  (*See* 8/10/17 Vol. II Tr. 4:3-14; PX151 at 13.5.)  Overlays were additional criteria Credit Suisse added to originator underwriting guidelines to harmonize them with Credit Suisse's more stringent and less permissive requirements.  (*See* 8/10/17 Vol. I Tr. 33:20-34:13.)  Based on their review, the due diligence vendors would grade loans on a scale from 1 to 3.  1 meant that a loan complied with guidelines, 2 meant the loan possessed compensating factors, and 3 meant the loan did not comply with guidelines or possess compensating factors, that it was missing documents, or that it was subject to a Credit Suisse overlay.  (*See* 8/10/17 Vol. II Tr. 16:11-19.)

47.     Often, "if a loan was marked as an event 3, because of the overlays, the purpose of that was to have [Credit Suisse] review it.  We flagged [3s] so we could review it."  (*See* 8/10/17 Vol. II Tr. 36:6-9; PX151 at 13.6.)  As a result, a 3 grade did not necessarily indicate anything at all about compliance with the originator's underwriting guidelines.  (8/10/17 Vol. II Tr. 17:6-15.)

48.     The final decision to purchase a loan through the bulk channel was made by Credit Suisse's Underwriting group. (*See* 8/10/17 Vol. II Tr. 36:13-19; PX151 at 13.6.)

19

49.     For loans acquired through the conduit, Credit Suisse's fulfillment centers conducted reviews on 100 percent of loans.  (*See* 8/10/17 Vol. II Tr. 33:13-24; PX151 at 12.1.)  Condition reports would identify any issues that the fulfillment centers may find, and Credit Suisse would review them.  If necessary, someone in the Underwriting group would resolve conditions and make the decision to purchase or not purchase a loan.  (*See* 8/10/17 Vol. II Tr. 34:10-25, 37:15-25; PX151 at 12.2.4.)

50.     In addition to credit and compliance due diligence, Credit Suisse conducted valuation due diligence on 100 percent of loans, using several different methods, including AVMs, broker price opinions and desk reviews.  (*See* DX3704; 8/10/17 Vol. II Tr. 42:2-46:13l; PX151 at 11.4, 13.7.)

51.     In addition to the due diligence processes that Credit Suisse employed prior to purchase or origination, Credit Suisse had a Quality Control group, which served to "check the [diligence] process" and ensure that "vendors and fulfillment centers [were] doing what [Credit Suisse] asked them to do", and to see if there are "things that [Credit Suisse] could take away from the process to make everything better".   Quality Control ("QC") involved review of loan samples by an outside vendor, typically Hanover.  (*See* 8/10/17 Vol. II Tr. 47:7-20.)

52.     There were two main differences between the review conducted by QC and Credit Suisse's due diligence review.  *First*, instead of using the actual underwriting guidelines to which the loans were originated, QC used the most recent internal Credit Suisse guidelines.  *Second*, given that the purpose of QC was different than that of the diligence process, Hanover would use in its review information that was unavailable to the credit and compliance reviewer, such as a new credit report, income verification, or owner-occupancy verification.  (*See* 8/10/17 Vol. II Tr. 48:10-21.)  As such, a loan flagged during QC review did not necessarily violate the applicable underwriting guidelines at origination.

Dated:  August 14, 2017                        Respectfully submitted,


                                               By */s/ Jonathan Sablone*  _____

                                               Jonathan Sablone (BBO #632998)
                                               Matthew T. McLaughlin (BBO #660878)
                                                   NIXON PEABODY LLP
                                                   100 Summer Street
                                                   Boston, Massachusetts 02110
                                                   Telephone: (617) 345-1342
                                                   Fax: (866) 947-1729
                                                   jsablone@nixonpeabody.com
                                                   mmclaughlin@nixonpeabody.com

                                               Of Counsel:

                                               Richard W. Clary (admitted pro hac vice)
                                               Michael T. Reynolds (admitted pro hac vice)
                                               Lauren A. Moskowitz (admitted pro hac vice)
                                                   CRAVATH, SWAINE & MOORE LLP
                                                   825 Eighth Avenue
                                                   New York, New York 10019
                                                   Telephone: (212) 474-1000
                                                   Fax: (212) 474-3700
                                                   rclary@cravath.com
                                                   mreynolds@cravath.com
                                                   lmoskowitz@cravath.com

                                               *Counsel for Defendant Credit Suisse Securities (USA)
                                               LLC*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 14, 2017.

By */s/ Jonathan Sablone*
Jonathan Sablone