**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>DLJ MORTGAGE CAPITAL, INC. et al.,<br><br>    Defendants. | Civil Action No.<br>11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. et al.,<br><br>    Defendants. | Civil Action No.<br>11-cv-30048-MGM |

**DEFENDANT'S FOURTH WEEKLY**
**PRELIMINARY PROPOSED FINDINGS OF FACT**

# **TABLE OF CONTENTS**

I.      Introduction...........................................................................................................1

II.     Legal Issues Raised by This Week's Evidence.........................................................1

        A.      MassMutual Has Failed to Identify Any Statement in the Offering
                Documents Rendered Misleading by Credit Suisse's Alleged
                Omissions..............................................................................................1

        B.      MassMutual's Attempt to Exclude Evidence Relevant to
                Materiality Fails.........................................................................................3

III.    Credit Suisse's Deposition Designations Further Demonstrate the
        Immateriality of the Alleged Misstatements and Omissions ..................................5

IV.     Mr. Kaiserman Effectively Withstood Extensive Cross-Examination ....................7

        A.      MassMutual Cannot Establish that Loans Underlying the
                Certificates at Issue Were Defective Through the Use of Emails
                Taken Out of Context.................................................................................7

        B.      MassMutual Misrepresents the Due Diligence Results of Other
                Banks Who Purchased Whole Loan Pools from Credit Suisse..................11

        C.      Quality Control Was Used to Improve Credit Suisse's Due
                Diligence Practices, Not to Repeat Due Diligence ....................................14

        D.      MassMutual Misconstrues the Sovereign Transaction ..............................16

        E.      Interpersonal Dynamics Between Mr. Fallacara and Mr. Sacco Do
                Not Establish the Existence of a Misstatement or Omission ....................17

        F.      MassMutual's Efforts to Impeach Mr. Kaiserman Were Ineffective ........17

Credit Suisse submits the following preliminary proposed findings of fact based on the evidence submitted during the fourth week of trial.

## I.   Introduction

1.   During the fourth week of trial, Credit Suisse submitted designations from MassMutual witnesses that further illustrate: (i) that MassMutual fully understood the nature of its RMBS investments; and (ii) that the alleged misstatements and omissions, if any, were immaterial.

2.   In addition, Mr. Kaiserman effectively withstood an extensive cross-examination by MassMutual, which consumed the entire week of trial.  That cross-examination included:

- MassMutual's attempts to insinuate that emails taken out of context about an originator mean that all loans purchased by Credit Suisse from that originator did not comply with guidelines or possess compensating factors, when those emails actually concern performance based on credit characteristics, not guideline compliance;
- MassMutual's misguided and misleading use of documents relating to Credit Suisse's sale of whole loans to other banks;
- MassMutual's misunderstanding of the purpose of Quality Control;
- MassMutual's insinuations based on interpersonal relationships in the RMBS Group;
- MassMutual's misunderstanding of the Sovereign transaction; and
- MassMutual's fruitless attempts to impeach Mr. Kaiserman.

3.   Mr. Kaiserman's explanations when questioned as to all of these points demonstrate that this material is either irrelevant or misleadingly presented.

## II.   Legal Issues Raised by This Week's Evidence

### A.   MassMutual Has Failed to Identify Any Statement in the Offering Documents Rendered Misleading by Credit Suisse's Alleged Omissions

4.   In MassMutual's proposed findings of fact for the third week of trial and again during the cross-examination of Mr. Kaiserman during the fourth week of trial, MassMutual repeatedly has attempted to establish alleged omissions that have no relation to the actual claims at issue.

5.   It is well settled that, "where liability is based on silence, a duty to disclose arises only to

correct or update what would otherwise be a materially misleading prior statement by the defendant". *See Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 687 (D. Mass. 1993). MassMutual has failed to identify any such statement.

6.     For example, in its most recent proposed findings of fact, MassMutual argued that "[b]y deposition designations and exhibits, MassMutual has also proven that Credit Suisse made material omissions regarding its quality control ("QC") process".  (MassMutual's 8/14/17 Proposed Findings of Fact, ECF No. 624, '047 Action, at 1.)  But MassMutual has not and cannot demonstrate that Credit Suisse made any statements at all about QC in the Offering Documents, that Credit Suisse had any legal obligation to perform QC in the first place, or how QC results could render misleading statements about compliance with underwriting guidelines given the uncontroverted testimony that verifying such compliance was not the purpose of QC.  (*See* 8/18/17 Vol. II Tr. 51:2-53:3.)

7.     Similarly, MassMutual argued during an extensive sidebar that certain emails regarding Credit Suisse's policies and practices on repurchases somehow establish an actionable omission. (8/17/17 Vol. II Tr. 8:7-21:8.)  In support of that contention, MassMutual's counsel suggested that omissions are actionable if the omitted information would "make the representations be understood better and differently".  (8/17/17 Vol. II Tr. 9:3-9.)  But that is a misstatement of the law, which requires that, in order to be actionable, the alleged omission must render an actual representation materially misleading.  *See Adams*, 838 F. Supp. at 687.

8.     MassMutual fails to meet that standard with respect to its assertions about repurchases.  As MassMutual conceded during the sidebar with the Court, the repurchase issue concerns contractual obligations under the pooling and servicing agreements to which MassMutual is not a party and which are not at issue (*see* 8/17/17 Vol. II Tr. 13:21-14:6)—not any representation in the Offering

Documents.  Moreover, MassMutual has not demonstrated how Credit Suisse's decision to putback

or not to putback a loan to the seller, which is governed by a specific set of representations and

warranties in the loan purchase agreement between that seller and Credit Suisse, has any bearing on

whether the loan complies with underwriting guidelines, or any other alleged misstatement at issue

here.[1]  (*See* 8/17/17 Vol. II Tr. 10:22-11:11.)

9.     Moreover, the potential changes to Credit Suisse's Quality Control process that are

discussed in various emails shown to Mr. Kaiserman are irrelevant for the additional reason that

those changes were not implemented (8/17/17 Vol. II Tr. 32:23-33:24), and Mr. Sack made clear

throughout that he would defer to Mr. Sacco, the person responsible for QC (PX431 ("I'm not

responsible for FC/UW so I'm not sure it is appropriate for me to continue to have debate.").)

10.    As a result, both MassMutual's questioning of Mr. Kaiserman on this issue and

MassMutual's designations from Mr. Sack (virtually all of which concern this issue) should be

given no weight.

### B.     MassMutual's Attempt to Exclude Evidence Relevant to Materiality Fails

11.    In its extensive objections to Credit Suisse's deposition designations from three MassMutual

witnesses (Howard Hill, Mary Kibbe and Vladimir Ladyzhets), MassMutual continues its effort to

exclude evidence highly relevant to materiality on the purported basis that, because the materiality

standard is an objective one, any evidence of MassMutual's own knowledge and motivations is

irrelevant.  (*See, e.g.*, MassMutual's 7/30/17 Proposed Findings of Fact, ECF No. 601-1, '047

Action, at 3-8.)  MassMutual is wrong.

---

[1] In a June 13, 2017 stipulation, attached as Exhibit B to the June 13, 2017 Pre-Trial
Memorandum (ECF No. 544, '047 Action), the parties defined the scope of the alleged
misstatements and omissions at issue in order to resolve a motion in limine previously filed by
Credit Suisse.

12.    *First*, since there has been no suggestion that MassMutual was unreasonable or wholly

idiosyncratic in its approach to RMBS investments, evidence of the behavior and motivations of

MassMutual is the best and most direct evidence before the Court as to how a reasonable RMBS

investor would analyze the Certificates at issue.  *See SEC v. Shapiro*, 494 F.2d 1301, 1307 (2d Cir.

1974) ("[W]e need not merely speculate as to how a reasonable investor might have received this

information. The behavior of appellant, his partner Shapiro, and others who knew of the merger, all

of whom were sophisticated investors, demonstrates empirically that the information was

material."); *see also U.S. v. Litvak*, 808 F.3d 160, 181-83 (2d Cir. 2015) ("The full context and

circumstances in which RMBS are traded were undoubtedly relevant to . . . materiality."); (8/10/17

Vol. II Tr. 68:7-11 (MassMutual's counsel stating: "And so when Mr. Canuel, who is an investor,

talks about what the things meant to him, that is evidence that's meaningful as to what a

hypothetical reasonable investor would understand and find material.")

13.    *Second*, the information already available to RMBS market participants, as evidenced in this

case by the knowledge of MassMutual, is highly relevant to determining whether an alleged

misstatement or omission significantly altered the "total mix" of information available.  *See*

*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ("Whether information is material

also depends on other information already available to the market; unless the statement significantly

altered the total mix of information available, it will not be considered material").  Accordingly, the

objective materiality inquiry neither requires nor permits a court to ignore the circumstances and

information with which the particular plaintiff at issue was faced.  *See Michaels v. Michaels*, 767

F.2d 1185, 1197-98 (7th Cir. 1985) (holding that "although we apply the objective standard of

materiality, the significance the reasonable shareholder would give a particular omitted fact depends

on the circumstances confronting him" and assessing materiality as to "the reasonable shareholder

standing in [plaintiff's] shoes").  Therefore, each of Credit Suisse's week four deposition

designations is relevant and admissible.

### III.   Credit Suisse's Deposition Designations Further Demonstrate the Immateriality of the Alleged Misstatements and Omissions

14.   Credit Suisse submitted designations from former MassMutual employees, Mary Kibbe,

Howard Hill and Vladimir Ladyzhets, which further demonstrate MassMutual's understanding of

the risky RMBS investments it sought out, as well as the immateriality of the alleged misstatements

and omissions regarding compliance with underwriting guidelines.

15.   *First*, the designations and exhibits from the depositions of Ladyzhets and Hill corroborate

earlier testimony that statements about compliance with underwriting guidelines did not play a

material role in MassMutual's consideration of RMBS investments.  In fact, Dr. Ladyzhets, who

was responsible for building the models that MassMutual used to analyze RMBS investments,

testified that he never reviewed underwriting guidelines and was not aware whether certain

originators guidelines were relatively more or less permissive.  (3/5/14 Ladyzhets Tr. 162:21-

163:13; 163:18-164:7.)  Similarly, Dr. Ladyzhets testified about a presentation that listed "[m]ajor

factors contributing to delinquency and default of fixed-rate loans".  (3/5/14 Ladyzhets Tr. 205:25-

206:22; DX0930 at 6.)  None of the nine factors listed concerned compliance with underwriting

guidelines.  (DX0930 at 6.)  Likewise, Mr. Hill, a managing director at Babson  who was

responsible for keeping MassMutual's CEO and others informed of happenings in the RMBS

market, testified that the information that "mattered" to him from prospectus supplements was "the

summary and the breakouts of characteristics" of the underlying collateral (5/3/14 Hill Tr. 84:3-

85:11)—he made no mention of underwriting guidelines.

16.   *Second*, the designations and exhibits from the depositions of Kibbe and Hill provide further

evidence that MassMutual targeted the riskiest segments of the RMBS market in at least two ways.

As discussed in prior proposed findings, when MassMutual earmarked certain purchases for inclusion in CDOs—*i.e.*, when it believed that it could pass the risk off to someone else—it purchased securities of far lower quality than those it purchased for its own account. For example, Exhibit 817 to the Kibbe deposition demonstrates that "the bulk of GIA residential exposure at the A- rating level and below" was allocated to the Storrs II CDO warehouse. (JX54 at -2195.) As that chart demonstrates, securities allocated to Storrs II made up 100% of the GIA's BBB- and BB rated RMBS, and only 0.62% of its AA rated RMBS. (JX54 at -2195.)

17.     MassMutual also targeted the riskiest segments of the RMBS market by purchasing RMBS certificates backed by high percentages of various forms of low or reduced documentation loans, the risks of which MassMutual was fully aware. For example, when asked in March 2007 by MassMutual's CEO, Roger Crandall, about the spillover effects of problems in the subprime market, Howard Hill responded: "I've been in this camp for quite a while. The lax underwriting (no doc) and loan products (option ARM, investment property) that are most often quoted in the press and research as problems are much more prevalent in the alt-A and jumbo pools than they were/are in subprime, especially in California." (DX 1000.) Hill also testified that, while "you can deal with 10 percent being low doc", his reaction to encountering a 100% low doc deal at a prior employer was: "holy crap. How do you even know what you get? Why would you buy that bond?" (5/3/14 Hill Tr. 118: 5-25.) Yet the bonds that MassMutual did buy and that are at issue in this case ranged from approximately 80% to 90% non-full documentation.[2]

_____

[2] (JX6 at III-4, III-10, III-17, III-24, III-31; JX10 at S-25; JX14 at S-23; JX17 at S-27; JX18 at S-28; JX20 at II-4; JX22 at III-40; JX25 at II-4; JX31 at II-4; JX33 at S-24; JX99 at S-26.)

18.    That MassMutual was so acutely aware of the risks of borrower misrepresentations inherent in such loans demonstrates the immateriality of allegedly omitted information indicating that the precise risks of which MassMutual was aware would potentially be borne out.

19.    *Third*, the designations and exhibits from the depositions of Hill and Ladyzhets provide context as to why MassMutual was not particularly concerned about disclosures regarding compliance with underwriting guidelines or, for that matter, about the quality of the avowedly permissive loan programs that produced the collateral it specifically sought out.  As evidenced by the models they used to analyze RMBS investments, MassMutual, like many reasonable market participants at the time, assumed that housing prices would continue to rise or remain stable. (3/6/14 Ladyzhets Tr. 550:25-551:19; 5/3/14 Hill Tr. 249:19-251:19.)  Indeed, their modeling did not even consider a scenario in which housing prices depreciated, rather than appreciated.  (*Id.*)  Dr. Ladyzhets explained why assumptions of rising housing prices would render underwriting quality a far less important concern:

> "There is a rather straight forward connection between the movement of house prices and the observed level of defaults. . . .  If HPA [housing price appreciation] is positive for a number of years, this might allow both, the lender and the borrower, to get away with their mistakes—the borrower cannot pay, but he/she can sell the house at a higher price and repay the loan; the lender is not receiving due payments, it can foreclose on the house, sell it at a higher price, and get its money back."  (DX624 at -40275-76.)

Far from suggesting, as MassMutual presently does, that material risks were obscured from its view during the relevant time period, Dr. Ladyzhets admitted, in hindsight, that, had MassMutual used more accurate macroeconomic assumptions, "even the very first generation of models that were built by June 2006 was able to give a pretty accurate assessment of the upcoming gruesome reality". (3/5/14 Ladyzhets Tr. 244:13-21; DX0624 at -40273.)

**IV.      Mr. Kaiserman Effectively Withstood Extensive Cross-Examination**

   **A.      MassMutual Cannot Establish that Loans Underlying the Certificates at Issue
   Were Defective Through the Use of Emails Taken Out of Context**

20.      MassMutual showed Mr. Kaiserman a number of email communications to which he was

not a party relating to originators that contributed loans underlying the certificates at issue.  (*See*

*e.g.*, PX279, PX313.)  These emails do not concern compliance with underwriting guidelines, or

any statement in the Offering Documents that MassMutual alleges is false or misleading.  Instead,

they contain commentary about the performance of the loans based on the credit characteristics of

these loans and the fact that guidelines permitted these types of loans, not whether the loans

complied with underwriting guidelines.

21.      For example, MassMutual offered into evidence an email in which Michael Daniel, head of

the Fixed Rate trading desk, complained about several originators:  "There's some real crap in this

pool.  And it's the same fvking [sic] originators every time – Security Atlantic, ACT, Resource

Bank, DreamHouse".  (PX313 at -2338.)  This document is evidence that those originators sold

loans that complied with guidelines, not the opposite.  Mr. Daniel was responding to an email which

stated that "[o]nly 1.77mm from all channels do not meet the CS LBL Alt-a guides", out of a pool

size of $923.6 million, or 0.19%.  (*Id.* at -2339.)  The email went on to state that, of that $1.77

million, $780,000 was brought in through the minibulk and bulk channels, to which the "CS LBL"

guidelines would not even apply.  (*Id.*)  Mr. Daniel was expressing his frustration with the objective

collateral characteristics of the loans, not stating a belief that the originators listed originated loans

that did not comply with underwriting guidelines.  Mr. Kaiserman explained that "the point that

Mike [Daniel] makes is the loans don't perform.  It's not that the loans don't meet guidelines, and I

think this email proves that.  It's not that he's using the term credit and performance to mean

noncompliance.  When in fact the type of loans, the layered risk, made them more likely to become

delinquent and default."  (8/16/17 Vol. I Tr. 38:19-25.)

22.    Mr. Kaiserman defined layered risk as "a combination of [underwriting] factors that makes the loan more likely to default.  It does not mean that they don't meet our guidelines.  It just means that they are more likely to default."  (8/16/17 Vol. I Tr. 25:5-10.)

23.    Mr. Daniel corroborated this account when he was questioned about the same document, explaining that his concern was based on his recollection that Resource Bank was "contributing a particularly high percentage of delinquent loans".  (8/4/17 Vol. I Tr. 107:5-17.)  Mr. Daniel explained on cross-examination that he was frustrated with originators like Resource Bank because "they would literally just sell us the highest LTV, lowest documentation loans in our eligibility matrix. . . . It's like you're giving a guy a seller incentive, and he's basically selling you the worst performing sector of your eligibility matrix, the highest LTV, lowest documentation loans.  Those ended up being the loans that, when home prices dropped, are the ones that went delinquent right away, and that's what you saw in these deal performances". (8/4/17 Vol. II 76:20-77:9.)  Once again, that has nothing to do with compliance with underwriting guidelines, which is the issue in this case.

24.    Similarly, Mr. Daniel characterized Security Atlantic and Fairmont Funding as problematic in another email, saying, "[t]he store is not being minded".  (PX279.)  Daniel Ezra, another trader, responded that he agreed, noting that along with "Resource Bank and Unprime", they have "got a quartet of sellers that are consistently" showing a high number of delinquencies.  (*Id.*)  Nowhere did anyone mention compliance with guidelines, or lack thereof.  As Mr. Kaiserman explained, when Mr. Daniel "refers to credit, he's not referring to compliance with underwriting guidelines", and the issue was that originators like Security Atlantic were "not delivering a broad spectrum of loans

across our eligibility but rather delivering loans with layered risks making them more likely to default." (8/16/17 Vol. I Tr. 30:2-11.)

25.     Mr. Kaiserman was also questioned about various references in emails to loans originated by Credit Suisse Financial Corporation (*i.e.*, the wholesale channel). (*See, e.g.*, PX412.) He explained that the loans being originated through the wholesale channel were on the riskier end of the credit spectrum, and those who criticized the performance of Credit Suisse's wholesale channel—such as Mr. Daniel and Mr. Vibert—frequently misattributed the performance problems they were seeing in those loans to problems in the fulfillment center diligence process, as opposed to the nature of the guidelines themselves. (8/16/17 Vol. I Tr. 30:12-30:23; 8/18/17 Vol. I Tr. 24:7-26:5.) As Mr. Kaiserman explained it, "We were originating loans with layered risks and when you look through all these emails, it's the same issue. They don't deliver us a suite of products along our business. They delivered on the very edges of our matrix. Those loans have a higher propensity to default. They defaulted. That's what the issue is." (8/18/17 Vol. I Tr. 25:25-26:5.) In other words, the performance issues were the result of the actual credit characteristics of the loans being produced through that channel, not the compliance or non-compliance with guidelines.

26.     The failure of traders Mr. Vibert and Mr. Daniel, and others like them, to grasp the distinction between diligence, compliance with guidelines and credit (*see* 8/16/17 Vol. I Tr. 30:12-30:23; 8/18/17 Vol. I Tr. 24:7-26:5), together with their propensity to exaggerate in order to "get individuals' attention" (8/18/17 Vol. II Tr. 78:15-16), led to many of the emails that MassMutual now presents as central to its case. But, properly understood, the emails actually have very little to do with the claims presented here.

27.     Many of the other emails with which Mr. Kaiserman was presented likewise discuss performance, not compliance, and therefore have no relevance to the claims at issue:

**PX427**: Mr. Daniel makes explicit reference to "performance in wholesale" and "deal performance" in reference to "a small number of correspondents"; he does not mention underwriting guidelines. Mr. Daniel also made clear during his own testimony that the reference to "underwriting" in the email did not necessarily refer to "whether somebody's following the guidelines . . . it could also refer to tightening existing underwriting guidelines." (8/4/17 Vol. II Tr. 14:14-21.)

**PX389**: Neither Mr. Daniel nor Margaret Dellafera mention underwriting guidelines, and instead discuss a "worst performing list" and repurchase obligations. MassMutual uses this email, and this email alone, to assert that originators like Pinnacle Direct Funding Corporation ("Pinnacle") were originating loans that did not comply with guidelines (*see* PX3115), yet its own reunderwriting results demonstrate why this is misleading: of the eight loans reunderwritten by MassMutual's expert, Richard Payne, that were originated by Pinnacle, he did not claim that *any* of them were defective. (PX1550; JX94; PX660.)

**PX317**: A trader, Daniel Ezra, casually agrees with an investor's assessment of Suntrust's performance as an originator, which he likened to "doo-doo". "[T]his is a statement from an RMBS investor identifying overall characteristics of loans and looking at the performance and saying, I just don't like this", and it "absolutely" does not "discuss[] whether Suntrust loans complied with underwriting guidelines". (8/18/17 Vol. II Tr. 60:4-9.) Of the six loans originated by Suntrust that were reunderwritten by Mr. Payne, he only claimed that one of them was defective. (PX1550; JX94; PX658.)

**PX254**: A transaction manager, Regang Ou, discusses the "migration of a nonprime originator into Alt A and the characteristics of the loans, the objective characteristics of the loans that they were producing as Alt A loans." (8/18/17 Vol. II Tr. 60:16-20.) It has nothing to do with compliance with guidelines. (8/18/17 Vol. II Tr. 60:10-15.)

28. The sheer volume of emails that MassMutual presented to Mr. Kaiserman does not compensate for the fact that they do not bear on the actual issues in this case.

      **B.**     **MassMutual Misrepresents the Due Diligence Results of Other Banks Who Purchased Whole Loan Pools from Credit Suisse**

29. Credit Suisse often sold pools of whole loans to other banks, including CitiBank, who was Credit Suisse's largest client for such sales. (8/18/17 Vol. II Tr. 73:14-16.) Citi performed due diligence on a sample of the loans, and "while [Credit Suisse] acquired loans to [its] guidelines, Citi oftentimes acquired loans to different guidelines and so not surprisingly there was a disconnect that caused issues to occur in connection with those sales." (8/16/17 Vol. I Tr. 63:11-25.) This was an occurrence for all whole loan samples; "there was often a mismatch between the criteria and

guidelines that [Credit Suisse] used to acquire loans and the guidelines that buyers used to buy loans from [Credit Suisse]." (8/16/17 Vol. I Tr. 91:12-22.)

30.    MassMutual attempted to take a document out of context in which Anne Lombardi, who worked in due diligence, notes that "Citi conditions are not restrictive for a Whole Loan deal, basically normal underwriting stips". (PX165.) This document clearly refers to "stips" or stipulations, not underwriting guidelines, which Mr. Kaiserman defined previously as "certain terms that [a party] expected the sale to include", or, as Ms. Lombardi writes, "conditions". (8/10/17 Vol. I Tr. 43:22-44:5; PX165.) This sentence does not "relate to Citi's underwriting guidelines that apply to the loans that Citi acquired in this transaction". (8/18/17 Vol. II Tr. 46:3-6.) This interpretation is confirmed by the fact that Ms. Lombardi immediately follows this sentence by noting a difference between Citi's underwriting guideline's and Credit Suisse's: "I do disagree with Citi's guideline that if monthly rental is disclosed in REO section of 1003, it is an automatic declination for doc type NIV. Our guidelines are not specific to this process." (PX165.) Thus, Ms. Lombardi's comment that the underwriting stips were "basically normal" for Citi does not establish that the results of Citi's diligence are tantamount to violations of Credit Suisse guidelines, as MassMutual repeatedly attempted to suggest.

31.    The documents that MassMutual itself presented demonstrate the irrelevance of the Citi whole loan sales. PX3100 is a loan-level analysis of Citi's due diligence results on the whole loan sale CS48. Out of 535 loans, only seven of those loans, or 1.3%, were "dropped" by Citi. (8/17/17 Vol. I Tr. 29:18-20.) Of those seven, only five of them had "underwriting guideline issues according to Citi's guidelines", and of those five, one of them was due to "missing credit documentation so that a decision could not be rendered", and for one other, "there were some questions in terms of whether or not the facts for that particular loan would be within [Credit

12

Suisse] guidelines or not", and for one other still, Mr. Kaiserman was "not sure [he] could render a

decision".   (8/17/17 Vol. I Tr. 50:12-51:6.)

32.      MassMutual attempts to distort the record to make it appear that the number of "drops"

because of underwriting guideline issues is higher than it actually was.  For example, while the text

of PX3006 states that "[o]f 130 loans with issues, we have determined that 66 of them were the fault

of someone in the fc", it is clear based on the attachments to that email—not included as part of

MassMutual's exhibit—that those 66 include at least 37 loans that were in fact cleared by Citi

during due diligence.  (8/18/17 Vol. II Tr. 46:20-49:5; DX3721; DX3722.)  Moreover, there is no

reason to believe that the reference to "fault" identifies loans that did not comply with the

guidelines that applied at origination.  (8/18/17 Vol. II Tr. 48:25-49:15.)

33.      On those occasions in which Credit Suisse did determine that a fulfillment center made a

mistake in clearing a loan that was later rejected by a buyer in a whole loan sale, Credit Suisse was

proactive in rectifying the error and ensuring it happened less frequently, if at all, in the future.

PX3005, admitted by MassMutual, is evidence of Credit Suisse's practices in this regard.  Mr.

Kaiserman emailed a plan of action "[b]ased on the results of our post closing review of the non-

bulk loans kicked by Citi in connection with the CS 46 sale".  (PX3005.)  That plan explained the

fulfillment centers had only made a combined seven "errors".  Despite that low number, Credit

Suisse planned to take specific corrective action:

> "Lydian and Ocwen will each be instructed on the issued noted above and advised
> that future errors . . . may result in the imposition of a penalty".
>
> "For [whole loan] sales (regardless of the identity of the purchaser) occurring on or
> after August 1, 2006, we will perform a similar review of each non-bulk loan
> rejected by the related purchaser and (a) provide the related FC with feedback to
> reduce/eliminate the likelihood that the problem would arise again and (b) impose
> a penalty on a case by case basis to the extent the same is deemed necessary"
>
> "Bruce will be added to the distribution list of the monthly QC reports produced by
> Rachel Romero so that Bruce and Eddie [Othman] can provide feedback / impose

penalties on the related FC for problem loans identified during our monthly QC reviews." (*Id.*)

Mr. Kaiserman also noted in his email that "the CS 47 sale (which closed in July) did not appear to suffer from the issues referred to above and as of right now, the CS 48 (which is closing at the end of August) does not appear to suffer from the above issues either.  Finally, we will schedule a meeting for the first week of September to review the loans kicked by Citi, Hudson City and Citizens Bank in each of the sales we have scheduled to close at the end of August".  (PX3005.)  It is clear based on the record that the number of loans that were removed from whole loan sales because they did not comply with *Credit Suisse's* (as opposed to the buyer's) underwriting guidelines was very low, and that, when that did occur, Credit Suisse took it seriously and took prompt corrective action.

### C.      Quality Control Was Used to Improve Credit Suisse's Due Diligence Practices, Not to Repeat Due Diligence

34.      Mr. Kaiserman testified that "part of the purpose of the quality control [procedures] was to review what the fulfillment centers were doing procedurally and also to gain an understanding of the product that we were offering and whether there were any lessons learned."  (8/17/17 Vol. II Tr. 39:7-10.)  The Conduit Manual, Credit Suisse's manual for its due diligence processes, states that "[c]redit decisions are reviewed to insure conformity with the appropriate underwriting guidelines (as referenced in Chapter 11, Section 11.3)", which refers specifically to the guidelines used for loans originated through the wholesale and loan-by-loan channels.  (PX151 at -7273; 8/18/17 Vol. II Tr. 52:2-10.)  Thus, importantly, loans in Quality Control were being reviewed against Credit Suisse's guidelines, not the guidelines that may have applied at origination.  (8/18/17 Vol. II Tr. 52:2-20.)  As the Quality Control reports stated, "[a]lthough these guidelines were not necessarily those that were utilized at the time of purchase, they were deemed to be an adequate 'bench-mark'

14

for assessing the investment quality of the loan." (DX243 at -8238.) In addition, they were conducting reverifications "that were not done by the originator when they originated the loan. And so not surprisingly, you may find findings that the originator did not find, and those were all done for the purpose of building a better product. If we learned information through this process that highlighted potential changes to our product offering, it was for that purpose." (8/18/17 Vol. II Tr. 52:11-52:3.) MassMutual's only evidence to the contrary is based on a misreading of the Conduit Manual. As a result of misunderstanding how Credit Suisse conducted Quality Control, MassMutual's attempts to tie those results to purported violations of underwriting guidelines fail.

35.      Moreover, its reliance on isolated emails that at best provide generalized evidence of the performance of a given originator (not specific to the actual loans at issue) is wholly inadequate to establish the existence of a misstatement or omission in this case. For example, in its binder to the Court listing the loan contributions by supposedly delinquent originators, MassMutual included Countrywide, likely because it contributed almost half of the original principal balance to ARMT 2006-1. (*See* PX3122.) But MassMutual's only evidence purportedly suggesting that Countrywide did not comply with underwriting guidelines is that 13 of 94 loans in one quality control sample were found to have a rating of "critical", which would be insufficient evidence even if "critical" meant that a loan failed to comply with origination underwriting guidelines, which it does not for reasons previously discussed. AmSouth Bank, N.A. is included as well (*see* PX3142), even though the only evidence MassMutual offers concerning it is that three of just *ten* loans were flagged in the same set of quality control results.

36.      Worse yet, MassMutual attempts to lump all these originators together, as if the mere mention of an originator in a single email casting doubt on its performance on particular loans establishes it as a wrongdoer, regardless of the actual content of those emails or the frequency with

which the originator is mentioned.  In doing so, MassMutual attempts to create the misleading impression that it has actually proven something with respect to a significant portion of the originators at issue, when in fact it has done nothing more than introduce emails about the performance of loans from originators that in many cases originated only a fraction of a percentage point of the approximately 30,000 loans at issue, often only for a small subset of the securitizations at issue.  (*See, e.g.*, PX3130 (showing that Security Atlantic Mortgage Co. originated no more than 0.49% of the overall number of loans at issue); PX3109 (showing that Resource Bank contributed 13.26% to only one of the SLGs at issue, and less than 3% to any others); PX3123 (showing that Sovereign Bank FSP contributed 1,301 loans to the relevant SLG in CSMC 2007-3, 311 loans to the relevant SLG in CSAB 2007-1, one loan to the relevant SLG in CSMC 2007-1, and zero loans to any of the other eight securitizations at issue)).)

37.    MassMutual's presentation of Quality Control results without including the relevant attachment was also misleading.  For example, PX3136 seems to indicate that American Home has a "critical" rating of over 30 percent, yet the attachment, DX3724, demonstrates it is based on a review of only eight loans, and that half of the so-called "critical" findings for those loans related to missing documents and only one related to compliance with underwriting guidelines.

### D.    MassMutual Misconstrues the Sovereign Transaction

38.    Credit Suisse purchased loans originated by Countrywide from Sovereign Bank FSB ("Sovereign") in an "atypical bulk transaction".  (8/18/17 Vol. I Tr. 40:9-12.)  The bulk transaction was atypical for several reasons:

- The loans in the transaction were more seasoned than usual, meaning it had been longer than usual since the loans were originated.  (8/18/17 Vol. II Tr. 62:12-15.)  On average, they were between one and two years old.  (8/18/17 Vol. II Tr. 64:3-10.)

- Credit Suisse agreed to limit the size of its due diligence sample to ten percent.  (8/18/17 Vol. I Tr. 40:17-21.)  That sample was taken from a pool of almost 9,000 loans, meaning that the

sample was just under 900 loans, almost as many loans as the reunderwriting experts reviewed in this entire litigation.  (*See* 8/18/17 Vol. II Tr. 32:19-21.)

- Credit Suisse agreed that it could remove up to 5% of the loans from the pool without consequence; Credit Suisse could remove more than 5%, but if it did so Sovereign would "have the right to keep the loans and not sell them".  (8/18/17 Vol. I Tr. 40:24-41:2; PX3019 at -9710.)  The loans that would have been removed but for this agreement "were going to move over to the scratch and dent desk", which bought loans that were defective in some way.  (8/18/17 Vol. II Tr. 9:25-10:13.)

- Credit Suisse agreed to only exclude a loan for "fraud".  (8/18/17 Vol. I Tr. 41:3-6.)  Despite that agreement, however, Credit Suisse conducted its typical diligence review and took an expansive view of what was excludable on the basis of "fraud" under the agreement with Sovereign, such that it could kick additional loans that did not meet its overall quality standards.  (8/18/17 Vol. II Tr. 65:4-20.)  As Mr. Kaiserman emphasized to the diligence team, if they thought a loan should be removed, "find fraud – make sense??"  (PX293.)

39.     Because the loans were so seasoned, the borrowers had already demonstrated an ability and willingness to repay.  As Mr. Kaiserman explained:  "The whole [due diligence] process is to identify the borrower's ability and willingness to repay within the confines of the guidelines.  Because you have a history, it makes it easier to figure out if they have the ability, not necessarily the willingness, but certainly the ability insofar as they've made payments."  (8/18/17 Vol. II Tr. 64:11-21.)  Mr. Kaiserman subsequently added that the payment history also demonstrate a willingness to repay the loan.  (8/18/17 Vol. II Tr. 64:22-24.)  In addition, due diligence was performed using Countrywide's contemporaneous guidelines, not the guidelines that applied at the time of origination.  (8/18/17 Vol. II Tr. 12:2-13.)  As a result, the due diligence results for the Sovereign transaction did not reflect whether or not the loans complied with the guidelines that applied at origination.

### E.     Interpersonal Dynamics Between Mr. Fallacara and Mr. Sacco Do Not Establish the Existence of a Misstatement or Omission

40.     While Mr. Sacco may occasionally have felt pressured by Mr. Fallacara during the relevant time period, MassMutual has not shown that it had any effect on how Mr. Sacco performed his job

or on Credit Suisse's decision to purchase any given loan.  As Mr. Kaiserman testified, "Rob came to me on several occasions expressing concern that he was repeatedly being questioned in terms of the decisions that he was making, and he said it was, you know, growing and becoming difficult for him, and I explained to him this is the pressure of any business. This is the role. You're going to keep doing your job, and you're going to deal with it."  (8/18/17 Vol. II Tr. 58:21-59:2.)  Mr. Kaiserman was unambiguous that, based on his day-to-day interactions with Mr. Sacco, Mr. Sacco did not clear loans "that he did not believe should have been cleared" as a result of any pressure. (8/18/17 Vol. II Tr. 59:15-23.)

## F.  MassMutual's Efforts to Impeach Mr. Kaiserman Were Ineffective

41.  Several times throughout its cross-examination for Mr. Kaiserman, MassMutual attempted to impeach Mr. Kaiserman by presenting testimony that was not actually inconsistent, was taken out of context or was used by MassMutual in a misleading manner.

42.  *First,* MassMutual read testimony for the purposes of impeachment that did not actually impeach.  For example, while on the stand, Mr. Kaiserman testified as follows:

> **Q.**  And is it your testimony, sir, that during the 2005-2007 time frame you can't remember anybody at Credit Suisse ever expressing negative views of due diligence vendors?  You only heard constructive feedback?
>
> **A.**  I heard feedback from a variety of people.  Some of them were less constructive than others, and I don't think I would say definitively none of them were concerns. (8/16/17 Vol. I Tr. 67:15-22.)

MassMutual then read testimony from a deposition taken of Mr. Kaiserman four years ago:

> **Question**:  Do you remember anybody ever expressing dissatisfaction with anyone of the due diligence vendors?
> **Answer**:  During what time?
> **Question**:  Let's say 2005 through 2007.
> **Answer**:  I think from time to time people offered constructive feedback as ways to improve the performance the job that was done, but I don't think it was negative.  (8/16/17 Vol. I Tr. 68:11-21.)

There is no inconsistency here; in each case Mr. Kaiserman is stating he remembers receiving

constructive feedback from colleagues. That he chose slightly different wording to convey the same sentiment four years apart establishes nothing.

43.     *Second*, MassMutual read testimony for the purposes of impeachment that took Mr. Kaiserman's prior testimony out of context. For example, Mr. Kaiserman testified at trial:

> **Q.** And is it your testimony, sir, that the people who reported to you would give you feedback about the due diligence being performed at the fulfillment centers but you would not characterize that feedback as concerns about the due diligence at the fulfillment centers?
>
> **A.** The people that worked for me gave me feedback realtime on the transactions they were working on and in their mind they may have expressed concerns about the work being done by the fulfillment center, but as was my practice if I saw something that caused me to be concerned, I would have looked into it. I'm aware of instances where people that worked for me raised what they thought were issues to me and I handled them accordingly. (8/16/17 Vol. I Tr. 62:2-15.)

MassMutual then read testimony from a deposition taken of Mr. Kaiserman four years ago:

> **Question**: Did any of the people who reported to you ever express concerns about the quality of the due diligence reviews that was happening in the fulfillment centers?
>
> **Answer**: From time to time, I received feedback about events occurring at the fulfillment center. Whether I would character that as concerns, I would say they were not concerns. It was feedback. (8/16/17 Vol. I Tr. 62:23-63:6.)

44.     Despite the fact that the statements are not actually inconsistent, MassMutual's counsel spent an inordinate amount of time criticizing Mr. Kaiserman for explaining that, in his prior testimony, he had in mind feedback that he had received concerning Credit Suisse's diligence in connection with whole loan sales to Citi, Credit Suisse's largest whole loan sale client. (8/16/17 Vol. I Tr. 62:2-68:21; 8/18/17 Vol. II Tr. 73:14-16.) MassMutual suggested that Mr. Kaiserman was being untruthful because, in his deposition, he had not yet been shown a document concerning whole loans sales. (8/16/17 Vol. I Tr. 64:1-68:21.)

45.     But MassMutual once again misrepresents the record. On the very same page of the deposition cited, Mr. Kaiserman testified that "in connection with a sale of whole loans, there would be a discussion around what happened when we purchased the loans". (8/18/17 Vol. II Tr. 72:16-73:5.) Thus, the context of the following questions and answers made clear that Citi whole loan

sales is indeed the precise situation he had in mind when he answered the question about feedback received from his team.  (8/18/17 Vol. II Tr. 72:6-16.)

46.     *Third*, MassMutual presented certain testimony in a misleading manner in order to attempt to impeach Mr. Kaiserman.  For example, Mr. Kaiserman testified at trial:

> **Q.**  Did anybody in the transaction management group have any role working with the put-back group?
> **A.**  Well, in addition to the discussion we just had about my role, I'm confident that Joe or Rick in my absence may have gone to folks on my team and asked them similar questions. (8/10/17 Vol. III Tr. 24:11-16.)

MassMutual then read testimony from a deposition taken of Mr. Kaiserman almost six years ago:

> **Question**:  To your understanding, did anyone in the transaction management group have any role in working with the put-back group?
> **Answer**:  No, sir.  (8/10/17 Vol. III Tr. 25:8-14.)

Yet, in his deposition, right after that testimony that was read to him, Mr. Kaiserman testified about interactions with the putback group:

> "You know, it's a long time ago.  I don't remember precisely what my activities were, but one example might be where a member of the putback group would come to me and said, I need a copy of the, you know, originator MLPA; where is it.  And I would provide it. Another example would be:  I see that there are two agreements here, which one is the active one.  Things like that", and went on to testify there were other interactions with the putback group as well.  (8/18/17 Vol. II Tr. 70:4-19.)

Thus, MassMutual selectively quoted Mr. Kaiserman's deposition to suggest an inconsistency, where there was none.  In fact, when Mr. Kaiserman referred to "the discussion we just had about my role", he was referring to questions at trial that elicited testimony in substance identical to the testimony he gave at his deposition about the nature of his interactions with the putback group. (8/10/17 Vol. III Tr. 23:8-24:2.)

47.     Considering all of the matters described above, Mr. Kaiserman effectively withstood MassMutual's cross-examination and testified credibly about the nature of Credit Suisse's mortgage business during the relevant time period, as well as its due diligence and quality control procedures.

Dated:  August 21, 2017                    Respectfully submitted,


                                           By */s/ Jonathan Sablone*                     

                                           Jonathan Sablone (BBO #632998)
                                           Matthew T. McLaughlin (BBO #660878)
                                                NIXON PEABODY LLP
                                                100 Summer Street
                                                Boston, Massachusetts 02110
                                                Telephone: (617) 345-1342
                                                Fax: (866) 947-1729
                                                jsablone@nixonpeabody.com
                                                mmclaughlin@nixonpeabody.com

                                           Of Counsel:

                                           Richard W. Clary (admitted pro hac vice)
                                           Michael T. Reynolds (admitted pro hac vice)
                                           Lauren A. Moskowitz (admitted pro hac vice)
                                                CRAVATH, SWAINE & MOORE LLP
                                                825 Eighth Avenue
                                                New York, New York 10019
                                                Telephone: (212) 474-1000
                                                Fax: (212) 474-3700
                                                rclary@cravath.com
                                                mreynolds@cravath.com
                                                lmoskowitz@cravath.com

                                           *Counsel for Defendant Credit Suisse Securities (USA)
                                           LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be

sent electronically to the registered participants as identified on the Notice of Electronic

Filing (NEF) and paper copies will be sent to those indicated as non-registered

participants on August 21, 2017.

By */s/ Jonathan Sablone*
Jonathan Sablone