**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br>    v.<br>DLJ MORTGAGE CAPITAL, INC., et al.,<br>    Defendants. | Civil Action No. 11-cv-30047-MGM |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br>    v.<br>CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., et al.,<br>    Defendants. | Civil Action No. 11-cv-30048-MGM |

**MASSMUTUAL'S PROPOSED FINDINGS OF FACT**
**AND DISCUSSION OF LEGAL ISSUES**

**<u>TRIAL WEEK 4</u>**

# TABLE OF CONTENTS

I.    Proposed Findings of Fact Based on This Week's Evidence ............................................... 1

    A.    The At-Issue Certificates Were the Products of a Broken, Corrupt System. .......... 1

        1.    Fallacara pressured people to approve unworthy loans. ............................ 2

        2.    Credit Suisse turned a blind eye to problematic originators that sold loans that wound up in MassMutual's securities. .............................. 2

        3.    Fallacara's leadership led to "systemic" underwriting and due diligence problems. ................................................................................... 7

        4.    Credit Suisse manipulated its quality control process to avoid reviewing loans that it could not put back to originators........................... 8

        5.    Credit Suisse manipulated its securitization process to include loans rejected by whole loan purchasers in the securities it sold to investors. ...................................................................................... 9

    B.    The Evidence of Systemic Problems in Credit Suisse's RMBS Operations Proves That Its Underwriting Representations Were False and Misleading......... 10

    C.    Kaiserman's Explanations Are Entitled to No Weight......................................... 13

        1.    The Conduit Manual. ............................................................................. 13

        2.    Quality control. ...................................................................................... 13

        3.    Due diligence. ........................................................................................ 14

        4.    Loan performance and underwriting......................................................... 14

        5.    Kaiserman's reinterpretation of documents and states of mind................ 16

    D.    MassMutual Is Entitled to a Missing Witness Inference Because of Credit Suisse's Failure to Call Sack.............................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Adelson v. Hananel,*
  652 F.3d 75 (1st Cir. 2011) .................................................................................. 18

*Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.,*
  804 F. Supp. 2d 141 (S.D.N.Y. 2011) ................................................................. 12

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ................................................................. 11

*Grajales-Romero v. Am. Airlines, Inc.,*
  194 F.3d 288 (1st Cir. 1999) ........................................................................... 18, 19

*Jones v. Otis Elevator Co.,*
  861 F.2d 655 (11th Cir. 1988) .............................................................................. 19

*Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.,*
  No. 11-30039-MGM, 2015 WL 3964560 (June 19, 2015) .................................... 12

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ............................................................................................... 12

*Meyer v. Jinkosolar Holdings Co.,*
  761 F.3d 245 (2d Cir. 2014) ................................................................................ 12

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
  135 S. Ct. 1318 (2015) ......................................................................................... 11

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
  632 F.3d 762 (1st Cir. 2011) ................................................................................ 11

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.,*
  714 F. Supp. 2d 475 (S.D.N.Y. 2010) ................................................................. 11

*Steinhilber v. McCarthy,*
  26 F. Supp. 2d 265 (D. Mass. 1998) .................................................................... 19

**Other Authorities**

2 MCCORMICK ON EVID. § 264 (7th ed.) .................................................................... 20

Credit Suisse called Bruce Kaiserman to be the spokesman for its RMBS policies and procedures, but his testimony and documents proved there was a wide gap between Credit Suisse's policies and the reality of its RMBS business.  Kaiserman's testimony revealed that Credit Suisse's RMBS business was rife with conflicts of interest that led to the origination and acquisition of loans that did not comply with underwriting guidelines.  His testimony also showed that although Credit Suisse learned about these problems through its due diligence program, its quality control efforts, and feedback from third-party loan buyers, it was unwilling or unable to fix them.  Credit Suisse never told investors about these problems.  Instead, it revamped its quality control process to avoid creating a paper trail that would hamper its efforts to offload noncompliant loans to investors through its securitizations.  This evidence establishes the falsity of Credit Suisse's representation that the loans backing the at-issue certificates generally complied with underwriting guidelines.  Further, Credit Suisse's failure to disclose any of these facts to investors is itself an actionable material omission.

Kaiserman's testimony also highlighted the centrality of Peter Sack to the contested issues in this case.  Given Credit Suisse's refusal to make Sack available to testify, the Court should presume that Sack's testimony would have been unfavorable to Credit Suisse.

## I.      Proposed Findings of Fact Based on This Week's Evidence

### A.      The At-Issue Certificates Were the Products of a Broken, Corrupt System.

1.      The evidence this week confirmed that there were profound, "systemic" problems with Credit Suisse's RMBS operations—from the improper pressure Mike Fallacara and his salesmen exerted on Rob Sacco's underwriting and due diligence decisions, to the purchase of poor-quality loans from originators with known underwriting problems, to the manipulation of the quality control process to avoid reviewing loans that could not be "put back" to originators.

### 1.      Fallacara pressured people to approve unworthy loans.

2.      In early 2006, Credit Suisse put together a presentation stating, "Sales and

Trading groups do not have credit authority." (PX126 at 34.)  This statement suggested that

underwriting and due diligence were independent from sales.  But the evidence shows that

Fallacara, head of Conduit sales, controlled underwriting and due diligence and regularly

pressured people to approve what Daniel described as "unworthy" loans, PX246 at 2:

- Sacco faced sales pressure "on a daily basis."  (PX1543 at 2 (offered without objection in Sacco deposition designations).)  "Sales agrees with the risk issues but since we may have done this in the past, we should continue to do it—regardless of how it may perform."  (*Id. See* Sacco 4/3/14 CPIM Dep. 297:3–299:8, '047 D.E. 587; '048 D.E. 626 ("the sales force [was] pressuring the underwriters and talking to us on a regular basis trying to convince us to approve loans that we denied").)

- Mike Daniel told his bosses Sacco "claims he regularly has to respond to pressure from Fallacara and salespeople to approve loans that he thinks are unworthy (and he showed me plenty of emails to prove it—undeniably)."  (PX246 at 2.)

- John Vibert, head of the ARM desk, agreed with Daniel.  In response to Daniel's email, Vibert said, "Rob should not report to Fallacara.  It is clearly too much of a conflict."  He then recounted a "talk with Kaiserman last night, who says that Rob is close to giving up because its so disheartening to (a) be constantly overruled, and (b) be constantly going against the rest of the conduit grain."  (*Id.* at 1.)

- Even company spokesman Kaiserman admitted that "there were people that felt pressured by Michael [Fallacara] in terms of their role . . . they were being questioned in terms of their judgment calls."  (Aug. 16 Tr. 85:18–25.)  "I think Rob [Sacco] felt pressure from all angles, including Michael [Fallacara], and to some extent from salespeople and traders.  I think it was all around."  (Aug. 18 pm Tr. 59:10–14.)

### 2.      Credit Suisse turned a blind eye to problematic originators that sold loans that wound up in MassMutual's securities.

3.      In the first quarter of 2006, the Conduit had 325 approved correspondent sellers

and 1,174 approved brokers.  (PX126 at 7.)  In May 2007, Credit Suisse identified a short list of

sellers to be reviewed by the Client Management Group "for termination/suspension."  Credit

Suisse Financial Corp., which originated all wholesale loans, was at the top of the list.  (PX412

at 2.)  Credit Suisse explained: "[O]ur Wholesale Channel [h]as the highest critical % and the

2

highest # of critical loans." (*Id.*)  Also on the list of sellers to be reviewed for suspension or

termination were Taylor Bean & Whitaker, Lime Financial Services, Aames Capital Corp.,

MortgageIT, and Countrywide—all of which contributed loans to MassMutual's securities.  (*See*

*id.* at 3; *see also generally* PX1512.)

4.      Other sellers in MassMutual's securities were also singled out as problematic,

including AmSouth Bank, Prime Mortgage Corp., American Home Bank, and Wall Street

Mortgage Bankers.  (*See* PX412 at 1–2; *see generally* PX1512.)

5.      Of the originators singled out in PX412, five of them—Credit Suisse Financial

Corp., Taylor Bean & Whitaker, Countrywide, MortgageIT, and American Home—were among

the seven originators disclosed to investors in the at-issue ProSupps, meaning they contributed

more than 10% of the loans to at least one of the at-issue SLGs.  *See* JX6 at S-6; JX10 at S-5;

JX99 at S-5; JX17 at S-5; JX18 at S-5; JX22 at S-5; JX31 at S-36; JX20 at S-33; JX25 at S-39;

JX14 at S-5; JX33 at S-5.  TBW, one of the seven, accounted for 100% of the loans in the pools

backing two of the securitizations at issue.  *See* PX3128.  In the other nine securities, Credit

Suisse's wholesale operation (loans originated by Credit Suisse Financial Corp.) was the largest

overall originator.  *See* PX3107.

6.      Many other documents evidenced substantial problems with originators that

contributed loans to the at-issue certificates during the relevant time period.  For example:

- PX427 (6/18/07 Daniel email: "What Paul [Heckman] does not realize, and neither do
  any of his [account executives in wholesale sales], is that our performance in
  wholesale has been crap.  Our deal performance is tainted in large part by wholesale
  and a small number of correspondents (Fairmont, ACT Lending, Silver State, Dream
  House, Security Atlantic, and Resource Bank).");  *see id*. at 14 ("TBW and Indy Mac
  should be out of business.").

- PX279 (12/27/06 Daniel/Ezra email: "Security Atlantic and Fairmont funding show
  up AGAIN!!  Are you fvcking kidding me?  This is exactly why we need to take more
  control of credit.  The store is not being minded."); *id*. ("Throw in Resource Bank and

Unprime and we've got a quartet that are consistently on this list.  Let's hope they continue to pay on EPD's.  There's nothing we can do on ACT loans."); *id.* (also listing Mortgage Store).

- PX104 (4/4/05 Sack email describing underwriting problems with Greenpoint loans).

- PX232 at 2 (10/17/06 Kaiserman email: "Security Atlantic has all but told us they do not have the funds necessary to buy back the loans we've asked them to repurchase . . . . We regularly recommended cutting them off during 2Q06 and finally, said enough is enough in August").  *Contrast* PX3130 (chart showing Security Atlantic loans in eight of MassMutual's securities, including several that were issued after the date of this email); *accord* PX1549A; Aug. 10 pm Tr. 36:12–17 ("Q.  So the [watch list] committee is recommending to the committee that you cut them off and the committee is rejecting the committee's recommendation?  A.  I think what I mean is an individual who is on the committee made a recommendation to cut them off and the committee discussed it and decided not to do it.").[1]

- PX254 at 2 (11/29/06 "[W]e should have growing concern with subprime guys going [Alt-A] judging by the production we're seeing from decision one and lime.").

- PX313 (Daniel email: "There's some real crap in this pool.  And it's the same fvking originators every time - Security Atlantic, ACT, Resource Bank, DreamHouse, . . .").

- PX389 (4/19/07 Daniel/Dellafera emails about sellers "on our worst performing list," including Resource Bank ("performance is way too bad to be an isolated problem . . . they perform poorly even after the EPD period.); Mortgage Store ("extremely evasive" their president "is a very slippery character.  His CFO is equally slimy feeling."); Dream House ("Worrisome account.  Don't trust them or their product."); Golden Empire ("Will do some digging."); Homefield ("They just shut their doors."); United Financial ("sizable repurchase obligations and we have made no headway"); Pinnacle ("We need to keep a close eye on them."); and Diversified ("Huge repurchase obligation and no liquidity whatsoever.").)

- PX392 (4/19/07 Vibert email describing the "crap loans" from Countrywide).

7.     Credit Suisse purchased a large pool of loans from Sovereign Bank, explicitly agreeing not to kick loans that violated underwriting guidelines.  Kaiserman was the lead negotiator of the Sovereign Bank purchase.  (Aug. 18 am Tr. 41:15–20.)

---

[1] The Client Management Group "[c]oordinates the Watch List Committee to discuss client issues like delinquencies, foreclosures, repurchase percentages, etc."  (PX107 at CS-MM-TR000057203.)  A Credit Suisse presentation from early 2006 explains that the role of the Watch List Committee is to "Review performance statistics . . . underwriting/valuation/ compliance/corporate structure and performance, on-site diligence results."  (PX126 at 19.)

8.     Credit Suisse bought the Sovereign loans "as is," (PX3019), agreeing to purchase the loans regardless of whether they were underwritten "generally in accordance" with underwriting guidelines.  (PX1538 at 7.)  Critically, Credit Suisse agreed that the only reason it would kick a loan from the Sovereign deal was for fraud, even if that meant Credit Suisse bought loans with underwriting defects.  (*See* Aug. 18 am Tr. 41:3–10; PX294; PX299.)  In fact, Credit Suisse did find loans with underwriting defects in the Sovereign pool, but did not kick them. (*See* PX298 at 1 (Nordyk explaining to Kaiserman that "I am not 'kicking for exceptions.'"); *id.* at 2–3 ("Clayton has found a number of guideline exceptions (fico score exceptions, LTV exceptions,[2] Program exceptions) However I am not rejecting for these items.").)

9.     Credit Suisse agreed to limit its due diligence to 10% of the Sovereign pool, rather than the usual 20%.  (Aug. 18 am Tr. 40:13–21.)  And Credit Suisse agreed that it would only kick 5% of the total pool based on the results of its due diligence.  (*Id.* at 40:24–41:2.)

10.    Moreover,

- Credit Suisse knew that the Sovereign loans had been originated primarily by Countrywide and CSFC itself.  (*See* Aug. 18 pm Tr. 32:19–25; *see also* PX3024.) These were originators that it had identified as problematic and evaluated for termination or suspension.  (*See* Aug. 18 pm Tr. 33:20–34:1 (referring to the list of sellers in PX412 at 2–3).)

- Credit Suisse performed due diligence on 10% of the loans in the Sovereign pool, and kicked half of those that it reviewed.  (*See* Aug. 18 pm Tr. 29:21–30:4.)  Credit Suisse would have rejected even more fraudulent loans, but it could not because of the overall kick cap in its agreement.  (*See id.* at 30:5–8; *see also* PX3025 (Kaiserman saying "[w]e should also get on the same page [with respect to] what type of fraud we are kicking the loan for").)

---

[2] Kaiserman admitted on cross-examination that LTVs are important, even for "seasoned" loans like those in the Sovereign Bank pool, meaning loans that are more than a few months old. (Aug. 18 pm Tr. 20:23–21:2.)

11.     In the end, Kaiserman thanked due diligence manager Jason Nordyk for "working through this mess," and reassured him that, "If it helps, it looks like we will make a killing on this trade." (*See* Aug. 18 pm Tr. 25:16–26:6 (discussing PX301).)  Credit Suisse indeed made a killing on the trade by securitizing the loans, including more than 1,500 such loans in the at-issue certificates.  (*See* PX3123.)  Credit Suisse failed to disclose that it only kicked some of the Sovereign loans for fraud and that it knew many of the Sovereign loans backing the at-issue certificates violated underwriting guidelines.  (*See* Aug. 18 am Tr. 53:4–9; PX298.)

12.     A majority of the loans at-issue came from originators with known problems:

| Securitization | Count of Loans | Percentage of Loans | Original Principal Balance | Percentage of Original Principal Balance |
|---|---|---|---|---|
| ARMT 2006-1 | 1,327 | 57.92% | $684,355,618.92 | 63.84% |
| ARMT 2007-1 | 1,664 | 58.78% | $483,339,763.81 | 58.99% |
| CSAB 2006-1 | 884 | 63.69% | $234,342,508.00 | 61.90% |
| CSAB 2006-2 | 1,875 | 49.70% | $492,779,835.00 | 48.80% |
| CSAB 2006-3 | 2,079 | 65.32% | $497,385,299.40 | 61.48% |
| CSAB 2006-4 | 1,924 | 57.31% | $413,074,513.00 | 55.03% |
| CSAB 2007-1 | 771 | 53.95% | $240,835,484.20 | 53.77% |
| CSMC 2007-1 | 2,130 | 55.32% | $690,375,651.17 | 55.57% |
| CSMC 2007-3 | 2,203 | 52.69% | $608,338,494.40 | 44.48% |
| TBW 2006-4 | 1,738 | 100.00% | $419,844,903.00 | 100.00% |
| TBW 2007-2 | 3,452 | 100.00% | $649,173,438.00 | 100.00% |

Source: PX3148–PX3158; *see also* PX3107–PX3117; PX3119–PX3120; PX3122–PX3123; PX3125; PX3127–PX3130; PX3134; PX3137–PX3140; PX3142–PX3144; and PX3146.

13.     Credit Suisse's documents show that many of these originators had rates of "critical" loans (a proxy for underwriting defects, because quality control reviewed loans for compliance with underwriting guidelines, *see* PX151 at 450) that were higher than 20%.  (*See* PX412.)  Credit Suisse's own wholesale loans had a historical QC fail rate of 35%.  (*See* PX431.)

6

### 3. Fallacara's leadership led to "systemic" underwriting and due diligence problems.

14.     The evidence shows that Fallacara's improper pressure and the purchase of large

numbers of loans from problematic originators led to "systemic problems" in the fulfillment

centers and underwriting.  (Aug. 17 pm Tr. 36:7–9 (discussing PX431 at 2)):

- With respect to wholesale loans, Pete Sack, Kaiserman's co-head of transaction management, noted there was a "wholesale QC historical fail rate of over 35% (major rep defects)."  (PX431 at 3.)  Despite serving as Credit Suisse's 30(b)(6) witness in several RMBS cases,  Kaiserman admitted he never asked Sack about this fact, and claimed he had never even seen the email.  (Aug. 17 pm Tr. 45:3–16.)

- "Consistently 90%+ of [Credit Suisse's] whole loan repurchase requests are LBL or wholesale."  (PX3010.)  And the head of the ARMs trading desk believed that "our diligence process is such a joke (really 100% diligence on resource bank???) and our expanded eligibility for every fly-by-night originator was so broad tha[t] any loan could, and did, get through what passed for diligence here."  (PX435.)

- Eddie Othman, head of the fulfillment centers, wrote in June 2007 that Heckman and the other wholesale sales force "don't care when the firm gets jammed with crap.  I don't see any of them speaking up and agreeing to terminate brokers when they know the broker is trying to deceive."  (PX427 at 1.)

- With respect to a pool of loans to be sold to Citi, Credit Suisse employee Anne Lombardi said regarding the large number of "conditions" Citi had put on the pool: "Non-bulk credit items are due to oversight by underwriters; not cross checking documents and not reading/review appraisal as to line adjustments and comparables not supportive of final market value . . . ."  (PX165 at 1.)  Elizabeth Pavlov forwarded the email to Kaiserman, explaining that the problems related to underwriting deficiencies, and asked him to "[p]lease help me persuade internal management of the loan by loan and minibulk due dili/UW processes that our reviews need to improve. Per below, we are not being as diligent as we should.  It's making it very difficult to clear loans which were underwritten/originated incorrectly."  (*Id.*)

- Kaiserman acknowledged that the due diligence at the fulfillment centers became a big enough problem that he imposed penalties on them "as a result of mistakes that they made."  (Aug. 16 Tr. 122:2–8 (discussing PX3005, which shows Kaiserman's criticisms related to underwriting problems, *e.g.*, "stated income loans where the related file included multiple applications that included different levels of stated income"); *see also* Aug. 16 Tr. 126:23–25 (acknowledging "poor underwriting"); Aug. 17 am Tr. 16:3–16 (acknowledging fulfillment center failures where, e.g., a file "had all the bells and whistles that someone should have picked up prior to funding"); *see also* PX3013.)

15.     All of these issues related to problems with Credit Suisse's due diligence and underwriting.  As Sacco explained to Kaiserman in October 2006, "I don't think we['ve] loosened ou[r] guidelines but are more relaxed around making exceptions (accepting stated income, appraisal variances, etc)."  (PX234; *see also* PX246 at 2 ("NONE of these are guideline issues, but are fulfillment/diligence issues."); *id.* (Sacco "maintains that our credit issues in our conduit are primarily fulfillment issues, not expanded guideline issues."); PX302 ("Our fulfillment process is broken").)

### 4.     Credit Suisse manipulated its quality control process to avoid reviewing loans that it could not put back to originators.

16.     In addition to its known systemic underwriting and due diligence problems, Credit Suisse manipulated its quality control processes to avoid reviewing loans from originators that Credit Suisse knew could not repurchase loans.  Credit Suisse did this to avoid creating situations where it would have to repurchase a loan from a securitization without being able to pass the cost of the repurchase on to the originator through a putback.  This would occur when Credit Suisse identified a securitized loan originated through its own wholesale channel or an insolvent originator that did not comply with the underwriting guidelines: the Pooling and Servicing Agreement required Credit Suisse to repurchase such a loan from the securitization, but there was no one to repurchase the loan from at Credit Suisse or the defunct originator.  (*See, e.g.*, PX375 (offered without objection in Sacco CPIM designations.)  In particular:

- Vibert recommended "a more manual request process for quality control," to avoid quality control of loans from "all the sellers like Silver State," where Credit Suisse knew that "quality control would only result in a potential obligation on our behalf to repurchase without any recourse to the seller."  (Aug. 17 pm Tr. 30:19–31:15.)

- Kaiserman testified that he understood that Credit Suisse's goal was to focus quality control "just on the people where we actually might get repaid if we have to repurchase the loans."  (Aug. 17 pm Tr. 31:16–21; *see also* PX232 at 1–2 (Kaiserman: "Security Atlantic has all but told us they do not have the funds necessary to buy back

the loans we've asked them to repurchase."  Daniel response: "It's not like we put defective loans back to them unless we catch an early delq anyways.").)

- Sack agreed: "We are legally obligated to repurchase/substitute for loans in deals that breach reps if we discover a breach . . . . We are not legally obligated to perform [quality control] to search for a breach."  (PX356; *see also* Aug. 17 pm Tr. 31:22–32:17.)  "[T]he only thing quality control will tell us is that there were compliance errors, occupancy misreps, et cetera."  (PX431; *see* Aug. 17 pm Tr. 35:24–36:9 (discussing PX431, wherein multiple members of the RMBS group agree to cut back on QC that won't result in a put-back).)  (*See also* PX420 (Sack: "I think the idea is that we don't want to spend a lot of $ to generate a lot of QC results that give us no recourse anyway but generate a lot of negative data, so no need to order QC on each of these [wholesale] loans.").)

- Kaiserman acknowledged he recommended holding off on buying a loan out of a deal until Credit Suisse knew whether they could put it back to the originator.  (*See* Aug. 17 am Tr. 67:4–17 (discussing PX283).)  He recommended pursuing a putback to the originator for a violation of underwriting guidelines, while at the same time saying "let's source it in a securitization."  (Aug. 17 pm Tr. 62:20–63:6; 64:23–65:12.)

- Credit Suisse avoided repurchase obligations for loans originated by its wholesale channel, because it could not put loans back to itself.  (PX203 (Kaiserman: "we tend not to try to put these [wholesale loans] back to the related seller (here, it would be us)); Sack FHLB Dep. 169:18–170:4, '047 D.E. 612; '048 D.E. 651.)

**5.     Credit Suisse manipulated its securitization process to include loans rejected by whole loan purchasers in the securities it sold to investors.**

17.     Credit Suisse securitized loans that were rejected by prospective whole loan purchasers like Citi.  Citi repeatedly rejected loans that made it through Credit Suisse's due diligence and underwriting process.  (*See* Aug. 16 Tr. 104:25–105:13.)  Unlike investors in Credit Suisse's securities (like MassMutual), whole loan purchasers had access to loan files, so they could perform their own due diligence on the loans and kick loans that did not comply with underwriting guidelines or had other defects.  (*See* Aug. 17 am Tr. 51:7–10.)  Some of the loans that Citi rejected ended up in MassMutual's securities.  (Aug. 18 pm Tr. 24:7–22; Aug. 17 am Tr. 51:11–18.)  Kaiserman saw no problem with this process.  (Aug. 17 am Tr. 51:19–53:18.)

18.     Confronted with PX3006, one of several documents pointing out problems that Citi identified with respect to Credit Suisse's loans, Kaiserman acknowledged that the problems

9

were noncompliance with underwriting guidelines caused by the ineptitude of Credit Suisse's fulfillment centers (as opposed to issues such as "mismatched" guidelines, layered risk, or early payment default).  (Aug. 16 Tr. 132:9–133:1.)

19.　　Credit Suisse's documents also show that the fulfillment centers were originating noncompliant loans.  For example, in October 2006, John Vibert wrote, "Our fulfillment process is a major problem.  Citi again came back with an embarrassing number of diligence kicks this month."  (PX229.)  He then described some of Citi's "kicks"—including "the loan file with 3 different applications, with 3 different stated incomes (amazingly, not the first time this has happened)" and "an employment verification kickout where the borrower never had a job, but rather had a letter stating his intent to **get** a job"—all of which related to underwriting defects. (*See id.*)  He concluded that Citi "only scratches the surface of our conduit via a 20% sample.  If their results are in any way representative of our compliance with our reps and warrants, we have major problems."  (*Id.* at 2.)  Kaiserman acknowledged that Vibert's point was that Citi was kicking a large number of the loans that came through Credit Suisse's conduit, even though Citi only sampled 20% of the loans, and that Vibert was using Citi's kicks "as a proxy for compliance with our own guidelines."  (Aug. 18 am Tr. 23:14–24:6.)

20.　　Credit Suisse did not tell investors during the 2006–2007 period that it was securitizing loans that other investment banks rejected as noncompliant with underwriting guidelines.  (Aug. 17 am Tr. 53:20–54:1.)

### B.　　The Evidence of Systemic Problems in Credit Suisse's RMBS Operations Proves That Its Underwriting Representations Were False and Misleading.

21.　　Kaiserman's testimony about the widespread problems in Credit Suisse's RMBS business is sufficient to prove that the underwriting guideline compliance representations in the offering documents were false.  And Credit Suisse's failure to inform investors about these

problems is itself an actionable material omission.  Investors like MassMutual reasonably expect statements in offering documents to rest on meaningful inquiry, and to "fairly align[] with the information in the issuer's possession at the time."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329–30 (2015) (investors do not expect statements in offering documents to "reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life."). Therefore, if an offering document "omits material facts about the issuer's inquiry [] or knowledge" and those facts conflict with what a reasonable investor would take from the representation, the issuer is liable for the omission.  *Id.* at 1329.

22.    The evidence that emerges from Kaiserman's testimony (and earlier, Daniel's testimony) demonstrates the falsity of Credit Suisse's representations that loans backing the at-issue certificates were originated generally in accordance with underwriting guidelines.  Credit Suisse offering documents omitted glaring negative facts about its RMBS business, rendering its underwriting guideline compliance representations misleading.  For example, Credit Suisse never told investors that it had "systemic problems" with underwriting and due diligence in its wholesale origination business, or that it continued to buy loans from originators it knew originated non-compliant loans.  As discussed above, these and other problems caused Credit Suisse to originate and acquire large numbers of loans that did not comply with underwriting guidelines.  Courts have held that proving such "repeated deviation from established underwriting standards" is legally sufficient to demonstrate that an RMBS issuer's promise that loans complied with underwriting guidelines is materially false.  *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010).[3]

---

[3] *See also, e.g.*, *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 772–73 (1st Cir. 2011); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104

23.     Outside the RMBS context, courts have held that a firm's failure to disclose known problems with its products or operations is actionable under the securities laws if knowledge of the problems would cast doubt on the firm's representations to investors:

- For example, the Supreme Court held that a firm's statements that it was "poised for growth" and that the safety of its products was "well established" were misleading because the firm knew that there was a possible link between its product and a serious health hazard, and "had not conducted any studies of its own to disprove that link." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 33, 47 (2011).

- Similarly, in *Meyer v. Jinkosolar Holdings Co.*, the Second Circuit considered whether the following statements in Jinksosolar's prospectus were misleading: "We have installed pollution abatement equipment at our facilities," and "We also maintain environmental teams at each of our manufacturing facilities," that are "on duty 24 hours." 761 F.3d 245, 247 (2d Cir. 2014). The court held that these statements were misleading if "the equipment and 24-hour team *were then failing* to prevent substantial violations of the Chinese regulations." *Id.* at 251 (emphasis added).

24.     Credit Suisse's statement that the loans backing the at-issue securities generally complied with underwriting guidelines were misleading for similar reasons: at the time Credit Suisse made the statement, it knew that its underwriting, due diligence, and quality control procedures *were then failing* to prevent substantial violations of underwriting guidelines. This alone is sufficient grounds for the Court to decide this case in MassMutual's favor. *Mass. Mut. Life Ins. Co. v. DB Structured Prods., Inc.*, No. 11-30039-MGM, 2015 WL 3964560, at *11 (June 19, 2015) ("Plaintiff is not required to come forward with perfect, or even statistically significant, evidence to support its claims.").

---

F. Supp. 3d 441, 521 (S.D.N.Y. 2015) (finding that underwriting guideline representations were false, in part because "defendants' own due diligence reviews found material flaws with loans that found their way into these SLGs"); *Emps.' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152–53 (S.D.N.Y. 2011).

### C.   Kaiserman's Explanations Are Entitled to No Weight.

#### 1.   The Conduit Manual.

25.     Credit Suisse tried to turn Kaiserman's direct testimony on the policies and

procedures in the Conduit Manual, PX151, into a story about how Credit Suisse actually followed

the procedures in the manual.  But on cross-examination, Kaiserman admitted he did not even use

the manual in his real-life business activities.  (Aug. 10 part 3 Tr. 23:2–7.)  Confronted with the

fact that the manual contradicted his claim about how the quality control group operated, he

switched gears and asserted that the manual "was written by, you know, someone that may not

have fully understood all the—the reasons we're doing what we're doing."  (Aug. 18 pm Tr.

41:2–8.)  In fact, Rob Sacco, Credit Suisse's head of underwriting and quality control, drafted

such manuals.  (Sacco 8/2/12 NJ Carp. Dep. 98:14–17, '047 DE. 588; '048 D.E. 627.)

#### 2.   Quality control.

26.     Kaiserman's explanations about quality control were implausible and incredible:[4]

- He testified that quality control was **not** intended to ensure conformity with the underwriting guidelines.  (*See* Aug. 18 pm Tr. 7:13–16; Aug. 10 part 2 Tr. 47:7–16.)

- But the Conduit Manual explicitly states that credit decisions **are** reviewed to ensure conformity with the underwriting guidelines.  (*See* Aug. 18 pm Tr. 7:17–20; 8:9–16; PX151 at 450 ("The purpose of the Quality Control Plan is to . . . . Confirm that all purchased and originated loans selected for review…are originated and underwritten to the applicable underwriting guidelines. . .").)

- Kaiserman asserted, "That's what the manual says," but "That's not what they did, sir."  (Aug. 18 pm Tr. 75:4–24.)

- When the Court asked whether due diligence was performed on the Credit Suisse-originated loans in the Sovereign Bank transaction discussed above, Kaiserman said that it was, referring to the quality control performed **for Credit Suisse by the third-party firm Hanover**.  (*See id.* at 37:16–20.)  When pressed on cross-examination, he claimed that what he meant was, "If **Countrywide or Sovereign** selected the loan for

---

[4] MassMutual's Week 3 Trial Brief catalogued numerous impeachments from Kaiserman's first day on the stand, August 10.  ('047 D.E. 624 at 21–23; '047 D.E. 664 at 21–23.)  This brief does not repeat those impeachments, but only those that came in his later testimony.

review when they acquired it, then **they** would have done a diligence review." (*Id.* at 39:25–40:2.)  He finally admitted that the so-called diligence he claimed took place "doesn't have anything to do with underwriting guidelines." (*Id.* at 40:13–16.)

- Kaiserman testified that quality control was also **not** intended to be a check on the quality of work the fulfillment centers were performing.  (Aug. 16 Tr. 56:1–10.)

- This testimony is contradicted by that of Jason Nordyk, who worked in due diligence and quality control at Credit Suisse, and who Credit Suisse has (so far) promised will testify live at trial.  Mr. Nordyk testified: "you also use [quality control results] to check the due diligence vendor's work, in this case with our fulfillment centers, our fulfillment center's work, so it would be a sample of loans that were reviewed by each of the fulfillment centers by Clayton, by Bohan so we can get a sense of quality of their work as well."  (Nordyk 6/13/13 FHLB Dep. 266:23–267:5.) [5]

### 3.    Due diligence.

27.    Kaiserman acknowledged he had little to do with due diligence, but that did not

stop him from offering opinions on the quality of the diligence that Credit Suisse performed:

- He said an adverse diligence sample was "able to identify all of the loans that did not meet guidelines without looking at a hundred percent of the loans," (Aug. 10 part 1 Tr. 80:22–81:3), despite the fact that the diligence samples were not statistically valid and Credit Suisse identified many red flags regarding bad loans.

- He said Credit Suisse's diligence vendors and fulfillment centers, "on balance across the work we asked them to do[,] . . . were doing a good job consistent with their instructions," (Aug. 16 Tr. 61:23–62:1), despite evidence that the fulfillment process was "broken," and that there were substantial problems with many originators.

- He claimed not to believe the fulfillment centers had any real need to improve, despite feedback from his team that "we are not being as diligent as we should.  It's making it very difficult to clear loans which were underwritten and originated incorrectly." (*Id.* at 115:15–116:12.)

### 4.    Loan performance and underwriting.

28.    Kaiserman attempted to explain away the many contemporaneous Credit Suisse

emails discussing its broken underwriting and due diligence operations.  His basic approach was

---

[5] Nordyk's deposition testimony is not designated, as he is on Credit Suisse's will-call witness list.  In the event Credit Suisse decides not to call Mr. Nordyk, MassMutual will serve and file designations from his depositions in its rebuttal case.

to characterize problems as "layered risk" and claim, "I don't think layered risk is part of the

underwriting guidelines. . . ." (Aug. 17 am Tr. 39:17–23.)  For example:

- Kaiserman said that the "systemic problems" his co-head Pete Sack and head trader Mike Daniel identified in the fulfillment centers and underwriting were not about due diligence or underwriting.  "[M]y view is the loans we were buying had layers of risk in it such that the loans were more likely to default, and those were the ones that people attributed to process errors in the fulfillment center." (Aug. 17 pm Tr. 37:4–7.)

- When Eddie Othman complained that no one at Credit Suisse terminated brokers even when they knew they were trying to "deceive," Kaiserman said, "I don't think he's saying they did not meet guidelines. . . . Eddie's just saying they're not trying to cause brokers to deliver a full suite of products and if they're only going to deliver the layered risk loans, we don't really want them but they don't care." (Aug. 16 Tr. 42:5–43:10.)

- Likewise, when Daniel said "there's some real crap in this pool," Kaiserman said he wasn't talking about bad loans.  He was "talking about performance of loans and credit, not compliance with guidelines." (*Id.* at 39:4–10.)

29.     But Kaiserman acknowledged he never read any of Daniel's depositions, despite

serving as Credit Suisse's 30(b)(6) witness in several cases.  (*Id.* at 39:22–25.)  Daniel's trial

testimony flatly contradicts the assertion that loan performance does not relate to underwriting

violations.  Daniel explained that high delinquencies (i.e., poor loan performance) raised

concerns that appraisals and stated income were inflated—clear problems with the underwriting

of the loans.  (*See* Aug. 4 part 1 Tr. 70:18–71:25; *see id.* 29:14–20.)  The evidence

overwhelmingly supports Daniel's view that loan performance is related to underwriting, and not

merely Kaiserman's elusive concept of "layered risk":

- *See, e.g.*, Nordyk NJ Carp. Dep. 162:8–12 (not yet designated) ("Q.  So there were more than three times as many guideline type errors in delinquent loans than in the monthly sample, correct?  A.  I think it is slightly less than three times as many, but close to three.");

- PX318 (Daniel: "a majority of the Resource Bank delinquencies are not EPDs.  It just seems that Resource Bank's underwriting is horrible, especially on the fixed side");

15

- PX394 (the reason certain sellers have poor performance is that the fulfillment centers "have basically given up");

- PX427 (Daniel: "performance in wholesale has been crap" and better underwriting is the most important thing needed to fix it);

- PX431 at 2 (Sack: "we already know: the loans aren't performing . . . the only thing QC will tell us is that there were compliance errors, occupancy misreps etc."; *see also* Aug. 4 pm Tr. 16:5–9) (Daniel agreeing with Sack).[6]

30.     Moreover, the evidence contradicts Kaiserman's litigation assertion that "layered risk" is somehow unrelated to underwriting guidelines.  Mr. Daniel's November 22, 2006, email to Kimura and Marriott makes this clear.[7]  Daniel explained that Rob Sacco "maintains that our credit issues in our conduit are primarily fulfillment issues, not expanded guideline issues." PX246 at 2.  Daniel went on to explain how Saco said Fallacara pressured him to approve "unworthy" loans.  Daniel then recounted the specific fulfillment issues Sacco faced pressure on from Fallacara.  One of those was: "Layered risk – he showed me pressure to purchase No doc, 80/20, first time home buyer with unreasonable income and a huge DTI."  *Id.*

### 5.     Kaiserman's reinterpretation of documents and states of mind.

31.     Kaiserman testified that most of the people he worked with were "confused" when they described the serious underwriting and diligence problems at Credit Suisse, that their concerns were baseless, or that they meant something other than what they said:

---

[6] Kaiserman also testified that references to "credit" in the documents do not refer to underwriting deficiencies.  He admitted others at Credit Suisse used the term "credit" to refer to "underwriting," but "I don't think that they fully understood the distinction between diligence, compliance with guidelines, and credit."  (Aug. 16 Tr. 30:12–23.)  The Conduit Manual once again contradicted his testimony: "Credit decisions are reviewed to ensure conformity with the appropriate underwriting guidelines," and "Credit Review" involves review of appropriate documents "to ensure that borrowers have demonstrated the financial ability and willingness to repay their debt"—the fundamental purpose of underwriting.  (PX151 at 454.)

[7] This is the email that Kaiserman said at trial reflected Daniel's "concern," but somehow claimed in his 30(b)(6) deposition did not reflect any "concern."  (Aug. 18 pm Tr. 82:15–83:11.)

- "I think the feedback that I received from people was along the lines of the feedback we saw earlier from folks like Mike Daniel and Daniel Ezra, and I think they oftentimes confused fulfillment center issues with performance . . . . And throughout discussions that I believe took place I informed them that it wasn't a function of fulfillment but rather the types of loans that you're looking at.  By that I mean, layered risks, loans whose propensity to default were higher than others, and that's why I said I didn't think they were negative."  (Aug. 16 Tr. 69:1–13.)

- John Vibert "continues to confuse compliance with guidelines with performance." (Aug. 18 am Tr. 24:14–18.)  Or, alternatively, "I think his words are misunderstood." (*Id.* at 25:3.)

- Kaiserman "did not characterize [the feedback he received about the fulfillment centers] as concerns. . ."  (Aug. 16 Tr. 63:3–25.)  The people who raised issues about the fulfillment centers were typically junior, new to their role, or didn't know what what was going on.  (Aug. 17 pm Tr. 37:23–38:9.)

- Pete Sack "suffered from sending emails prematurely without investigating, without asking questions, only to learn after the fact that he was mistaken."  (Aug. 16 Tr. 93:16–19.)

- When Rob Sacco said he agreed with Pete Sack "on all points" in Sack's email about "systemic problems" in fulfillment and underwriting, (PX431 at 2), Kaiserman insisted Sacco meant he agreed on only a "subset" of those points.  "I think what Rob wrote is not what Rob meant.  I think he was agreeing on some but not all.  Q.  And when was the last time you talked to Mr. Sacco about that?  A.  I don't know that I spoke to him about this email."  (Aug. 17 pm Tr. 42:2–6.)

- When Craig Eckes wrote, "Do you see a recurring theme here?  Consistently 90%+ of our whole loan repurchase requests are LBL or wholesale," (PX3010), Kaiserman testified, "I don't think Craig necessarily had the perspective to say what you suggested he said in terms of, you know, the recurring theme."  (Aug. 16 Tr. 82:8–11.)

32.     Kaiserman chalked up his own emails describing underwriting failures as being

"poor attempts at humor":

- When Citi declined a loan based on the borrowers' inability to make the loan payments on their stated employment (a basic violation of underwriting guidelines), Kaiserman called the loan a "pig."  (PX3008.)  He then denied that the reference had anything to do with the deficiencies with the loan and instead called it a "poor attempt at humor."  (Aug. 17 am Tr. 20:12–21:14; 22:14–21.)

- In another email, where Kaiserman said about a loan, "better still, did anybody look at this file?" he said he was not questioning whether the fulfillment center was doing its job; it was just another "poor attempt at humor."  (Aug. 17 pm Tr. 54:22–55:25.)

33.    Kaiserman testified that a handful of others understood the truth as he did.  First he identified Mike Fallacara and wholesale salesman Paul Heckman.  After a pause (having apparently realized that relying on Fallacara and his number two was not helping his case), Kaiserman added head of underwriting Rob Sacco, head of fulfillment Eddie Othman, and due diligence manager Jason Nordyk.  (Aug. 18 am Tr. 25:16–26:5.)  But of course, those latter individuals authored several of the very statements Kaiserman tried so hard to explain away.  (*See supra* ¶¶ 15, 30 (regarding Othman's statements in PX427); ¶ 32 (regarding Sacco's statement in PX431); *see also* ¶¶ 28, 31 (Nordyk testimony contradicting Kaiserman).

### D.    MassMutual Is Entitled to a Missing Witness Inference Because of Credit Suisse's Failure to Call Sack.

34.    This week's testimony established that Credit Suisse's failure to call Pete Sack entitles MassMutual to a presumption that his testimony would be unfavorable to Credit Suisse.  *See Graves v. United States*, 150 U.S. 118, 121 (1893) ("[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.").

35.    Missing witness inferences are warranted where, as here, a party fails to call a witness who is "favorably disposed to testify for that party" or who is "peculiarly available to that party, such as being within that party's exclusive control."  *Grajales-Romero v. Am. Airlines, Inc.*, 194 F.3d 288, 298 (1st Cir. 1999) (internal quotation marks omitted); *see also Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011) (missing witness inference appropriate in bench trials).

36.    Sack is the archetypal missing witness.  First, Sack has direct personal knowledge of many of the key issues in this case:

- Sack was co-head of the Transaction Management Group with Kaiserman.  (Aug. 10 part 3 Tr. 7:17–21.)

- Sack had more to do with the at-issue certificates than Kaiserman did.  Kaiserman focused on the acquisition and sale of whole loans, while Sack was responsible for securitizations.  (Aug. 17 am Tr. 49:22–24; Aug. 10 part 3 Tr. 7:22–8:6.)

- Sack wrote many of the documents that reveal the tremendous dysfunction in Credit Suisse's RMBS business.  (*See, e.g.*, PX431 at 2 ("I think we already know we have systemic problems in FC/UW re both compliance and credit."); PX290 (offered in evidence through Sack's FHLB deposition designations over Credit Suisse's objection) ("I've been looking on an ad hoc basis at Alt A deals but I want to make it programmatic because currently we have no consistent reporting process to identify channels/originators that generate the bad loans . . . ."); PX303 ("[T]he number of defects in [Credit Suisse's wholesale loans] is disturbingly high, and some are credit issues that could be predictive of poor performance later.").)

37.     Second, because Sack is a current Credit Suisse employee, he is both favorably disposed toward Credit Suisse and within its exclusive control.  (Aug. 16 Tr. 93:20–94:5.)  *See Grajales-Romero*, 194 F.3d at 298.[8]  Because he is outside the subpoena range, MassMutual cannot secure his appearance through compulsory process.  (Aug. 16 Tr. 96:4–18.)

38.     Third, there is ample reason to infer that Sack's testimony would be unfavorable to Credit Suisse.  Many of Sack's emails indicate that during the relevant time period of 2006–2007, he had a dim view of both the quality of the loans that Credit Suisse was securitizing and of Credit Suisse's internal processes.  Moreover, Sack himself advocated the adoption of practices that benefited Credit Suisse at the expense of investors, such as the manipulation of the quality control program, which Credit Suisse never disclosed.  (*See, e.g.*, PX376.)

39.     Drawing a missing witness inference is particularly appropriate in this case given that Credit Suisse has tried to obscure Sack's damaging documents and testimony:

- Kaiserman attempted to downplay concerns Sack expressed in emails by speculating about what Sack meant.  (*E.g.*, Aug. 16 Tr. 91:9–92:12 (speculating that when Sack

---

[8] *See also Jones v. Otis Elevator Co.*, 861 F.2d 655, 659 (11th Cir. 1988) ("A witness is unavailable in a practical sense when this relationship is such that it creates bias or hostility against the opposing party."); *Steinhilber v. McCarthy*, 26 F. Supp. 2d 265, 281 (D. Mass. 1998) ("The employer-employee relationship is recognized as one creating practical unavailability due to the economic ties of the employee to his employer.") (internal quotation omitted.).

wrote he was "concerned about credit," he was talking about "a disconnect between the guidelines used by [Credit Suisse] and the guidelines used by the buyer").)

- Similarly, Kaiserman portrayed Sack—his counterpart and co-leader of the transaction management group—as ill-informed about basic aspects of Credit Suisse's business: "Q. And are you telling us today that Sack didn't understand the difference that you draw between layered risk and deficient underwriting? A. I think both Pete and Mike made that mistake, yes." (Aug. 17 pm Tr. 38:3–6.)

- Kaiserman also tried to characterize Sack as impulsive and prone to misjudgment: "Pete suffered from sending emails prematurely without investigating, without asking questions, only to learn after the fact that he was mistaken." (Aug. 16 Tr. 93:13–19.)

- Credit Suisse has tried through its objections to keep out much of Sack's deposition testimony.  Credit Suisse objected to large portions of MassMutual's designations from Sack's FHLB deposition on relevance grounds, though the testimony concerns topics such as Credit Suisse's review of loans securitized in the CSMC and ARMT shelves, ('047 D.E. 612 at 22; '048 D.E. 651 at 22), and Sack's recommendation that Credit Suisse change its quality control process to avoid obligations to repurchase loans from securities.  (*Id.* at 13.)  Credit Suisse objected to *all* of MassMutual's designations from Sack's SEC deposition on the ground that the deposition "relates to an SEC proceeding that was the subject of one of Credit Suisse's motions in limine," (*id.* at 5), even though MassMutual's designations do not mention the SEC investigation or settlement at all.

Credit Suisse's attempts to recharacterize and downplay Sack's documents and views are precisely what the missing witness inference is designed to offset.  *See* 2 McCormick On Evid. § 264 (7th ed.) (explaining that the "procedural effect" of the presumption "is to impair the value of the opponent's evidence and to give greater credence to the positive evidence of the adversary upon any issue upon which it is shown that the missing witness might have knowledge.").

August 21, 2017

Respectfully submitted,

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY

*/s/ Katherine M. Swift*

John J. Egan (BBO 151680)
EGAN FLANAGAN AND COHEN, P.C.
67 Market Street, P.O. Box 9035
Springfield, Massachusetts 01102
Telephone: (413) 737-0260
Facsimile: (413) 737-0121

Joseph C. Smith, Jr. (admitted *pro hac vice*)
Lester C. Houtz (admitted *pro hac vice*)
Karma M. Giulianelli (admitted *pro hac vice*)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202
Telephone: (303) 592-3100
Facsimile: (303) 592-3140

Philip S. Beck (admitted *pro hac vice*)
Jeffrey A. Hall (admitted *pro hac vice*)
Steven J. Nachtwey (admitted *pro hac vice*)
Cindy L. Sobel (admitted *pro hac vice*)
Katherine M. Swift (admitted *pro hac vice*)
Joshua P. Ackerman (admitted *pro hac vice*)
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, 3rd Floor
Chicago, Illinois 60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440
kate.swift@bartlit-beck.com

*Counsel for Plaintiff Massachusetts Mutual Life
Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on this 21st day of August, 2017.

*/s/ Katherine M. Swift*